# Exhibit 1

Exhibit 1
Page 15

DENNIS B. HILL (SBN 218131)
D.B. HILL, A PROFESSIONAL LAW CORPORATION
640 Fifth Street, Suite 200
Lincoln, CA 95648
ticketmasterlawsuit@gmail.com
Tel: (916) 434-2553
Fax: (916) 434-2560

**FILED**
Superior Court of California
County of Los Angeles

**12/14/2022**

Sherri R. Carter, Executive Officer / Clerk of Court

By: _____ Deputy
        K. Martinez

Attorneys for Plaintiffs JULIE BARFUSS ET AL.

SUPERIOR COURT OF CALIFORNIA

COUNTY OF LOS ANGELES

| | |
|---|---|
| JULIE BARFUSS, ET AL.<br><br>                Plaintiffs,<br><br>        vs.<br><br>LIVE NATION ENTERTAINMENT, INC.,<br>TICKETMASTER L.L.C., and DOES 1 to 100,<br><br>                Defendants. | Case No.: 22STCV37958<br><br>**FIRST AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs JULIE BARFUSS, RANDY FLOYD BARFUSS, SELENA MONETTE

MILLER, RUMER HENRY, CHRISTY LABONNE, KRIS LABONNE, COURTNEY

BUTLER, DANIELLE LIPS, MARK BURTON, CASSANDRA DIAMOND, EDWARD

HAKOBJANYAN, JOSE R. HERNANDEZ, MELISSA QUINTERO, JENNIFER USELTON,

CLAY MURRAY, JOSEPH AKMAKJIAN, LAUREN MICHELE GOTTHELF, KELLI

HERNANDEZ, MICHAEL COLLINS, VENISHA JARDIN, EMILY NIKLAUS DAVIS,

JENNIFER BAGGETT, SARAH CHATTIN, DARCY RUBINO, JENNIFER TIERNEY,

KAREN BRANDEL, JESSICA BEEKER, JENNIFER BEEMAN, BETSY VICTORIA

WANNER, KATY JOHNSON, ANDREW GAUTERI, AYTZA GAUTERI, MICHAEL

VITULLI, MELONY PUGH, ASHLEIGH CAMACHO, ANTHONY LANNI, ANTHONY

Electronically Received 12/14/2022 12:31 PM

Exhibit 1
Page 16

LEBLANC, DENISE HULL, JENNIFER LANDRY, KELLY MELTON, KATHLEEN MILLIGAN, MORGAN SMALLWOOD, SEAN SMALLWOOD, CRYSTAL WILLIS, ALYSSA MCCOY, REBECCA COLE, ASHLEY BOVE, RUMMER HENRY, DAWN WEICZOREK, MARANDA GOMEZ, LAUREN KEATING, MEGHAN CLARKE, TEENA MARIE COOK, STEPHANIE PALMER, ANNIE PATOTA, PAULA C. MILLER, STACI DOWNING, DELAYNA LUTCHKA, SOFIA LEWIS, JESSE ADAMS, AMANDA FROST, HOLLY TAYSOM, THERESA A. STANDING, LAURA HASTINGS, SABRINA DARNELL, CATHERINE BUGDEN, JANIS HOUSTON, JENNIFER HUDSON, MELODY LANGEVIN, KATHLEEN BEECH, SKYE LANDAU, KYLE JORDAN, CINDY DEIMLING, DANIELLE MUNOZ, ABIGAIL ALVORD, MICHAEL BASCONE, APRIL STUMPE, DEREK LEVESQUE, KILEY KRZYZEK, DANIEL REYES, ROSEMARIE PATTERSON, GABRIELLA BLUNCK, ANTHONY BLUNCK, WILLIAM R. NOAH, JIMMY HOANG TA, CARRIE BASTAIN, BRETT ANDREW WALT, AUDREY COSTAR, JOE HERNANDEZ, ADRIENNE HERNANDEZ, JEAN PIERRE ESPINOZO, LAUREN CHAPPELL, MELINDA SCHNECK, LISA DAY, MEGAN JOY SKEUSE, BEATRIZ AGUILAR, CHRYS JARDIN, JESSICA SCHROETTER, JOE HERNANDEZ, TERESA EICHINGER, JACQUELYN BEAN, KIM BEAN, MAVERICK WAGNER, DOROTHY LYNN FENTON, TONI MAE B. ABACA, TRACEY ROMAN, TIMOTHY ELLIS, GLEN BRISTOL, SHERRY PONIWAZ, IRENE PEREZ, NIKITA RAMIREZ, KANDICE BRIDGES, EILEEN HAUBRICH, DEBORAH SNOW, SAMANTHA TOSETTI, JENNIFER PITT, KEYLEIGH AIELLO, TRACY LE, ASHLEE UNDERWOOD, NANCY CORDERO, ALLISON MCCROAN, MATT MCCROAN, SALOMON PASSARIELLO, KATHERINE WAGNER, DAVID KILBRIDGE, JENNIFER CONTINILLO, CHRISTOPHER TOTH, HOLLIE MEYERS, DORA SCHARF, JASON

Exhibit 1
Page 17

SCHACTER, LINDSAY LAFOUNTAINE, LISA SHEPPARD, EMMA EARNEST, LINDA MARTIN, PATRICK DALTON, SOFIA GANZ, JENNIFER WILKINS, MICHELLE FERA, TRACI RENEE O'BRIEN, HOLLY SMITH, CARMEN FIENGO, MAURA MATVEY, SIERRA BRUNNER, CLEOFI BLASS, KATHERINE GLASS, RACHAEL COOMBS, KAITLIN ROSE GROGG, PAM THAXTON, CARLY THAXTON, BRENDA GALLAGHER, DIANE DOUGLAS, JACQUELINE SONETHANOUPHET, SEAN KNEPPER, KIMBERLY STEVENSON, JENNIFER KELLY, ALEXANDRIA MARTELLI, CENDRA SHEPHARD, JENNI TRANWEAVER, TAYLOR WOOLEY, KATIE YOUNKINS, GRABIEL GOMES, FRANK SCOLARO, WILLIAM O. WATSON, ANGELIA BALTHASER, HEATHER SLACK, ASHLEY QUELLETTE, ED MASSUDA, KARISSA PITSTICK, CYNTHIA C. COLE, WALLY NUNEZ, MICHELLE BARTO, MOLLY RAHE, DEBBIE BROWN, JASON BROWN, MICHELLE ROBBINS, KARL PARTCH, CAROLINE MANGAN, SABRINA HASTINGS, CONRAD HAUBRICH, JOHN WILLIS, ELISABETH CLAPP, SHELLY GRAUPNER, RAFAEL ORTIZ III, LORI BRREDLOVE, DUSTIN SPIELMAN, VIRIGINIA SPIELMAN, REBECCA BROWN, KEVIN BROWN, CHAD GILLIGAN, KRISTIN GILLIGAN, LOREN DUNSWORTH, JORI KUBECK, MARISSA KIRHNER, ROBERT LAYMAN, KACEY L. BURGESS, ELIZABETH CAMPBELL, JENNIFER MATHIEU, TYREL HARTMAN, MICHAEL USELTON, REBECCA VAN DALE, GRACE VAN DALE, JESSICA KRIZMAN, CINDY MUETH, ANELLA STRUDLER, JENNIFER HOPPE, ANTONIA MASCARI, VERONICA HIGAREDA, IAN CLITES, ANGELA DUNBAR, TATYANA BARDASH, LORA ELLIS, LARISSA SOLOMON, JESSICA TAYLOR, KATHLEEN OWENS, KENNETH ENGLESON, MONICA ENGLESON, NICHOLAS ENGLESON, JENNIFER VIEIRA, CAVAN FARLEY, TIFFANY BRAY, EMILY GAUDET,

Exhibit 1
Page 18

ELIZABETH ATKINSON, GENESIS BORRERO, MELISSA BAILEY, ELEANA VILLA, TELKA BECKER, MICHELE FIEDLER, AMY MAUPIN, XIAO SEBESTIEN SANG, WENDY THOMAS, DANIEL REYES, MARY KIRK, MARIBEL SERRAO, MADISON SHANER, ROCHELLE CATRILLO, MICHAEL BERLIN, ROBERT NOAH, ASHLYNN ALEXANDER, ALYRA PARKER, NICHOLAS RITTER MCGEE, BRUCE NUNELEY, STACY LESTAGE, DAWN ADRIAN, KRISTEN NEWMAN, PENNY KARRISON, MARY VANDIVER, JESSICA VANWINKLE, MYKENZIE DAY, JENNIFER LEMEKE, SHANNON LARSEN, BRANDY ADAMS, BRADLEY EMERSON, KATHERINE L. EAVES, NATALIE CRUZE, JOANNA COOPER, and TAMMY STEEVES ("Plaintiffs") bring this lawsuit against Defendants LIVE NATION ENTERTAINMENT, INC. and TICKETMASTER LLC (collectively referred to as "Ticketmaster") for unlawful conduct in violation of California's Cartwright Act and the California Unfair Competition Law, to recover parens patriae damages, disgorgement, restitution, penalties, and fees and costs, as well as damages arising from fraud, misrepresentation, and fraudulent inducement.

