JOHN M. GENGA (SB# 125522)
GENGA & ASSOCIATES, P.C.
jgenga@gengalaw.com
16501 Ventura Blvd., Suite 400
Encino, CA  91436
(747) 231-3400 | Fax: (818) 474-7070

JENNIFER A. KINDER (*pro hac vice*)
jkinder@justcallkinder.net
GRIFFIN T. McMILLIN (*pro hac vice*)
gmcmillin@justcallkinder.net
KINDER LAW PLLC
3701 W. Northwest Hwy., Suite 304
Dallas, TX  75220
(214) 812-9800 | Fax: (214) 484-2144

DENNIS B. HILL (SBN 218131)
ticketmasterlawsuit@gmail.com
D.B. HILL, a Professional Law Corporation
640 Fifth Street, Suite 200
Lincoln, CA  95648
(916) 434-2553 | Fax: (916) 434-2560

Attorneys for Plaintiffs
JULIE BARFUSS, *et al.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIE BARFUSS, RANDY FLOYD BARFUSS, SELENA MONETTE MILLER, RUMER HENRY, CHRISTY LABONNE, KRIS LABONNE, COURTNEY BUTLER, DANIELLE LIPS, CASSANDRA DIAMOND, EDWARD HAKOBJANYAN, JOSE R. HERNANDEZ, MELISSA AYALA QUINTERO, JENNIFER USELTON, CLAY MURRAY, JOSEPH AKMAKJIAN, LAUREN MICHELE GOTTHELF, KELLI HERNANDEZ, MICHAEL COLLINS, VENISHA JARDIN, EMILY NIKLAUS DAVIS, JENNIFER BAGGETT, SARAH CHATTIN, DARCY RUBINO, | Case No.: 2:23-cv-01114-GW (KKx)<br><br>**SECOND AMENDED** [*FIRST AMENDED FEDERAL, PER FED. R. CIV. P. 15(a)(1)*] **COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

JENNIFER TIERNEY, KAREN
BRANDEL, JESSICA BECKER,
JENNIFER BEEMAN, BETSY
VICTORIA WANNER, KATHRYN
JOHNSON, ANDREW GAUTIERI,
AYTZA GAUTIERI, MICHAEL
VITULLI, MELONY PUGH,
ASHLEIGH CAMACHO, ANTHONY
LANNI, ANTHONY LEBLANC,
DENISE HULL, JENNIFER LANDRY,
KELLY MELTON, KATHLEEN
MILLIGAN, MORGAN
SMALLWOOD, SEAN
SMALLWOOD, CRYSTAL WILLIS,
ALYSSA MCCOY, REBECCA COLE,
ASHLEY BOVE, RUMER HENRY,
DAWN WIEZCROREZ, MARANDA
GOMEZ, LAUREN KEATING,
MEGHAN CLARKE, TEENA MARIE
COOK, STEPHANIE PALMER,
ANNIE PATOTA, PAULA C.
MILLER, STACI DOWNING,
DELAYNA LUTCHKA, SOFIA
LEWIS, JESSE ADAMS , AMANDA
FROST, HOLLY TAYSOM,
THERESA A. STANDING, LAURA
HASTINGS, SABRINA DARNELL,
CATHERINE BUGDEN, JANIS
HOUSTON, JENNIFER HUDSON,
MELODY LANGEVIN, KATHLEEN
BEECH, SKYE LANDAU, KYLE
JORDAN, CINDY DEIMLING,
DANIELLE MUNOZ, ABIGAIL
ALVORD, MICHAEL BASCONE,
APRIL STUMPE, DEREK
LEVESQUE, KILEY KRZYZEK,
DANIEL REYES, ROSEMARIE
PATTERSON, GABRIELLA
BLUNCK, ANTHONY BLUNCK,
WILLIAM R. NOAH, JIMMY HOANG
TA, CARRIE BASTAIN, BRETT
ANDREW WALT, AUDREY
COSTAR, ADRIENNE HERNANDEZ,
JEAN PIERRE ESPINOZO, LAUREN
CHAPPELL, MELINDA SCHNECK,
LISA DAY, MEGAN JOY SKEUSE,
BEATRIZ AGUILAR, CHRYS
JARDIN, TERESA EICHINGER,
JACQUELYN BEAN, KIM BEAN,
MAVERICK WAGNER, DOROTHY
LYNN FENTON, TONI MAE B.
ABACA, TRACEY ROMAN,
TIMOTHY ELLIS, GLEN BRISTOL,
SHERRY PONIEWAZ, IRENE
PEREZ, NIKITA RAMIREZ,

-2-

KANDICE BRIDGES, EILEEN
HAUBRICH, DEBORAH SNOW,
SAMANTHA TOSETTI, KAYLEIGH
AIELLO, TRACY LE, ASHLEE
UNDERWOOD, NANCY CORDERO,
ALLISON MCCROAN, MATT
MCCROAN, SALOMON
PASSARIELLO, KATHERINE
WAGNER, DAVID KILBRIDGE,
JENNIFER CONTINILLO,
CHRISTOPHER TOTH, HOLLIE
MEYERS, DORA SCHARF, JASON
SCHACTER, LINDSAY
LAFOUNTAINE, EMMA EARNEST,
LINDA MARTIN, PATRICK
DALTON, SOFIA GANZ, JENNIFER
WILKINS, MICHELLE FERA, TRACI
RENEE O'BRIEN, HOLLY SMITH,
CARMEN FIENGO, MAURA
MATVEY, SIERRA BRUNNER,
CLEOFI BLASS, KATHERINE
GLASS, RACHAEL COOMBS,
KAITLIN ROSE GROGG, PAM
THAXTON, CARLY THAXTON,
BRENDA GALLAGHER, DIANE
DOUGLAS, JACQUELINE
SONETHANOUPHET, SEAN
KNEPPER, KIMBERLY
STEVENSON, JENNIFER KELLY,
ALEXANDRIA MARTELLI,
CENDRA SHEPHERD, JENNI
TRANWEAVER, TAYLOR
WOOLEY, KATIE YOUNKINS,
GABRIEL GOMES, FRANK
SCOLARO, WILLIAM O. WATSON,
ANGELIA BALTHASER, HEATHER
SLACK, ASHLEY QUELLETTE, ED
MASSUDA, KARISSA PITSTICK,
CYNTHIA C. COLE, WALLY
NUNEZ, MICHELLE BARTO,
MOLLY RAHE, DEBBIE BROWN,
JASON BROWN, MICHELLE
ROBBINS, KARL PARTCH,
CAROLINE MANGAN, SABRINA
HASTINGS, CONRAD HAUBRICH,
JOHN WILLIS, ELISABETH CLAPP,
SHELLY GRAUPNER, RAFAEL
ORTIZ III, LORI BREEDLOVE,
DUSTIN SPIELMAN, VIRGINIA
SPIELMAN, REBECCA BROWN,
KEVIN BROWN, CHAD GILLIGAN,
KRISTIN GILLIGAN, LOREN
DUNSWORTH, JORI KUBEK,
MARISSA KIRCHNER, ROBERT
LAYMAN, KACEY L. BURGESS,

-3-

1  ELIZABETH CAMPBELL, JENNIFER
MATHIEU, TYREL HARTMAN,
2  MICHAEL USELTON, REBECCA
VAN DALE, GRACE VAN DALE,
3  JESSICA KRIZMAN, CINDY
MUETH, ANELLA STRUDLER,
4  JENNIFER HOPPE, ANTONIA
MASCARI, VERONICA HIGAREDA,
5  IAN CLITES, ANGELA DUNBAR,
TATYANA BARDASH, LORA ELLIS,
6  LARISSA SOLOMON, JESSICA
TAYLOR, KATHLEEN OWENS,
7  KENNETH ENGLESON, MONICA
ENGLESON, NICHOLAS
8  ENGLESON, JENNIFER VIEIRA,
CAVAN FARLEY, TIFFANY BRAY,
9  EMILY GAUDET, ELIZABETH
ATKINSON, GENESIS BORRERO,
10  MELISSA BAILEY, ELEANA VILLA,
TELKA BECKER, MICHELE
11  FIEDLER, AMY MAUPIN, XIAO
SEBASTIEN SANG, WENDY
12  THOMAS, MARY KIRK, MARIBEL
SERRAO, MADISON SHANER,
13  ROCHELLE CASTRILLO, MICHAEL
BERLIN, ROBERT NOAH,
14  ASHLYNN ALEXANDER, ALYRA
PARKER, NICHOLAS RITTER
15  MCGEE, BRUCE NUNELEY, STACY
LESTAGE, DAWN ADRIAN,
16  KRISTEN NEWMAN, PENNY
HARRISON, MARY VANDIVER,
17  JESSICA VAN WINKLE, MYKENZIE
DAY, JENNIFER LEMEKE,
18  SHANNON LARSEN, BRANDY
ADAMS, BRADLEY EMERSON,
19  KATHERINE L. EAVES, NATALIE
CRUZE, JOANNA COOPER, TAMMY
20  STEEVES, FLOR FLORES, ANGELA
DINNERVILLE, ANN CLARK, ANNE
21  ST. CLAIR, AGATHE DAWSON,
ALEXANDRA PREJZNER, ALEXIS
22  SCHNATMEIR, ALI MOLAVI,
ALTON W. DO, ALYSSA DAHLE,
23  RONNY DAHLE, AMANDA
DONMOYER, AMY KELLY, JOHN
24  KELLY, ANDREA RENE PIERCE,
ANJIE CROW, ARTHUR MEYER JR.,
25  ASHLEY CATE, ASHLEY
MCNEALY, BOB BRIDE, CALIE
26  HOLIAN, CARISSA
HOPPENWORTH, CATHERINE
27  HATFIELD, CATHERINE TAIN,
CHRISTOPHER KING, CHRISTEL
28  MENA KAFATI, CHRISTINA

-4-

RONDASH, DAVID COOK, DANELL GEERTSON, DAWN CALLAHANDIAMOND DANIELS, DONNA FOLLBAUM, ELMER BUNGER, JEFF FOLLBAUM, ELMER BUNGER, ELISA PIRARD, EMILY GRANDUSKY, EMILY MOLLENKOPF, ERICA SIMPSON, EVA BARNA, GEORGE NICHOLAS, HALEY HUSCHKA, HUGH DALY, ISABEL RODRIGUEZ, ISAI VALDEZ, JAMIE HILD, JILL BANA, JOEL HARRELL, JOHN MONTUORI III, JULIANA FUHRMANN, KAITAN PEREZ, KARA VERBSKY, KAREN WHITE, KATIELYN GARELIK, KEITH MARAVICH, KHARMA NOEL, KIMBERLY MCNAUGHTON, KRISTY VOELKER, LAURA BOWERS, BRYAN BOWERS, LAURA MONDRICK, LAURA L. SQUILLACE, LAURA WATSON, LAURIE STAPLETON, LORI RIKARD, MARK RIKARD, MACKENZIE WRAY, MAGGIE OTTEN, MARIA RAMOS, MARK KIRSCHNER, MARLA DUPREE, MELANIE VASQUEZ, MICHAEL SUSSMAN, MICHELLE JONES, NANCY RAMOS, PATRICIA JULIAN, RACHAEL SHEPLEY, RACHAEL TALBOT, RAELICIA REYES, RANDEE KIRBY, RAYMOND CHACE JR., ROBYN SPENCER, ROSE SHAPIRO, ROY SHAULI, SAMANTHA SAUER, SAMAY GHEEWALA, SANFORD GLOVINSKY, BRENDA MARHALL, SARA HIGGINS, TIM HIGGINS, SAVANNAH DAHLQUIST, SAVANNAH ELIZABETH JONES, SHANNON DENZEL-BARTOK, SHANNON FERN GUYOTT, SHANNON TIERNEY, SONYA ROBEL, STACEY TUCKER, STEPHANIE DILAVERI, STEPHANIE HALCZENKO, SUSAN BERNSTEIN, SUSAN CONLON, TERESA CONRAD, FRED CONRAD, TIFFANY LYNN PAUL, TIM DYAR, TRACY HUYNH and VERONICA POLIVANAYA,

Plaintiffs,

**SECOND AMENDED** [*FIRST AMENDED FEDERAL*] **COMPLAINT**

vs.

