# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 23-1114-GW-KKx | | Date | May 14, 2025 |
|---|---|---|---|---|
| Title | *Julie Barfuss, et al. v. Live Nation Entertainment, Inc., et al.* | | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | None Present | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

**PROCEEDINGS:** **IN CHAMBERS - TENTATIVE RULINGS ON DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT [138]; DEFENDANT STADCO LA, LLC'S MOTION TO DISMISS PLAINTIFFS' CLAIMS AGAINST DEFENDANT PURSUANT TO RULE 12(B)(6) [154]; and DEFENDANTS' MOTION FOR SANCTIONS [140]**

Attached hereto is the Court's Tentative Rulings on the above-entitled Motions [138, 154], set for hearing on May 15, 2025 at 8:30 a.m.

| | : | |
|---|---|---|
| | Initials of Preparer | JG |

***Julie Barfuss et al v. Live Nation Entertainment, Inc. et al***; Case No. 2:23-cv-01114-GW-(DTBx) Tentative Rulings on: (1) Ticketmaster's and Live Nation's Motion to Dismiss the Third Amended Complaint, (2) Ticketmaster's and Live Nation's Motion to Compel Arbitration, (3) Ticketmaster's and Live Nation's Motion for Sanctions, (4) StadCo's Motion to Dismiss, and (5) StadCo's Motion to Compel Arbitration

Before the Court are Ticketmaster's and Live Nation's Motion to Dismiss ("MTD #1," Docket No. 138) and StadCo's Motion to Dismiss ("MTD #2," Docket No. 154).[1][2]  The Court has considered the Motions as well as Plaintiffs' opposition briefs and Defendants' reply briefs.  For the reasons stated herein, the Court would **GRANT** the Motions with leave to amend in part, with the exception that the Court will entertain further argument on the negligence claim at the hearing.

---

[1] Ticketmaster's and Live Nation's Motion to Compel Arbitration ("Motion to Compel #1," Docket No. 139), and StadCo's Motion to Compel Arbitration ("Motion to Compel #2," Docket No. 154), have been withdrawn.  *See* Docket Nos. 159, 160.

In their Motions to Compel Arbitration, Defendants argued that even if the Court were to find that Plaintiffs have stated a viable claim for relief, the claims of five of the 355 Plaintiffs (Clay Murray, Heather Slack, Eleana Villa, Elmer Bunger, and Virginia Spielman) ("The JAMS Plaintiffs") fail for the additional reason that they agreed to arbitrate all disputes at JAMS.  *See* Motion to Compel #1 at 1; Motion to Compel #2 at 3.

Plaintiffs responded by asserting that this was a misunderstanding based on the email addresses used by the JAMS Plaintiffs; Defendants were under the mistaken impression that the JAMS Plaintiffs had not signed the New Era ADR Terms of Use when attempting to purchase Taylor Swift tickets because they did so with a different email address. Motion to Compel #1 Opp., Docket No. 151 at 2.  Each of the five Plaintiffs put forth a declaration, attesting to this email discrepancy.  *See* Docket No. 151-1.

Defendants subsequently withdrew their Motions to Compel Arbitration.  *See* Docket Nos. 159, 160.

[2] Ticketmaster and Live Nation's Motion for Sanctions, *see* Docket No. 140, has been rendered moot.

Ticketmaster and Live Nation moved for sanctions against Plaintiffs on the grounds that their core allegations regarding the sale and resale of tickets for Taylor Swift's "The Eras" Tour were "objectively baseless," and counsel "failed to make a reasonable inquiry into the facts underlying their allegations."  *See* Motion for Sanctions at 1. Ticketmaster and Live Nation asserted that Plaintiffs' claims were based on three false premises that Plaintiffs knew to be false: "(1) that there was no cost-free way to register for Ticketmaster's Verified Fan program for The Eras Tour; (2) that all registrants for the program were guaranteed a code to participate in the onsale; and (3) that Ticketmaster was the sole authorized channel for the resale of tickets to the tour."  *Id.*  Ticketmaster and Live Nation contend, citing to multiple websites substantiating their claims, that "(1) registration for the Verified Fan program was completely free; (2) registrants were specifically advised that registration did not guarantee access to the onsale; and (3) Ticketmaster, unlike its competitors in secondary ticketing, did not host resale listings for United States stops of The Eras Tour."  *Id.*

In response, Plaintiffs made three admissions: (1) "The TAC does not allege as fact that there was no cost-free way to become a Verified Fan for The Eras Tour," *see* Sanctions Opp., Docket No 153 at 7 (internal quotation marks omitted); (2) "The TAC does not allege as fact that all Verified Fans were guaranteed a code to participate in the Eras Tour sale," *id.* at 8 (internal quotation marks omitted); and (3) "The TAC does not allege as fact that Ticketmaster was the sole authorized channel for the resale of tickets to The Eras Tour," *id.* (internal quotation marks omitted).

Accepting these "binding judicial admissions that none of the challenged statements are 'allege[d] as fact,'" Ticketmaster and Live Nation concluded that the Motion for Sanctions was "moot."  *See* Sanctions Reply, Docket No. 162 at 3.  For that reason, the Court will not consider the Motion for Sanctions.

I.    **Background**

Julie Barfuss along with 49 other individuals initiated this action against Live Nation Entertainment, Inc. ("Live Nation") and Ticketmaster L.L.C. ("Ticketmaster") (collectively, "Defendants") in the Superior Court of California, County of Los Angeles, on December 5, 2022. Barfuss et al. ("Plaintiffs") filed a First Amended Complaint ("FAC") on December 14, 2022, *see* Docket No. 1-1, a Second Amended Complaint ("SAC") on April 6, 2023, *see* Docket No. 44, and a Third Amended Complaint ("TAC") on January 27, 2025, *see* Docket No. 128.[3]  The TAC brings six causes of action for: (1) breach of contract; (2) fraud; (3) negligent misrepresentation; (4) negligence; (5) antitrust violations (unlawful tying, exclusive dealings, price discrimination, price fixing, group boycotting, and a market division scheme); and (6) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq.[4]  *See* TAC ¶¶ 396-496.  It seeks unspecified damages (including actual damages, punitive damages, and treble damages), injunctive relief, civil penalties, attorneys' fees, and other forms of relief.  *See id.*  The Court's review of the TAC reveals the following allegations.[5]

Ticketmaster, in conjunction with its parent company, Live Nation, and stadium owners like StadCo, engage in anticompetitive conduct to force fans to use Ticketmaster for presales, general sales, and secondary sales, charging "prices that exceed what a competitive market would dictate." TAC ¶ 1.  Leveraging Live Nation's relationship with concert venues around the country, Ticketmaster controls between 70 and 80% of the primary ticketing market for such venues.  *Id.* ¶ 370.  Venues also promote Ticketmaster as the only "official" secondary ticketing exchange, giving Ticketmaster a significant advantage in the secondary ticketing market, where it promotes scalpers in order to increase the fees it earns.  *Id.* ¶¶ 371, 375.