Plaintiffs allege as follows:

## I.   <u>INTRODUCTION</u>

### (Applicable to all causes of action)

1.      This case concerns the anticompetitive conduct of Ticketmaster, to impose higher prices on music concert attendees in the presale, sale, and resale market. This included Taylor Swift fans, which lead to the ticket sale disaster that occurred on November 15, 2022, and November 16, 2022. The disaster continued with the cancellation of general sale tickets, scheduled for November 18, 2022. Based on information and belief, Ticketmaster has effectuated this anticompetitive scheme by forcing fans of musicians to exclusively use

Exhibit 1
Page 19

Ticketmaster for presale and sales prices, which are above what a competitive market price would be. Ticketmaster has also forced attendees to exclusively use Ticketmaster's "Secondary Ticket Exchange"—i.e., the platform Ticketmaster operates for the resale of concert tickets. Defendants have undertaken this anticompetitive conduct for the purpose of obtaining service fees and profits that they could not earn in a competitive market for secondary ticket services, referred to herein as the "Secondary Ticket Services Market." Defendant's anticompetitive behavior has substantially harmed and will continue to substantially harm Taylor Swift fans, as well as competition in the ticket sales marker and the Secondary Ticket Services Market.

2.      Taylor Swift and Taylor Swift Management, a global superstar and AMA's most-awarded artist of all time, contracted with Ticketmaster for venues regarding Taylor Swift's "The Eras" Tour. This tour is her first since the pandemic. "Lover Fest", her 2020 tour, was previously canceled due to the COVID-19 pandemic. As one of the most, if not the most, iconic artists in the world, millions of fans attempted to purchase tickets to "The Eras" Tour.

3.      Based on information and belief, at all times, Ticketmaster controlled the registration and access to Taylor Swift's "The Eras" Tour tickets. Ticketmaster announced registration for the TaylorSwiftTix presale during November 1-9, 2022. This announcement guaranteed a "leveling the playing field without racing against bots-for ticket access". This announcement also announced preferred access to participate in this sale as a "Lover Fest" "verified" fan. In order to access this sale, registration was required via the same Ticketmaster Account as the "Lover Fest" purchase.

4.      Based on information and belief, before Defendant's unlawful conduct caused harm in the Secondary Ticket Services Market, Defendant had been active principally in the sale of primary or first-sale Taylor Swift tickets. The term "Primary Ticket Market" refers to the

Exhibit 1
Page 20

market for the primary or first sale of concert tickets, and a "Primary Ticket Platform" is the platform for selling and distributing concert tickets.

5.     Based on information and belief, Ticketmaster has made agreements with the stadiums in every location of the Taylor Swift tour, and these stadiums are the only venues able to hold large concerts. Because no other venue can hold half as many people as the stadiums and venues working through Ticketmaster, Taylor Swift and other popular musicians have no choice but to work through Ticketmaster. And because artists like Taylor Swift have to go through Ticketmaster, their fans do as well. This means virtually all major music concert ticket sales in California and the United States go through Ticketmaster's Primary Ticket Platform.

6.     Based on information and belief, Ticketmaster has also expanded into the secondary ticket market. For years, scalpers[1] have been a problem in the secondary market. Ticketmaster has stated that it has taken steps to address this issue, but in reality, has taken steps to make additional profit from the scalped tickets. Ticketmaster forces purchases of tickets from its site to use only Ticketmaster's Secondary Ticket Exchange for the resale of those tickets. Ticketmaster then gets the higher fees paid by fans who have no choice but to pay for the "right" to use the Ticketmaster Secondary Ticket Exchange platform. By doing so, it has strived and succeeded in removing competition from both the Primary and Secondary markets. This has gained inflated revenues otherwise unavailable to it. Instead of competition, Ticketmaster has conspired with stadiums to force fans to buy more expensive tickets that Ticketmaster gets additional fees from every time the tickets are resold.

7.     Ticketmaster had violated previously violated the terms of its merger with Live

---

[1] Ticket scalpers buy tickets to performances not to attend the performance but to resell the ticket later at an inflated price in order to make a profit.

Exhibit 1
Page 21

Nation in 2019 after it had retaliated against concert venues that chose ticketing companies other than Ticketmaster. Based on information and belief, Ticketmaster has continued this behavior despite increased judicial scrutiny.

8.     Based on information and belief, the central components of Ticketmaster's scheme are as follows. First, stadium venues contractually require that the resale of concert tickets be effectuated only through Ticketmaster's Secondary Ticket Exchange. These venues have enforced and continue to enforce this requirement, while Ticketmaster continues to allow scalpers to buy up tickets over buyers who actually plan to attend the performance. Ticketmaster allows transferring tickets but buying tickets this way means a buyer needs to send a ticket reseller money and hope they aren't being scammed and get the ticket. Because of how risky buying resold tickets outside of Ticketmaster is, Ticketmaster has left itself as the only real choice for buying tickets.

9.     On November 14, 2022, "verified" fans of the TaylorSwiftTix presale were sent a code, as well as a link via text to the cell phone associated with the Ticketmaster registration. The text encouraged login via desktop over using a cell phone. Based on information and belief, however, thousands of "verified" fans were not sent codes or sent codes that did not work.

10.     Based on information and belief, on November 15, 2022, millions of "verified" fans that had received codes were unable to purchase tickets. This was the result of the excessive distribution of codes and the addition of 14 million non-verified Ticketmaster users that were allowed access to the TaylorSwiftTix presale.

11.     Ticketmaster also offered a presale for Taylor Swift's "The Eras" Tour tickets via email for Capital One cardholders. The link associated with this sale opened to Ticketmaster.

Exhibit 1
Page 22

The same registration was required. The last six digits of the Capital One cardholder's account would be used as the code to access ticket sales on November 16, 2022, at 2:00 pm local venue time.

12.     Millions of fans waited up to eight hours and were unable to purchase tickets as a result of insufficient ticket releases and other issues similar to the prior presale.

13.     Ticketmaster had advertised a general ticket sale to Taylor Swift's "The Eras Tour" to begin on November 18, 2022. Ticketmaster canceled the general sale on November 17, 2022, citing the insufficient quality of the remaining tickets.

14.     Based on information and belief, Ticketmaster intentionally and purposefully mislead ticket purchasers by allowing scalpers and bots access to TaylorSwiftTix presale.

15.     Based on information and belief, Ticketmaster intentionally and purposefully mislead TaylorSwiftTix presale ticketholders by providing codes to 1.4 million "verified' fans with the option of purchasing six tickets each to three venue locations. Ticketmaster did not have enough seats to meet the demand this number of codes would require. Ticketmaster intentionally provided codes when it could not satisfy ticket demand.

16.     Based on information and belief, Ticketmaster intentionally and knowingly partnered with Capital One for presale and advertising tickets. Ticketmaster released less than ten percent of the venues' seating capacity for this sale, resulting in millions denied access to even a single ticket.

17.     Based on information and belief, Ticketmaster intentionally and knowingly allowed scalpers and bots access to both ticket sales.

18.     Based on information and belief, Ticketmaster intentionally and knowingly scheduled a general sale of tickets knowing they would not have the quantity necessary to

Exhibit 1
Page 23

facilitate the sale.

19.     Based on information and belief, Ticketmaster allowed tickets to be resold during the TaylorSwiftTix presale. And Ticketmaster allowed tickets to be resold during the TaylorSwiftTix presale as if the tickets were at face value negotiated by Taylor Swift Management, when in fact they were double and triple the negotiated price. Ticketmaster was eager to allow this arrangement, as Ticketmaster is paid again in additional fees every time a ticket is resold. And Ticketmaster restricts official resales to its own Secondary Resale Market.

20.     Based on information and belief, Ticketmaster intentionally and knowingly allowed TaylorSwiftTix presale purchasers to purchase VIP tickets knowing that the mailed portion of the VIP package would be voided and never reach the fan.

21.     Based on information and belief, Ticketmaster intentionally and knowingly sold obstructed view tickets without purchasers knowing that the tickets were obstructed.

22.     Based on information and belief, Ticketmaster intentionally, knowingly, and oppressively required signatures on a waiver that the purchaser was not provided adequate time to read, contemplate, or negotiate. This is illustrated in the millions of fans making multiple failed attempts at ticket check-out to finish the purchase because tickets had been removed from their basket without adequate time to check out and purchase tickets.

23.     Based on information and belief, Ticketmaster knowingly and intentionally allowed tickets to be removed from a purchases basket/order before being allowed adequate time to review waiver, release, and complete purchase.

24.     Based on information and belief, Ticketmaster allowed bots and scalpers to remove tickets from a fan's basket without being allowed adequate time to complete the sale.

25.     Based on information and belief, Ticketmaster allowed ADA-compliant seats to

Exhibit 1
Page 24

be sold without verification of disability or need, thus depriving individuals with disabilities access ADA compliant seats.

26.     The policy and spirit of the California antitrust laws are to promote the free play of competitive market forces and the lower prices to consumers that result. Ticketmaster is the dominant online venue for concert presale, sale, and resale in the United States, has violated the policy, spirit, and letter of those laws by imposing agreements and policies at the retail and wholesale level that have prevented effective price competition across a wide swath of online ticket sales.