LIVE NATION ENTERTAINMENT, INC., TICKETMASTER L.L.C., KROENKE SPORTS & ENTERTAINMENT, LLC, SOFI TECHNOLOGIES, INC. and DOES 1 through 10, inclusive,

Defendants.

As and for their Second Amended Complaint since filing this action in the California Superior Court, County of Los Angeles, and their first amendment since defendants noticed the removal of the action to this United States District Court, plaintiffs allege as follows:

PROPRIETY OF AMENDMENT, WITHOUT PREJUDICE TO REMAND

1.      Plaintiffs submit this pleading as the first amendment to the pleading as to which defendants noticed removal from the California Superior Court.  They do so pursuant to Fed. R. Civ. P. 15(a)(1), which provides:

> A party may amend its pleading once as a matter of course within:
>
> (A) 21 days after serving it, or
>
> (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

The First Amended Complaint removed from the state court is one that otherwise would require a responsive pleading, and defendants have not yet filed one, or a motion under Fed. R. Civ. P. 12(b), (e), or (f).  Accordingly, plaintiffs submit this

amended pleading timely, and do so properly as the one amendment in this Court they may file as a matter of right under Rule 15(a)(1), without "the opposing party's written consent or the court's leave" under Rule 15(a)(2).  The Ninth Circuit recognizes that, where a plaintiff has "amended its complaint once … before the case was removed to federal court," it should "ha[ve] the opportunity to amend its … claim under the Federal Rules." *Me Renee LLC v. Elite World, S.A.*, 674 F. App'x 620, 622 (9th Cir. 2016).

2.     As a further threshold matter, plaintiffs submit this amended pleading without prejudice to their contention that this Court lacks subject matter jurisdiction to adjudicate this dispute.  The right to contest "subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived." *United States v. Cotton*, 535 U.S. 625, 630, 122 S. Ct. 1781, 152 L. Ed. 2d 860 (2002).  Nevertheless, out of an abundance of caution, plaintiffs state affirmatively that they do not by this amendment intend to waive, but rather that they expressly reserve, their right to contest the subject matter jurisdiction of this Court, including to move to remand the case to the California Superior Court.

3.     This amended pleading identifies numerous additional plaintiffs and names two more defendants.  Plaintiffs do not file this amended pleading to defeat diversity jurisdiction so as to give the Court discretion to reject it under 28 U.S.C. § 1447(e); complete diversity did not previously exist in any event, as defendants purported to remove the case to this Court as a "mass action" under 28 U.S.C. § 1332(d)(11), which does not require complete diversity and is not affected by this amendment.  Rather, plaintiffs will move to remand on the basis that "jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under subsection (a)" – *i.e.*, "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs …." 28 U.S.C. § 1332(a), (d)(11)(B)(i).  This amendment will not impact the likelihood of such a motion succeeding or not, as the Court will decide, as the sole

issue on that motion, whether defendants shall have proven by a preponderance of the evidence those particular plaintiffs, numbering at least 100, whose claims meet the jurisdictional minimum. *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 88 (2014), citing 28 U.S.C. § 1446(c)(2)(B); *Gaus v. Miles, Inc.*, 980 F.2d 564, 567 (9th Cir. 1992) ("defendant bears the burden of actually proving the facts to support jurisdiction, including the jurisdictional amount"). This amended pleading does not detract from that exercise. To the contrary, it makes available that many more plaintiffs to enable defendants to get to at least a hundred. And, by identifying the universe of parties that now exist, this amended pleading allows the Court to decide the issue only once for the parties now named to end up before a tribunal that has proper subject matter jurisdiction.

## INTRODUCTION RE NATURE OF CASE

4.      Plaintiffs have brought this case to rectify and recover damages for the anticompetitive conduct of Ticketmaster L.L.C. ("Ticketmaster"). In concert with (pun intended) its parent company, Live Nation Entertainment, Inc. ("Live Nation"), Ticketmaster's misconduct imposes higher prices in the presale, sale and resale market for music concert tickets. Plaintiff are informed and believe and on that basis allege that Ticketmaster has effectuated this anticompetitive scheme by forcing fans of musicians to use Ticketmaster exclusively to buy concert tickets, for "presales" and well as general sales to the public, at prices that exceed what a competitive market would dictate, including by requiring the most suitable venues for large concerts – most of which Live Nation owns and controls, a rare exception being SoFi Stadium in Inglewood, California, whose owner and major stakeholder plaintiffs name as defendants in this amended pleading – to use Ticketmaster as their exclusive ticket provider. Ticketmaster also has forced ticket purchasers to use, exclusively, its "Secondary Ticket Exchange," the platform it operates for the resale of concert tickets.

5.      Ticketmaster and Live Nation have undertaken this anticompetitive conduct for the purpose of obtaining sales, resales, service and other fees and profits that they could not earn in a competitive market for either initial or secondary ticket sales (referred to herein, respectively, as the "Primary Ticket Market" and the "Secondary Ticket Market," and the services in those markets as "Primary Ticket Services" and ""Secondary Ticket Services," respectively). Defendants' anticompetitive behavior has substantially harmed concertgoers and will continue to do so unless enjoined judicially, forbidden legislatively, or both. Fans of mega-star Taylor Swift come within the members of the general public who have suffered from such wrongful acts.  They experienced a well-publicized ticket presale disaster that occurred on November 15 and 16, 2022, continued with the cancellation of general sale tickets hitherto scheduled for November 18, 2022, and led to hearings before the United States Senate Judiciary Committee on January 24, 2023, whose members openly called upon the Department of Justice and Federal Trade Commission to investigate and bring legal action to put an end to Ticketmaster's abusive practices.  About three hundred fifty-five (355) individual victims of such monopolistic behavior – the plaintiffs herein, each with his or her own story to tell – seek to do their part toward that end by this action.

## JURISDICTION AND VENUE

6.      Defendants have purported to invoke the subject matter jurisdiction of this Court by removing this action, for now, from the California Superior Court. They have cited as a basis for so doing the federal Class Action Fairness Act, 28 U.S.C. § 1332(d).  Plaintiffs dispute this position, including in particular pursuant to 28 U.S.C. § 1332(d)(11)(B)(i), and expressly reserve the right to challenge such alleged jurisdiction, including by motion to remand.

7.      If this Court does have subject matter jurisdiction in this action, which plaintiffs deny, venue would properly lie in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and 1441(a).