In November 2022, Plaintiffs were victims of the "well-publicized ticket presale disaster" for Taylor Swift's "The Eras" Tour.  *Id.* ¶ 3.  There were two presales through which Plaintiffs experienced injury: the TaylorSwiftTix presale, for which fans were required to register with

---

[3] There are now 355 named Plaintiffs involved in the action.

[4] The TAC adds StadCo LA, LLC ("StadCo"), which "owns and operates SoFi Stadium," *see* TAC ¶ 366, as the third named Defendant.  Plaintiffs later limited the claims it seeks to bring against StadCo.  *See* Notice of Dismissal of Certain Claims, Docket No. 150.

[5] The well-pled facts therein are accepted as true for the purpose of this ruling.  *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001).

Ticketmaster's Verified Fan program, and the Capital One presale, which was limited to Capital One cardholders. *Id.* ¶¶ 378, 380. Ticketmaster, which "at all times controlled the registration and access to Taylor Swift's 'The Eras' Tour tickets," engaged in several acts that harmed Plaintiffs. *Id.* ¶ 373. Ticketmaster (1) "intentionally and purposefully misled ticket purchasers by allowing scalpers and bots access to TaylorSwiftTix presale," resulting in verified fans and Capital One cardholders being promised presale codes that did not come or receiving codes that did not work and ultimately not receiving tickets, *see id.* ¶¶ 378-85, (2) "intentionally and knowingly allowed TaylorSwiftTix presale purchasers to purchase VIP tickets knowing that the mailed portion of the VIP package would be voided and never reach the fan," *id.* ¶ 387; (3) "intentionally and knowingly sold obstructed view tickets without purchasers knowing that the tickets were obstructed," *id.* ¶ 388; (4) provided tickets at seat locations other than those for which Plaintiffs purchased their tickets, *id.* ¶ 404; (5) "knowingly and intentionally allowed tickets to be removed from a purchaser's order" by bots and scalpers without giving purchasers "adequate time to review waivers and releases and complete their purchases," *id.* ¶¶ 390-91; and (6) sold "ADA-compliant seats… without verification of disability or need," *id.* ¶ 392.

Before the Court are Ticketmaster and Live Nation's Motion to Dismiss and StadCo's Motion to Dismiss.

## II.    <u>Legal Standard</u>

Under Federal Rule of Civil Procedure 12(b)(6), a party may bring a motion to dismiss for failure to state a claim upon which relief can be granted. Rule 12(b)(6) must be read in conjunction with Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that a pleader is entitled to relief," in order to give the defendant "fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Under Rule 12(b)(6), the court must: (1) construe the complaint in the light most favorable to the plaintiff, and (2) accept all well-pleaded factual allegations as true, as well as all reasonable inferences to be drawn from them. *See Sprewell*, 266 F.3d at 988; *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998). In its consideration of the motion, the court is limited to the allegations on the face of the complaint (including documents attached thereto), matters which are properly judicially noticeable, and "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v.*

*Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001). Dismissal pursuant to Rule 12(b)(6) is proper only where there is either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988); *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121-22 (9th Cir. 2008); *see also Twombly*, 550 U.S. at 561-63 (dismissal for failure to state a claim does not require the appearance, beyond a doubt, that the plaintiff can prove "no set of facts" in support of its claim that would entitle it to relief).

Under Rule 9(b), a party "alleging fraud or mistake ... must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy Rule 9(b)'s particularity requirement, the complaint must include "an account of the 'time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations.'" *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (quoting *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004)). In other words, the pleading "must 'identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false.'" *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013) (quoting *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011)). However, "intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); *see also Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993) (explaining that Rule 9(b)'s heightened pleading standard may be relaxed when the allegations of fraud relate to matters particularly within the opposing party's knowledge, such that a plaintiff cannot be expected to have personal knowledge).

Under Federal Rule of Civil Procedure 15(a)(2), federal courts are instructed to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a). A district court, however, may in its discretion deny leave to amend "due to 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment.'" *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

### III.    **Discussion**

Ticketmaster and Live Nation seek to dismiss the TAC in its entirety without leave to amend.  They argue that Plaintiffs fail to plausibly allege (1) a breach of contract; (2) fraud or negligent misrepresentation; (3) negligence; (4) any antitrust violation; or (5) a UCL claim.  *See generally* MTD #1.  StadCo seeks to dismiss all claims Plaintiffs bring against it, arguing that Plaintiffs have failed to allege any involvement of StadCo, let alone an antitrust or UCL violation. *See generally* MTD #2.

1. Breach of Contract

"To allege a cause of action for breach of contract, a plaintiff must allege, (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff."  *Bushell v. JPMorgan Chase Bank, N.A.*, 220 Cal. App. 4th 915, 921 (2013) (internal quotation marks and citation omitted).  Defendants assert that Plaintiffs fail to plead a contract with the required specificity and do not plausibly allege any breach.  MTD # 1 at 7.

Plaintiffs allege two breach of contract theories, one before ticket purchase and one after. TAC ¶¶ 397-405.  Regarding the first, Plaintiffs allege that each of them entered into a contract with Ticketmaster on November 15, 2022, in which "Ticketmaster agreed that, in exchange for Plaintiffs purchasing a significant amount of merchandise and/or in exchange for their purchase of the canceled 'Lover's Fest' tickets, Plaintiffs would be entitled to participate [as a verified fan] in the presale of 'The Eras' tour tickets."  *Id.* ¶ 397.  Plaintiffs claim that Ticketmaster breached the contract by failing to provide a "proper presale," in that it "did not exclude those without codes," "did not give out codes to those who qualified," and "did not give those with codes the fair chance to get a ticket they were entitled to."  *Id.* ¶ 399.  Regarding the second contract claim, Plaintiffs allege that as part of the same November 15, 2022 contract, Ticketmaster agreed to provide tickets when purchased at an agreed-upon price.  *Id.* ¶ 401.  Plaintiffs allege that Ticketmaster breached this contract when it took tickets away from certain Plaintiffs weeks and months after purchase, increased prices during Plaintiffs' purchases, provided seats at locations different from the seats purchased, and provided no refund or other compensation.  *Id.* ¶¶ 401, 404.