27.     Based on information and belief, Ticketmaster claims these agreements and policies improve customer experiences and keep ticket prices down. This is in spite of the massive number of customer complaints Ticketmaster receives every day, the dramatic increase in ticket prices since Ticketmaster achieved monopoly power, and the excessive service fees Ticketmaster attaches that are far higher than service fees for any similar service in other markets. Ticketmaster is a monopoly that is only interested in taking every dollar it can from a captive public.

28.     California antitrust laws are concerned with protecting market competition and preventing a single, dominant company from setting overly prices because of its lack of competitors. Ticketmaster has allied with stadiums to entrench its dominance to harm consumers in California and across the United States.

## II.     <u>JURISDICTION AND VENUE</u>

29.     This action is brought under the Cartwright Act, California Business and Professions Code section 16720, et seq., and the California Unfair Competition Law, California Business and Professions Code section 17200, et seq., for equitable, monetary, and other relief

Exhibit 1
Page 25

due to Ticketmaster's unlawful conduct.

30.     At all relevant times alleged in this Complaint, Ticketmaster did and continues to do substantial business in or affecting the State of California, and the injuries that have been sustained as a result of Ticketmaster's illegal conduct occurred in part in California, rendering this Court's exercise of jurisdiction over Ticketmaster proper.

31.     Venue is proper in the County of Los Angeles because it is the location of Ticketmaster's primary place of business.