**SECOND AMENDED [*FIRST AMENDED FEDERAL*] COMPLAINT**

## THE PARTIES

A.      *Plaintiffs*:

8.      Each of the persons listed below in paragraphs 9 through 363, inclusive, is an adult individual.

9.      Julie Barfuss resides and is domiciled in Utah.

10.     Randy Floyd Barfuss resides and is domiciled in Utah.

11.     Selena Monette Miller resides and is domiciled in Alabama.

12.     Rumer Henry resides and is domiciled in Arkansas.

13.     Christy LaBonne resides and is domiciled in Arkansas.

14.     Kris LaBonne resides and is domiciled in Arkansas.

15.     Courtney Butler resides and is domiciled in Arizona.

16.     Danielle Lips resides and is domiciled in Arizona.

17.     Cassandra Diamond resides and is domiciled in California.

18.     Edward Hakobjanyan resides and is domiciled in California.

19.     Jose R. Hernandez resides and is domiciled in California.

20.     Melissa Ayala Quintero resides and is domiciled in California.

21.     Jennifer Uselton resides and is domiciled in California.

22.     Clay Murray resides in Rhode Island and is domiciled in California.

23.     Joseph Akmakjian resides and is domiciled in Colorado.

24.     Lauren Michele Gotthelf resides and is domiciled in Colorado.

25.     Kelli Hernandez resides and is domiciled in Colorado.

26.     Michael Collins resides and is domiciled in Florida.

27.     Venisha Jardin resides and is domiciled in Florida.

28.     Emily Niklaus Davis resides and is domiciled in Georgia.

29.     Jennifer Baggett resides and is domiciled in Georgia.

30.     Sarah Chattin resides and is domiciled in Kansas.

31.     Darcy Rubino resides and is domiciled in Massachusetts.

32.     Jennifer Tierney resides and is domiciled in Massachusetts.

SECOND AMENDED [*FIRST AMENDED FEDERAL*] COMPLAINT

33. Karen Brandel resides and is domiciled in Michigan.

34. Jessica Becker resides and is domiciled in North Carolina.

35. Jennifer Beeman resides and is domiciled in North Carolina.

36. Betsy Victoria Wanner resides and is domiciled in North Carolina.

37. Kathryn Johnson resides and is domiciled in North Carolina.

38. Andrew Gautieri resides and is domiciled in New Jersey.

39. Aytza Gautieri resides and is domiciled in New Jersey.

40. Michael Vitulli resides and is domiciled in New Jersey.

41. Melony Pugh resides and is domiciled in Ohio.

42. Ashleigh Camacho resides and is domiciled in Pennsylvania.

43. Anthony Lanni resides and is domiciled in Rhode Island.

44. Anthony LeBlanc resides and is domiciled in Rhode Island.

45. Denise Hull resides and is domiciled in Texas.

46. Jennifer Landry resides and is domiciled in Texas.

47. Kelly Melton resides and is domiciled in Texas.

48. Kathleen Milligan resides and is domiciled in Texas.

49. Morgan Smallwood resides and is domiciled in Texas.

50. Sean Smallwood resides and is domiciled in Texas.

51. Crystal Willis resides and is domiciled in Texas.

52. Alyssa McCoy resides and is domiciled in Virginia.

53. Rebecca Cole resides and is domiciled in Texas.

54. Ashley Bove resides and is domiciled in Rhode Island.

55. Rumer Henry resides and is domiciled in Little Rock, Arkansas.

56. Dawn Wiezcrorez resides and is domiciled in Chicago, Illinois.

57. Maranda Gomez resides and is domiciled in Little Rock, Arkansas.

58. Lauren Keating resides and is domiciled in Albany, New York.

59. Meghan Clarke resides and is domiciled in Andover, Massachusetts.

60. Teena Marie Cook resides and is domiciled in Moline, Illinois.

SECOND AMENDED [*FIRST AMENDED FEDERAL*] COMPLAINT

61.   Stephanie Palmer resides and is domiciled in Derry, New Hampshire.

62.   Annie Patota resides and is domiciled in Norfolk, Virginia.

63.   Paula C. Miller resides and is domiciled in Akron, Ohio.

64.   Staci Downing resides and is domiciled in Pittsburgh, Pennsylvania.

65.   Delayna Lutchka resides and is domiciled in Carterville, Illinois.

66.   Sofia Lewis resides and is domiciled in the United States.

67.   Jesse Adams resides and is domiciled in the United States.

68.   Amanda Frost resides and is domiciled in the United States.

69.   Holly Taysom resides and is domiciled in Saratoga Springs, Utah.

70.   Theresa A. Standing resides and is domiciled in St. Peters, Missouri.

71.   Laura Hastings resides and is domiciled in the United States.

72.   Sabrina Darnell resides and is domiciled in St. Pekin, Illinois.

73.   Catherine Bugden resides and is domiciled in Salt Lake City, Utah.

74.   Janis Houston resides and is domiciled in Naples, Florida.

75.   Jennifer Hudson resides and is domiciled in the United States.

76.   Melody Langevin resides and is domiciled in Casa Grande, Arizona.

77.   Kathleen Beech resides and is domiciled in Studio City, California.

78.   Skye Landau resides and is domiciled in Newton, Massachusetts.

79.   Kyle Jordan resides and is domiciled in Atlanta, Georgia.

80.   Cindy Deimling resides and is domiciled in the United States.

81.   Danielle Munoz resides and is domiciled in Jurupa Valley, California.

82.   Abigail Alvord resides and is domiciled in Veneta, Oregon.

83.   Michael Bascone resides and is domiciled in Howell, New Jersey.

84.   April Stumpe resides and is domiciled in O'Fallon, Missouri.

85.   Derek Levesque resides and is domiciled in Norwell, Massachusetts.

86.   Kiley Krzyzek resides and is domiciled in West Hartford, Connecticut.

87.   Daniel Reyes resides and is domiciled in College Station, Texas.

88.  Rosemarie Patterson resides and is domiciled in Milford, New Jersey.

89.  Gabriella Blunck resides and is domiciled in the United States.

90.  Anthony Blunck resides and is domiciled in the United States.

91.  William R. Noah resides and is domiciled in the United States.

92.  Jimmy Hoang Ta resides and is domiciled in Kansas City, Missouri.

93.  Carrie Bastain resides and is domiciled in Evansville, Indiana.

94.  Brett Andrew Walt resides and is domiciled in King of Prussia, Pennsylvania.

95.  Audrey Costar resides and is domiciled in the United States.

96.  Adrienne Hernandez resides and is domiciled in the United States.

97.  Jean Pierre Espinozo resides and is domiciled in Florida.

98.  Lauren Chappell resides and is domiciled in Jacksonville, Florida.

99.  Melinda Schneck resides and is domiciled in Macungie, Pennsylvania.

100.  Lisa Day resides and is domiciled in the United States.

101.  Megan Joy Skeuse resides and is domiciled in the United States.

102.  Beatriz Aguilar resides and is domiciled in Clanton, Michigan.

103.  Chrys Jardin resides and is domiciled in Lutz, Florida.

104.  Teresa Eichinger resides and is domiciled in Foboro, Massachusetts.

105.  Jacquelyn Bean resides and is domiciled in O'Fallon, Missouri.

106.  Kim Bean resides and is domiciled in O'Fallon, Missouri.

107.  Maverick Wagner resides and is domiciled in Wake Forest, North Carolina.

108.  Dorothy Lynn Fenton resides and is domiciled in Santa Ana, California.

109.  Toni Mae B. Abaca resides and is domiciled in Union City, New Jersey.

110.  Tracey Roman resides and is domiciled in the United States.

111.  Timothy Ellis resides and is domiciled in Clara City, Minnesota.

SECOND AMENDED [*FIRST AMENDED FEDERAL*] COMPLAINT

112. Glen Bristol resides and is domiciled in Tukwila, Washington.

113. Sherry Poniewaz resides and is domiciled in Hubertus, Wisconsin.

114. Irene Perez resides and is domiciled in Irvine, California.

115. Nikita Ramirez resides and is domiciled in Los Angeles, California.

116. Kandice Bridges resides and is domiciled in Dallas, Texas.

117. Eileen Haubrich resides and is domiciled in the United States.

118. Deborah Snow resides and is domiciled in the United States.

119. Samantha Tosetti resides and is domiciled in Weaverville, California.

120. Kayleigh Aiello resides and is domiciled in New York.

121. Tracy Le resides and is domiciled in Forney, Texas.

122. Ashlee Underwood resides and is domiciled in Dalton, Georgia.

123. Nancy Cordero resides and is domiciled in the United States.

124. Allison McCroan resides and is domiciled in Fort Myers, Florida.

125. Matt McCroan resides and is domiciled in Fort Myers, Florida.

126. Salomon Passariello resides and is domiciled in the United States.

127. Katherine Wagner resides and is domiciled in Dallas, Texas.

128. David Kilbridge resides and is domiciled in the United States.

129. Jennifer Continillo resides and is domiciled in Hickman, California.

130. Christopher Toth resides and is domiciled in Los Angeles, California.

131. Hollie Meyers resides and is domiciled in Upland, Indiana.

132. Dora Scharf resides and is domiciled in North York, Ontario, Canada.

133. Jason Schacter resides and is domiciled in the United States.

134. Lindsay LaFountaine resides and is domiciled in Wilder, Vermont.

135. Emma Earnest resides and is domiciled in Arden, North Carolina.

136. Linda Martin resides and is domiciled in North Carolina.

137. Patrick Dalton resides and is domiciled in Sandwich, Illinois.

138. Sofia Ganz resides and is domiciled in Orlando, Florida.

139. Jennifer Wilkins resides and is domiciled in Oakland, California.

140.   Michelle Fera resides and is domiciled in Chandler, Arizona.

141.   Traci Renee O'Brien resides and is domiciled in Flintridge, California.

142.   Holly Smith resides and is domiciled in Brentwood, Tennessee.

143.   Carmen Fiengo resides and is domiciled in Houston, Texas.

144.   Maura Matvey resides and is domiciled in Washington, D.C..

145.   Sierra Brunner resides and is domiciled in Cresson, Pennsylvania.

146.   Cleofi Blass resides and is domiciled in Jersey City, New Jersey.

147.   Katherine Glass resides and is domiciled in Menlo Park, California.

148.   Rachael Coombs resides and is domiciled in Deerfield, New Hampshire.

149.   Kaitlin Rose Grogg resides and is domiciled in Easton, Pennsylvania.

150.   Pam Thaxton resides and is domiciled in Cincinnati, Ohio.

151.   Carly Thaxton resides and is domiciled in Cincinnati, Ohio.

152.   Brenda Gallagher resides and is domiciled in the United States.

153.   Diane Douglas resides and is domiciled in the United States.

154.   Jacqueline Sonethanouphet resides and is domiciled in the United States.

155.   Sean Knepper resides and is domiciled in Austintown, Ohio.

156.   Kimberly Stevenson resides and is domiciled in the United States.

157.   Jennifer Kelly resides and is domiciled in Elmhurst, Illinois.

158.   Alexandria Martelli resides and is domiciled in the United States.

159.   Cendra Shepherd resides and is domiciled in the United States.

160.   Jenni Tranweaver resides and is domiciled in the United States.

161.   Taylor Wooley resides and is domiciled in Norcross, Georgia.

162.   Katie Younkins resides and is domiciled in Cuyahoga Falls, Ohio.

163.   Gabriel Gomes resides and is domiciled in the United States.

164.   Frank Scolaro resides and is domiciled in the United States.

165.   William O. Watson resides and is domiciled in the United States.

166.   Angelia Balthaser resides and is domiciled in the United States.

167.   Heather Slack resides and is domiciled in Beverly Massachusetts.

168.   Ashley Quellette resides and is domiciled in Pennsauken, New Jersey.

169.   Ed Massuda resides and is domiciled in the United States.

170.   Karissa Pitstick resides and is domiciled in the United States.

171.   Cynthia C. Cole resides and is domiciled in the United States.

172.   Wally Nunez resides and is domiciled in Ontario, California.

173.   Michelle Barto resides and is domiciled in Maple Shade, New Jersey.

174.   Molly Rahe resides and is domiciled in the United States.

175.   Debbie Brown resides and is domiciled in Delray Beach, Florida.

176.   Jason Brown resides and is domiciled in Delray Beach, Florida.

177.   Michelle Robbins resides and is domiciled in the United States.

178.   Karl Partch resides and is domiciled in the United States.

179.   Caroline Mangan resides and is domiciled in Bellingham, Washington.

180.   Sabrina Hastings resides and is domiciled in Benbrook, Texas.

181.   Conrad Haubrich resides and is domiciled in the United States.

182.   John Willis resides and is domiciled in Peoria, Illinois.

183.   Elisabeth Clapp resides and is domiciled in the United States.

184.   Shelly Graupner resides and is domiciled in the United States.

185.   Rafael Ortiz III resides and is domiciled in the United States.

186.   Lori Breedlove resides and is domiciled in the United States.

187.   Dustin Spielman resides and is domiciled in the United States.

188.   Virginia Spielman resides and is domiciled in the United States.

189.   Rebecca Brown resides and is domiciled in the United States.

190.   Kevin Brown resides and is domiciled in the United States.

191.   Chad Gilligan resides and is domiciled in Loveland, Ohio.

-16-

**SECOND AMENDED [*FIRST AMENDED FEDERAL*] COMPLAINT**

192.    Kristin Gilligan resides and is domiciled in Loveland, Ohio.

193.    Loren Dunsworth resides and is domiciled in Los Angeles, California.

194.    Jori Kubek resides and is domiciled in Chicago, Illinois.

195.    Marissa Kirchner resides and is domiciled in the United States.

196.    Robert Layman resides and is domiciled in Hoover, Alabama.

197.    Kacey L. Burgess resides and is domiciled in the United States.

198.    Elizabeth Campbell resides and is domiciled in Woodstock, Virginia.

199.    Jennifer Mathieu resides and is domiciled in Wheeling, West Virginia.

200.    Tyrel Hartman resides and is domiciled in Denver, Colorado.

201.    Michael Uselton resides and is domiciled in the United States.

202.    Rebecca Van Dale resides and is domiciled in the United States.

203.    Grace Van Dale resides and is domiciled in the United States.

204.    Jessica Krizman resides and is domiciled in Providence, Rhode Island.

205.    Cindy Mueth resides and is domiciled in Smithton, Illinois.

206.    Anella Strudler resides and is domiciled in the United States.

207.    Jennifer Hoppe resides and is domiciled in the United States.

208.    Antonia Mascari resides and is domiciled in Zionsville, Indiana.

209.    Veronica Higareda resides and is domiciled in the United States.

210.    Ian Clites resides and is domiciled in the United States.

211.    Angela Dunbar resides and is domiciled in Louisville, Kentucky.

212.    Tatyana Bardash resides and is domiciled in the United States.

213.    Lora Ellis resides and is domiciled in New Bern, North Carolina.