In order to plead the existence of a contract, the complaint, at a minimum, "must identify the specific provision of the contract allegedly breached by the defendant."  *Donohue v. Apple, Inc.*, 871 F. Supp. 2d 913, 930 (N.D. Cal. 2012) (citation omitted); *DeLeon v. Wells Fargo Bank,*

*N.A.*, 5:10-cv-01390-LHK, 2011 WL 311376, at *10 (N.D. Cal. Jan. 28, 2011) (plaintiff must allege sufficient facts "to allow the Court to draw a reasonable inference that [there was a] definite promise, supported by consideration, that would establish a binding and enforceable contract"). Defendants argue that because Plaintiffs failed to attach the alleged contract to the TAC or plead its essential terms with particularity, the breach of contract claims should be dismissed.[6]  In their Motion to Dismiss, Defendants sought to clarify whether Plaintiffs were referring to the Verified Fan Terms or to some other agreement.  *See* MTD #1 at 8.  Plaintiffs do not clarify what document they are referring to and argue that it is not necessary for them to provide the contract as long as the Court can "generally… discern… what material obligation of the contract the defendant allegedly breached," *see* MTD #1 Opp. (citing *Albert's Organics, Inc. v. Holzman*, 445 F. Supp. 3d 463, 476 (N.D. Cal. 2020), and that they have made the terms of the agreement clear.

The Court finds that at this point, Plaintiffs have failed to allege with the requisite particularity the existence of a contract.  There are many issues with Plaintiffs' breach of contract theory.  Firstly, Plaintiffs have suggested that the alleged contract contained certain terms (though those terms are often only vaguely described), but they have not stated from where these terms were derived, even after Defendants demonstrated this lack of clarity in their Motion to Dismiss. *See* MTD Opp. #1 at 4-5.  The Court is left without a clear impression of how Plaintiffs were presented with the alleged contract, leading to confusion about what its terms truly were.[7] Furthermore, regarding the first contract theory (that before ticket purchase), Plaintiffs' allegation that "Ticketmaster agreed that, in exchange for Plaintiffs purchasing a significant amount of merchandise and/or in exchange for their purchase of the canceled 'Lover's Fest' tickets, Plaintiffs would be entitled to participate [as a verified fan] in the presale of 'The Eras' tour tickets," TAC ¶ 397, appears to conflict with their Sanctions Opposition, which states that Plaintiffs "[do] not allege as fact that there was no cost-free way to become a Verified Fan for The Eras Tour" and "[do] not in any way suggest 'that all Verified Fans were guaranteed a code to participate in' the Eras Tour sale," Sanctions Opp. at 7-8.  If the contract Plaintiffs reference is the Verified Fan

---

[6] For the purposes of the Breach of Contract section, the Court will refer to Ticketmaster and Live Nation collectively as "Defendants," as Plaintiffs have not alleged that StadCo is liable for breach of contract.  *See generally* TAC.

[7] Defendants raised the possibility that the contract is the Verified Fan Terms, *see* MTD #1 at 8, but Plaintiffs did not respond to this open question.

Terms, which are incorporated by reference in the TAC,[8] it appears that those terms also directly contradict Plaintiffs' allegations. *See* Docket No. 138-3 ("A PURCHASE OR PAYMENT OF ANY KIND WILL NOT INCREASE YOUR CHANCES OF GETTING AN ACCESS CODE."). Particularly considering the seeming contradiction, more specificity from Plaintiffs in terms of what Defendants represented is required. The Court is currently left to guess not only what form the contract took and how the parties agreed to it, but also what its terms truly were. *See A.B. Concrete Coating Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 491 F. Supp. 3d 727, 736 (E.D. Cal. 2020) ("[T]he contract's nature or purpose cannot be discerned from plaintiff's minimal factual allegations.").[9] The Motion to Dismiss is thus **GRANTED** with regard to the breach of contract claim with leave to amend.

>        2.    Fraud and Negligent Misrepresentation

"The essential elements of a count for intentional misrepresentation are (1) a misrepresentation, (2) knowledge of falsity, (3) intent to induce reliance, (4) actual and justifiable reliance, and (5) resulting damage." *Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 230-31 (2013). "The essential elements of a count for negligent misrepresentation are the same except that it does not require knowledge of falsity but instead requires a misrepresentation of fact by a person who has no reasonable grounds for believing it to be true." *Id.* at 231. Federal Rule of Civil Procedure 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). This heightened pleading standard applies to both fraud claims and negligent misrepresentation claims if specific allegations of fraud are made. *See Cambridge Lane, LLC v. J-M Mfg. Co., Inc.*, No. 2:10-cv-06638-GW-MAR, 2020 WL 8410437, at \*7 (C.D. Cal. May 14, 2020). The pleading "must 'identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly

---

[8] "Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Plaintiffs did not object to its incorporation.

[9] The Court would note that the second contract theory (that after ticket purchase) appears more plausible but still suffers from a lack of clarity around what form the contract took, how the parties agreed to it, and whether its alleged terms conflict with judicially noticeable material. Furthermore, Defendants raised the point that Plaintiffs state inconsistent theories when they claim that all Plaintiffs were harmed when they did *not* secure tickets but also that all Plaintiffs were harmed when they *did* secure tickets on terms allegedly different from those promised. *See* MTD #1 at 8. Plaintiffs have not responded to this argument but may do so at the hearing.

fraudulent statement, and why it is false.'" *Salameh*, 726 F.3d at 1133 (quoting *United States ex rel. Cafasso.*, 637 F.3d at 1055).

Plaintiffs cite *Walling v. Beverly Enters.*, 476 F.2d 393, 397 (9th Cir. 1973) for the contention that a pleading suffices under Rule 9(b) if it identifies "the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." MTD Opp. at 6. Plaintiffs claim to meet this standard, highlighting five allegations (1) "Ticketmaster made out that spending enough would get a buyer a code and they would have a fair chance to get a ticket," TAC ¶ 409; (2) "Ticketmaster made it appear as if only those with codes would be able to join the presale, but millions of buyers without codes were able to get tickets," *id.* ¶ 408; (3) "[Ticketmaster] warned buyers, including Plaintiffs, not to use their phones to purchase tickets from its site… [and] instead advised using a laptop or desktop computer," *id.* ¶ 411; (4) Ticketmaster promised and represented "to buyers of the canceled Taylor Swift 'Lover Fest' tour… that their purchases for that prior tour would advantage them in acquiring tickets for The Eras tour," *id.* ¶ 412; and (5) "[Ticketmaster] caused prospective purchasers to believe that participating in [the Capital One] program would increase their chance of getting tickets," *id.* ¶ 413.

Defendants argue that the alleged "untruths" fail under 9(b) because they lack detail, are contradicted by the Verified Fan Terms or Plaintiffs' Opposition to Defendants' Motion for Sanctions, or are immaterial.[10]    Defendants assert that "Plaintiffs' fraud and negligent misrepresentation claims boil down to Plaintiffs' insistence that they were led to believe—by somebody, via some statement or statements, located somewhere on Ticketmaster's website, that some or all of them saw at some time 'before … or on November 15, 2022'—that the onsale for The Eras Tour would somehow go differently than Plaintiffs now think it did." MTD #1 Reply at 7 (citing MTD #1 Opp. at 7).