### III.     THE PARTIES

**A.  Plaintiffs**

32.     Plaintiff Julie Barfuss resides and is domiciled in Utah.

33.     Plaintiff Randy Floyd Barfuss resides and is domiciled in Utah.

34.     Plaintiff Selena Monette Miller resides and is domiciled in Alabama.

35.     Plaintiff Rumer Henry resides and is domiciled in Arkansas.

36.     Plaintiff Christy LaBonne resides and is domiciled in Arkansas.

37.     Plaintiff Kris LaBonne resides and is domiciled in Arkansas.

38.     Plaintiff Courtney Butler resides and is domiciled in Arizona.

39.     Plaintiff Danielle Lips resides and is domiciled in Arizona.

40.     Plaintiff Mark Burton resides and is domiciled in California.

41.     Plaintiff Cassandra Diamond resides and is domiciled in California.

42.     Plaintiff Edward Hakobjanyan resides and is domiciled in California.

43.     Plaintiff Jose R. Hernandez resides and is domiciled in California.

44.     Plaintiff Melissa Quintero resides and is domiciled in California.

45.     Plaintiff Jennifer Uselton resides and is domiciled in California.

Exhibit 1
Page 26

46.     Plaintiff Clay Murray resides in Rhode Island and is domiciled in California.

47.     Plaintiff Joseph Akmakjian resides and is domiciled in Colorado.

48.     Plaintiff Lauren Michele Gotthelf resides and is domiciled in Colorado.

49.     Plaintiff Kelli Hernandez resides and is domiciled in Colorado.

50.     Plaintiff Michael Collins resides and is domiciled in Florida.

51.     Plaintiff Venisha Jardin resides and is domiciled in Florida.

52.     Plaintiff Emily Niklaus Davis resides and is domiciled in Georgia.

53.     Plaintiff Jennifer Baggett resides and is domiciled in Georgia.

54.     Plaintiff Sarah Chattin resides and is domiciled in Kansas.

55.     Plaintiff Darcy Rubino resides and is domiciled in Massachusetts.

56.     Plaintiff Jennifer Tierney resides and is domiciled in Massachusetts.

57.     Plaintiff Karen Brandel resides and is domiciled in Michigan.

58.     Plaintiff Jessica Becker resides and is domiciled in North Carolina.

59.     Plaintiff Jennifer Beeman resides and is domiciled in North Carolina.

60.     Plaintiff Betsy Victoria Wanner resides and is domiciled in North Carolina.

61.     Plaintiff Katy Johnson resides and is domiciled in North Carolina.

62.     Plaintiff Andrew Gauteri resides and is domiciled in New Jersey.

63.     Plaintiff Aytza Gauteri resides and is domiciled in New Jersey.

64.     Plaintiff Michael Vitulli resides and is domiciled in New Jersey.

65.     Plaintiff Melony Pugh resides and is domiciled in Ohio.

66.     Plaintiff Ashleigh Camacho resides and is domiciled in Pennsylvania.

67.     Plaintiff Anthony Lanni resides and is domiciled in Rhode Island.

68.     Plaintiff Anthony LeBlanc resides and is domiciled in Rhode Island.

Exhibit 1
Page 27

69.    Plaintiff Denise Hull resides and is domiciled in Texas.

70.    Plaintiff Jennifer Landry resides and is domiciled in Texas.

71.    Plaintiff Kelly Melton resides and is domiciled in Texas.

72.    Plaintiff Kathleen Milligan resides and is domiciled in Texas.

73.    Plaintiff Morgan Smallwood resides and is domiciled in Texas.

74.    Plaintiff Sean Smallwood resides and is domiciled in Texas.

75.    Plaintiff Crystal Willis resides and is domiciled in Texas.

76.    Plaintiff Alyssa McCoy resides and is domiciled in Virginia.

77.    Plaintiff Rebecca Cole resides and is domiciled in Texas.

78.    Plaintiff Ashley Bove resides and is domiciled in Rhode Island.

79.    Plaintiff Rummer Henry resides and is domiciled in Little Rock, Arkansas.

80.    Plaintiff Dawn Weiczorek resides and is domiciled in Chicago, Illinois.

81.    Plaintiff Maranda Gomez resides and is domiciled in Little Rock, Arkansas.

82.    Plaintiff Lauren Keating resides and is domiciled in Albany, New York.

83.    Plaintiff Meghan Clarke resides and is domiciled in Andover, Massachusetts.

84.    Plaintiff Teena Marie Cook resides and is domiciled in Moline, Illinois.

85.    Plaintiff Stephanie Palmer resides and is domiciled in Derry, New Hampshire.

86.    Annie Patota resides and is domiciled in Norfolk, Virginia.

87.    Paula C. Miller resides and is domiciled in Akron, Ohio.

88.    Staci Downing resides and is domiciled in Pittsburgh, Pennsylvania.

89.    Delayna Lutchka resides and is domiciled in Carterville, Illinois.

90.    Sofia Lewis resides and is domiciled in the United States.

91.    Jesse Adams resides and is domiciled in the United States.

Exhibit 1
Page 28

92.     Amanda Frost resides and is domiciled in the United States.

93.     Holly Taysom resides and is domiciled in Saratoga Springs, Utah.

94.     Theresa A. Standing resides and is domiciled in St. Peters, Missouri.

95.     Laura Hastings resides and is domiciled in the United States.

96.     Sabrina Darnell resides and is domiciled in St. Pekin, Illinois.

97.     Catherine Bugden resides and is domiciled in Salt Lake City, Utah.

98.     Janis Houston resides and is domiciled in Naples, Florida.

99.     Jennifer Hudson resides and is domiciled in the United States.

100.    Melody Langevin resides and is domiciled in Casa Grande, Arizona.

101.    Kathleen Beech resides and is domiciled in Studio City, California.

102.    Skye Landau resides and is domiciled in Newton, Massachusetts.

103.    Kyle Jordan resides and is domiciled in Atlanta, Georgia.

104.    Cindy Deimling resides and is domiciled in the United States.

105.    Danielle Munoz resides and is domiciled in Jurupa Valley, California.

106.    Abigail Alvord resides and is domiciled in Veneta, Oregon.

107.    Michael Bascone resides and is domiciled in Howell, New Jersey.

108.    April Stumpe resides and is domiciled in O'Fallon, Missouri.

109.    Derek Levesque resides and is domiciled in Norwell, Massachusetts.

110.    Kiley Krzyzek resides and is domiciled in West Hartford, Connecticut.

111.    Daniel Reyes resides and is domiciled in College Station, Texas.

112.    Rosemarie Patterson resides and is domiciled in Milford, New Jersey.

113.    Gabriella Blunck resides and is domiciled in the United States.

114.    Anthony Blunck resides and is domiciled in the United States.

Exhibit 1
Page 29

115.   William R. Noah resides and is domiciled in the United States.

116.   Jimmy Hoang Ta resides and is domiciled in Kansas City, Missouri.

117.   Carrie Bastain resides and is domiciled in Evansville, Indiana.

118.   Brett Andrew Walt resides and is domiciled in King of Prussia, Pennsylvania.

119.   Audrey Costar resides and is domiciled in the United States.

120.   Joe Hernandez resides and is domiciled in the United States.

121.   Adrienne Hernandez resides and is domiciled in the United States.

122.   Jean Pierre Espinozo resides and is domiciled in Florida.

123.   Lauren Chappell resides and is domiciled in Jacksonville, Florida.

124.   Melinda Schneck resides and is domiciled in Macungie, Pennsylvania.

125.   Lisa Day resides and is domiciled in the United States.

126.   Megan Joy Skeuse resides and is domiciled in the United States.

127.   Beatriz Aguilar resides and is domiciled in Clanton, Michigan.

128.   Chrys Jardin resides and is domiciled in Lutz, Florida.

129.   Jessica Schroetter resides and is domiciled in the United States.

130.   Joe Hernandez resides and is domiciled in Eastvale, California.

131.   Teresa Eichinger resides and is domiciled in Foboro, Massachusetts.

132.   Jacquelyn Bean resides and is domiciled in O'Fallon, Missouri.

133.   Kim Bean resides and is domiciled in O'Fallon, Missouri.

134.   Maverick Wagner resides and is domiciled in Wake Forest, North Carolina.

135.   Dorothy Lynn Fenton resides and is domiciled in Santa Ana, California.

136.   Toni Mae B. Abaca resides and is domiciled in Union City, New Jersey.

137.   Tracey Roman resides and is domiciled in the United States.

Exhibit 1
Page 30

138. Timothy Ellis resides and is domiciled in Clara City, Minnesota.

139. Glen Bristol resides and is domiciled in Tukwila, Washington.

140. Sherry Poniwaz resides and is domiciled in Hubertus, Wisconsin.

141. Irene Perez resides and is domiciled in Irvine, California.

142. Nikita Ramirez resides and is domiciled in Los Angeles, California.

143. Kandice Bridges resides and is domiciled in Dallas, Texas.

144. Eileen Haubrich resides and is domiciled in the United States.

145. Deborah Snow resides and is domiciled in the United States.

146. Samantha Tosetti resides and is domiciled in Weaverville, California.

147. Jennifer Pitt resides and is domiciled in the United States.

148. Kayleigh Aiello resides and is domiciled in New York.

149. Tracy Le resides and is domiciled in Forney, Texas.

150. Ashlee Underwood resides and is domiciled in Dalton, Georgia.

151. Nancy Cordero resides and is domiciled in the United States.

152. Allison McCroan resides and is domiciled in Fort Myers, Florida.

153. Matt McCroan resides and is domiciled in Fort Myers, Florida.

154. Salomon Passariello resides and is domiciled in the United States.

155. Katherine Wagner resides and is domiciled in Dallas, Texas.

156. David Kilbridge resides and is domiciled in the United States.

157. Jennifer Continillo resides and is domiciled in Hickman, California.

158. Christopher Toth resides and is domiciled in Los Angeles, California.

159. Hollie Meyers resides and is domiciled in Upland, Indiana.

160. Dora Scharf resides and is domiciled in North York, Ontario, Canada.

Exhibit 1
Page 31

161.   Jason Schacter resides and is domiciled in the United States.

162.   Lindsay LaFountaine resides and is domiciled in Wilder, Vermont.

163.   Lisa Sheppard resides and is domiciled in Sebastopol, California.

164.   Emma Earnest resides and is domiciled in Arden, North Carolina.

165.   Linda Martin resides and is domiciled in the United States.

166.   Patrick Dalton resides and is domiciled in Sandwich, Illinois.

167.   Sofia Ganz resides and is domiciled in Orlando, Florida.

168.   Jennifer Wilkins resides and is domiciled in Oakland, California.

169.   Michelle Fera resides and is domiciled in Chandler, Arizona.

170.   Traci Renee O'Brien resides and is domiciled in Flintridge, California.

171.   Holly Smith resides and is domiciled in Brentwood, Tennessee.

172.   Carmen Fiengo resides and is domiciled in Houston, Texas.

173.   Maura Matvey resides and is domiciled in the United States.

174.   Sierra Brunner resides and is domiciled in Cresson, Pennsylvania.

175.   Cleofi Blass resides and is domiciled in Jersey City, New Jersey.

176.   Katherine Glass resides and is domiciled in Menlo Park, California.

177.   Rachael Coombs resides and is domiciled in Deerfield, New Hampshire.

178.   Kaitlin Rose Grogg resides and is domiciled in Easton, Pennsylvania.

179.   Pam Thaxton resides and is domiciled in Cincinnati, Ohio.

180.   Carly Thaxton resides and is domiciled in Cincinnati, Ohio.

181.   Brenda Gallagher resides and is domiciled in the United States.

182.   Diane Douglas resides and is domiciled in the United States.

183.   Jacqueline Sonethanouphet resides and is domiciled in the United States.

Exhibit 1
Page 32

184. Sean Knepper resides and is domiciled in Austintown, Ohio.

185. Kimberly Stevenson resides and is domiciled in the United States.

186. Jennifer Kelly resides and is domiciled in Elmhurst, Illinois.

187. Alexandria Martelli resides and is domiciled in the United States.

188. Cendra Shepherd resides and is domiciled in the United States.

189. Jenni Tranweaver resides and is domiciled in the United States.

190. Taylor Wooley resides and is domiciled in Norcross, Georgia.

191. Katie Younkins resides and is domiciled in Cuyahoga Falls, Ohio.

192. Gabriel Gomes resides and is domiciled in the United States.

193. Frank Scolaro resides and is domiciled in the United States.

194. William O. Watson resides and is domiciled in the United States.

195. Angelia Balthaser resides and is domiciled in the United States.

196. Heather Slack resides and is domiciled in Beverly Massachusetts.

197. Ashley Quellette resides and is domiciled in Pennsauken, New Jersey.

198. Ed Massuda resides and is domiciled in the United States.

199. Karissa Pitstick resides and is domiciled in the United States.

200. Cynthia C. Cole resides and is domiciled in the United States.

201. Wally Nunez resides and is domiciled in Ontario, California.

202. Michelle Barto resides and is domiciled in Maple Shade, New Jersey.

203. Molly Rahe resides and is domiciled in the United States.

204. Debbie Brown resides and is domiciled in Delray Beach, Florida.

205. Jason Brown resides and is domiciled in Delray Beach, Florida.

206. Michelle Robbins resides and is domiciled in the United States.

Exhibit 1
Page 33

207.    Karl Partch resides and is domiciled in the United States.

208.    Caroline Mangan resides and is domiciled in Bellingham, Washington.

209.    Sabrina Hastings resides and is domiciled in Benbrook, Texas.

210.    Conrad Haubrich resides and is domiciled in the United States.

211.    John Willis resides and is domiciled in Peoria, Illinois.

212.    Elisabeth Clapp resides and is domiciled in the United States.

213.    Shelly Graupner resides and is domiciled in the United States.

214.    Rafael Ortiz III resides and is domiciled in the United States.

215.    Lori Brredlove resides and is domiciled in the United States.

216.    Dustin Spielman resides and is domiciled in the United States.

217.    Virginia Spielman resides and is domiciled in the United States.