214.    Larissa Solomon resides and is domiciled in San Francisco, California.

215.    Jessica Taylor resides and is domiciled in the United States.

216.    Kathleen Owens resides and is domiciled in the United States.

217.    Kenneth Engleson resides and is domiciled in Fuquay Varina, North Carolina.

218. Monica Engleson resides and is domiciled in Fuquay Varina, North Carolina.

219. Nicholas Engleson resides and is domiciled in High Point, North Carolina.

220. Jennifer Vieira resides and is domiciled in Attleboro, Massachusetts.

221. Cavan Farley resides and is domiciled in the United States.

222. Tiffany Bray resides and is domiciled in Philadelphia, Pennsylvania.

223. Emily Gaudet resides and is domiciled in New Haven, Connecticut.

224. Elizabeth Atkinson resides and is domiciled in Fort Worth, Texas.

225. Genesis Borrero resides and is domiciled in the United States.

226. Melissa Bailey resides and is domiciled in Sutersville, Pennsylvania.

227. Eleana Villa resides and is domiciled in the United States.

228. Telka Becker resides and is domiciled in the United States.

229. Michele Fiedler resides and is domiciled in Philadelphia, Pennsylvania.

230. Amy Maupin resides and is domiciled in the United States.

231. Xiao Sebastien Sang resides and is domiciled in Cerritos, California.

232. Wendy Thomas resides and is domiciled in the United States.

233. Mary Kirk resides and is domiciled in the United States.

234. Maribel Serrao resides and is domiciled in Long Beach, California.

235. Madison Shaner resides and is domiciled in Denver, Colorado.

236. Rochelle Castrillo resides and is domiciled in the United States.

237. Michael Berlin resides and is domiciled in the United States.

238. Robert Noah resides and is domiciled in the United States.

239. Ashlynn Alexander resides and is domiciled in the United States.

240. Alyra Parker resides and is domiciled in Wilmington, Delaware.

241. Nicholas Ritter McGee resides and is domiciled in the United States.

242. Bruce Nuneley resides and is domiciled in the United States.

-18-

243.   Stacy Lestage resides and is domiciled in Sylvania, Ohio.

244.   Dawn Adrian resides and is domiciled in Salinas, California.

245.   Kristen Newman resides and is domiciled in Escondito, California.

246.   Penny Harrison resides and is domiciled in Potomac, Maryland.

247.   Mary Vandiver resides and is domiciled in the United States.

248.   Jessica Van Winkle resides and is domiciled in the United States.

249.   Mykenzie Day resides and is domiciled in the United States.

250.   Jennifer Lemeke resides and is domiciled in the United States.

251.   Shannon Larsen resides and is domiciled in Oviedo, Florida.

252.   Brandy Adams resides and is domiciled in Louisville, Kentucky.

253.   Bradley Emerson resides and is domiciled in Austin, Texas.

254.   Katherine L. Eaves resides and is domiciled in Norman, Oklahoma.

255.   Natalie Cruze resides and is domiciled in the United States.

256.   Joanna Cooper resides and is domiciled in the United States.

257.   Tammy Steeves resides and is domiciled in the United States.

258.   Flor Flores resides and is domiciled in Texas.

259.   Angela Dinnerville resides and is domiciled in California.

260.   Ann Clark resides and is domiciled in Utah.

261.   Anne St. Clair resides and is domiciled in Pennsylvania.

262.   Agathe Dawson resides and is domiciled in Texas.

263.   Alexandra Prejzner resides and is domiciled in Illinois.

264.   Alexis Schnatmeir resides and is domiciled in Missouri.

265.   Ali Molavi resides and is domiciled in Florida.

266.   Alton W. Do resides and is domiciled in California.

267.   Alyssa Dahle resides and is domiciled in California.

268.   Ronny Dahle resides and is domiciled in California.

269.   Amanda Donmoyer resides and is domiciled in Pennsylvania.

270.   Amy Kelly resides and is domiciled in Massachusetts.

271. John Kelly resides and is domiciled in Massachusetts.

272. Andrea Rene Pierce resides and is domiciled in Illinois.

273. Anjie Crow resides and is domiciled in Tennessee.

274. Arthur Meyer Jr. resides and is domiciled in Arizona.

275. Ashley Cate resides and is domiciled in Washington.

276. Ashley McNealy resides and is domiciled in Tennessee.

277. Bob Bride resides and is domiciled in California.

278. Calie Holian and is domiciled in the United States.

279. Carissa Hoppenworth resides and is domiciled in Michigan.

280. Catherine Hatfield resides and is domiciled in Texas.

281. Catherine Tain resides and is domiciled in Texas.

282. Christopher King resides and is domiciled in Illinois.

283. Christel Mena Kafati resides and is domiciled in Florida.

284. Christina Rondash resides and is domiciled in Kansas.

285. David Cook resides and is domiciled in Colorado.

286. Danell Geertson resides and is domiciled in California.

287. Dawn Callahan resides and is domiciled in Massachusetts.

288. Diamond Daniels resides and is domiciled in Tennessee.

289. Donna Follbaum resides and is domiciled in Michigan.

290. Jeff Follbaum resides and is domiciled in Michigan.

291. Elmer Bunger resides and is domiciled in Ohio.

292. Elisa Pirard resides and is domiciled in California.

293. Emily Grandusky resides and is domiciled in West Virginia.

294. Emily Mollenkopf resides and is domiciled in California.

295. Erica Simpson resides and is domiciled in South Carolina.

296. Eva Barna resides and is domiciled in Georgia.

297. George Nicholas resides and is domiciled in Massachusetts.

298. Haley Huschka resides and is domiciled in Colorado.

299.   Hugh Daly resides and is domiciled in Illinois.

300.   Isabel Rodriguez resides and is domiciled in California.

301.   Isai Valdez resides and is domiciled in Washington.

302.   Jamie Hild resides and is domiciled in Pennsylvania.

303.   Jill Bana resides and is domiciled in Illinois.

304.   Joel Harrell resides and is domiciled in North Carolina.

305.   John Montuori III resides and is domiciled in New Jersey.

306.   Juliana Fuhrmann resides and is domiciled in Illinois.

307.   Kaitan Perez resides and is domiciled in Texas.

308.   Kara Verbsky resides and is domiciled in Colorado.

309.   Karen White resides and is domiciled in Connecticut.

310.   Katielyn Garelik resides and is domiciled in Michigan.

311.   Keith Maravich resides and is domiciled in North Carolina.

312.   Kharma Noel resides and is domiciled in West Virginia.

313.   Kimberly McNaughton resides and is domiciled in Oklahoma.

314.   Kristy Voelker resides and is domiciled in Ohio.

315.   Laura Bowers resides and is domiciled in North Carolina.

316.   Bryan Bowers resides and is domiciled in North Carolina.

317.   Laura Mondrick resides and is domiciled in North Carolina.

318.   Laura L. Squillace resides and is domiciled in North Carolina.

319.   Laura Watson resides and is domiciled in Florida.

320.   Laurie Stapleton resides and is domiciled in Massachusetts.

321.   Lori Rikard resides and is domiciled in Alabama.

322.   Mark Rikard resides and is domiciled in Alabama.

323.   Mackenzie Wray resides and is domiciled in Virginia.

324.   Maggie Otten resides and is domiciled in Iowa.

325.   Maria Ramos resides and is domiciled in Massachusetts.

326.   Mark Kirschner resides and is domiciled in Missouri.

327.   Marla Dupree resides and is domiciled in Texas.

328.   Melanie Vasquez resides and is domiciled in Florida.

329.   Michael Sussman resides and is domiciled in the United States.

330.   Michelle Jones resides and is domiciled in Kentucky.

331.   Nancy Ramos resides and is domiciled in California.

332.   Patricia Julian resides and is domiciled in Illiniois.

333.   Rachael Shepley resides and is domiciled in Illinois.

334.   Rachael Talbot resides and is domiciled in Colorado.

335.   Raelicia Reyes resides and is domiciled in California.

336.   Randee Kirby resides and is domiciled in Tennessee.

337.   Raymond Chace Jr. resides and is domiciled in Maryland.

338.   Robyn Spencer resides and is domiciled in New Jersey.

339.   Rose Shapiro resides and is domiciled in New York.

340.   Roy Shauli resides and is domiciled in California.

341.   Samantha Sauer resides and is domiciled in Wisconsin.

342.   Samay Gheewala resides and is domiciled in Illinois.

343.   Sanford Glovinsky resides and is domiciled in North Carolina.

344.   Brenda Marhall resides and is domiciled in North Carolina.

345.   Sara Higgins resides and is domiciled in Illinois.

346.   Tim Higgins resides and is domiciled in Illinois.

347.   Savannah Dahlquist resides and is domiciled in Virginia.

348.   Savannah Elizabeth Jones resides and is domiciled in Tennessee.

349.   Shannon Denzel-Bartok resides and is domiciled in Minnesota.

350.   Shannon Fern Guyott resides and is domiciled in Michigan.

351.   Shannon Tierney resides and is domiciled in Virginia.

352.   Sonya Robel resides and is domiciled in Washington.

353.   Stacey Tucker resides and is domiciled in Ohio.

354.   Stephanie Dilaveri resides and is domiciled in Kansas.

355.   Stephanie Halczenko resides and is domiciled in Pennsylvania.

356.   Susan Bernstein resides and is domiciled in Florida.

357.   Susan Conlon resides and is domiciled in California.

358.   Teresa Conrad resides and is domiciled in Indiana.

359.   Fred Conrad resides and is domiciled in Indiana.

360.   Tiffany Lynn Paul resides and is domiciled in Arizona.

361.   Tim Dyar resides and is domiciled in South Carolina.

362.   Tracy Huynh resides and is domiciled in Texas.

363.   Veronica Polivanaya resides and is domiciled in California.

B.   *Named Defendants*:

364.   Defendant Live Nation is a Delaware corporation with its principal place of business at 9348 Civic Center Drive, Beverly Hills, Calfornia 90210.

365.   Defendant Ticketmaster is a wholly owned subsidiary of Live Nation and is a limited liability company organized and existing under the laws of Virginia with its principal place of business at 9348 Civic Center Drive, Beverly Hills, California 90210.

366.   Defendant Kroenke Sports & Entertainment, LLC ("KSE") is a limited liability company organized and existing under the laws of the state of Delaware, with its principal place of business in the state of Colorado.  Plaintiffs are informed and believe and on that basis allege that KSE owns SoFi Stadium, one of the venues for the Taylor Swift concert tour that is the subject of this action.

367.   Defendant SoFi Technologies, Inc. ("SoFi") is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in the state of California.  Plaintiffs are informed and believe and on that basis allege that SoFi pays considerable sums to have its names on and to sponsor the stadium and the events held there, and receives substantial benefits from such investment, including from Taylor Swift and other concert ticket sales.

368.   The term "SoFi Stadium" as used hereinafter refers to both KSE and SoFi collectively.

C.   *Fictitiously Named Defendants and Co-Liability*:

369.   Plaintiffs do not know the true identity, nature and capacity of the defendants they name herein as Does 1 through 10, inclusive.  Plaintiffs are informed and believe and based thereon allege that each of these defendants is in some way responsible for the damages and injuries alleged in the complaint. Plaintiffs are further informed and believe and based thereon allege that Does 1 through 10, inclusive, include but are not limited to the following: various persons, firms, corporations, organizations and/or other business entities that have participated as co-conspirators in the conduct, acts, omissions and violations alleged herein as the basis for liability and have performed acts in furtherance of these conspiracies.

370.   Plaintiffs are informed and believe and based thereon allege that, at all times material hereto, each of the defendants was the agent, co-conspirator or alter-ego, and in these or other capacities participated in or had some responsibility for, the acts of each of its codefendants, including both named and Doe defendants, and in doing the things hereinafter alleged was acting within the course and scope of such agency and/or employment, with the permission and consent or at the direction and control of all their codefendants.  As such, unless expressly stated to the contrary, all references to any defendant herein shall be deemed to include each and every other defendant, including Does 1 through 10, inclusive.

FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

A.   *The Ticketmaster/Live Nation Stranglehold*

371.   Ticketmaster is the largest ticketing company and the dominant provider of Primary Ticket Services in the United States.  Published sources as far back as 1993 have cited its annual revenues at over a billion dollars.  *E.g.*, Chicago Tribune, *Microsoft Co-Founder Paul Allen Buys Control of Ticketmaster* (Nov. 23,

1993).  In 2010, after acquiring Front Line Management, a premier artist manager and representation firm, Ticketmaster merged with Live Nation, then the country's largest event promoter, which also managed many major artists.  That elicited an antitrust action by the Justice Department and several states that ended in a July 30, 2010 consent decree, ostensibly to curb the merger's anticompetitive effect.  It hasn't worked.

372.   For many years Ticketmaster has served as the exclusive provider of Primary Ticket Services for concert venues, most owned or controlled by Live Nation.  Published sources pin Ticketmaster's share of the Primary Ticket Market at between 70 and 80 percent.  Such dominance allows it essentially to force music fans and concert venues to use only Ticketmaster for presales and sales of concert tickets, at prices well exceeding what a competitive market would tolerate.

373.   Ticketmaster, including through its TicketExchange, TicketsNow, and TM+ brands, also acts as the exclusive Secondary Ticket Exchange partner for most if not all such venues. As discussed more fully below, as part of the exclusive Secondary Ticket Exchange partnership that Ticketmaster has with these concert venues, Ticketmaster is promoted as the only "official" Secondary Ticket Exchange and refuses to allow any other Secondary Ticket Exchange to integrate technically with the platform by which Ticketmaster sells primary tickets (its "Primary Ticket Platform").  Taylor Swift ticket holders, therefore, may only use Ticketmaster as the sole "authorized" channel through which they may sell or transfer their tickets.