While *Walling*, on which Plaintiffs rely, focuses on the ability of the defendant to "prepare an adequate answer from the allegations," subsequent Ninth Circuit cases have more fulsomely defined what this requires. In *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986), the Ninth Circuit held: "We have interpreted Rule 9(b) to mean that the

---

[10] For the purposes of the Fraud and Negligent Misrepresentation section, the Court will refer to Ticketmaster and Live Nation collectively as "Defendants," as Plaintiffs have not alleged that StadCo is liable fraud or negligent misrepresentation. *See* Notice of Dismissal of Certain Claims, Docket No. 150.

pleader must state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." Later cases have built upon this standard. *See Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004) (dismissing as insufficient under 9(b) a complaint that described the time and place of purportedly fraudulent legal notices but "contain[ed] not a word of the notices' specific contents" and failed to "attach the notices to [the] complaint"); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126 (9th Cir. 2009) (dismissing as insufficient under 9(b) a complaint in part because nowhere did the plaintiff "specify what the [allegedly fraudulent] television advertisements or other sales material specifically stated"); *see also Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 668 (9th Cir. 2019) ("[T]he pleading must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false.") (internal quotation marks omitted).

In their opposition, Plaintiffs refer to seven statements that they claim were fraudulent, *see* MTD #1 Opp. at 6-7; due to the overlapping nature of these statements, the Court has simplified the alleged fraudulent statements to the five listed above. Once again, there are multiple issues with Plaintiffs claims. Firstly, while the Plaintiffs state in their opposition that the misrepresentations appeared on Ticketmaster's website, *see* MTD #1 Opp. at 7, there appears to be no mention of this in the TAC, *see generally* TAC. If indeed the alleged misrepresentations were on the website, Plaintiffs should describe where on the website they were and how they came into contact with the statements. Furthermore, regarding the content of the alleged misrepresentations, Statements 1, 2, and 4 appear to be directly contradicted by the Verified Fan Terms and Plaintiffs' admissions in their Sanctions Opp. As Plaintiffs have stated that (1) "The TAC does not allege as fact that there was no cost-free way to become a Verified Fan for The Eras Tour," *see* Opposition to Motion for Sanctions at 7 (internal quotation marks omitted); and (2) "The TAC does not allege as fact that all Verified Fans were guaranteed a code to participate in the Eras Tour sale," *id.* at 8 (internal quotation marks omitted), and the Verified Fan Terms stated "A PURCHASE OR PAYMENT OF ANY KIND WILL NOT INCREASE YOUR CHANCES OF GETTING AN ACCESS CODE," *see* Docket No. 138-3 at 3, it is not clear to the Court how Plaintiffs were misled by Defendants to believe otherwise. Particularly considering the seeming contradiction, more specificity from Plaintiffs in terms of what Defendants represented and how it made them believe something that was false, is required. *See Edwards*, 356 F.3d at 1066

(dismissing as insufficient under 9(b) a complaint that "contain[ed] not a word of the notices' specific contents" and failed to "attach the notices to [the] complaint").  The third and fifth alleged misrepresentations are also lacking for additional reasons.  Regarding the third, it is not clear to the Court why Defendants' advice regarding procuring tickets on a smartphone versus a computer is material or constitutes a misrepresentation; furthermore, more detail is required under 9(b) to substantiate such allegations.[11]  Regarding the fifth, it is not clear to the Court that participation in the Capital One sale did not increase Plaintiffs chances of getting tickets.  The Motion to Dismiss is thus **GRANTED** with regard to the fraud and negligent misrepresentation claims with leave to amend.

The Court recommends to Plaintiffs that, in amending their fraud claims, they clearly separate out each alleged misrepresentation, followed (or joined) immediately by the "who, what, when, where and how" details that *must* accompany the allegation,[12] along with an explanation for how the statement/representation was misleading/false when made.

3.  Negligence

To establish negligence, Plaintiffs must plausibly allege: (1) a legal duty of care owed by the defendant to the plaintiff, (2) a breach of that duty, (3) causation linking the breach to the plaintiff's injury, and (4) actual damages.  *Ladd v. Cnty. of San Mateo*, 12 Cal. 4th 913, 917 (1996).  A legal duty of care "means the duty to use ordinary care in activities from which harm to the plaintiff might reasonably be anticipated."  *Pirozzi v. Apple Inc.*, 913 F. Supp. 2d 840, 851 (N.D. Cal. 2012) (citing 6 Witkin, Summary of Cal. Law, Torts § 835, p. 53 (10th ed. 2005)).

The TAC alleges that "Ticketmaster has failed to use reasonable care" in that it neglects to "employ the types of tools routinely used by other [similar] online [ticket] sellers… to accommodate the traffic" on its site.  TAC ¶ 426.  Plaintiffs explain that Ticketmaster has "ceded" the responsibility to "maintain its platform adequately" to "data security providers such as Amazon by using [their] CloudFront product," but has purchased a lower-grade version of the product that does not have "sufficient capacity to deal with the issues that Ticketmaster reasonably should know

---

[11] That some phone users may have procured tickets before some computer users does not necessarily even suggest that using a phone was a more effective method of procuring tickets.

[12] In brief, the Court agrees with Defendant that those details are not sufficiently pled thus far, and that neither Defendant nor the Court should have to examine "the context" of Plaintiff's allegations to make educated guesses at those details.

its platform faces." *Id.* ¶ 427.  They further claim that "Ticketmaster has allowed other third parties, such as Klarna and Monetate, to run software on its platform that may impede its functioning." *Id.*  These issues cause "unreasonable delay," lead to "unauthorized traffic" on the platform," and lead to "fail[ures] [in] process[ing] user input accurately (or at all)." *Id.* ¶ 425.

Defendants attack only the duty element.[13]  They assert that "as a matter of law, Ticketmaster does not owe any legal duty to Plaintiffs to ensure that a high-demand onsale like The Eras Tour (or any onsale) will be free from a third party's illicit attempt to attack the platform, or to ensure that third parties properly run their software on the platform." MTD # 1 at 11.

Plaintiffs assert a theory based in contract, citing *N. Am. Chem. Co. v. Superior Ct.*, 59 Cal. App. 4th 764, 766 (1997) for the proposition that "[a] contract to perform services gives rise to a duty of care that requires that such services be performed in a competent and reasonable manner... [and] [a] negligent failure to do so may be both a breach of contract and a tort."  As Plaintiffs have failed to adequately plead the existence of a contract, this theory fails.[14]  To the extent Plaintiffs are asserting the duty arises from elsewhere, they should say so.