218.    Rebecca Brown resides and is domiciled in the United States.

219.    Kevin Brown resides and is domiciled in the United States.

220.    Chad Gilligan resides and is domiciled in Loveland, Ohio.

221.    Kristin Gilligan resides and is domiciled in Loveland, Ohio.

222.    Loren Dunsworth resides and is domiciled in Los Angeles, California.

223.    Jori Kubek resides and is domiciled in Chicago, Illinois.

224.    Marissa Kirchner resides and is domiciled in the United States.

225.    Robert Layman resides and is domiciled in Hoover, Alabama.

226.    Kacey L. Burgess resides and is domiciled in the United States.

227.    Elizabeth Campbell resides and is domiciled in Woodstock, Virginia.

228.    Jennifer Mathieu resides and is domiciled in Wheeling, West Virginia.

229.    Tyrel Hartman resides and is domiciled in Denver, Colorado.

Exhibit 1
Page 34

230.    Michael Uselton resides and is domiciled in the United States.

231.    Rebecca Van Dale resides and is domiciled in the United States.

232.    Grace Van Dale resides and is domiciled in the United States.

233.     Jessica Krizman resides and is domiciled in Providence, Rhode Island.

234.    Cindy Mueth resides and is domiciled in Smithton, Illinois.

235.    Anella Strudler resides and is domiciled in the United States.

236.    Jennifer Hoppe resides and is domiciled in the United States.

237.    Antonia Mascari resides and is domiciled in Zionsville, Indiana.

238.    Veronica Higareda resides and is domiciled in the United States.

239.    Ian Clites resides and is domiciled in the United States.

240.    Angela Dunbar resides and is domiciled in Louisville, Kentucky.

241.    Tatyana Bardash resides and is domiciled in the United States.

242.    Lora Ellis resides and is domiciled in New Bern, North Carolina.

243.    Larissa Solomon resides and is domiciled in San Francisco, California.

244.    Jessica Taylor resides and is domiciled in the United States.

245.    Kathleen Owens resides and is domiciled in the United States.

246.    Kenneth Engleson resides and is domiciled in Fuquay Varina, North Carolina.

247.    Monica Engleson resides and is domiciled in Fuquay Varina, North Carolina.

248.    Nicholas Engleson resides and is domiciled in High Point, North Carolina.

249.    Jennifer Vieira resides and is domiciled in Attleboro, Massachusetts.

250.    Cavan Farley resides and is domiciled in the United States.

251.    Tiffany Bray resides and is domiciled in Philadelphia, Pennsylvania.

252.    Emily Gaudet resides and is domiciled in New Haven, Connecticut.

Exhibit 1
Page 35

253.    Elizabeth Atkinson resides and is domiciled in Fort Worth, Texas.

254.    Genesis Borrero resides and is domiciled in the United States.

255.    Melissa Bailey resides and is domiciled in Sutersville, Pennsylvania.

256.    Eleana Villa resides and is domiciled in the United States.

257.    Telka Becker resides and is domiciled in the United States.

258.    Michele Fiedler resides and is domiciled in Philadelphia, Pennsylvania.

259.    Amy Maupin resides and is domiciled in the United States.

260.    Xiao Sebastien Sang resides and is domiciled in Cerritos, California.

261.    Wendy Thomas resides and is domiciled in the United States.

262.    Daniel Reyes resides and is domiciled in College Station, Texas.

263.    Mary Kirk resides and is domiciled in the United States.

264.    Maribel Serrao resides and is domiciled in Long Beach, California.

265.    Madison Shaner resides and is domiciled in Denver, Colorado.

266.    Rochelle Castrillo resides and is domiciled in the United States.

267.    Michael Berlin resides and is domiciled in the United States.

268.    Robert Noah resides and is domiciled in the United States.

269.    Ashlynn Alexander resides and is domiciled in the United States.

270.    Alyra Parker resides and is domiciled in Wilmington, Delaware.

271.    Nicholas Ritter McGee resides and is domiciled in the United States.

272.    Bruce Nuneley resides and is domiciled in the United States.

273.    Stacy Lestage resides and is domiciled in Sylvania, Ohio.

274.    Dawn Adrian resides and is domiciled in Salinas, California.

275.    Kristen Newman resides and is domiciled in Escondito, California.

Exhibit 1
Page 36

276. Penny Harrison resides and is domiciled in Potomac, Maryland.

277. Mary Vandiver resides and is domiciled in the United States.

278. Jessica VanWinkle resides and is domiciled in the United States.

279. Mykenzie Day resides and is domiciled in the United States.

280. Jennifer Lemeke resides and is domiciled in the United States.

281. Shannon Larsen resides and is domiciled in Oviedo, Florida.

282. Bandy Adams resides and is domiciled in Louisville, Kentucky.

283. Bradley Emerson resides and is domiciled in Austin, Texas.

284. Katherine L. Eaves resides and is domiciled in Norman, Oklahoma.

285. Natalie Cruze resides and is domiciled in the United States.

286. Joanna Cooper resides and is domiciled in the United States.

287. Tammy Steeves resides and is domiciled in the United States.

288. Based on information and belief, all plaintiffs are adult individuals.

**B. Defendants**

289. Defendant LIVE NATION ENTERTAINMENT, INC. is a Delaware corporation with its principal place of business at 9348 Civic Center Drive, Beverly Hills, Calfornia 90210.

290. Defendant TICKETMASTER L.L.C. is a wholly owned subsidiary of LIVE NATION ENTERTAINMENT, INC., and is a limited liability company organized and existing under the laws of Virginia with its principal place of business at 9348 Civic Center Drive, Beverly Hills, California 90210.

291. Ticketmaster is the largest ticketing company and the dominant provider of Primary Ticket Platform services in the U.S. with 2014 revenues of approximately $1.55 billion. Ticketmaster, through its TicketExchange, TicketsNow, and TM+ brands, also provides

Exhibit 1
Page 37

Secondary Ticket Exchange services in the U.S. Ticketmaster also merged with Live Nation in 2010 to gain even greater market dominance.

292.    Ticketmaster has been the exclusive provider of Primary Ticket Platform services for concert venues for many years and is the exclusive Secondary Ticket Exchange partner for most if not all of them. As discussed more fully below, as part of the exclusive Secondary Ticket Exchange partnership that Ticketmaster has with these concert venues, Ticketmaster is promoted as the only "official" Secondary Ticket Exchange and refuses to allow any other Secondary Ticket Exchange to integrate technically with Ticketmaster's Primary Ticket Platform. In addition, Ticketmaster is the only "authorized" channel through which Taylor Switch ticket holders may sell or transfer their tickets.

### C.  DOE defendants and agency

293.    Plaintiff is unaware of the true identity, nature, and capacity of each of the defendants designated DOES 1 through 100. Plaintiff is informed and believes and thereon alleges that each of these defendants is in some way responsible for the damages and injuries alleged in the complaint. Plaintiff is further informed and believes and thereon alleges that DOES 1 through 100 include but are not limited to the following: various persons, firms, corporations, organizations, and/or other business entities, that have participated as co-conspirators in the conduct, acts, omissions, and violations alleged herein as the basis for liability and have performed acts in furtherance of these conspiracies.

294.    At all times material to the allegations of this complaint each of the defendants was the agent and/or employee of each of the codefendants, including named and DOE defendants, and in doing the things hereinafter alleged was acting within the course and scope of such agency and/or employment and with the permission and consent of all their co-defendants.

Exhibit 1
Page 38

All references to Ticketmaster and/or Live Nation Entertainment, Inc. include all defendants named or sued under the identity of a DOE defendant.

## IV.   FIRST CAUSE OF ACTION

### (As against all defendants)

*Breach of Contract*

295.    Plaintiffs reallege and incorporate by reference each and every other paragraph of this complaint as if fully set forth here.

296.    Plaintiffs entered into a Contract with Ticketmaster on November 15, 2022, setting forth the covenants, conditions, and terms of the parties' agreement.  The material terms of the contract include, but are not limited to, the following: Defendant agreed that, in exchange for Plaintiffs purchasing a significant amount of merchandise and/or in exchange for their purchase of the canceled "Lover's Fest" tickets, Plaintiffs would be entitled to participate in the presale of "The Eras" tour tickets.  Only those individuals who satisfied either of these conditions would be allowed into the presale via a code as a "verified" fan and have preferred status to purchase tickets.  Plaintiffs relied upon and accepted such terms and conditions, thereby purchasing merchandise and/or accepting the benefit from the canceled "Lover's Fest."

297.    Plaintiffs have performed all obligations to Ticketmaster except those obligations Plaintiffs were prevented or excused from performing.

298.    Ticketmaster breached the Contract by failing to actually provide the proper presale it promised. It did not exclude those without codes. It did not give out codes to those who qualified. And it did not give those with codes the fair chance to get a ticket they were entitled to. Plaintiffs and Ticketmaster had an agreement leading up to the presale that made a contract and Ticketmaster violated it to Plaintiffs' detriment.

Exhibit 1
Page 39

299.    Plaintiffs sustained damages proximately caused by Ticketmaster under this cause of action in the amount of thousands of dollars.

300.    Plaintiffs are entitled to attorney fees by agreement or a statute according to proof.

## V.    SECOND CAUSE OF ACTION

**(As against all defendants)**

*Intentional Misrepresentation*

301.    Plaintiffs reallege and incorporate by reference each and every other paragraph of this complaint as if fully set forth here.

302.    Ticketmaster made statements to Plaintiffs about the presale for Taylor Swift tickets, particularly regarding how to get codes, who would get codes, how to get tickets, and who would be able to be part of the presale. Ticketmaster also failed to disclose that they had sent more codes than they could accommodate with tickets. Ticketmaster had no intention of following these statements to Plaintiffs. Ticketmaster willfully, purposely, and intentionally deceived Plaintiffs for its own benefit.

303.    Ticketmaster did not give everyone a code that it said was entitled to one. Codes would arbitrarily be denied, even though many Plaintiffs had paid good money.

304.    Ticketmaster gave instructions on how to get tickets, including warning buyers, including Plaintiffs, not to use their phones. Ticketmaster advised using a laptop or desktop computer. However, not only were phone users able to get tickets, but they were also able to get ahead of those on computers.

305.    Ticketmaster claimed that only those with codes would be able to join the presale, but millions of buyers without codes were able to get tickets. Many of those without codes were scalpers, and Ticketmaster benefited from scalped tickets as they must be resold on

Exhibit 1
Page 40

Ticketmaster, who gets an additional fee.

306.    Ticketmaster gave out more codes than tickets. Even if millions of buyers without codes had been given tickets, only about half of those with codes would be able to get tickets.

307.    Ticketmaster reserved some tickets for the Capital One sale, but it was plagued by the same issues as the presale.

308.    All of these issues led to the disaster that was the Taylor Swift "The Eras" tour ticket sale. Ticketmaster was responsible for addressing every issue. Ticketmaster either intended for this to happen from the beginning or knew these issues were present, yet Ticketmaster intentionally made no mention of this and hid information from buyers, including Plaintiffs.

309.    Plaintiffs sustained damages proximately caused by Ticketmaster under this cause of action in the amount of thousands of dollars.

310.    Plaintiffs are entitled to attorney fees by agreement or a statute according to proof.

## VI.    THIRD CAUSE OF ACTION

### (As against all defendants)

### *Fraud*

311.    Plaintiffs reallege and incorporate by reference each and every other paragraph of this complaint as if fully set forth here.

312.    Ticketmaster engaged in the above behavior with the intent to defraud Plaintiffs. One of the ways buyers such as Plaintiffs could be "verified" was by spending a certain amount of money on official Taylor Swift merchandise. Ticketmaster made out that spending enough would get a buyer a code and they would have a fair chance to get a ticket. Neither statement was true, but by misleading Plaintiffs, Ticketmaster was able to get buyers and many Plaintiffs to buy merchandise. Ticketmaster had an agreement with the merchandise sellers and benefited from

Exhibit 1
Page 41

the additional money spent on merchandise.

313.    Ticketmaster also benefited from their misleading the buyers of the canceled Taylor Swift "Lover Fest" tour. By making similar promises to these buyers, which included some Plaintiffs, Ticketmaster was able to appease any issue these buyers and Plaintiffs had with Ticketmaster's handling of the prior tour following its cancelation due to COVID-19.