B.   *Taylor Swift's "The Eras" Tour*

374.   A global superstar named "Artist of the Year" by the American Music Awards seven times (five more than any other), Taylor Swift just last month began "The Eras" concert tour, her first since the COVID-19 pandemic made her cancel the "Lover Fest" tour she had scheduled for 2020.  Given Ms. Swift's status as one

-25-

of the most, if not the most, iconic artists in the world, millions of fans attempted to purchase tickets to "The Eras" Tour.

375.   Ms. Swift, herself or through Taylor Swift Management, contracted with Ticketmaster for venues regarding Taylor Swift's "The Eras" Tour.  Based on information and belief, Ticketmaster at all times controlled the registration and access to Taylor Swift's "The Eras" Tour tickets.  It announced registration for a TaylorSwiftTix presale during November 1-9, 2022, purporting to guarantee "leveling the playing field without racing against bots for ticket access."  This announcement also promised preferred access for "Lover Fest" purchasers to participate in this sale as "verified" fans.  For fans to access this sale, they had to register via the same Ticketmaster Account as for their "Lover Fest" purchases.

C.   *Ticketmaster's Scheme with Live Nation, Other Stadiums and Resellers for Concert Tickets Generally*

376.   Based on information and belief, Ticketmaster has made agreements with the stadiums in every location of the Taylor Swift tour, including at SoFi Stadium in Inglewood, California owned by defendant KSE and from which defendant SoFi receives substantial economic benefits from ticket sales.  Such stadiums are the only venues able to hold large concerts.  Because no other venue can hold half as many people as the stadiums and venues working through Ticketmaster, Taylor Swift and other popular musicians have no choice but to work through Ticketmaster.  And because artists like Taylor Swift have to go through Ticketmaster, their fans do as well.  This means virtually all major music concert ticket sales in California and the United States go through Ticketmaster's Primary Ticket Platform.

377.   Ticketmaster has also expanded into the Secondary Ticket Market. For years, scalpers have been a problem in that market. Ticketmaster has stated that it has taken steps to address this issue, but in reality has enabled itself to make additional profit from the scalped tickets.  Ticketmaster forces purchasers of tickets

-26-

from its Primary Ticket Platform to use only Ticketmaster's Secondary Ticket Exchange for the resale of those tickets.  It also has a little-known reseller program by which it authorizes third parties essentially to scalp tickets at inflated prices.  In either case, Ticketmaster then gets the higher fees paid by fans left with no choice but to pay for the "right" to use the Ticketmaster Secondary Ticket Exchange platform or to buy from authorized "resellers."  By such conduct, Ticketmaster has strived and succeeded in removing competition from both the Primary and Secondary Ticket Markets, gaining inflated revenues otherwise unavailable to it. Instead of competition, Ticketmaster has conspired with stadiums to force fans to buy more expensive tickets that Ticketmaster gets additional fees from every time the tickets are resold.

378.   Ticketmaster had violated previously violated the terms of its merger with Live Nation in 2019 after it had retaliated against concert venues that chose ticketing companies other than Ticketmaster. Based on information and belief, Ticketmaster has continued this behavior despite increased judicial scrutiny.

D.   *Defendants' Scheme as to Taylor Swift's "The Eras" Tour*

379.   Based on information and belief, the central components of Ticketmaster's scheme, executed in tandem with its parent Live Nation, are as follows.  First, stadium venues, including SoFi Stadium, contractually require that the resale of concert tickets be effectuated only through Ticketmaster's Secondary Ticket Exchange. These venues have enforced and continue to enforce this requirement, while Ticketmaster continues to allow scalpers to buy up tickets over buyers who actually plan to attend the performance.  Ticketmaster allows transferring tickets but buying tickets this way means a buyer needs to send a ticket reseller money and hope they aren't being scammed and get the ticket.  Because of how risky buying resold tickets outside of Ticketmaster is, Ticketmaster has left itself, via its Secondary Ticket Exchange, as the only real choice for buying tickets previously sold to others.

380.   On November 14, 2022, "verified" fans of the TaylorSwiftTix presale were sent a code, as well as a link via text to the cell phone associated with the Ticketmaster registration.  The text encouraged login via desktop over using a cell phone.  Based on information and belief, however, thousands of "verified" fans were not sent codes or sent codes that did not work.

381.   Based on information and belief, on November 15, 2022, millions of "verified" fans that had received codes were unable to purchase tickets.  This was the result of the excessive distribution of codes and the addition of 14 million non-verified Ticketmaster users that were allowed access to the TaylorSwiftTix presale.

382.   Ticketmaster also offered a presale for Taylor Swift's "The Eras" Tour tickets via email for Capital One cardholders.  The link associated with this sale opened to Ticketmaster.  The same registration was required.  The last six digits of the Capital One cardholder's account would be used as the code to access ticket sales on November 16, 2022, at 2:00 pm local venue time.  Yet, millions of fans waited up to eight hours and but could not purchase tickets as a result of insufficient ticket releases and other issues similar to the prior presale.

383.   Ticketmaster had advertised a general ticket sale to Taylor Swift's "The Eras" tour to begin on November 18, 2022.  It canceled the general sale on November 17, 2022, however, citing insufficient quantity of remaining tickets.

384.   Based on information and belief, Ticketmaster intentionally and purposefully misled ticket purchasers by allowing scalpers and bots access to TaylorSwiftTix presale.  Indeed, it publicly blamed the presale fiasco on what it described as an unanticipated number of bots crashing its platform.

385.   Based on information and belief, Ticketmaster intentionally and purposefully misled TaylorSwiftTix presale ticketholders by providing codes to 1.4 million "verified' fans with the option of purchasing six tickets each to three venue locations. Ticketmaster did not have enough seats to meet the demand this number

SECOND AMENDED [*FIRST AMENDED FEDERAL*] COMPLAINT

of codes would require. Ticketmaster intentionally provided codes when it could not satisfy ticket demand.

386.   Based on information and belief, Ticketmaster intentionally and knowingly partnered with Capital One for presale and advertising tickets. Ticketmaster released less than ten percent of the venues' seating capacity for this sale, resulting in millions denied access to even a single ticket.  Based on information and belief, Ticketmaster intentionally and knowingly allowed scalpers and bots access to this as well as the prior ticket presale.

387.   Based on information and belief, Ticketmaster intentionally scheduled a general sale of tickets knowing it would not have the quantity of tickets needed to effectuate the sale.

388.   Based on information and belief, Ticketmaster allowed tickets to be resold during the TaylorSwiftTix presale.  And Ticketmaster allowed tickets to be resold during the TaylorSwiftTix presale as if the tickets were at face value negotiated by Taylor Swift or Taylor Swift Management, when in fact they were double or triple the negotiated price or more.  (On information and belief, Taylor Swift had arranged for her concert tickets to sell from $49 to $449 each, but good luck getting a ticket for anywhere close to that range today.)  Ticketmaster eagerly allowed this arrangement, as it gets additional fees every time a ticket is resold. And Ticketmaster restricts official resales to its own Secondary Ticket Exchange.

E.   *Other Consequences of Defendants' Scheme for Taylor Swift Fans*

389.   Based on information and belief, Ticketmaster intentionally and knowingly allowed TaylorSwiftTix presale purchasers to purchase VIP tickets knowing that the mailed portion of the VIP package would be voided and never reach the fan.

390.   Based on information and belief, Ticketmaster intentionally and knowingly sold obstructed view tickets without purchasers knowing that the tickets were obstructed.

391.   Based on information and belief, Ticketmaster intentionally, knowingly, and oppressively required signatures on a waiver that the purchaser was not provided adequate time to read, contemplate, or negotiate. This is illustrated in the millions of fans making multiple failed attempts at ticket check-out to finish the purchase because tickets had been removed from their basket without adequate time to check out and purchase tickets.

392.   Based on information and belief, Ticketmaster knowingly and intentionally allowed tickets to be removed from a purchases basket/order before being allowed adequate time to review waiver, release, and complete purchase.

393.   Based on information and belief, Ticketmaster allowed bots and scalpers to remove tickets from a fan's basket without being allowed adequate time to complete the sale.

394.   Based on information and belief, Ticketmaster allowed ADA-compliant seats to be sold without verification of disability or need, thus depriving individuals with disabilities access ADA compliant seats.

395.   The policy and spirit of the California antitrust laws are to promote the free play of competitive market forces and the lower prices to consumers that result. Ticketmaster is the dominant online venue for concert presale, sale, and resale in the United States, has violated the policy, spirit, and letter of those laws by imposing agreements and policies at the retail and wholesale level that have prevented effective price competition across a wide swath of online ticket sales.

396.   Based on information and belief, Ticketmaster claims these agreements and policies improve customer experiences and keep ticket prices down.  This, in spite of the massive number of customer complaints Ticketmaster receives every day, the dramatic increase in ticket prices since Ticketmaster achieved monopoly power, and the excessive service fees Ticketmaster attaches that are far higher than service fees for any similar service in other markets.

Ticketmaster is a monopoly that is only interested in taking every dollar it can from a captive public.

397.   California antitrust laws are concerned with protecting market competition and preventing a single, dominant company from setting overly prices because of its lack of competitors.  Ticketmaster and Live Nation have their own internal anti-competitive arrangement and have allied with other stadiums to entrench their dominance to harm consumers in California and across the U.S.

<u>FIRST CLAIM FOR RELIEF</u>

Breach of Contract

(Against Ticketmaster)

398.   Plaintiffs reallege and incorporate by reference each and every other paragraph of this complaint as if fully set forth here.

A.   *Breach of Contract During the Presale*

399.   Plaintiffs entered into a contract with Ticketmaster on November 15, 2022, setting forth the covenants, conditions and terms of the parties' agreement ("Conract").  The material terms of the Contract include, but are not limited to, the following: Ticketmaster agreed that, in exchange for Plaintiffs purchasing a significant amount of merchandise and/or in exchange for their purchase of the canceled "Lover's Fest" tickets, Plaintiffs would be entitled to participate in the presale of "The Eras" tour tickets.  Only those individuals who satisfied either of these conditions would be allowed into the presale via a code as a "verified" fan.  Plaintiffs relied upon and accepted such terms and conditions, thereby purchasing merchandise and/or otherwise expending funds in connection with the canceled "Lover's Fest" tour.

400.   Plaintiffs have performed all obligations to Ticketmaster except those obligations Plaintiffs were prevented or excused from performing.

401.   Ticketmaster breached the Contract by failing to actually provide the proper presale it promised.  It did not exclude those without codes.  It did not give

out codes to those who qualified.  And it did not give those with codes the fair chance to get a ticket they were entitled to.  Plaintiffs and Ticketmaster had an agreement leading up to the presale that made the Contract and Ticketmaster violated it to Plaintiffs' detriment.

402.   As a direct and proximate result of Ticketmaster's breach of the Contract, Plaintiffs each have sustained damages in the amount of thousands of dollars.

B.   *Breach of Contract After Ticket Purchase*

403.   Plaintiffs entered into a Contract with Ticketmaster on or around November 15, 2022, setting forth the covenants, conditions and terms of the parties' agreement.  In addition to those set forth in subsection A above, the material terms of the Contract include, but are not limited to, the following: In exchange for a stated price, a Plaintiff who completed a purchase online would receive tickets for that price.  However, in breach of that contract, ticket prices increased during Plaintiffs' purchases in breach of the Contract for the purchase of such tickets at a lower stated price.

404.   Plaintiffs paid money to Ticketmaster directly or indirectly through Ticketmaster's secondary market to receive tickets.  By purchasing these tickets, Plaintiffs were buying the ability to see the Taylor Swift "The Eras" tour in a specific location and seat.  Plaintiffs paid money that was good consideration for this Contract.

405.   Plaintiffs performed all obligations to Ticketmaster. They then received tickets from Ticketmaster directly or indirectly.

406.   Ticketmaster breached the Contract by unjustly and unlawfully taking tickets away from certain Plaintiffs weeks and months after purchase.  It also breached by providing tickets at seat locations other than those for which Plaintiffs purchased their tickets, including seats for those with disabilities.  Ticketmaster has given no reason why it took or switched tickets from Plaintiffs' accounts, and

1    many Plaintiffs have not even received a refund or other compensation for their

2    removed or switched tickets.