Furthermore, while it is generally true, as Ticketmaster and Live Nation point out, that "owes no duty to control the conduct of another, nor to warn those endangered by such conduct," *Regents of Univ. of California v. Superior Ct.*, 4 Cal. 5th 607, 619 (2018), "[t]he no-duty-to-protect rule is not absolute." *Brown v. USA Taekwondo*, 11 Cal. 5th 204, 215 (2021).  "In a case involving harm caused by a third party, a person may have an affirmative duty to protect the victim of another's harm if that person is in what the law calls a 'special relationship' with either the victim or the person who created the harm." *Id.*  "[A] special relationship between the defendant and the dangerous third party is one that 'entails an ability to control [the third party's] conduct.'" *Id.* at 216.  Because "[t]he existence of such a special relationship puts the defendant in a unique position to protect the plaintiff from injury… The law requires the defendant to use this position accordingly." *Id.*  Still, even if an exception to the no-duty-to-protect rule is found, the Court must then "weigh[] the *Rowland* factors to see if a duty should be imposed." *Jackson v. Airbnb, Inc.*,

---

[13] For the purposes of the negligence section, the Court will refer to Ticketmaster and Live Nation collectively as "Defendants," as Plaintiffs have not alleged that StadCo is liable negligence.  *See generally* TAC.

[14] Defendants also assert that a person "'may not ordinarily recover in tort for the breach of duties that merely restate contractual obligations.'"  MTD #1 Reply at 8 (citing *Aas v. Superior Ct.*, 24 Cal. 4th 627, 643 (2000)).

639 F. Supp. 3d 994, 1006 (C.D. Cal. 2022) (citing *Brown*, 11 Cal. 5th at 212-13).[15]

Here, Plaintiffs have alleged that Ticketmaster has the ability to control scalpers through third-party security providers, but it has opted to "ally" with scalpers instead because it "gets additional fees every time a ticket is resold, and Ticketmaster is the only place where tickets can be 'officially' resold." TAC ¶¶ 458, 463. Further, they have alleged that Ticketmaster controls other third parties, such as Klarna and Monetate, and allows them "to run software on its platform that may impede its functioning." *Id.* at 427. Still, Plaintiffs have made no attempt to argue that such a special relationship exists or that the *Rowland* factors are satisfied. Given this, the Court will allow further argument on this point at the hearing should Plaintiffs believe they can triumph on this argument.

        4. <u>Antitrust Violations</u>

Plaintiffs allege that "Ticketmaster, including in collusion with SoFi Stadium and its own parent, Live Nation, has coordinated efforts to foreclose competition in the Primary Ticket Market and the Secondary Ticket Market, in violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 et seq." TAC ¶ 430. Plaintiffs put forth six antitrust theories: (1) unlawful tying; (2) exclusive dealing; (3) price discrimination;[16] (4) price fixing; (5) group boycotting; and (6) a market division scheme.

The Cartwright Act "generally outlaws any combinations or agreements which restrain trade or competition or which fix or control prices ... and declares that, with certain exceptions, every trust is unlawful, against public policy and void." *In re Cipro Cases I & II*, 61 Cal. 4th 116, 136 (2015) (quoting *Pac. Gas & Elec. Co. v. Cnty. of Stanislaus*, 16 Cal. 4th 1143, 1147 (1997) (internal citations omitted)). "The analysis under California's antitrust law mirrors the analysis

---

[15] The *Rowland* factors are "a means for deciding whether to limit a duty derived from other sources." *Brown*, 11 Cal. 5th at 217. Such considerations include:

> the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.

*Id.*

[16] This is the only antitrust theory under which Plaintiffs do not claim that StadCo should also be found liable. *See* Notice of Dismissal of Certain Claims, Docket No. 150. Plaintiffs allege that all Defendants are liable under all of the other theories.

under federal law because the Cartwright Act ... was modeled after the Sherman Act." *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001); *see also Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000) ("Our disposition of [the plaintiff's] Sherman Act claims disposes of its claims under the California Cartwright Act. The Cartwright Act is patterned after the Sherman Act, and 'federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act.'" (quoting *Marin Cnty. Bd. of Realtors, Inc. v. Palsson*, 16 Cal. 3d 920, 925 (1976)).

Ticketmaster and Live Nation argue that Plaintiffs' antitrust claims fail for the threshold reason that Plaintiffs "do not even purport to define any relevant antitrust market" and that each of Plaintiffs' theories also fails because Plaintiffs have not pled essential elements. *See* MTD #1 at 12. StadCo makes many similar arguments and also asserts that Plaintiffs have failed to make "any substantive allegations against StadCo." *See* MTD #2 at 7-8.[17]

### a. Market Definition

"In order to state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power within a 'relevant market.' That is, the plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008). Still, "[t]here is no requirement that these elements of the antitrust claim be pled with specificity... [and] [a]n antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect." *Id.* "Allegations of a relevant market and market power generally pass the test at the pleading stage unless the market definition is 'facially unsustainable.'" *Biddle v. Walt Disney Co.*, 696 F. Supp. 3d 865, 882 (N.D. Cal. 2023) (citing *Newcal*, 513 F.3d at 1045).

In *Newcal*, the Ninth Circuit stated the relevant market: (i) must be "a product market," not one defined by consumers; (ii) must encompass the product as well as "all economic substitutes for the product"; and (iii) may include a submarket if it is "economically distinct from the general product market." *Newcal*, 513 F.3d at 1045. Submarkets are identified by indicia like "industry or public recognition of the submarket as a separate economic entity, the product's peculiar

---

[17] The Court would note at the outset that the allegations against StadCo are generally threadbare. For instance, Plaintiffs fail to even allege that any particular plaintiff attempted to or actually purchased a ticket to see the Eras Tour at SoFi Stadium. *See* MTD #2 at 7; MTD #2 Opp. at 3-4. As discussed more fulsomely herein, Plaintiffs allegations, particularly in regard to StadCo, will need to be bolstered if their antitrust claims are to go forward.

characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity
to price changes, and specialized vendors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325
(1962). "Defining the relevant market requires identifying those competitors who have the actual
or potential ability to deprive each other of significant levels of business… [but] [t]he process of
defining the relevant market is [generally] a factual inquiry for the jury." *High Tech. Careers v.
San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993).

 Market power may be demonstrated through two types of proof: (1) "direct evidence of the
injurious exercise of market power [such as] evidence of restricted output and supracompetitive
prices," or (2) "circumstantial evidence" showing that "the defendant owns a dominant share of
the market" and "there are significant barriers to entry." *Rebel Oil Co. v. Atl. Richfield Co.*, 51
F.3d 1421, 1434 (9th Cir. 1995). A showing that the defendant has a market share of greater than
65% typically is sufficient to "establish a prima facie case of market power." *Image Tech. Servs.,
Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997). "Numerous cases hold that a
market share of less than 50 percent is presumptively insufficient to establish market power," but
"[w]hen the claim involves attempted monopolization, most cases hold that a market share of 30
percent is presumptively insufficient to establish the power to control price." *See Rebel Oil Co.*,
51 F.3d at 1438 (finding that a defendant's "market share of 44 percent is sufficient as a matter of
law to support a finding of market power, if entry barriers are high and competitors are unable to
expand their output in response to supracompetitive pricing."). "There is no authority which
suggests that antitrust plaintiffs must explain in their complaints how they calculated market
share… [and] [c]ourts have repeatedly held that a rough estimation of the defendant's market
share, with no explanation of how that estimation was made, is sufficient at the pleading stage."
*Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 778 (N.D. Cal. 2022).