314.    Ticketmaster made these promises without any intent to perform as expected. Ticketmaster intended to induce performance from Plaintiffs and other buyers for its own benefit. Ticketmaster concealed all the issues it knew would be present in the presale.

315.    Plaintiffs reasonably relied upon Ticketmaster's material representations and promises, which turned out not to be true and/or made by Ticketmaster without any intent to actually perform. Ticketmaster never had the requisite intent or ability to perform their obligations under the Contract. Had Plaintiffs known the actual facts, or that Ticketmaster never intended to perform their promises, Plaintiffs would not have entered into the Contract or invested in the transaction by buying a large amount of Taylor Swift Merchandise.

316.    Plaintiffs sustained damages proximately caused by Ticketmaster under this cause of action in the amount of thousands of dollars, which is a reasonable value.

317.    Plaintiffs are entitled to attorney fees by agreement or a statute according to proof.

318.    Ticketmaster's acts and omissions stated herein constitute fraud as defined in California Civil Code section 3294 and Plaintiffs should recover, in addition to actual damages, damages to make an example of and to punish Ticketmaster in an amount to be proven at trial.

## VII.    FOURTH CAUSE OF ACTION

### (As against all defendants)

*Fraudulent Inducement*

Exhibit 1
Page 42

319.    Plaintiffs reallege and incorporate by reference each and every other paragraph of this complaint as if fully set forth here.

320.    By way of the wrongful acts and omissions as alleged herein, Ticketmaster will be unjustly enriched if they are able to profit from Plaintiffs' actions free from any claims by Plaintiffs.

321.    Plaintiffs are informed and believe that Plaintiffs' claims against Ticketmaster are actionable and recoverable. Plaintiffs sustained damages proximately caused by Ticketmaster under this cause of action in the amount of thousands of dollars, which is a reasonable value.

322.    Plaintiffs are entitled to attorney fees by agreement or a statute according to proof.

323.    Ticketmaster's acts and omissions stated herein constitute fraud as defined in California Civil Code section 3294 and Plaintiffs should recover, in addition to actual damages, damages to make an example of and to punish Ticketmaster in an amount to be proven at trial.

## VIII.   FIFTH CAUSE OF ACTION

### (As against all defendants)

*Antitrust Violations*

324.    Plaintiffs reallege and incorporate by reference each and every other paragraph of this complaint as if fully set forth here.

325.    There is an actual controversy between Plaintiffs on the one hand and Defendant on the other hand as to their rights, obligations, and interests concerning the Contract and/or the Property.

326.    Due to this actual controversy, Plaintiffs are entitled to a determination of their rights and obligations concerning the Contract and the Property pursuant to an equitable order of declaratory relief.

Exhibit 1
Page 43

327.    Ticketmaster's coordinated efforts to foreclose competition in the Secondary Ticket Services Market constitute a violation of the Cartwright Act.

328.    Ticketmaster has been able to accomplish this violation because of the individual and collective market power that Golden State and Ticketmaster wield over the sale of Taylor Swift tickets through Primary Ticket Platforms.

329.    Ticketmaster's coordinated illegal acts and efforts to force ticket holders to use Ticketmaster as their exclusive provider of Secondary Ticket Exchange services; monitor, enforce and/or coerce compliance with their restrictive policies; exclusively market and promote Ticketmaster has achieved and will achieve no legitimate efficiency benefits to counterbalance their demonstrated anticompetitive effects, including the foreclosure of competition in the Secondary Ticket Services Market.

330.    Ticketmaster's conspiracy to monopolize the Secondary Ticket Services Market, Ticketmaster's illegal exclusive dealing arrangements, Ticketmaster's attempted monopolization of the Secondary Ticket Services Market, and other illegal acts in furtherance thereof each also constitute a violation of the Cartwright Act.

331.    As a result of Ticketmaster's violation of the Cartwright Act, Plaintiffs have been and will continue to be injured in its business and property in an amount not presently known with precision, but which is, at minimum, thousands of dollars prior to trebling.

## IX.    FIRST ANTITRUST CLAIM

*Unlawful Tying*

332.    Plaintiffs reallege and incorporate by reference each and every other paragraph of this complaint as if fully set forth here.

333.    Ticketmaster's conduct in foreclosing competition in the Secondary Ticket Services

Exhibit 1
Page 44

Market for Taylor Swift tickets constitutes an illegal tying arrangement in violation of the California Business and Professional Code. Cal. Bus. & Prof. Code, § 16727, et. seq. A tying arrangement is a conditional selling dependent on the purchase of another product or service.

334.   The Primary Ticket Market and the Secondary Ticket Services Market are distinct and separate markets. Taylor Swift and other touring musician tickets sold in the Primary Ticket Market and Secondary Ticket Exchange services are distinct products.

335.   Ticketmaster possesses substantial market power over the sale of Taylor Swift and other touring musician tickets in the Primary Ticket Market. For those seeking to purchase primary Taylor Swift tickets, there is no other option but to make these purchases through Ticketmaster's Primary Ticket Platform, at the price set by Ticketmaster, and on Ticketmaster's terms.

336.   Ticketmaster and all the venues part of Taylor Swift's upcoming tour have agreed to and do mandate that all Taylor Swift tickets sold in the Primary Ticket Market is not resold in the Secondary Ticket Services Market other than through Ticketmaster's Secondary Ticket Exchange. Ticketmaster has actually canceled or threatened to cancel tickets in other cases unless ticket holders agree to use Ticketmaster exclusively for Secondary Ticket Exchange services. Ticketmaster has also previously revoked or threatened to revoke its continued sale of primary tickets to season ticket holders who are identified as reselling their primary tickets through any Secondary Ticket Exchange provider other than Ticketmaster. Thus, Ticketmaster is tying the sale of Taylor Swift tickets sold in the Primary Market to Ticketmaster's Secondary Ticket Exchange services for the resale of Taylor Swift tickets. As a result of this tying arrangement, Taylor Swift ticket holders, who would otherwise prefer the Secondary Ticket Exchange services of providers other than Ticketmaster, including those offered by StubHub, have been forced to use Ticketmaster for Secondary Ticket Exchange services.

Exhibit 1
Page 45

337.   This tying arrangement – which has been reinforced and strengthened by the concert venues' exclusive marketing, promotion, and integration of Ticketmaster for Secondary Ticket Exchange services – has substantially foreclosed other Secondary Ticket Exchange providers from competing in the Secondary Ticket Services Market, thereby affecting a not insubstantial volume of commerce. It has harmed and will continue to harm competition in that market by forcing Taylor Swift ticket buyers and sellers in the Secondary Ticket Services Market to pay artificially high fees and by reducing the quantity and quality of secondary Taylor Swift tickets available for sale in the Secondary Ticket Services Market and has reduced the quantity of tickets actually sold in the Secondary Ticket Services Market.

338.   Ticketmaster also created a tying arrangement regarding the presale of tickets for Taylor Swift's "The Eras" tour in the Primary Ticket Services Market.

339.   In order for potential buyers to be able to purchase tickets during the presale, they needed to be a "verified" Taylor Swift fan. Buyers could prove their verification status by having tickets to Taylor Swift's prior tour, "Lover Fest", which was canceled due to COVID-19. The other way to obtain verification was for a buyer to buy a non-insignificant amount of Taylor Swift merchandise. There was no cost-free way for a buyer to become verified, purchase of additional, separate items was required to be "verified". Once verified, a buyer would be given a code. This code was supposed to be the only way to buy tickets during the presale.

340.   On the day of the presale, it became clear that getting tickets during the presale would be the only real way to get tickets from the Primary Ticket Services Market. Without engaging in the tying arrangement Ticketmaster had with the prior tour or the merchandise, it would have been impossible for non-verified buyers to get tickets. With 1.4 million codes allowing a buyer to get up to 6 tickets, there were not going to be any tickets left after the pre-sale. Even if the sale

Exhibit 1
Page 46

of Taylor Swift tickets had gone as planned, buyers were being forced to pay additional fees just to have the chance of buying tickets.

341. There are no legitimate business justifications or efficiencies for either of Ticketmaster's tying arrangements that counterbalance their demonstrated anticompetitive effects.

342. This tying arrangement constitutes a violation Cal. Bus. & Prof. Code, §§ 16720, 16727. Under California law, this is a per se violation. *People v. National Association of Realtors* (1984) 155 Cal. App. 3d 578, 583 [202 Cal. Rptr. 243] ("Tying arrangements are illegal per se 'whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product' [citations removed] and when 'a total amount of [10 Cal. App. 4th 1361] business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie. ...'").

343. As a result of Ticketmaster's illegal tying arrangements, Plaintiffs have been and will continue to be injured in their property in an amount not presently known with precision, but which is, at minimum, over a thousand dollars with trebling per Plaintiff.

344. Ticketmaster's antitrust violations have caused substantial economic injury to Plaintiffs in an amount not presently known with precision, but which is, at minimum, thousands of dollars.

345. Plaintiffs are entitled to attorney fees by agreement or a statute according to proof.

346. Ticketmaster's violations of California antitrust law are expansive that Plaintiffs should recover, in addition to actual damages, damages to make an example of and to punish Ticketmaster in an amount to be proven at trial.

// //

// //

Exhibit 1
Page 47

## X.    SECOND ANTITRUST CLAIM

### *Exclusive Dealings*

347.    Plaintiffs reallege and incorporate by reference each and every other paragraph of this complaint as if fully set forth here.