3        407.   As a direct and proximate result of Ticketmaster's breach of the

4    Contract, Plaintiffs each have sustained damages in the amount of thousands of

5    dollars.

6                        SECOND CLAIM FOR RELIEF

7                                  Fraud

8                          (Against All Defendants)

9        408.   Plaintiffs reallege and incorporate by reference each and every other

10   paragraph of this complaint as if fully set forth here.

11       409.   With the knowing participation of and expectation of benefit by Live

12   Nation, its stadiums and others including SoFi Stadium, Ticketmaster made false

13   representations, promises and statements to Plaintiffs about the presale for Taylor

14   Swift tickets at and before the time of such presale.  More particularly, such

15   misrepresentations and false promises included, among other things, how to and

16   who could get "codes" and/or otherwise establish themselves as "verified" fans,

17   how best to get tickets, and who could participate in the presale.

18       410.   Regarding codes, Ticketmaster made representations it knew were

19   false and promises it had no intention of performing.  Among other things,

20   Ticketmaster claimed that only those with codes would be able to join the presale,

21   but millions of buyers without codes were able to get tickets.  Many of those

22   without codes were scalpers, and Ticketmaster benefited from scalped tickets as

23   they must be resold on Ticketmaster, which gets an additional fee.

24       411.   One of the ways buyers such as Plaintiffs could become "verified"

25   was by spending a certain amount of money on official Taylor Swift merchandise.

26   Ticketmaster made out that spending enough would get a buyer a code and they

27   would have a fair chance to get a ticket. Neither statement was true; Ticketmaster

28   did not give everyone a code that it said was entitled to one.  It arbitrarily denied

                                      -33-

codes, even though many Plaintiffs had paid good money to qualify for a code in reliance on Ticketmaster's promises.  By misleading Plaintiffs, Ticketmaster was able to get Plaintiffs and many other hopeful ticket purchasers to buy merchandise, and Ticketmaster benefitted thereby due to its agreements with the merchandise sellers.

412.   By providing "codes" and describing how fans could become "verified," Ticketmaster led prospective purchasers, including Plaintiffs, to believe that they would have a greater likelihood of acquiring tickets by obtaining a code and/or becoming verified, causing Plaintiffs to part with money in reliance on such promises and representations.  Yet, Ticketmaster failed to disclose that it had sent more codes than it could accommodate with tickets.

413.   Ticketmaster purported to give additional instructions on how to get tickets.  Among other things, it warned buyers, including Plaintiffs, not to use their phones to purchase tickets from its site.  Ticketmaster instead advised using a laptop or desktop computer. However, not only were phone users able to get tickets, they also got them ahead of those on computers.

414.   Ticketmaster made similar promises and representations to buyers of the canceled Taylor Swift "Lover Fest" tour – e.g., that their purchases for that prior tour would advantage them in acquiring tickets for The Eras tour.  By making similar promises to these buyers, which included some Plaintiffs, Ticketmaster was able to appease any issue these buyers and Plaintiffs had with Ticketmaster's handling of the prior tour following its cancelation due to COVID-19.

415.   Ticketmaster further reserved tickets for the Capital One sale, a promotion by which it caused prospective purchasers to believe that participating in that program would increase their chance of getting tickets.  However, the promotion suffered many of the same issues as the presale.  It did not have enough tickets to supply those attempting to purchase through the Capital One program, and did not so inform prospective purchasers before they parted with value to

participate in it.  Nor during the Capital One sale did Ticketmaster limit ticket sales solely to Capital One cardholders.

416.   Ticketmaster made the foregoing representations and promises knowing they were false and without any intent to perform them. Ticketmaster intended to induce Plaintiffs and other buyers to rely on its false representations and promises by taking steps that inured to their detriment but to the benefit of Ticketmaster.

417.   Ticketmaster knew the obstacles it would face in the Taylor Swift presale and the Capital One sale.  Yet, it concealed them from prospective purchasers, including Plaintiffs.  It did so intending that Plaintiffs would participate in these events and part with consideration in reliance on them functioning smoothly and giving Plaintiffs an enhanced likelihood of acquiring tickets when in fact the opposite occurred, as Ticketmaster knew it would.

418.   Plaintiffs reasonably relied upon Ticketmaster's material representations and promises, which Ticketmaster made knowing them to be false and without any intent actually to perform them.  Had Plaintiffs known the true facts, or that Ticketmaster never intended to perform their promises, Plaintiffs would not have parted with the additional consideration that Ticketmaster had led them to believe would give them an advantage in acquiring Taylor Swift tickets.

419.   As a direct and proximate result of Ticketmaster's intentional misrepresentations and false promises, made with the support and expectation of benefit by Live Nation, its stadiums and others including SoFi Stadium, Plaintiffs each have sustained damages in the amount of thousands of dollars.

420.   Ticketmaster made the foregoing false representations and promises, with the support and expectation of benefit by Live Nation, its stadiums and others including SoFi Stadium, intentionally and maliciously to take advantage of Plaintiffs and deprive them of their right to have chosen how to act freely based on information that Ticketmaster should have made available to them truthfully and

completely.  The acts and omissions stated herein thus constitute fraud, oppression and/or malice as defined in California Civil Code section 3294, entitling Plaintiffs to recover, in addition to actual damages, punitive damages adequate in light of their net worth to make an example of and to punish Defendants, in an amount to be proven at trial.

THIRD CLAIM FOR RELIEF

Negligent Misrepresentation

(Against All Defendants)

421.   Plaintiffs reallege and incorporate by reference each and every other paragraph of this complaint as if fully set forth here.

422.   With the participation of and expectation of benefit by Live Nation, its stadiums and others including SoFi Stadium, Ticketmaster made the promises and representations set forth in the Second Claim for Relief above with no reasonable basis to believe their truth and reasonably expecting Plaintiffs to rely upon them by parting with value.

423.   Defendants in fact did cause Plaintiffs to rely on their false promises and representations by parting with value exactly as Defendants had expected, for their own benefit and to the detriment of Plaintiffs, as Plaintiffs did not know the falsity of the promises and representations at the time Defendants made them.

424.   As a direct and proximate result of their justifiable reliance on the false representations and promises made and/or aided and abetted by Defendants, Plaintiffs each suffered damages in the thousands of dollars.

FOURTH CLAIM FOR RELIEF

Negligence

(Against Ticket Master and Live Nation)

425.   Plaintiffs reallege and incorporate by reference each and every other paragraph of this complaint as if fully set forth here.

-36-

**SECOND AMENDED [*FIRST AMENDED FEDERAL*] COMPLAINT**

426.   From the fan's purchase of a ticket through his or her attendance at an event, Ticketmaster and Live Nation dominate the entire concert-going experience in the United States.  They hold themselves out as leaders in their field and claim to provide superior service to all concert-goers starting with their ticket purchases.

427.   Ticketmaster knows well the issues it and legitimate ticket buyers face with bots, scalpers and other unauthorized traffic on its ticket sales platform.  It owes buyers a duty of reasonable care to allow them to use the platform for the purpose for which Ticket master provides it, and for the platform to function properly and not cause unreasonable delay, fail to process user input accurately (or at all) or "crash" altogether.

428.   Since its online ticket sales technology constitutes the essence of its business, Ticketmaster should foresee the need to protect it from bot attacks and other unauthorized uses that impede or prevent its functioning.  Yet, Ticketmaster has failed to use reasonable care and employ the types of tools routinely used by other online sellers which Ticketmaster has the means itself to create or acquire with a capacity robust enough to accommodate the traffic, authorized or not, that Ticketmaster as an online seller of 70-80% of all concert tickets in the marketplace reasonably knows exists on its platform in general and should readily foresee with respect to a major performer such as Taylor Swift in particular who has not toured in years.

429.   Ticketmaster not only has breached its duty of care to maintain its platform adequately for its intended use by ticket buyers, it appears to have ceded that responsibility to third party data security providers such as Amazon by using that vendor's CloudFront product but without expending the sums necessary for a version of that product that has sufficient capacity to deal with the issues that Ticketmaster reasonably should know its platform faces.  Moreover, Ticketmaster has allowed other third parties, such as Klarna and Monetate, to run software on its platform that may impede its functioning and which gathers data behind the scenes

for Ticketmaster to use, sell or otherwise monetize the personal information of ticket purchasers without their knowledge and for the benefit of itself and of its parent Live Nation, both of whom also benefit from the increased ticket prices that its poor performing technology causes users to pay to be done with their frustrating online experience.

430.  As a direct and proximate result of the negligent failure of defendants Ticketmaster and Live Nation to use reasonable care in their interaction with them as prospective Taylor Swift concert ticket purchasers, Plaintiffs each have suffered economic damages in the thousands of dollars, as well as noneconomic damages for pain, suffering, loss of time, emotional distress and invasion of privacy, among other things, in amounts subject to proof at trial.

<u>FIFTH CLAIM FOR RELIEF</u>

Antitrust Violations

(Against All Defendants)

431.  Plaintiffs reallege and incorporate by reference each and every other paragraph of this complaint as if fully set forth here.

432.  Ticketmaster, including in collusion with SoFi Stadium and its own parent, Live Nation, has coordinated efforts to foreclose competition in the Primary Ticket Market and the Secondary Ticket Market, in violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq*.  Ticketmaster and Live Nation have been able to accomplish this violation, including with SoFi Stadium, because of the individual and collective market power that they wield over the sale of Taylor Swift tickets through their Primary Ticket Platform and Secondary Ticket Exchange.

433.  As set forth in greater detail below, Ticketmaster and Live Nation together conduct themselves as a "trust" defined in Cal. Bus. & Prof. Code § 16720 and made illegal by § 16726, and involve therein third parties such as SoFi Stadium that agree to participate in their illegal activities.  Ticketmaster requires

venues, and those such as SoFi Stadium agree, to use Ticketmaster's Primary Ticket Platform exclusively for the initial sale of concert tickets, and did so specifically as to such tickets for Taylor Swift's The Eras tour.  Ticketmaster then forces ticket holders to use Ticketmaster as their exclusive provider of Secondary Ticket Exchange services from which it derives additional revenue. Ticketmaster's practices have achieved and will achieve no legitimate efficiency benefits to counterbalance their demonstrated anticompetitive effects, including the foreclosure of competition in the Primary and Secondary Ticket Services Market and the unjust enrichment of Ticketmaster, Live Nation and their stadium co-conspirators, including SoFi Stadium.

A.    *First Antitrust Claim: Unlawful Tying*

434.   Plaintiffs reallege and incorporate by reference each and every other paragraph of this complaint as if fully set forth here.

435.   Ticketmaster's conduct in foreclosing competition in the Secondary Ticket Services Market for Taylor Swift tickets constitutes an illegal tying arrangement in violation of Cal. Bus. & Prof. Code § 16727. A tying arrangement is a conditional selling dependent on the purchase of another product or service.

436.   The Primary Ticket Market and the Secondary Ticket Market are distinct and separate markets. Taylor Swift and other touring musician tickets sold in the Primary Ticket Market and Secondary Ticket Market are distinct products.

437.   Ticketmaster possesses substantial market power over the sale of Taylor Swift and other touring musician tickets in the Primary Ticket Market.  For those seeking to purchase primary Taylor Swift tickets, there is no other option but to make these purchases through Ticketmaster's Primary Ticket Platform, at the price set by Ticketmaster, and on Ticketmaster's terms.