 Ticketmaster and Live Nation argue that Plaintiffs' market definitions for Primary Ticket
Market and Secondary Ticket Market both fail because the customer base is not defined, the
territory is not defined, whether primary and secondary tickets are substitutes for one another is
not clear, and market power is boldly stated with no factual support. *See* MTD #1 at 12-14.
Plaintiffs argue that they have "describe[d] a nationwide market for primary and secondary large
concert ticket sales, and Defendants' power in and acts to stifle competition in that market," citing
large swaths of the TAC. MTD #1 Opp. at 10. They further allude to *United States et al v. Live
Nation Entertainment, Inc. et al*, Case No. 1:24-cv-03973-AS (S.D.N.Y.), a similar antitrust action

brought by the United States Department of Justice ("DOJ") and Attorneys General from 39 states
and the District of Columbia against Defendants in the United States District Court for the
Southern District of New York (the "Public Enforcer Action"), in which they claim the market
definitions are similar. *Id.*

Plaintiffs allege in the TAC that "Ticketmaster and Live Nation have undertaken…
anticompetitive conduct for the purpose of obtaining sales, resales, service and other fees and
profits that they could not earn in a competitive market for either initial or secondary ticket sales."
TAC ¶ 2. Plaintiffs assert that, based on several published sources, Ticketmaster controls 70-80%
of the Primary Ticket Market, *id.* ¶ 370, in part through exclusive agreements with venues, *see id.*
¶ 431, and it uses this dominance to "essentially force[] purchasers of tickets from its Primary
Ticket Platform to use only Ticketmaster's Secondary Ticket Exchange for the resale of those
tickets," *see id.* ¶¶ 375, 377, allowing Ticketmaster to dominate the secondary market as well.
Plaintiffs assert that the Primary Ticket Market and Secondary Ticket Market are national, *see,*
*e.g., id.* ¶ 446, that they are distinct and separate products, *see, e.g., id.* ¶ 434, and it appears clear
throughout that the customer base is made up of fans.

Defendants claim that the TAC does not address many of these issues, but it appears to do
just that. Furthermore, because "[t]he process of defining the relevant market is [generally] a
factual inquiry for the jury," *High Tech. Careers*, 996 F.2d at 990, and "a rough estimation of the
defendant's market share, with no explanation of how that estimation was made, is sufficient at
the pleading stage," *Klein*, 580 F. Supp. 3d at 778, at this time, the Court will not require more
from the Plaintiffs in terms of market definition.

### b. Tying Claim

"A tying arrangement is a device used by a seller with market power in one product market
to extend its market power to a distinct product market … [by] condition[ing] the sale of one
product (the tying product) on the buyer's purchase of a second product (the tied product)."
*Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 912 (9th Cir. 2008). The Supreme Court has
held that "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation
of its control over the tying product to force the buyer into the purchase of a tied product that the
buyer either did not want at all, or might have preferred to purchase elsewhere on different terms
[because] [w]hen such 'forcing' is present, competition on the merits in the market for the tied
item is restrained and the Sherman Act is violated." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466

U.S. 2, 12 (1984), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).

Plaintiffs allege two distinct tying arrangements. Regarding the first, Plaintiffs allege that "Ticketmaster is tying the sale of Taylor Swift tickets sold in the Primary Market to Ticketmaster's Secondary Ticket Exchange services for the resale of Taylor Swift tickets." TAC ¶ 436. Regarding the second, Plaintiffs allege that "Ticketmaster also created a tying arrangement regarding the presale of tickets for Taylor Swift's 'The Eras' tour in the Primary Ticket Market" by tying "Verified Fan Status" to the purchase of merchandise or a Lover Fest ticket. *Id.* ¶ 438-39.

Ticketmaster and Live Nation assert that the first tie fails because it is premised on an "implausible single-brand market limited to 'Taylor Swift tickets,'" and there is no "forced imposition of a second product," as no one was "forced to resell their Taylor Swift primary tickets at all." MTD #1 at 15. Furthermore, Plaintiffs admit that "[t]he TAC does not allege as fact that Ticketmaster was the sole authorized channel for the resale of tickets to The Eras Tour." Sanctions Opp. at 8 (internal quotation marks omitted). Ticketmaster and Live Nation allege that the second tie fails because the alleged tying product market is incoherent, verified fan status is not a product, and no purchase was necessary to receive an access code.[18] MTD #1 at 15-16. StadCo adds that the tying claims against StadCo fail because the claims do not allege that StadCo was involved in either alleged tie.

Plaintiffs fail to substantively respond to Ticketmaster and Live Nation's arguments. The Court finds that regarding the first tie, even if Plaintiffs were to expand the market beyond simply Taylor Swift tickets, there appears to be no forced purchase of a second product, as Plaintiffs have conceded, defeating the tie. Regarding the second tie, the tying product market is ill-defined and verified fan status does not appear to be a product for the purposes of a tying claim. The Motions to Dismiss are thus **GRANTED** with regard to both tying claims without leave to amend.

### c. Exclusive Dealing Claim

Exclusive dealing is a business practice whereby a supplier of a good contracts with a distributor to sell its products on an exclusive basis and to refrain from handling the products of rival suppliers. *See Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997).

---

[18] Plaintiffs later conceded that no purchase was required to receive an access code. *See* Sanctions Opp. at 7 (internal quotation marks omitted) ("The TAC does not allege as fact that there was no cost-free way to become a Verified Fan for The Eras Tour.").

"The main antitrust objection to exclusive dealing is its tendency to 'foreclose' existing competitors or new entrants from competition in the covered portion of the relevant market during the term of the agreement." *Id.*  Because there are "well-recognized economic benefits to exclusive dealing arrangements, including the enhancement of interbrand competition," *id.*, "California courts have determined that vertical restraints of trade, including exclusive dealing contracts, are not per se unreasonable but instead are subject to a 'rule of reason' analysis," *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1000 (9th Cir. 2008).  An exclusive dealing contract is proscribed when it is "probable that performance of the contract will foreclose competition in a substantial share of the affected line of commerce."  *Id.* (internal quotation marks and citations omitted).