348.    Ticketmaster's conduct has allowed it to control the supply of tickets to music concerts. In order for artists like Taylor Swift to sell to buyers wanting to see them in concert, the buyers and artists must go through Ticketmaster. This has forced both groups into exclusive dealings with Ticketmaster that lessen competition as well as created and strengthened Ticketmaster's monopolistic power, which violates California law. *See* Cal. Bus. & Prof. Code, § 16727.

349.    Ticketmaster has dominant, monopolistic power in the market of Primary and Secondary Ticket Sales markets. Ticketmaster currently controls over 70% of this market. Ticketmaster's high market share as well as its agreements with concert venues have given it extreme power. While a small percentage of concert venues use other providers, for most Californians and Americans, Ticketmaster is the only provider available.

350.    Ticketmaster's forced exclusive dealings have allowed it to charge above-market prices and excessive fees while preventing competition against them. In markets without a singular, monopolistic company, charging prices and fees like Ticketmaster would be impossible. And Ticketmaster does not do anything to justify these higher costs. Ticketmaster's service is not superior or reliable; the massive disaster of the Taylor Swift presale is evidence enough of this. Ticketmaster does not charge high prices to give a better service, it charges higher prices because it has no real competition and wants to take every dollar it can from buyers.

351.    The foreclosure of competition has led to increased prices and/or decreased output and has harmed competition.

Exhibit 1
Page 48

352.     There is no legitimate business justification or efficiency gained for these exclusive

dealings. All it does it take money from the hands of artists and buyers and into the hands of

Ticketmaster, a purely anticompetitive effect that is actionable under California law. *See Gianelli*

*Distributing Co. v. Beck & Co.*, 172 Cal. App. 3d 1020 (1985). As a result, Plaintiffs have been

and will continue to be injured in their property.

353.     Ticketmaster's antitrust violations have caused substantial economic injury to Plaintiffs

in an amount not presently known with precision, but which is, at minimum, thousands of

dollars.

354.     Plaintiffs are entitled to attorney fees by agreement or a statute according to proof.

355.     Ticketmaster's violations of California antitrust law are expansive that Plaintiffs should

recover, in addition to actual damages, damages to make an example of and to punish

Ticketmaster in an amount to be proven at trial.

## XI.     THIRD ANTITRUST CLAIM

### *Price Discrimination*

356.     Plaintiffs reallege and incorporate by reference each and every other paragraph of this

complaint as if fully set forth here.

357.     Ticketmaster's conduct in its dynamic pricing and manipulation of its Secondary Ticket

Services Market for Taylor Swift tickets constitutes price discrimination in violation of the

California Business and Professional Code. Cal. Bus. & Prof. Code, § 17301, et. seq.; *See Harris*

*v. Capitol Records Distributing Corp.* (1966) 64 Cal.2d 454. Price discrimination involves giving

different prices to different buyers for comparable goods.

358.     Not all concert tickets are of equal value. Different venues may vary in general admission

prices, groups of seats vary in desirability, and some tickets contain VIP benefits. However, seats

Exhibit 1
Page 49

that have about the same view of the musician, at the same venue, and with the same amount of VIP benefits are essentially equal in value and should be at or a similar price.

359.    Under Ticketmaster's dynamic pricing scheme, comparable tickets were sold at radically different prices. Dynamic pricing is when Ticketmaster raises the prices of tickets as more tickets are selling, justifying it as the tickets are more in demand and, and are thus more valuable. Taylor Swift did not opt for dynamic pricing, but Ticketmaster implemented it anyways.

360.    Ticketmaster justifies this pricing as meeting demand. However, this argument is nonsensical. Ticketmaster does not raise prices when a large number of people are in a waiting queue to buy tickets, it only raises ticket prices as fewer tickets remain. Rather than "meeting demand", Ticketmaster arbitrarily punishes the people that were unable to get to the front of the line. Those who buy tickets under Dynamic pricing are paying higher prices solely because Ticketmaster has created the flimsiest of excuses to justify anticompetitively taking additional money for itself.

361.    Ticketmaster's behavior has not been to the benefit of honest buyers, but to the benefit of scalpers. Ticketmaster failed to stop millions of people without codes from buying during the presale, many of whom were scalpers. And Ticketmaster benefits from scalpers. Ticketmaster gets additional fees every time a ticket is resold, and Ticketmaster is the only place where tickets can be officially resold. Ticketmaster also prevents sellers from charging below a certain price. Ticketmaster has set up a system where scalping is not only allowed, but tacitly encouraged. And Ticketmaster is able to do all of this because of its monopoly power. As a result of Ticketmaster's behavior, Plaintiffs have been and will continue to be injured in their property.

362.    Ticketmaster's antitrust violations have caused substantial economic injury to Plaintiffs in an amount not presently known with precision, but which is, at minimum, thousands of

Exhibit 1
Page 50

dollars.

363.   Plaintiffs are entitled to attorney fees by agreement or a statute according to proof.

364.   Ticketmaster's violations of California antitrust law are expansive that Plaintiffs should recover, in addition to actual damages, damages to make an example of and to punish Ticketmaster in an amount to be proven at trial.

## XII.   FOURTH ANTITRUST CLAIM

*Price Fixing*

365.   Plaintiffs reallege and incorporate by reference each and every other paragraph of this complaint as if fully set forth here.

366.   Ticketmaster's conduct of allying with scalpers and venues has amounted to price fixing. Horizontal Price fixing involves competitors allying to set one price for any product, commodity, or service through any agreement to raise, stabilize or otherwise affect prices. This agreement does not need to be formalized.

367.   This agreement has allowed Ticketmaster to raise prices above what it would be able to otherwise. Because Ticketmaster has competitors like SeatGeek charge ticket prices at the same cost as Ticketmaster, it prevents buyers from being able to find a cheaper alternative. The only way prices could stay this high for both Ticketmaster and its competitors is through an agreement between them in violation of California antitrust laws.

368.   Ticketmaster has also committed Vertical Price Fixing. Vertical price fixing makes any agreement between a buyer and seller regarding the price at which the buyer resells a product is illegal. Under California law, this is a per se violation of the Cartwright Act. *Mailand v. Burckle*, 20 Cal. 3d 376 (Cal. 1978).

369.   Ticketmaster has controlled the resale of tickets bought through it. Ticketmaster forces

Exhibit 1
Page 51

buyers to resell on its platform. And Ticketmaster controls what prices the buyer can resell at. This prevents the price of tickets from falling and forces new buyers to pay higher prices under Dynamic prices. If Ticketmaster did not do this, it might decrease the number of people willing to pay for the monopolistic priced Dynamic Pricing tickets.

370.   Ticketmaster's horizontal and vertical price fixing have harmed Plaintiffs, and as a result, Plaintiffs have been and will continue to be injured in their property.

371.   Ticketmaster's antitrust violations have caused substantial economic injury to Plaintiffs in an amount not presently known with precision, but which is, at minimum, thousands of dollars.

372.   Plaintiffs are entitled to attorney fees by agreement or a statute according to proof.

373.   Ticketmaster's violations of California antitrust law are expansive that Plaintiffs should recover, in addition to actual damages, damages to make an example of and to punish Ticketmaster in an amount to be proven at trial.

### XIII.   <u>FIFTH ANTITRUST CLAIM</u>

*Group Boycotting*

374.   Plaintiffs reallege and incorporate by reference each and every other paragraph of this complaint as if fully set forth here.

375.   Ticketmaster is also beholden to the agreement it had with the Justice Department, forbidding it from threatening concert venues with losing access to its tours if those venues decided to use ticketing providers other than Ticketmaster. This agreement has been extended to 2025. Despite this agreement, Ticketmaster has continued to engage in group boycotting, where competitors ally together to boycott any specific entity.

376.   Ticketmaster has gathered to a group boycott with competitors like SeatGeek in its

Exhibit 1
Page 52

relevant market to refuse to conduct business with any competitor that does not conform to Ticketmaster's demands. Ticketmaster does this through its monopolistic size and power as well as its collusion with concert venues. Any competitor of Ticketmaster that does conform to its demands will be barred from doing business with most if not all large concert venues. This has been done to both inflate prices and prevent new competitors from entering the market, all to Ticketmaster's benefit.

377.    The Ticketmaster-led group boycotting is a violation of California law and helped keep ticket prices at an above-market price. It also allowed Ticketmaster to force Plaintiffs to buy tickets at these inflated prices to Plaintiffs' harm, and as a result, Plaintiffs have been and will continue to be injured in their property.

378.    Ticketmaster's antitrust violations have caused substantial economic injury to Plaintiffs in an amount not presently known with precision, but which is, at minimum, thousands of dollars.

379.    Plaintiffs are entitled to attorney fees by agreement or a statute according to proof.

380.    Ticketmaster's violations of California antitrust law are expansive that Plaintiffs should recover, in addition to actual damages, damages to make an example of and to punish Ticketmaster in an amount to be proven at trial.


## XIV.   SIXTH ANTITRUST CLAIM

*Market Division Scheme*

381.    Plaintiffs reallege and incorporate by reference each and every other paragraph of this complaint as if fully set forth here.

382.    Ticketmaster has engaged in a market division scheme, by which it has divided customers

Exhibit 1
Page 53

into certain regions with its competitors. This is a violation of California antitrust law.