438.   Ticketmaster and all the venues part of Taylor Swift's upcoming tour, including SoFi Stadium and those owned or controlled by Live Nation, have agreed to and do mandate that all Taylor Swift tickets sold in the Primary Ticket

Market are not resold in the Secondary Ticket Market other than through Ticketmaster's Secondary Ticket Exchange. Ticketmaster has actually canceled or threatened to cancel tickets in other cases unless ticket holders agree to use Ticketmaster exclusively for Secondary Ticket Exchange services. Ticketmaster has also previously revoked or threatened to revoke its continued sale of primary tickets to season ticket holders who are identified as reselling their primary tickets through any Secondary Ticket Exchange provider other than Ticketmaster. Thus, Ticketmaster is tying the sale of Taylor Swift tickets sold in the Primary Market to Ticketmaster's Secondary Ticket Exchange services for the resale of Taylor Swift tickets. As a result of this tying arrangement, Taylor Swift ticket holders, who would otherwise prefer the Secondary Ticket Exchange services of providers other than Ticketmaster, including those offered by StubHub, SeatGeek and the like, have been forced to use Ticketmaster for Secondary Ticket Exchange services.

439.   This tying arrangement – which has been reinforced and strengthened by the exclusive marketing, promotion, and integration of Ticketmaster for Secondary Ticket Exchange services by the concert venues, including those owned or controlled by Live Nation as well as SoFi Stadium – has substantially foreclosed other Secondary Ticket Exchange providers from competing in the Secondary Ticket Market, thereby affecting a not insubstantial volume of commerce.  It has harmed and will continue to harm competition in that market by forcing Taylor Swift ticket buyers and sellers in the Secondary Ticket Market to pay artificially high prices and fees and by reducing the quantity and quality of secondary Taylor Swift tickets available for sale and actually sold in the Secondary Ticket Market.

440.   Ticketmaster also created a tying arrangement regarding the presale of tickets for Taylor Swift's "The Eras" tour in the Primary Ticket Market.  So that potential buyers could purchase tickets during the presale, they needed to have "verified" Taylor Swift fan status.  Buyers could prove such credentials by having tickets to Taylor Swift's prior tour, "Lover Fest", which was canceled due to

COVID-19. The other way to obtain verification was for a buyer to buy a non-insignificant amount of Taylor Swift merchandise. There was no cost-free way for a buyer to become verified, purchase of additional, separate items was required to be "verified". Once verified, a buyer would be given a code. This code was supposed to be the only way to buy tickets during the presale.

441.   On the day of the presale, it became clear that getting tickets during the presale would be the only real way to get tickets from the Primary Ticket Market.  Without engaging in the tying arrangement Ticketmaster had with the prior tour or the merchandise, it would have been impossible for non-verified buyers to get tickets.  With 1.4 million codes allowing a buyer to get up to 6 tickets, there were not going to be any tickets left after the pre-sale.  Even if the sale of Taylor Swift tickets had gone as planned, buyers were being forced to pay additional fees just to have the chance of buying tickets.

442.   There are no legitimate business justifications or efficiencies for either of Ticketmaster's tying arrangements that counterbalance their demonstrated anticompetitive effects.  This tying arrangement constitutes a violation Cal. Bus. & Prof. Code, §§ 16720, 16727.  Under California law, this is a per se violation. *People v. Nat'l Ass'n of Realtors*, 155 Cal. App. 3d 578, 583 (1984 ) ("Tying arrangements are illegal per se 'whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product' … and when 'a total amount of … business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie ....'") (citations omitted).

443.   As a direct and proximate result of Defendants' illegal tying arrangements, Plaintiffs have been and will continue to be injured in their property in an amount not presently known with precision, but which is, at minimum, thousands of dollars per Plaintiff before mandatory trebling.

444.    Pursuant to Bus. & Prof. Code § 16750(a), Plaintiffs have the right to recover the fees of their attorneys they reasonably incur in this action, according to proof, as well as interest on their actual damages at the statutory rate, and to preliminary and permanent injunctive relief to stop Defendants' unlawful conduct.

445.    Defendants' illegal tying arrangements violate obligations to Plaintiffs not arising from contract and constitute willful misconduct that is fraudulent, oppressive and/or malicious so as to entitle Plaintiffs, in addition to trebled actual damages, punitive damages to make an example of and to punish Defendants in an amount to be proven at trial.

B.    *Second Antitrust Claim: Exclusive Dealings*

446.    Plaintiffs reallege and incorporate by reference each and every other paragraph of this complaint as if fully set forth here.

447.    Ticketmaster's conduct has allowed it to control the supply of tickets to music concerts. In order for artists like Taylor Swift to sell to buyers wanting to see them in concert, the buyers and artists must go through Ticketmaster. This has forced both groups into exclusive dealings with Ticketmaster that lessen competition as well as created and strengthened Ticketmaster's monopolistic power, which violates California law. See Cal. Bus. & Prof. Code, § 16727.

448.    Ticketmaster has dominant, monopolistic power in the market of Primary and Secondary Ticket Markets. Ticketmaster currently controls between 70 and 80 percent of this market, according to published sources. Ticketmaster's high market share as well as its agreements with concert venues have given it extreme power. While a small percentage of concert venues use other providers, for most Californians and Americans, Ticketmaster is the only provider available.

449.    Ticketmaster's forced exclusive dealings, and the willing complicity therein by venues such as SoFi Stadium, have allowed it to charge above-market prices and excessive fees while preventing competition against them. In markets without a singular, monopolistic company, charging prices and fees like

Ticketmaster would be impossible. And Ticketmaster does not do anything to justify these higher costs. Ticketmaster's service is not superior or reliable; the massive disaster of the Taylor Swift presale is evidence enough of this. Ticketmaster does not charge high prices to give a better service, it charges higher prices because it has no real competition and wants to take every dollar it can from buyers.

450.   The foreclosure of competition has led to increased prices and/or decreased output and has harmed competition.

451.   There is no legitimate business justification or efficiency gained for these exclusive dealings. All it does it take money from the hands of artists and buyers and into the hands of Ticketmaster, a purely anticompetitive effect that is actionable under California law. See *Gianelli Distributing Co. v. Beck & Co.*, 172 Cal. App. 3d 1020 (1985). As a result, Plaintiffs have been and will continue to be injured in their property.

452.   As a direct and proximate result of Defendants' illegal exclusive dealing arrangements, Plaintiffs have been and will continue to be injured in their property in an amount not presently known with precision, but which is, at minimum, thousands of dollars per Plaintiff before mandatory trebling.

453.   Pursuant to Bus. & Prof. Code § 16750(a), Plaintiffs have the right to recover the fees of their attorneys they reasonably incur in this action, according to proof, as well as interest on their actual damages at the statutory rate, and to preliminary and permanent injunctive relief to stop Defendants' unlawful conduct.

454.   Defendants' illegal exclusive dealing arrangements violate obligations to Plaintiffs not arising from contract and constitute willful misconduct that is fraudulent, oppressive and/or malicious so as to entitle Plaintiffs, in addition to trebled actual damages, punitive damages to make an example of and to punish Defendants in an amount to be proven at trial.

C.    *Third Antitrust Claim: Price Discrimination*

455.   Plaintiffs reallege and incorporate by reference each and every other paragraph of this complaint as if fully set forth here.

456.   Ticketmaster's conduct in changing pricing during sales on its Primary Ticket Platform and manipulation of its Secondary Ticket Market for Taylor Swift tickets constitutes price discrimination in violation of Cal. Bus. & Prof. Code, § 17031. See *Harris v. Capitol Records Distributing Corp.*, 64 Cal.2d 454 (1966). Price discrimination involves giving different prices to different buyers the sane or comparable goods in the same location.

457.   Not all concert tickets are of equal value. Different venues may vary in general admission prices, groups of seats vary in desirability, and some tickets come with VIP benefits.  However, seats that have about the same view of the musician, at the same venue, and with the same amount of VIP benefits are essentially equal in value and should sell at a similar price.

458.   Under Ticketmaster's dynamic pricing scheme, comparable tickets were sold at radically different prices. Dynamic pricing is when Ticketmaster raises the prices of tickets as more tickets are selling, justifying it as the tickets are more in demand and, and are thus more valuable. Taylor Swift did not opt for dynamic pricing, but Ticketmaster implemented it anyways.

459.   Ticketmaster justifies this pricing as meeting demand. However, this argument is nonsensical.  Ticketmaster does not raise prices when a large number of people are in a waiting queue to buy tickets, it only raises ticket prices as fewer tickets remain.  Rather than "meeting demand," Ticketmaster arbitrarily punishes the people that were unable to get to the front of the line.  Those who buy tickets under dynamic pricing are paying higher prices solely because Ticketmaster has created the flimsiest of excuses to justify anticompetitively taking additional money for itself.

460.   Ticketmaster's behavior has not been to the benefit of honest buyers, but to the benefit of scalpers. Ticketmaster failed to stop millions of people without codes from buying during the presale, many of whom were scalpers. And Ticketmaster benefits from scalpers. Ticketmaster gets additional fees every time a ticket is resold, and Ticketmaster is the only place where tickets can be officially resold. Ticketmaster also prevents sellers from charging below a certain price. Ticketmaster has set up a system where scalping is not only allowed, but tacitly encouraged. And Ticketmaster is able to do all of this because of its monopoly power. As a result of Ticketmaster's behavior, Plaintiffs have been and will continue to be injured in their property.

461.   As a direct and proximate result of Defendants' illegal price discrimination, Plaintiffs have been and will continue to be injured in their property in an amount not presently known with precision, but which is, at minimum, thousands of dollars per Plaintiff before mandatory trebling.

462.   Pursuant to Bus. & Prof. Code § 16750(a), Plaintiffs have the right to recover the fees of their attorneys they reasonably incur in this action, according to proof, as well as interest on their actual damages at the statutory rate, and to preliminary and permanent injunctive relief to stop Defendants' unlawful conduct.

463.   Defendants' illegal price discrimination arrangements violate obligations to Plaintiffs not arising from contract and constitute willful misconduct that is fraudulent, oppressive and/or malicious so as to entitle Plaintiffs, in addition to trebled actual damages, punitive damages to make an example of and to punish Defendants in an amount to be proven at trial.

D.   *Fourth Antitrust Claim: Price Fixing*

464.   Plaintiffs reallege and incorporate by reference each and every other paragraph of this complaint as if fully set forth here.

465.   Ticketmaster's conduct of allying with scalpers and venues has amounted to price fixing.  Horizontal price fixing involves competitors allying to

set one price for any product, commodity, or service through any agreement to raise, stabilize or otherwise affect prices.  This agreement does not need to be formalized.

466.   This agreement has allowed Ticketmaster to raise prices above what it would be able to otherwise.  Because Ticketmaster has competitors like SeatGeek charge ticket prices at the same cost as Ticketmaster, it prevents buyers from being able to find a cheaper alternative.  The only way prices could stay this high for both Ticketmaster and its competitors is through an agreement between them in violation of California antitrust laws.

467.   Ticketmaster has also committed vertical price fixing.  Vertical price fixing makes any agreement between a buyer and seller regarding the price at which the buyer resells a product illegal.  Under California law, this is a per se violation of the Cartwright Act.  *Mailand v. Burckle*, 20 Cal. 3d 376 (Cal. 1978).

468.   Ticketmaster has controlled the resale of tickets bought through it.  Ticketmaster forces buyers to resell on its platform. And Ticketmaster controls what prices the buyer can resell at.  This prevents the price of tickets from falling and forces new buyers to pay higher prices under dynamic prices.  If Ticketmaster did not do this, it might decrease the number of people willing to pay for the monopolistic priced dynamic pricing tickets.

469.   As a direct and proximate result of Defendants' illegal price fixing, Plaintiffs have been and will continue to be injured in their property in an amount not presently known with precision, but which is, at minimum, thousands of dollars per Plaintiff before mandatory trebling.

470.   Pursuant to Bus. & Prof. Code § 16750(a), Plaintiffs have the right to recover the fees of their attorneys they reasonably incur in this action, according to proof, as well as interest on their actual damages at the statutory rate, and to preliminary and permanent injunctive relief to stop Defendants' unlawful conduct.