Plaintiffs appear to allege that Defendants are guilty of exclusive dealing because "both [fans and artists] have agreed to virtually exclusive dealings with Ticketmaster that have lessened competition as well as created and strengthened Ticketmaster's monopolistic power, which violates California law."  TAC ¶ 445.  They assert that such exclusive dealings "and the willing complicity therein by venues such as SoFi Stadium, have allowed it and them to charge above-market prices and excessive fees."  *Id.* ¶ 447.  Ticketmaster and Live Nation argue that Plaintiffs vague allegations are not sufficient, even at the pleading stage, and that they do not have standing to make such an argument in any case.  MTD #1 at 16.  StadCo adds that Plaintiffs have failed to clarify the market and which parties have been foreclosed from entering it.  MTD #2 at 11.  Plaintiffs respond to the standing argument, but they make no effort to clarify why they have alleged enough specific facts to avoid dismissal.  *See* MTD Opp. #1 at 11-12.  While this Court has already found antitrust standing to be satisfied under similar circumstances, *see Skot Heckman et al v. Live Nation Entertainment, Inc. et al*, Case No. 2:22-cv-00047-GW-GJS, Docket No. 314, the Court would agree with Ticketmaster and Live Nation that, as the allegations stand, it is not clear what agreement gives rise to the exclusive dealing claim.  While Plaintiffs reference elsewhere in their brief the "numerous multi-year, exclusive contracts with leagues, teams, managers and venues" that Ticketmaster has entered into, TAC ¶ 487, those do not appear to be the agreements at the heart of the exclusive dealing claim, as they are not mentioned in that section of the TAC.  It is not clear to the Court what agreements between Ticketmaster and artists and fans the TAC is referring to.  Furthermore, if Plaintiffs are referring to an exclusive ticketing agreement simply between StadCo and Ticketmaster, that is unlikely to amount to an antitrust violation.  *See*

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961) ("In practical application, even though a contract is found to be an exclusive-dealing arrangement, it does not violate the section unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected."); *see also Omega Env't, Inc.*, 127 F.3d at 1162. The Motions to Dismiss are thus **GRANTED** with regard to the exclusive dealing claim with leave to amend.

### d. Price Discrimination Claim

California Business & Professions Code § 17031 defines locality discrimination as

> discrimination between different sections, communities or cities or portions thereof, or between different locations in such sections, communities, cities or portions thereof in this State, by selling or furnishing an article or product, at a lower price in one section, community or city, or any portion thereof, or in one location in such section, community, or city or any portion thereof, than in another.

Cal. Bus. & Prof. Code § 17031.

The TAC alleges that Ticketmaster breached this provision when it charged fans significantly different prices for "seats that have about the same view of the musician, at the same venue, and with the same amount of VIP benefits." TAC ¶ 455. Plaintiffs assert that it is unlawful for Plaintiffs to raise prices "as fewer tickets remain," *id.* ¶ 457, and that its behavior benefits scalpers who resell the tickets for significant profits, *id.* ¶ 458.

Ticketmaster and Live Nation argue that the statute is wholly unapplicable as "it has nothing to do with dynamic online ticket pricing," MTD #1 at 18, and simply "bars discrimination in sales to different geographic locations," *id.* (quoting *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1104 (9th Cir. 1999)). The Court agrees with Ticketmaster and Live Nation that this statute was not intended to protect consumers from the harm alleged here, and Plaintiffs have cited to no case in which this statute was applied in a similar fashion. Ticketmaster's and Live Nation's Motion to Dismiss is **GRANTED** with regard to the price discrimination claim without leave to amend.

### e. Price Fixing Claim

"Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988). Both horizontal and vertical "price-fixing agreements are unlawful on their face." *Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 342 (1982). "The aim and result of every

price-fixing agreement, if effective, is the elimination of one form of competition… [and] [t]he power to fix prices, whether reasonably exercised or not, involves power to control the market and to fix arbitrary and unreasonable prices." *United States v. Trenton Potteries Co.*, 273 U.S. 392, 397 (1927). "Plaintiff, in order to succeed on a… price-fixing claim, must prove that there is a conspiracy or a concerted action between two or more actors to fix prices and that the price-fixing conspiracy is illegal pursuant to the applicable legal standard." *Lucas v. Citizens Commc'ns Co.*, 409 F. Supp. 2d 1206, 1218 (D. Haw. 2005), *aff'd*, 244 F. App'x 774 (9th Cir. 2007). There must be "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556.

Plaintiffs claim that Ticketmaster has engaged in both horizontal and vertical price fixing. Plaintiffs appear to allege that Ticketmaster enters into horizontal price fixing agreements with scalpers, venues, and competing primary ticket sellers, claiming that "Ticketmaster's conduct of allying with scalpers and venues such as SoFi Stadium has amounted to price fixing," TAC ¶ 463, and further asserting that "[b]ecause Ticketmaster has competitors like SeatGeek charge ticket prices at the same cost as Ticketmaster, it prevents buyers from being able to find a cheaper alternative." *Id.* ¶ 464. In terms of vertical prince fixing, Plaintiffs allege that Ticketmaster "essentially forces buyers to resell on its platform… [and] controls what prices the buyer can resell at." *Id.* ¶ 466.

Ticketmaster and Live Nation assert that all price fixing arguments fail because Plaintiffs have failed to allege with any particularity the existence of an agreement. MTD #1 at 18-19. StadCo reiterates the particularity argument and asserts more broadly that alleged agreements between Ticketmaster and rival ticketing companies or scalpers have nothing to do with StadCo. MTD #2 at 11-13. Plaintiffs respond by citing to large swaths of the TAC and assert they need only present enough facts taken as true to *suggest* an agreement was made. MTD Opp. #1 at 13 (citing *Twombly*, 550 U.S. at 556).

Firstly, the Court does not fully understand what Plaintiffs are claiming constitutes horizontal price discrimination and what constitutes vertical price discrimination. Horizontal price discrimination requires an agreement between competitors; thus, while it at least makes sense to claim that SeatGeek and Ticketmaster have engaged in horizontal price fixing, *see* TAC ¶ 464, the Court does not understand how Ticketmaster can engage in horizontal price fixing with scalpers and venues, *see* TAC ¶ 463. Secondly, the allegation that Ticketmaster engaged in price fixing

with SeatGeek is lacking. "Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 544; *see also Freeman v. San Diego Ass'n of Realtors*, 77 Cal. App. 4th 171, 189 (1999) ("A general demurrer will be sustained where the complaint makes conclusory allegations of a combination and does not allege with factual particularity that separate entities maintaining separate and independent interests combined for the purpose to restrain trade."). Here, Plaintiffs do not even allege facts to demonstrate parallel conduct, and their allegation of an agreement is conclusory.

Plaintiffs' vertical price fixing allegations are also insufficient. They assert that Ticketmaster "essentially forces" buyers to resell on its platform and "controls what prices the buyer can resell at." TAC ¶ 466. This allegation lacks factual backing and appears to contradict Plaintiffs' admission that "[t]he TAC does not allege as fact that Ticketmaster was the sole authorized channel for the resale of tickets to The Eras Tour." Sanctions Opp. at 8 (internal quotation marks omitted). Plaintiffs will need to clarify this claim. Furthermore, in any price fixing scheme, the involvement of StadCo is not particularly clear. The Motions to Dismiss are thus **GRANTED** with regard to the price fixing claim with leave to amend. In a potential amended complaint, Plaintiffs would do well to provide more detail on these alleged agreements and also clarify whether they are alleging that Ticketmaster's alleged agreements with venues, such as SoFi Stadium, amount to price fixing and how that is the case.