383.    Ticketmaster has monopoly power, but it still has smaller competitors. It has specifically carved out small territories to give to competitors like SeatGeek in an attempt to hide the level of monopolistic power and control Ticketmaster has. In exchange for giving SeatGeek territory, Ticketmaster has made SeatGeek set price tickets at the same high price as Ticketmaster. This allows these competitors to set high prices and not actually compete with each other.

384.    There are no pro-competitive benefits to this arrangement. This arrangement has effectively ended competition in this market and has allowed Ticketmaster to unilaterally set prices. Buyers have no choice in who they buy tickets from and are forced to pay monopolistic pricing set by Ticketmaster.

385.    Ticketmaster has carved up the market by territory to keep prices high. This has allowed them to continue their monopolistic control and pricing, and as a result, Plaintiffs have been and will continue to be injured in their property.

386.    Ticketmaster's antitrust violations have caused substantial economic injury to Plaintiffs in an amount not presently known with precision, but which is, at minimum, thousands of dollars.

387.    Plaintiffs are entitled to attorney fees by agreement or a statute according to proof.

388.    Ticketmaster's violations of California antitrust law are expansive that Plaintiffs should recover, in addition to actual damages, damages to make an example of and to punish Ticketmaster in an amount to be proven at trial.

## XV.    SIXTH CAUSE OF ACTION

*Violation of California UCL Section 17200*

389.    Plaintiffs reallege and incorporate by reference each and every other paragraph of this

Exhibit 1
Page 54

complaint as if fully set forth here.

390.    160. Ticketmaster has used additional, unfair practices to make it difficult for ticket holders to sell their tickets on competitive Secondary Ticket Exchanges. Ticketmaster has done this by leveraging its position as a dominant provider of Primary Ticket Platforms.

391.    As found by the Department of Justice, Ticketmaster has historically dominated Primary Ticket Platform services. It has maintained its dominance in this business by entering into numerous multi-year, exclusive contracts with leagues, teams, and venues. Indeed, Ticketmaster's market power in the Primary Ticket Platform services is evidenced by the high fees that it has charged and continues to charge for Primary Ticket Platform services – fees that are substantially higher than fees charged by other Primary Ticket Platform competitors.

392.    Moreover, Ticketmaster's market power in Primary Ticket Platform services is buttressed by high barriers to entry and expansion in this business, including barriers created by Ticketmaster's threats to enforce its multi-year, exclusive agreements. Ticketmaster has, for example, threatened action against StubHub, a much smaller competitor, for even approaching Ticketmaster business partners with offers to sell additional, unsold ticket inventory, claiming that such overtures would constitute tortious interference with Ticketmaster's exclusive contracts. Specifically, Ticketmaster cautioned StubHub that: "It has come to our attention that StubHub is approaching Ticketmaster clients seeking to sell our client's primary tickets. As is well known in the industry. . . Ticketmaster's client ticketing contracts are generally exclusive and therefore contain contractual commitments by our clients not to sell primary tickets through any third-party." Ticketmaster has likewise imposed contractual restrictions in its Primary Ticket Platform contracts that preclude teams, leagues, and venues from distributing any of their ticket inventory via actual or potential competitors.

Exhibit 1
Page 55

393.     Specifically, Ticketmaster exercised its dominance in Primary Ticket Platform services by delaying the delivery of the electronic copy of the originally purchased, primary ticket or the barcode associated with that ticket to the primary ticket purchaser. Ticketmaster has chosen to delay the delivery of PDF images or barcodes associated with original, primary tickets for numerous musical concerts until weeks or months after the ticket was purchased and only a few days before the relevant event.

394.     This practice makes it extremely difficult for a primary ticket purchaser to resell his or her ticket on competitive non-Ticketmaster Secondary Ticket Exchanges. Indeed, the delaying of the delivery of these tickets or bar codes effectively bars the reseller from selling that ticket on a competitive Secondary Ticket Exchange. This is because ticket purchasers are reluctant to purchase a ticket on a Secondary Ticket Exchange from a stranger (with no brand recognition) in the hope that the reseller will transfer the tickets weeks or months after a secondary ticket purchase occurs.

395.     Of course, Ticketmaster facilitates secondary purchases on its own Secondary Ticket Exchange even before delivering the primary ticket to the reseller: it guarantees that it will directly deliver the ticket to the secondary purchaser at the designated delivery time, likely a few days before the event, if a secondary transaction is made. StubHub and other competitive Secondary Ticket Exchanges cannot provide this same direct delivery guarantee because they are barred from electronically integrating with Ticketmaster's Primary Ticket Platform.

396.     Accordingly, this Ticketmaster practice of delaying delivery of primary tickets has caused ticket holders to incur consumer harm and has caused competitive foreclosure to Secondary Ticket Exchanges.

397.     Another tactic in which Ticketmaster has engaged to leverage its dominance in Primary

Exhibit 1
Page 56

Ticket Platform services is its increased issuance of so-called paperless tickets. These virtual tickets allow entry to the event only upon showing at the gate picture identification and the credit card used for the purchase. Transferring or reselling these tickets is only possible through Ticketmaster's Secondary Ticket Exchange platform. According to the independent American Antitrust Institute, "[i]nstead of benefiting consumers, the trend favoring paperless tickets appears to be motivated by a desire of the dominant primary ticket provider to block out competition in the secondary ticket (resale) market."

398.    These practices are unlawful business acts or practices within the meaning of Section 17200 of California's Unfair Competition Law ("UCL").

399.    Ticketmaster has also made deceptive and/or false statements intended to mislead consumers about the reliability of other Secondary Ticket Exchange, the authenticity of Taylor Swift tickets sold on other Secondary Ticket Exchange, and the ability of purchasers to obtain secondary Taylor Swift tickets from sources other than Ticketmaster.

400.     Such unlawful, unfair, and deceptive practices are ongoing and continue to date.

401.    Ticketmaster's unlawful, unfair, and deceptive business practices have caused substantial economic injury to Plaintiffs in an amount not presently known with precision, but which is, at minimum, thousands of dollars.

402.    Plaintiffs are entitled to attorney fees by agreement or a statute according to proof.

403.    Ticketmaster's violations of California antitrust law are expansive that Plaintiffs should recover, in addition to actual damages, damages to make an example of and to punish Ticketmaster in an amount to be proven at trial.

// //

// //

Exhibit 1
Page 57

## XVI.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray that this Court enter judgment against Defendant, adjudging, and decreeing that:

a.   Ticketmaster has engaged in contracts and/or combinations in violation of California Business and Professions Code sections 16720 and 16750(a), and Plaintiffs have been injured as a result of this violation;

b.   The unlawful conduct, contracts, and/or combinations alleged herein be adjudged and decreed to be an unreasonable restraint of trade;

c.   Ticketmaster has engaged in acts or practices that are unlawful, and which constitute unfair competition within the meaning of Business and Professions Code section 17200, with acts or practices violative of the California Cartwright Act, sections 16720 and 16750(a) of the Business and Professions Code;

d.   Ticketmaster has engaged in acts or practices that are unfair, irrespective of the violation of any other law, and which constitute unfair competition within the meaning of Business and Professions Code section 17200;

e.   Pursuant to Business and Professions Code section 16760, that Plaintiffs be awarded their damages, trebled, in an amount according to proof;

f.   Pursuant to Business and Professions Code sections 16750(c) and 16754.5, that the Court enter all orders necessary to prevent Ticketmaster as well as Ticketmaster's successors, agents, representatives, employees, and all persons who act in concert with Ticketmaster from engaging in any act or practice that constitutes a violation of the Cartwright Act, section 16720, et. seq., of the Business and Professions Code, including such mandatory injunctions as may reasonably be

Exhibit 1
Page 58

necessary to restore and preserve fair competition, and by disgorging ill-gotten gains arising from its anticompetitive acts;

g.   That Ticketmaster be ordered to compensate Plaintiffs for the deadweight loss to the economy caused by these acts;

h.   Pursuant to Business and Professions Code section 17203, that the Court enter all orders or judgments as may be necessary to restore to any person in interest any money or other property that Ticketmaster may have acquired by violations of Business and Professions Code section 17200, as proved at trial;

i.   Pursuant to Business and Professions Code section 17206, that the Court assess a civil penalty of two thousand five hundred dollars ($2,500) against Ticketmaster for each violation of Business and Professions Code section 17200, as proved at trial;

j.   Plaintiffs recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

k.   Plaintiffs receive such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

Respectfully submitted:

Dated this December 13, 2022          D.B. HILL, A PROFESSIONAL LAW CORPORATION

Dennis B. Hill,
Attorneys for Plaintiffs JULIE BARFUSS ET AL

Exhibit 1
Page 59

## **VERIFICATION OF COMPLAINT FOR DAMAGES**

I, JULIE J. BARFUSS, the undersigned declare:

I have read the foregoing FIRST AMENDED COMPLAINT.  I hereby attest that the same is true of my own knowledge, except as to those matters which are therein stated on my information and/or belief, and as to those matters I believe to be true.  The allegations of law set forth in the individual causes of action are based on my information and belief.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct.

This Verification was executed on December 13, 2022, in West Jordan, Utah.


Signature: _____

Exhibit 1
Page 60