471.   Defendants' illegal price fixing arrangements violate obligations to Plaintiffs not arising from contract and constitute willful misconduct that is fraudulent, oppressive and/or malicious so as to entitle Plaintiffs, in addition to trebled actual damages, punitive damages to make an example of and to punish Defendants in an amount to be proven at trial.

E.   *Fifth Antitrust Claim: Group Boycotting*

472.   Plaintiffs reallege and incorporate by reference each and every other paragraph of this complaint as if fully set forth here.

473.   Ticketmaster and Live Nation also must adhere to the agreement it reached with the Justice Department, forbidding it from threatening concert venues with losing access to its tours if those venues decided to use ticketing providers other than Ticketmaster.  This agreement has been extended to 2025.  Despite this agreement, Ticketmaster and Live Nation, in collusion with other stadiums including SoFi Stadium. have continued to engage in group boycotting, where competitors ally together to boycott any specific entity.

474.   Ticketmaster has engaged in a group boycott with competitors like SeatGeek in its relevant market to refuse to conduct business with any competitor that does not conform to Ticketmaster's demands. Ticketmaster does this through its monopolistic size and power as well as its collusion with concert venues. Any competitor of Ticketmaster that does conform to its demands will be barred from doing business with most if not all large concert venues. This has been done to both inflate prices and prevent new competitors from entering the market, all to Ticketmaster's benefit.

475.   The Ticketmaster-led group boycotting is a violation of California law and has helped keep ticket prices at an above-market price. It also has allowed Ticketmaster to force Plaintiffs to buy tickets at these inflated prices to Plaintiffs' harm, and as a result, Plaintiffs have been and will continue to be injured in their property.

476.   As a direct and proximate result of Defendants' illegal group boycotting, Plaintiffs have been and will continue to be injured in their property in an amount not presently known with precision, but which is, at minimum, thousands of dollars per Plaintiff before mandatory trebling.

477.   Pursuant to Bus. & Prof. Code § 16750(a), Plaintiffs have the right to recover the fees of their attorneys they reasonably incur in this action, according to proof, as well as interest on their actual damages at the statutory rate, and to preliminary and permanent injunctive relief to stop Defendants' unlawful conduct.

478.   Defendants' illegal group boycotting arrangements violate obligations to Plaintiffs not arising from contract and constitute willful misconduct that is fraudulent, oppressive and/or malicious so as to entitle Plaintiffs, in addition to trebled actual damages, punitive damages to make an example of and to punish Defendants in an amount to be proven at trial.

F.   *Sixth Antitrust Claim: Market Division Scheme*

479.   Plaintiffs reallege and incorporate by reference each and every other paragraph of this complaint as if fully set forth here.

480.   Ticketmaster, in collusion with its parent Live Nation as well as stadiums not owned by Live Nation, including SoFi Stadium, has engaged in a market division scheme, by which it has divided customers into certain regions with its competitors.  This violates California antitrust law.

481.   Ticketmaster has monopoly power, but it still has smaller competitors. It has specifically carved out small territories to give to competitors like SeatGeek in an attempt to hide the level of monopolistic power and control Ticketmaster has. In exchange for giving SeatGeek territory, Ticketmaster has made SeatGeek set price tickets at the same high price as Ticketmaster. This allows these competitors to set high prices and not actually compete with each other.

482.   There are no pro-competitive benefits to this arrangement. This arrangement has effectively ended competition in this market and has allowed

Ticketmaster to unilaterally set prices. Buyers have no choice in who they buy tickets from and are forced to pay monopolistic pricing set by Ticketmaster.

483.    Ticketmaster has carved up the market by territory to keep prices high. This has allowed them to continue their monopolistic control and pricing, and as a result, Plaintiffs have been and will continue to be injured in their property.

484.    As a direct and proximate result of Defendants' illegal market division scheme, Plaintiffs have been and will continue to be injured in their property in an amount not presently known with precision, but which is, at minimum, thousands of dollars per Plaintiff before mandatory trebling.

485.    Pursuant to Bus. & Prof. Code § 16750(a), Plaintiffs have the right to recover the fees of their attorneys they reasonably incur in this action, according to proof, as well as interest on their actual damages at the statutory rate, and to preliminary and permanent injunctive relief to stop Defendants' unlawful conduct.

486.    Defendants' illegal market division scheme violates obligations to Plaintiffs not arising from contract and constitute willful misconduct that is fraudulent, oppressive and/or malicious so as to entitle Plaintiffs, in addition to trebled actual damages, punitive damages to make an example of and to punish Defendants in an amount to be proven at trial.

<u>SIXTH CLAIM FOR RELIEF</u>

Violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.*

(Against All Defendants)

487.    Plaintiffs reallege and incorporate by reference each and every other paragraph of this complaint as if fully set forth here.

488.    Ticketmaster in collusion with its parent Live Nation as well as stadiums not owned by Live Nation, including SoFi Stadium, has used additional unfair practices to make it difficult for ticket holders to sell their tickets on competitive Secondary Ticket Exchanges. Ticketmaster has done this by leveraging its position as a dominant provider of Primary Ticket Services.

489.   As found by the Department of Justice, Ticketmaster has historically dominated the market for Primary Ticket Services.  It has maintained its control over this business by entering into numerous multi-year, exclusive contracts with leagues, teams, managers and venues. Indeed, Ticketmaster's market power in the Primary Ticket Market is evidenced by the high fees that it has charged and continues to charge for Primary Ticket Services – fees that are substantially higher than fees charged by competitors for the same services.

490.   Moreover, Ticketmaster's power in the market for Primary Ticket Services is buttressed by high barriers to entry and expansion in this business, including barriers created by Ticketmaster's threats to enforce its multi-year, exclusive agreements. Ticketmaster has, for example, threatened action against StubHub, a much smaller competitor, for even approaching Ticketmaster business partners with offers to sell additional, unsold ticket inventory, claiming that such overtures would constitute tortious interference with Ticketmaster's exclusive contracts.  Specifically, Ticketmaster cautioned StubHub that: "It has come to our attention that StubHub is approaching Ticketmaster clients seeking to sell our client's primary tickets.  As is well known in the industry. . . Ticketmaster's client ticketing contracts are generally exclusive and therefore contain contractual commitments by our clients not to sell primary tickets through any third-party." Ticketmaster has likewise imposed contractual restrictions in its Primary Ticket Services contracts that preclude teams, leagues, venues and other parties from distributing any of their tickets through actual or perceived competitors.

491.   Specifically, and among other things, Ticketmaster has exercised its dominance in Primary Ticket Services by delaying the delivery of the electronic copy of the originally purchased, primary ticket or the barcode associated with that ticket to the primary ticket purchaser.  Ticketmaster has chosen to delay the delivery of PDF images or barcodes associated with original, primary tickets for

-50-

numerous musical concerts until weeks or months after the ticket was purchased and only a few days before the relevant event.

492.   This practice makes it extremely difficult for a primary ticket purchaser to resell his or her ticket on competitive non-Ticketmaster Secondary Ticket Exchanges.  Indeed, the delaying of the delivery of these tickets or bar codes effectively bars the reseller from selling that ticket on such competitive exchanges.  This is because ticket purchasers are reluctant to purchase a ticket on a Secondary Ticket Exchange from a stranger (with no brand recognition) in the hope that the reseller will transfer the tickets weeks or months after a secondary ticket purchase occurs.

493.   Of course, Ticketmaster facilitates secondary purchases on its own Secondary Ticket Exchange even before delivering the primary ticket to the reseller: it guarantees that it will directly deliver the ticket to the secondary purchaser at a designated delivery time, likely a few days before the event, if a secondary transaction is made.  StubHub and other competitors for Secondary Ticket Services cannot provide this same direct delivery guarantee because Ticketmaster prevents them from electronically integrating with its Primary Ticket Platform.  This practice of delaying delivery of primary tickets has caused ticket holders to incur consumer harm and has caused competitive foreclosure to other Secondary Ticket Exchanges.

494.   Another tactic in which Ticketmaster has engaged to leverage its dominance in the market for Primary Ticket Services is its increased issuance of so-called paperless tickets.  These virtual tickets allow entry to the event only upon showing at the gate picture identification and the credit card used for the purchase. Transferring or reselling these tickets is only possible through Ticketmaster's Secondary Ticket Exchange.  According to the independent American Antitrust Institute, "[i]nstead of benefiting consumers, the trend favoring paperless tickets

appears to be motivated by a desire of the dominant primary ticket provider to block out competition in the secondary ticket (resale) market."

495.   These practices are unlawful business acts or practices within the meaning of California's Unfair Competition Law, Bus/ & Prof. Code §§ 17200 et seq. ("UCL").

496.   Ticketmaster also has made deceptive and/or false statements intended to mislead consumers about the reliability of other Secondary Ticket Exchange, the authenticity of Taylor Swift tickets sold on other Secondary Ticket Exchange, and the ability of purchasers to obtain secondary Taylor Swift tickets from sources other than Ticketmaster.

497.   Such unlawful, unfair, and deceptive practices are ongoing and continue to date and should be enjoined by this Court.

498.   Ticketmaster's unlawful, unfair, and deceptive business practices have caused Plaintiffs to part with value in an amount not presently known with precision, but which is, at minimum, in the thousands of dollars per plaintiff, to which each is entitled to restitution.

PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment in their favor as follows:

1.   On the First Claim for Relief, for damages according to proof, in amounts reaching thousands of dollars per plaintiff.

2.   On the Second Claim for Relief:

 a.   For damages according to proof, in amounts reaching thousands of dollars per plaintiff; and

 b.   For punitive damages adequate in light of Defendants' adequate net worth to make an example of and to punish them, in an amount to be proven at trial.

3.   On the Third Claim for Relief, for damages according to proof, in amounts reaching thousands of dollars per plaintiff.

4.   <u>On the Fourth Claim for Relief</u>:

    a.   For economic damages according to proof, in amounts reaching thousands of dollars per plaintiff; and

    b.   For noneconomic damages to each plaintiff according to proof.

5.   <u>On the Fifth Claim for Relief</u>:

    a.   For actual damages according to proof, in amounts reaching thousands of dollars per plaintiff;

    b.   For mandatory trebling of each plaintiff's actual damages;

    c.   For interest on the actual damages of each plaintiff at the statutory rate;

    d.   For the fees of their attorneys reasonably incurred herein, according to proof;

    e.   For injunctive relief prohibiting further acts by Defendants in restraint of trade, including such mandatory injunctions as may reasonably be necessary to restore and preserve fair competition, and by disgorging ill-gotten gains arising from its anticompetitive acts; according to proof; and

    f.   For punitive damages adequate in light of Defendants' net worth adequate to make an example of and to punish them, in an amount to be proven at trial.

6.   <u>On the Sixth Claim for Relief</u>:

    a.   For restitution to Plaintiffs, according to proof, in amounts reaching thousands of dollars per plaintiff; and

    b.   For injunctive relief prohibiting further unlawful, unfair or fraudulent business acts or practices by Defendants, according to proof.

7.   <u>On all causes of action</u>:

    a.   For costs of suit; and

SECOND AMENDED [*FIRST AMENDED FEDERAL*] COMPLAINT

1            b.      For such other and further relief as the Court may deem just and

2    proper.

3

4    DATED:  April 6, 2023               ___/s/ John Genga_____

5                                       John M. Genga
     GENGA & ASSOCIATES, P.C.

6                                       Attorneys for Plaintiffs
     JULIE BARFUSS *et al.*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-54-

1

<u>DEMAND FOR JURY TRIAL</u>

2

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs

3

hereby demand trial by jury on all issues so triable.

4

5

DATED:  April 6, 2023          ___/s/ John Genga_____

6

John M. Genga
GENGA & ASSOCIATES, P.C.

7

Attorneys for Plaintiffs
JULIE BARFUSS *et al.*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SECOND AMENDED [*FIRST AMENDED FEDERAL*] COMPLAINT**