### f. *Group Boycotting Claim*

"The classic 'group boycott' is a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level." *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 453 n.5 (9th Cir. 2021) (internal quotation marks and citation omitted). Plaintiffs allege that "Ticketmaster has engaged in a group boycott with competitors like SeatGeek in its relevant market to refuse to conduct business with any competitor that does not conform to Ticketmaster's demands." TAC ¶ 472. Once again, as Defendants assert, this allegation is far from sufficient; it is not at all clear what Ticketmaster's demands are, what it means to "refuse to conduct business with any competitor," or even who has signed on to these alleged agreements. The Motions to Dismiss are thus **GRANTED** with regard to the group boycotting claim with leave to amend.

### g. *Market Division Scheme Claim*

"Horizontal market division refers to an agreement between competitors or potential competitors to divide territories, customers, or products among themselves. Such conduct is per se illegal, as has been repeatedly stated by both federal and California courts." § 9:43. Antitrust violations—Prohibited practices—Horizontal market division, The Rutter Group-California Criminal Law § 9:43 (2024-2025 ed.). Plaintiffs allege that Ticketmaster has "specifically carved out small territories to give to competitors like SeatGeek in an attempt to hide the level of monopolistic power and control Ticketmaster has," demanding in return that SeatGeek "set price tickets at the same high price as Ticketmaster." TAC ¶ 479. Once again, Plaintiffs have failed to allege any facts that would "nudge[] their claims across the line from conceivable to plausible," particularly as "parallel conduct does not suggest conspiracy," *Twombly*, 550 U.S. at 544, 547, and the Motions to Dismiss are thus **GRANTED** with regard to the market division scheme claim with leave to amend.

### h. Conclusion

While Plaintiffs have alleged a coherent market, they have failed to plead any of their antitrust theories with the requisite particularity or clarity. This is particularly so with regard to StadCo. *See, e.g., Kidron v. Movie Acquisition Corp.,* 40 Cal. App. 4th 1571, 1590 (1995) ("An entity that engages in legitimate business with a party that is acting tortiously cannot be deemed a co-conspirator, absent clear evidence of an agreement to join in the tortious conduct."). Plaintiffs will need to amend as discussed above if this claim is to go forward.[19]

### 5. UCL Claim

Finally, Plaintiffs, alleging similar acts of wrongdoing as alleged elsewhere in the TAC, claim that Defendants' allegedly unfair, unlawful, and fraudulent practices constitute a breach of the UCL. TAC ¶¶ 485-96. To state a claim under the UCL, a plaintiff must "establish that the practice is either unlawful (*i.e.*, is forbidden by law), unfair (*i.e.*, harm to victim outweighs any benefit) or fraudulent (i.e., is likely to deceive members of the public)." *Albillo v. Intermodal Container Servs., Inc.*, 114 Cal. App. 4th 190, 206 (2003).

As the Court has granted the Motion on the previous claims, a UCL claim based on the unlawful prong or the fraudulent prong both fail. *See, e.g., In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 54 n.7 (9th Cir. 2022) (dismissing a UCL

---

[19] The Court would not at this time find such amendment to necessarily be futile. *See Skot Heckman et al v. Live Nation Entertainment, Inc. et al*, Case No. 2:22-cv-00047-GW-GJS, Docket No. 314.

based on the existence of an antitrust conspiracy, when the allegations of such a conspiracy were
found to be inadequately pled); *see also* MTD Opp. #1 at 14 ("The motion concedes that this UCL
prong 'rise[s] and fall[s]' with the violations of contract, misrepresentation, negligence and
antitrust alleged."); *id.* at 15 (conceding that the same 9(b) standard as applied to fraud claims
above applies here).  Thus, the only remaining UCL claim is under the "unfair" prong.

The Court will first consider whether this claim can go forward at all, considering that in
*Sonner v. Premier Nutrition Corp.*, the district court determined and the Ninth Circuit affirmed
that the plaintiff must "establish that she lacks an adequate remedy at law before securing equitable
restitution for past harm under the UCL and CLRA" because "[i]t is a basic doctrine of equity
jurisprudence that courts of equity should not act ... when the moving party has an adequate remedy
at law."  971 F.3d 834, 844 (9th Cir. 2020) (internal citations omitted).  Defendants assert that
Plaintiffs have not alleged that they lack an adequate remedy at law.  MTD #1 at 21.  Plaintiffs
respond that "to the extent Defendants contend that plaintiffs must plead they lack an adequate
remedy at law, an injunction against future violations is proper precisely because damages cannot
fully compensate such harm."  MTD #1 Opp. at 15 (citing TAC ¶ 495 ("Defendants' deceptive
practices are ongoing and continue to date and should be enjoined by this Court."))[20]  The Court
would find, much like that in *Stafford v. Rite Aid Corp.*, No. 3:17-cv-01340-TWR-AHG, 2023 WL
2876109, at *4 (S.D. Cal. Apr. 10, 2023) that Plaintiffs' claims are "facially deficient and warrant
dismissal" because the "Third Amended Complaint does not even contain the phrase 'inadequate
remedy at law.'"  *See also Adams v. Cole Haan, LLC*, No. 8:20-cv-00913-JWH-DFM, 2020 WL
5648605, at *2 (C.D. Cal. Sept. 3, 2020) (explaining the "clear rule in *Sonner*" is "that plaintiffs
must plead the inadequacy of legal remedies before requesting equitable relief").  In a future
amended complaint, Plaintiffs must demonstrate why an injunction would provide Plaintiffs with
relief that money damages could not remedy.  *See Franckowiak v. Scenario Cockram USA, Inc.*,
No. 2:20-cv-08569-JFW-PVC, 2020 WL 9071697, at *3 (C.D. Cal. Nov. 30, 2020) (holding that
because "Plaintiff's UCL allegations [seeking injunctive relief] are predicated on the identical
wage and hour violations alleged in Plaintiff's" other cause of action, "Plaintiff has not, and cannot,
successfully allege that her legal remedies are inadequate [as] her claims for restitution and
injunctive relief are premised on the allegedly unpaid wages (*i.e.*, a legal remedy).").

---

[20] Plaintiffs appear to drop their claim for restitution under the UCL.

Defendants' Motions with regard to the UCL claim are **GRANTED** with leave to amend.

**IV.**    <u>**Conclusion**</u>

Based on the foregoing discussion, the Court **GRANTS** the Motions with leave to amend in part, with the exception that the Court will entertain further argument on the negligence claim at the hearing.