# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 23-1114-GW-KKx | Date | November 12, 2025 |
|---|---|---|---|
| Title | *Julie Barfuss, et al. v. Live Nation Entertainment, Inc., et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | None Present | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

**PROCEEDINGS:    IN CHAMBERS - TENTATIVE RULINGS ON DEFENDANTS'
MOTION TO DISMISS FOURTH AMENDED COMPLAINT [172]**


Attached hereto is the Court's Tentative Ruling on Defendants' Motion [172] set for hearing on
November 13, 2025 at 8:30 a.m.

Initials of Preparer    JG

*__Julie Barfuss et al v. Live Nation Entertainment, Inc. et al__*; Case No. 2:23-cv-01114-GW-(DTBx)
Tentative Ruling on Motion to Dismiss the Fourth Amended Complaint

      Before the Court is Defendants' Motion to Dismiss the Fourth Amended Complaint
("4AC") (the "Motion").  *See* Motion, Docket No. 172.  The Court has considered the Motion,
Plaintiffs' opposition ("Opp.," Docket No. 173), and Defendants' reply ("Reply," Docket
No. 174).  For the reasons stated herein, the Court would **GRANT** the Motion **IN PART** without
leave to amend and **DENY** the Motion **IN PART**.

## I.    Background

      Julie Barfuss along with forty-nine other individuals initiated this action against Live
Nation Entertainment, Inc. ("Live Nation") and Ticketmaster L.L.C. ("Ticketmaster")
(collectively, "Defendants") in the Superior Court of California, County of Los Angeles, on
December 5, 2022.  *See* Docket No. 1, at 1.  Barfuss, et al. ("Plaintiffs") filed a First Amended
Complaint ("1AC") on December 14, 2022, *see* 1AC, Docket No. 1-1, a Second Amended
Complaint ("2AC") on April 6, 2023, *see* 2AC, Docket No. 44, and a Third Amended Complaint
("3AC") on January 27, 2025, *see* 3AC, Docket No. 128.[1]  Defendants Live Nation and
Ticketmaster filed a motion to dismiss the 3AC on February 26, 2025, *see* Docket No. 138, and a
motion for sanctions on March 14, 2025, *see* Docket No. 140.  Defendant StadCo filed a separate
motion to dismiss the 3AC on April 15, 2025.  *See* Docket No. 154.  Motions to compel arbitration
were also filed but later withdrawn.  *See* Docket No. 165, at 1 n.1.  On May 15, 2025, the Court
granted the motions to dismiss with leave to amend in part and deemed moot the motion for
sanctions.  *See* Docket Nos. 165-66.  Plaintiffs filed the 4AC on July 14, 2025.[2]  *See* 4AC, Docket
No. 168.

      The 4AC brings eight causes of action for: (1) monopolization of Primary Concert
Ticketing Market and U.S. Eras Tour Market in violation of Sherman Act § 2; (2) unlawful
exclusive dealing in violation of Sherman Act § 1; (3) unlawful exclusive dealing in violation of
Cal. Bus. & Prof. Code §§ 16720, 16727; (4) negligence; (5) fraud; (6) negligent

---

[1] The 3AC added StadCo LA, LLC ("StadCo"), which "owns and operates SoFi Stadium," *see* 3AC ¶ 366, as the
third named Defendant.  Plaintiffs later limited the claims it sought to bring against StadCo.  *See* Notice of Dismissal
of Certain Claims, Docket No. 150.

[2] StadCo is no longer a named Defendant, and Plaintiffs indicate that they will move to voluntarily dismiss StadCo
without prejudice.  *See* 4AC ¶ 367.  There are also now 357 named Plaintiffs involved in this action.  *See id.* ¶ 408.

misrepresentation; (7) breach of contract; and (8) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq. *See generally* 4AC. Plaintiffs seek unspecified damages (including actual damages, punitive damages, and treble damages), injunctive relief, attorney's fees, and other forms of relief. *See id.* The Court's review of the 4AC reveals the following allegations.[3]

This case arises out of concert ticket sales for Taylor Swift's "The Eras" Tour in the United States ("Eras Tour"). *Id.* ¶ 1. Specifically, the harms alleged in this case stem from two presales: the TaylorSwiftTix Verified Presale for Verified Fans ("Verified Fan Presale") and the TaylorSwiftTix Presale powered by Capital One ("Capital One Presale"). *See id.* It is alleged that Live Nation and Ticketmaster engaged in years of anticompetitive conduct that has harmed concertgoers throughout the United States, including fans of Ms. Swift ("Swifties"[4]) who attempted to participate in such presales. *Id.*

Established in 1996 as a live events promoter, Live Nation has grown in recent decades to encompass "nearly the entire live entertainment industry, including live event promotions, primary and secondary ticketing, venue ownership and operations, sponsorships, artist management and more." *Id.* ¶ 370. Plaintiff's attribute this growth to Live Nation's strategy of "aggressively acquiring smaller players in the live entertainment sphere to consolidate power in concert promotions." *Id.* Ticketmaster – which was founded in 1976 as an independent ticketing company – has not only "been the largest primary ticketer for major concert venues for decades" but also "expanded largely through acquisitions to consolidate its leading position in primary ticketing." *Id.* ¶ 371. Plaintiffs claim that Ticketmaster "expanded and solidified its dominance" by (1) "passing more ticketing costs, in the form of fees, onto consumers – who have no choice but to use its services – and then shar[ing] some of such additional revenue with venues;" and (2) "paying venues large upfront advances in exchange for the exclusive, multi-year right to sell and distribute their tickets." *Id.* Live Nation and Ticketmaster went from being direct competitors in the provision of primary ticketing services for major concert venues to merging in early 2009. *Id.*

---

[3] The well-pled facts therein are accepted as true for the purpose of this ruling. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001).

[4] The term "Swifties" has merited an entry in Wikipedia which includes the following description: "Regarded by journalists as one of the largest and most devoted fanbases in music, Swifties are known for their high levels of participation, community, and cultural impact on the music industry and popular culture." Wikipedia, https://en.wikipedia.org/wiki/Swifties (last visited Nov. 12, 2025).

¶ 372.

It is alleged that "Live Nation and Ticketmaster have become the combined behemoth known today by acquiring competitors or entering into agreements with them that marginalize their relevance and reduce the obstacles they pose to its ongoing expansion." *Id.* ¶ 376. Leveraging its relationship with artists and concert venues around the country, Live Nation "easily install[s] Ticketmaster as the sole ticketing service provider at its own large concert venues" and "put[s] other venue owners and operators to the choice of either using Ticketmaster as their exclusive provider of primary ticketing services to get them the artists that Live Nation represents and the concerts it promotes, or using a competing ticketer and risk losing access to those artists and acts." *Id.* ¶ 377. Plaintiffs claim that this anticompetitive conduct "has harmed fans . . . by limiting their choices and driving up the prices they pay for tickets and ancillary products and services." *Id.* ¶ 385.

Ms. Swift, herself or through her management, contracted with Ticketmaster to provide primary concert ticketing services on an exclusive basis for venues hosting her concerts on the Eras Tour. *Id.* ¶ 404. It is alleged that "Ticketmaster controlled at all times the registration for and access to Taylor Swift's the Eras Tour tickets." *Id.* On November 1, 2022, Ticketmaster announced on its blog the opening of registration for the Verified Fan Presale that was to take place between November 1-9, 2022, with the presale itself set to occur on November 15, 2022 and the general public on-sale set to begin on November 18, 2022. *Id.* ¶¶ 405, 413; *see* Ex. F. Docket No. 168-6, at 2. Swifties were already familiar with these Verified Fan presales from prior tours, such as Ms. Swift's "Reputation" Tour (in 2018) and "Lover Fest" Tour (set to begin in 2020, but cancelled due to the COVID-18 pandemic). 4AC ¶ 406. Ticketmaster represented through its blog that "Previous Lover Fest Verified Fan purchasers will receive preferred access to participate in the TaylorSwiftTix Presale." Ex. F, Docket No. 168-6, at 2. Based on prior tours, Swifties expected to receive a "code" that would give them "preferred access" to and a "boost" in line for the Verified Fan Presale so long as they registered using the same Ticketmaster account that they had used for prior tours. 4AC ¶ 407. Registrants for the Verified Fan Presale also received an email notifying them that their "Loyal Fan" status, which could be earned by purchasing merchandise associated with Ms. Swift's "Midnights" album, would "boost [their] place in line for the [Verified Fan Presale]." *See id.* ¶ 408 (citing Ex. L, Docket No. 168-13).

Ticketmaster announced that: (1) 3.5 million individuals registered as Verified Fans for the

Verified Fan Presale; (2) 1.5 million of these individuals were provided codes that would allow them to actually participate in the presale; and (3) the remaining two million were wait-listed.  *See id.* ¶ 411 (citing Ex. M, Docket No. 168-14).  Of the 357 named Plaintiffs in this action, 290 became Verified Fans and received codes to access the Verified Fan Presale.  *See id.* ¶ 410.  Upon selecting tickets, however, these particular plaintiffs received various error messages and were unable to purchase any tickets.  *See id.*  On November 17, 2022, Ticketmaster announced that bot attacks and Swifties without codes drove the unprecedented traffic on its website, which Plaintiffs claim resulted in the various technical issues they experienced.  *See id.* ¶ 411.

On November 4, 2022, Ticketmaster had also announced on its blog that holders of Capital One credit cards could purchase Eras Tour tickets before they went on sale to the general public on November 18, 2022.  *See id.* ¶ 412 (citing Ex. Y, Docket No. 168-26, at 2).  Of the 357 plaintiffs in this action, 101 – many of whom claim they obtained a Capital one card for the purpose of this presale – accessed the Capital One Presale but could not complete their purchases of any tickets due to multiple stated errors.  *See id.*  The general public on-sale was thereafter cancelled due to the "insufficient quantity of remaining tickets."  *See id.* ¶ 413 (citing Ex. Q, Docket No. 168-18).  Ticketmaster revealed that two million tickets were sold during the Verified Fan Presale and 400,000 during the Capital One Presale, leaving no tickets left for the general public on-sale.  *See id.* ¶ 411.

It is alleged that Plaintiffs were injured by "the monopoly created by Live Nation and Ticketmaster" and that "Defendants' conduct deprived [P]laintiffs of the opportunity they had been promised to participate meaningfully, or at all, in the Verified Fan Presale, the Capital One Presale or a public onsale, which led to most paying thousands of dollars for tickets with a face value of a fraction thereof."  *Id.* ¶ 414.

On August 28, 2025, Defendants filed the instant Motion.  *See* Motion.

## II.    <u>Legal Standard</u>

### 1.    <u>Rule 12(b)(6)</u>

Under Federal Rule of Civil Procedure 12(b)(6), a party may bring a motion to dismiss for failure to state a claim upon which relief can be granted.  Rule 12(b)(6) must be read in conjunction with Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief," in order to give the defendant "fair notice of what the claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007).

Under Rule 12(b)(6), the court must: (1) construe the complaint in the light most favorable to the plaintiff, and (2) accept all well-pleaded factual allegations as true, as well as all reasonable inferences to be drawn from them. *See Sprewell*, 266 F.3d at 988; *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998). In its consideration of the motion, the court is limited to the allegations on the face of the complaint (including documents attached thereto), matters which are properly judicially noticeable, and "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001). Dismissal pursuant to Rule 12(b)(6) is proper only where there is either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988); *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121-22 (9th Cir. 2008); *see also Twombly*, 550 U.S. at 561-63 (dismissal for failure to state a claim does not require the appearance, beyond a doubt, that the plaintiff can prove "no set of facts" in support of its claim that would entitle it to relief).

2. Rule 9(b)

Under Rule 9(b), a party "alleging fraud or mistake . . . must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy Rule 9(b)'s particularity requirement, the complaint must include "an account of the 'time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations.'" *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (quoting *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004)). In other words, the pleading "must 'identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false.'" *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013) (quoting *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011)). However, "intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); *see also Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993) (explaining that Rule 9(b)'s heightened pleading standard may be relaxed when the allegations of fraud relate to matters particularly within the opposing party's knowledge, such that a plaintiff cannot be expected to have personal

knowledge).

    3.  Rule 15(a)

Under Federal Rule of Civil Procedure 15(a)(2), federal courts are instructed to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a). A district court, however, may in its discretion deny leave to amend "due to 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment.'" *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

## III.   Discussion

Defendants seek the dismissal of the 4AC in its entirety with prejudice. *See* Motion at 1. The Court will address each of Plaintiffs' claims in the order that they are raised in the Motion.

### A.  Negligence (Claim Four)

To establish negligence, Plaintiffs must plausibly allege: (1) a legal duty of care owed by the defendant to the plaintiff, (2) a breach of that duty, (3) causation linking the breach to the plaintiff's injury, and (4) actual damages. *Ladd v. Cnty. of San Mateo*, 12 Cal. 4th 913, 917 (1996). A legal duty of care "means the duty to use ordinary care in activities from which harm to the plaintiff might reasonably be anticipated." *Pirozzi v. Apple Inc.*, 913 F. Supp. 2d 840, 851 (N.D. Cal. 2012) (citing 6 Witkin, Summary of Cal. Law, Torts § 835, p. 53 (10th ed. 2005)).

    1.  Economic Loss Rule

Defendants first assert that Plaintiffs' fourth claim for negligence is barred by California's economic loss rule because Plaintiffs have not alleged anything other than economic damages. *See* Motion at 5. Plaintiffs contend in opposition that the economic loss rule is inapplicable here where Plaintiffs allege harm caused by the breach of a duty of care that arises from a "special relationship." *See* Opp. at 7.

"The California Supreme Court has recognized that '[t]he economic loss rule requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise.'" *In re Safeway Tuna Cases*, No. 3:15-cv-05078-EMC, 2016 WL 3743364, at *2 (N.D. Cal. July 13, 2016) (quoting *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004)). Purely economic losses may not be recovered unless there is "(1) personal injury, (2) physical damage to property,

(3) a 'special relationship' existing between the parties, or (4) some other common law exception to the rule." *Kalitta Air, L.L.C. v. Cent. Tex. Airborne Sys., Inc.*, 315 F. App'x 603, 605 (9th Cir. 2008) (citing *J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 803-04 (1979)).  The economic loss rule is necessary to "prevent[ ] the law of contract and the law of tort from dissolving one into the other." *Robinson Helicopter*, 34 Cal. 4th at 988 (internal quotation omitted).  California courts have understood the rationale for the rule to be "particularly strong" where the alleged claims are based on "commercial activities that negligently or inadvertently [went] awry." *UMG Recordings, Inc. v. Glob. Eagle Ent., Inc.*, 117 F. Supp. 3d 1092, 1104 (C.D. Cal. 2015) (quoting *Robinson Helicopter* 34 Cal. 4th at 991 n.7).

First, as a result of Defendants' alleged negligence, Plaintiffs allege that they have suffered not only economic damages but also "noneconomic damages for pain, suffering, loss of time, emotional distress and invasion of privacy, among other things, in amounts subject to proof at trial." *See* 4AC ¶ 465.  Defendants assert that this "conclusory plea" is insufficient to take the claim for negligence outside the scope of the economic loss rule. *See* Motion at 6.  The Court would agree.  Plaintiffs offer no explanation, let alone a plausible one, describing these noneconomic damages.[5]  Without any such explanation, the Court would find that Plaintiffs have not sufficiently alleged any cognizable physical injury.

Second, the Court would observe that "[t]he allegations made with regard to the breach of contract claim closely parallel those made with regard to the negligence . . . claim[ ]." *Lincoln Gen. Ins. Co. v. Access Claims Adm'rs, Inc.*, No. 2:07-cv-01015-LKK-(EFBx), 2007 WL 2492436, at *8 (E.D. Cal. Aug. 30, 2007) (finding the negligence claim barred by the economic loss rule). For their breach of contract claim, Plaintiffs allege that they "entered into a binding contract with Ticketmaster based on its Terms of Use, Ex. S[, Docket No. 168-20] and modified by course of dealing, promotional material and email and other communications by Ticketmaster to its customers, including [P]laintiffs."  4AC ¶ 483.  Plaintiffs claim that Ticketmaster breached this contract by (1) "allow[ing] users without codes to participate in and buy tickets during the Verified Fan Presale"; (2) "let[ting] in bots, scalpers and fake accounts to both the Verified Fan and Capital

---

[5] As recognized in *Erlich v. Menezes*, 21 Cal. 4th 543, 558-59 (1999): "damages for mental suffering and emotional distress are generally not recoverable in an action for breach of an ordinary commercial contract in California . . . . Cases from other jurisdictions have formulated a similar rule, barring recovery of emotional distress damages for breach of contract except in cases involving contracts in which emotional concerns are the essence of the contract."

One presales"; and (3) failing to "give 'preferred access' or a 'boost . . . in line' to prior 'Lover Fest' Verified Fans or to purchasers of 'Midnights' merchandise." *Id.* ¶ 484 (internal citations omitted). For their negligence claim, Plaintiffs allege that Defendants "fail[ed] to exercise reasonable care and employ . . . tools, routinely used by other online sellers, to prevent harm from third parties to [P]laintiffs and others" when Ticketmaster had "foresee[n] the need to protect its platform from bot attacks and other uses, authorized or not, that impede or prevent its functioning." *Id.* ¶¶ 460-61. Plaintiffs claim that Defendants' failure to do so "resulted in 14 million users accessing the Verified Fan Presale, including users without codes, 3.5 ***billion*** system requests and the inability of countless fans . . . to participate as promised in the negligently handled Ver[i]fied Fan Presale or in the public onsale." *Id.* ¶ 457 (emphasis in original). "In short, the breach of contract claim subsumes the negligence . . . claim[ ]." *Lincoln Gen. Ins.*, 2007 WL 2492436, at *8. Without more, these allegations appear to suggest only that Defendants negligently performed the contract, which is not enough to overcome the economic loss rule.

Third, the Court would find that Plaintiffs has not provided a basis for finding that the special relationship exception is applicable here, although they might be able to.[6] "Where a special relationship exists between the parties, a plaintiff may recover for loss of expected economic advantage through the negligent performance of a contract although the parties were not in contractual privity." *J'Aire*, 24 Cal. 3d at 804 (citations omitted). To determine whether a plaintiff

---

[6] Defendants assert that the special relationship exception does not apply because Plaintiffs and Defendants are in privity of contract. *See* Motion at 7 n.4 (citing *Body Jewelz, Inc. v. Valley Forge Ins. Co.*, 241 F. Supp. 3d 1084, 1092 (C.D. Cal. 2017) and 4AC ¶ 483). Plaintiffs contend in opposition that "[t]he 4AC pleads a duty not arising from any contract" and that "[t]o the extent it also includes a breach of contract claim, [P]laintiffs have a right to plead inconsistently or in the alternative." Opp. at 8 (citing *Echo & Rig Sacramento, LLC v. AmGuard Ins. Co.*, 698 F. Supp. 3d 1210, 1219 (E.D. Cal. 2023)). Defendants argue in response that both parties agree that they are in a contractual relationship. *See* Reply at 3-4. Specifically, Defendants indicate that Plaintiffs' "unpled, alternative 'there is no contract at all' theory" fails because, while the parties may dispute what exactly the contract says, the parties do not dispute the existence of an express contract that governs the relationship between them. *See id.*

Defendants rely on the Ninth Circuit's decision in *Total Coverage, Inc. v. Cendant Settlement Servs. Grp., Inc.*, 252 F. App'x 123 (9th Cir. 2007). In *Total Coverage*, the Ninth Circuit indicated that, while Rule 8(e)(2)'s liberal pleading policy permits claims to be plead in the alternative such that "a pleading 'should not be construed as an admission against another alternative or inconsistent pleading in the same case,'" such a policy has limits. *Id.* at 126 (quoting *McCalden v. Cal. Library Ass'n*, 955 F.2d 1214, 1219 (9th Cir. 1990)). The Ninth Circuit explained that contradictory statements of fact may be asserted only when a pleader is "legitimately in doubt about the facts in question." *Id.* (quoting *Am. Int'l Adjustment co. v. Galvin*, 86 .3d 1455, 1461 (7th Cir. 1996) and 5 Wright & Miller, *Federal Practice and Procedure* § 1285 (3d ed. 2004)). Here, as was the case in *Total Coverage*, "there is no dispute about the existence or validity of the express contract." *See id.* Plaintiffs "do[ ] not allege that the contract is void, rescinded, or otherwise unenforceable, and [Defendants] agree[ ] that the express contract governs the relationship between the parties." *Id.* As such, it would appear to the Court that Plaintiffs cannot support their negligence claim by suggesting that there is no contractual relationship between the parties.

lacking privity with a defendant may recover purely economic loss for claims resulting from the negligent performance of services, California courts consider six factors:

> (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct and (6) the policy of preventing future harm.

*Id.* (citation omitted).    Courts must weigh all six factors in determining whether a special relationship exists, and the presence or absence of one factor is not decisive.  *See Kalitta Air*, 315 F. App'x at 606.

Plaintiffs aver that Defendants owe a duty of care arising from "a 'special relationship' with [P]laintiff[s] in a situation that [D]efendant[s] control[ ]."  Opp. at 7.  Specifically, Plaintiffs claim that this special relationship began with "Defendants' sole control over ticketing" and Plaintiffs' reliance on Defendants' "hyping [of] their industry leading secure technology, generally and for Eras itself."  *See id.* at 8-9.  Plaintiffs argue that "[t]his combination of control and dependency creates a special relationship that imposes a duty upon Defendants to provide a service that does as designed and without disruption from parties recognized by Defendants . . . as 'not supposed to be there.'"  *Id.* (quoting 4AC ¶ 461) (citing Ex. P, Docket No. 168-17 and *Dix v. Live Nation Ent., Inc.*, 56 Cal. App. 5th 590, 605 (2020)).  While they seek to invoke the special relationship exception specifically under *Kalitta Air* and *J'Aire*, Plaintiffs do not even mention the six factors set forth in these cases.[7]  The Court would decline to find that the special relationship

---

[7] Defendants appear to suggest that the first *J'Aire* factor weighs against finding a special relationship because Plaintiffs "were no different from any other purchaser of the same product."  *See* Reply at 2 n.3 (quoting *Greystone Homes, Inc. v. Midtec, Inc.*, 168 Cal. App. 4th 1194, 1231 (2008) (citing *City of San Diego v. Amoco Chem. Co.*, No. 3:98-cv-00474-B-(LSP), 1999 WL 33548157, at *5 (S.D. Cal. Sept. 9, 1999), *aff'd*, 9 F. App'x 598 (9th Cir. 2001)).  While courts must weigh all of the *J'Aire* factors, some courts consider the first of these factors to be "the most important."  *See, e.g.*, *Whitesides v. E\*TRADE Sec., LLC*, No. 3:20-cv-05803-JSC, 2021 WL 930794, at *6 (N.D. Cal. Mar. 11, 2021).

The Court finds the decision in *Ott v. Alfa-Laval Agri, Inc.*, 31 Cal. App. 4th 1439 (1995), by the California Court of Appeal instructive here.  In *Ott*, the owners of a family dairy farm sued milking machine manufacturers for lost profits resulting from the failure of their machines.  The court evaluated the *J'Aire* factors and concluded that no special relationship existed that would allow plaintiffs to recover for purely economic losses in part because "neither the pleadings nor the evidence suggest[ed] the 1970 milking system was 'intended to affect' the plaintiffs in any way particular to the plaintiffs, as opposed to all potential purchasers of the equipment."  *Id.* at 1455.  The court explained that "to the extent the milking system was intended to affect the plaintiffs in the same way as all retail buyers, this becomes a traditional products liability or negligence case in which economic damages are not available."  *Id.* at 1456 (citing *Seely v. White Motor Co.*, 63 Cal. 2d 9, 18 (1965)).  As in *Ott*, Plaintiffs do not appear to have pleaded facts suggesting that Defendants' ticketing service was intended to affect them differently than other potential purchasers of tickets to the Eras Tour.

exception applies here barring any explanation from Plaintiffs as to why the *J'Aire* factors weigh in favor of finding a special relationship.  Even if the economic loss rule does not bar Plaintiffs' negligence claim, however, the Court fails to see how any such claim may proceed when Plaintiffs still do not allege any plausible duty for purposes of their negligence claim.

     2.  Duty

Defendants assert that the negligence claim fails because Plaintiffs again fail to articulate any legally cognizable duty.  *See* Motion at 7.  Plaintiffs allege, in relevant part, that:

> By undertaking exclusive control of the Verified Fan and Capital One Presales and positioning them as the primary – and, as it turned out, only – avenues to access tickets, Ticketmaster voluntarily assumed a special relationship with [P]laintiffs. This relationship gave rise to a duty of care to manage the presale process with reasonable competence, to safeguard [P]laintiffs from foreseeable harm (including bot activity, system failure, and unfair access) and to honor the representations made to those who relied on the Verified Fan and Capital One Presales.  This duty is consistent with but in addition to that owed generally under California law, which provides that "everyone is responsible, not only for the result of his or her willful acts, but also for injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person . . . ."

4AC ¶ 448 (quoting Cal. Civ. Code § 1714(a)).  Defendants claim that Plaintiffs fail to allege any general duty under § 1714(a) and that no special relationship existed.  *See* Motion at 7-11. Plaintiffs contend in opposition that they have sufficiently alleged a duty arising from a special relationship.  *See* Opp. at 8-9; *see also* Section III.A.1, *supra*.

Under California law, "[e]veryone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself."  *See Cabral v. Ralphs Grocery Co.*, 51 Cal. 4th 764, 771 (2011) (quoting Cal. Civ. Code § 1714(a)).  It is also "well established that, as a general matter, there is no duty to act to protect others from the conduct of third parties." *Delgado v. Trax Bar & Grill*, 36 Cal. 4th 224, 235 (2005) (citations omitted).  California courts have recognized certain exceptions to this general no-duty-to-protect rule, one of which is the special relationship doctrine.  *See id.*  Under this exception, "a duty to warn or protect may be found if the defendant has a special relationship with the potential victim that gives the victim a right to expect protection."  *Regents of Univ. of Cal. v. Super. Ct.*, 4 Cal. 5th 607, 619 (2018) (citations omitted).  Examples of such relationships include "common carriers and their passengers, or innkeepers and their guests."  *Id.* at 620 (citation omitted).  Even if such an

exception is found, courts must weigh the *Rowland* factors to see if a duty should be imposed.  *See
Jackson v. Airbnb, Inc.*, 654 F. Supp. 3d 990, 994 (C.D. Cal. 2023) (citations omitted).  The
*Rowland* factors to be weighed are: "the foreseeability of harm to the plaintiff, the degree of
certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's
conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy
of preventing future harm, the extent of the burden to the defendant and consequences to the
community of imposing a duty to exercise care with resulting liability for breach, and the
availability, cost, and prevalence of insurance for the risk involved." *Brown v. USA Taekwondo*,
11 Cal. 5th 204, 211 n.3 (2021) (quoting *Rowland v. Christian*, 69 Cal. 2d 108, 113 (1968)).

Plaintiffs allege that Defendants' duty under § 1714(a) required Defendants to "provide a
service that functions properly and for its stated purpose – that is, to allow users to access its ticket
purchasing platform and for the platform to function properly, with responsive user interfaces, and
not to cause unreasonable delay, fail to process user input accurately (or at all) or 'crash' altogether
– so that users actually could purchase tickets or have a real opportunity to do so within a
reasonable period of time."[8]  4AC ¶ 450.  Plaintiffs also allege that a special relationship existed
(1) "[b]ecause those wanting to purchase tickets for the Eras Tour presale had to go through
Ticketmaster as the tour's exclusive primary ticketer;" and (2) "Ticketmaster, in turn, had sole and
complete control over its own site and the user's experience on it." *Id.* ¶ 459.  Plaintiffs claim that
this special relationship extends to "parties other than customers who use its site – including
services that Ticketmaster allows to run software on its platform, such as Klarna and Monetate,
that may impede its functioning, as well as rogue agents such as bots and ticket scalpers – because
it solely controls the site and the ability of such third parties to access and use it for their advantage
and to the potential harm of customers such as plaintiffs." *Id.*

Defendants assert that Plaintiffs' allegations imply that Defendants "have a 'special
relationship' with every one of the millions of people who wanted to purchase Eras Tour tickets,
whether they were 'authorized' to access Defendants' services or not."  Motion at 9.  Defendants
claim that such a relationship cannot exist in this context for three reasons: First, imposing a legal
duty to protect millions of Swifties solely because Ticketmaster was allegedly the exclusive

---

[8] Defendants assert that "this purported duty is just a restatement of Plaintiffs' (flawed) contract claim – *i.e.*, that
Ticketmaster promised them access codes or tickets but failed to deliver."  Motion at 7 (citing 4AC ¶¶ 482-85).  As
such, Defendants argue that Plaintiffs may not recover in tort.  *See id.* (citing *Aas v. Super. Ct.*, 24 Cal. 4th 627, 643
(2000)).  Plaintiffs do not respond to this argument in their opposition.  This argument, therefore, is deemed conceded.

primary ticketer for the Eras Tour risks imposing liability in negligence on every website offering and exercising exclusive control over any service "whenever a customer is unhappy with third-party conduct that impacted the service."[9]  *See id.*  Second, Defendants do not have a special relationship with "rogue agents such as bots and ticket scalpers" because Defendants do not control the conduct of bots and scalpers.[10]  *See id.* at 10.  Third, even if a special relationship existed, applying the *Rowland* factors would not give rise to the kind of duty Plaintiffs allege (*i.e.*, "a sweeping duty to guarantee a ticket-buying experience which is never delayed, never affected by bots or scalpers, and which always meets Plaintiffs' nebulous expectations – even in the face of record-breaking demand").[11]  *See id.* at 11.

Without addressing any of these arguments, Plaintiffs contend in opposition that Defendants had "plentiful tools at their disposal, foresaw the demand for Eras Tour tickets and announced their readiness for it" and "Plaintiffs relied entirely on these professed, available protections, having no choice but to seek Eras Tour admission through Ticketmaster."  *See* Opp. at 9.  Relying on *Dix*, Plaintiffs suggest that Defendants' control and Plaintiffs' dependence are what gives rise to the special relationship.  *See id.* (citing *Dix*, 56 Cal. App. 5th at 605).

Considering the facts alleged, the Court is unpersuaded that the special relationship exception to the no-duty-to-protect rule is applicable here.  Finding a special relationship between Defendants and Plaintiffs just because the former were allegedly the sole providers of an online service Plaintiffs wished to use renders virtually any website that offers a unique service potentially liable for any third-party interference or breakdown.  The Court declines to create such an unbounded duty of care.  Moreover, the Court would agree with Defendants that "Plaintiffs'

---

[9] It is unclear from the 4AC whether Ticketmaster by itself came up with the idea/concept of the Verified Fan Presale and/or Capital One Presale and thereafter set out the requirements/process of each or whether any of the foregoing was agreed upon the Swift and her management (as to the former) and Capital One (as to the latter).  Also, did Ticketmaster receive any benefits/concessions from Swift or Capital One in setting up the presales?

Further, it appears that persons had to take steps to qualify for eligibility to participate in the Verified Fan and Capital One presales – for example, by purchase Swift merchandise or obtaining a Capital One credit card.  Thus, those persons were not the same as "every one of the millions of people who wanted to purchase Eras Tour tickets."

[10] The 4AC does not indicate whether Defendants actually benefited monetarily from the fact that the tickets – which would have otherwise been sold to persons participating in the Verified Fan and Capital One presales – wound up being sold to "rogue agents such as bots and ticket scalpers" and/or to individuals who were not participating in the presales.

[11] The 4AC also does not indicate whether the glitches involved in the Eras Tour ticket fiasco had ever previously occurred in Ticketmaster's history.

desire for Taylor Swift tickets does not give rise to the type of heightened vulnerability and dependence that the special relationship duty is designed to address." *See* Reply at 5 (comparing *Giraldo v. Dep't of Corr. & Rehab.*, 168 Cal. App. 4th 231, 250 (2008) with *Regents*, 4 Cal. 5th at 621). Indeed, Plaintiffs do not cite to any authority that supports the kind of duty they allege exists here. There does not appear to be any special relationship between Defendants and the bots and scalpers because Defendants exercised no control over (and/or there is no allegation that they should have expected) the wrongful acts of such third parties.

Even if the Court were to find a special relationship, Plaintiffs make no attempt to explain in their opposition how the *Rowland* factors weigh in favor of imposing a duty under these circumstances. Instead, Plaintiffs appear to suggest without citing to any supporting authority that the burden rests on Defendants to show that these factors weigh against imposing any duty. *See* 4AC ¶ 463; Opp. at 9. Such burden, however, rests with Plaintiffs. *See Brown*, 11 Cal. 5th at 212-13 (noting that a plaintiff must satisfy both the special relationship test and the *Rowland* factors before a duty to protect the plaintiff from third-party harm can be imposed on the defendant); *see also Smith v. Freund*, 192 Cal. App. 4th 466, 474 (2011).

Because the Court finds many of the same issues with Plaintiffs' negligence claim that it had previously identified, *see* Docket No. 165, at 11-12, the Court would **GRANT** the Motion with respect to claim four, at the hearing the Court will discuss with the parties whether the dismissal should be with or without leave to amend.

## B. Fraud and Negligent Misrepresentation (Claims Five and Six)

"The essential elements of a count for intentional misrepresentation are: (1) a misrepresentation, (2) knowledge of falsity, (3) intent to induce reliance, (4) actual and justifiable reliance, and (5) resulting damage." *Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 230-31 (2013). "[A]lleging why the promise was false when made requires pleading facts from which it can be inferred that the promisor had no intention of performing at the time the promise was made." *UMG Recordings*, 117 F. Supp. 3d at 1108. "The essential elements of a count for negligent misrepresentation are the same except that it does not require knowledge of falsity but instead requires a misrepresentation of fact by a person who has no reasonable grounds for believing it to be true." *Id.* at 231. Federal Rule of Civil Procedure 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R.

Civ. P. 9(b). This heightened pleading standard applies to both fraud claims and negligent misrepresentation claims if specific allegations of fraud are made. *See Cambridge Lane, LLC v. J-M Mfg. Co., Inc.*, No. 2:10-cv-06638-GW-(MARx), 2020 WL 8410437, at *7 (C.D. Cal. May 14, 2020). The pleading "must 'identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false.'" *Salameh*, 726 F.3d at 1133 (quoting *United States ex rel. Cafasso.*, 637 F.3d at 1055).

Plaintiffs allege the following eight representations were false when made:

(1) "Lover Fest Verified Fan purchasers" did not "receive preferred access to participate in TaylorSwiftTix Presale" over other Verified Fans as stated on Ticketmaster's November 1, 2022 blog.

(2) Those who a received "Loyal Fan" email from TaylorSwift.com, including by purchasing "Midnights" merchandise, did not get a "boost" of their "place in line" as they were told they would get. . . .

(3) Ticketmaster did not allow "[o]nly fans who have been verified and invited to shop by receiving an access code [to] have the opportunity to purchase tickets during the TaylorSwiftTix Presale powered by Verified Fan," as promised in its November 1, 2022 blog. . . .

(4) Bots and scalpers admittedly accessed the Verified Fan Presale despite assurances that "[o]nly fans who have been verified and invited to shop by receiving an access code [to] have the opportunity to purchase tickets during the TaylorSwiftTix Presale powered by Verified Fan," that tickets would end up in "hands of fans who want to attend the show and . . . out of the hands of bots," and that Ticketmaster employs industry leading protective technology. . . .

(5) Ticketmaster delayed and shortened the Capital One Presale, contrary to what it had promised, and had fewer tickets available than they had created the impression would be available and which typically get allocated apart from other sales. . . .

(6) Ticketmaster allowed the use of transferred codes despite representing that it would not.

(7) Ticketmaster cancelled the public onsale it had promised . . . .

(8) Most broadly, Ticketmaster misrepresented that becoming a Verified Fan with a code would mean something that would distinguish such fans from others and from bots and scalpers, when in fact it meant nothing . . .

4AC ¶ 473 (internal citations omitted).

Defendants assert that these allegations fail to satisfy Rule 9(b)'s heightened pleading

standard.[12]  *See* Motion at 11-14.  Specifically, Defendants assert that "Plaintiffs do not and cannot allege with particularity that any specific representation was *false when it was made*."  *Id.* at 12 (emphasis in original) (citing *Richardson v. Reliance Nat'l Indem. Co.*, No. 3:99-cv-02952-CRB, 2000 WL 284211, at *4-5 (N.D. Cal. Mar. 9, 2000)).  Defendants claim that these alleged misrepresentations were merely "promises to do something *in the future*."  *Id.* at 13 (emphasis in original).  Defendants provide three examples to illustrate their point: (1) "[t]hat the general onsale was cancelled does not demonstrate that Defendants never intended to hold one;" (2) "if certain Plaintiffs were told they would later receive 'boosts' or 'preferred access' but ultimately did not get tickets, that does not demonstrate that Defendants never intended to provide 'boosts' or 'preferred access' in the first place"; and (3) "even if Defendants had promised that the Verified Fan program could prevent 100% of bots and scalpers from affecting the onsale in any way (which they did not), such a promise is not rendered fraudulent just because some bots and scalpers ultimately did manage to impact the sale."  *Id.* at 14 (citing *Magpali v. Farmers Grp., Inc.*, 48 Cal. App. 4th 471, 481 (1996)).

Plaintiffs contend in opposition that their fraud and negligent misrepresentations claims are sufficiently pled under Rule 9(b) because Plaintiffs have alleged generally Defendants' knowledge

---

[12] Defendants also assert that the economic loss rule bars both the fraud and negligent misrepresentations claims. *See* Motion at 11-12.  Plaintiffs address this argument in a footnote, suggesting that *Robinson Helicopter* rejects the notion that the economic loss rule bars these specific claims.  *See* Opp. at 10 n.3 (citing *Robinson Helicopter*, 34 Cal. 4th. at 991).  Defendants argue in response that this exception to the economic loss rule is "not settled law."  Reply at 6.

Of the cases cited by Defendants, the Court finds most persuasive here *Medawar v. Otis Elevator Co.*, No. 2:20-cv-05155-MEMF-(Ex), 2021 WL 1034840 (C.D. Cal. Feb. 9, 2021).  In *Medawar*, the court examined *Robinson Helicopter* and indicated that "the economic loss rule does not bar a fraud claim when the fraudulent conduct at issue is *independent* from the breach of contract."  *Id.* at *3 (emphasis in original) (citing *Robinson Helicopter*, 34 Cal. 4th at 991).  The court explained that "in *Robinson Helicopter*, it was not the promises that the defendant made as part of the underlying contract which gave rise to the fraud claim, but rather misrepresentations made subsequent to contract formation, which was separate, intentional conduct."  *Id.* (citing same).  Here, Plaintiffs' fraud and negligent misrepresentation claims are based on affirmative misrepresentations made during the formation of the alleged contract.  The alleged seven misrepresentations were all part of the alleged contract, not "separate, intentional conduct."  *See* FAC ¶ 483 ("Plaintiffs entered into a binding contract with Ticketmaster based on its Terms of Use, Ex. S[, Docket No. 168-20] and modified by course of dealing, *promotional material and email and other communications by Ticketmaster to its customers*, including [P]laintiffs." (emphasis added)).  "In essence, Plaintiffs attempt to take 'allegations underpinning a straightforward claim for breach of a commercial contract and recast them as torts,' which 'consist of nothing more than [Defendants'] alleged failure to make good on [their] contractual promises.'  *Medawar*, 2021 WL 1034840, at *4 (quoting *JMP Sec. LLP v. Altair Nanotechnologies Inc.*, 880 F. Supp. 2d 1029, 1043 (N.D. Cal. 2012)).

Based on the cases cited by Defendants and the apparent lack of discussion from Plaintiffs, the Court is skeptical about the application of the economic loss rule to Plaintiffs' fraud and misrepresentation claims.  Even if such claims could survive the economic loss rule, however, the Court would find that these claims fail for other reasons.

of falsity. *See* Opp. at 12. Plaintiffs claim that "when Defendants made these promises, they knew of their falsity and had no reasonable basis to believe their truth." *Id.* at 10 (citing 4AC ¶¶ 473, 479). Plaintiffs then appear to argue that the fact that Verified Fans with access codes and boosts were unable to purchase tickets "evinces an utter lack of concern on Defendants' part as to what, or whether they ever intended to act as, they had promised" and "strongly supports an intent not to perform as and when promised." *See id.* at 11. Plaintiffs also appear to argue that because "bots disrupted the presale," "Defendants knew or at least should have known that their promises to keep out bots and their repeated touting of their security technology falsely portrayed what they could and ultimately did do when it came to The Eras Tour presale." *Id.* (internal citations omitted). Regarding "the truncated Capital One presale and the aborted general onsale," Plaintiffs appear to suggest that Defendants did not "intend[ ] to allow such sales as promised" because they did not "allot[ ] tickets for each tranche of sales." *Id.* at 11-12.

The Court would find that Plaintiffs have not sufficiently alleged facts from which it may be inferred that Defendants had no intention of performing at the time each of the representations were made. Plaintiffs appear to concede in their opposition that their theory is premised on Defendants' failure to deliver on the promises they made. *See, e.g.*, Opp. at 12 ("Had they intended to allow such sales as promised, Defendants could have acted as they had represented and allotted tickets for each tranche of sales. That they did not indicates they did not intend such sales or care whether they provided them."). This theory cannot support their fraud claim. *See UMG Recordings*, 117 F. Supp. 3d at 1108 ("Mere nonperformance of a promise does not suffice to show the falsity of the promise." (citations omitted)).[13]

For representations one and two, there are no facts to suggest that Defendants had no intention of giving "preferred access" to "Lover Fest Verified Fan purchasers" or a "boost" to recipients of "Loyal Fan" emails. The fact that some Plaintiffs falling into either category of fan status were unable to buy tickets does not necessarily indicate that they did not get the preferred access or boost to which they believed they were entitled (*but see* footnote 13). For representations

---

[13] There is a question, however, as to numbers. It is the Court's understanding that every verified fan who received an access code could purchase up to six tickets; and Defendants had issued about 1.5 million access codes. Consequently, there was the possibility that verified fans with access codes could purchase up to nine million tickets. If the total number of available seats in all of the venues in the United States portion of the Eras Tour totaled significantly less than nine million (say about 2.4 million), then potentially, all of the tickets could have been sold out during the Verified Fan Presale and before the Capital One Presale even started. The Court would inquiry how the Defendants planned for that situation.

three and four, that bots and fans without codes were able to access the presales does not suggest that Defendants had no intention of ensuring that only Verified Fans gained access to the presales (although they seemed to have made that promise).  For representation five, even though the Capital One Presale was pushed back one day, *see* 4AC ¶ 412, the presale still occurred and some four-hundred thousand Swifties were able to purchase tickets through that presale, *see id.* ¶ 411. It is unclear to the Court what kind of "impression" Plaintiffs appear to have received with respect to the number of tickets that would be available for the Capital One Presale and how its delay suggests an intent not to perform (*but see* footnote 13).  *See id.* ¶ 473(e) (citations omitted).  For representation six, Plaintiffs fail to adequately explain how "Ticketmaster allowed the use of transferred codes."  *See id.* ¶ 473(f) (citing Ex. F, Docket No. 168-6, at 5).  Without further detail, it is unclear to the Court how representation six is false.  For representation seven, as disappointing as it may have been to Swifties, the cancellation of the general public on-sale alone does not suggest that Defendants had no intention of holding one when they represented that such sale would take place.  For representation eight, Plaintiffs do not allege with any sufficiency the "who, what, when, where, and how" details that must accompany this allegation.  Moreover, that some Verified Fans were unable to purchase tickets does not suggest that Defendants had absolutely no intention of distinguishing access for Verified Fans with codes and everyone else who seemingly wished to purchase tickets to the Eras Tour, including bots and scalpers.  Plaintiffs' negligent misrepresentation claim fares no better because there are no facts in the 4AC that plausibly suggest Defendants had no reasonable grounds for believing their representations to be true when they were made.

Because Plaintiffs do not appear to have sufficiently plead the requisite state of mind for either their fraud or negligent misrepresentation claim, the Court would **GRANT** the Motion with respect to claims five and six, at the hearing the Court will discuss with the parties whether the dismissal should be with or without leave to amend.

### C.  Breach of Contract (Claim Seven)

"To allege a cause of action for breach of contract, a plaintiff must allege, (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff."  *Bushell v. JPMorgan Chase Bank, N.A.*, 220 Cal. App. 4th 915, 921 (2013) (internal quotation marks and citation omitted).  To state a claim for a breach of contract, "it is absolutely essential to plead the terms of the contract either [verbatim] or according

to legal effect." *Twaite v. Allstate Ins. Co.*, 216 Cal. App. 3d 239, 252 (1989*); see also Langan v. United Servs. Auto. Ass'n*, 69 F. Supp. 3d 965, 980 (N.D. Cal. 2014) ("To plead a claim for breach of contract, Plaintiff must at least allege the material terms of a specific contract . . . .").

Plaintiffs allege that they "entered into a binding contract with Ticketmaster based on its Terms of Use, Ex. S[, Docket No. 168-20] and modified by course of dealing, promotional material and email and other communications by Ticketmaster to its customers, including [P]laintiffs." 4AC ¶ 483. Plaintiffs then appear to allege four different contract theories:

(1) 290 Plaintiffs claim that "Ticketmaster offered to give Verified Fans with codes first access to tickets starting with the Presale on November 15, 2022, free of interference from bots and scalpers." *Id.* ¶ 483(b) (citations omitted). These Plaintiffs claim to have "accepted this offer by performance that included registering to become Verified Fans and following all instructions, supplying personal information, obtaining a code that Ticketmaster had deemed necessary to participate in the Presale, investing 8-12 hours of their time obtaining tickets for their online shopping carts and attempting to purchase them . . . " ("Contract One"). *Id.*

(2) 101 Plaintiffs claim that "Ticketmaster offered to give Capital One cardholders access to tickets immediately after the Presale of November 15, 2022, again free of interference from bots and scalpers." *Id.* ¶ 483(c) (citations omitted). These Plaintiffs claim to have "accepted this offer by performance that included obtaining a Capital One credit card, registering in accordance with the program's instructions, supplying personal information, investing 8-12 hours of their time obtaining tickets for their online shopping carts and attempting to purchase them . . . " ("Contract Two"). *Id.*

(3) 37 Plaintiffs claim that "Ticketmaster offered 'preferred access' to prior 'Lover Fest' Verified Fans – which, for that tour, had meant getting a 'spot in line . . . based on . . . total boosts from the previous Taylor Swift Tix campaign' – as well as a 'boost . . . in line' for buying merchandise surrounding the release of Ms. Swift's 'Midnights' album." *Id.* ¶ 483(d) (citations omitted). These Plaintiffs claim that they "accepted one or the other of these offers by signing in with qualifying information, supplying personal information and, like the others, investing an entire day attempting to consummate purchases that Ticke[t]master's system rejected" ("Contract Three"). *Id.*

(4) Three Plaintiffs claim that they "purchased Eras Tour tickets in the Verified Fan Presale" but "later had these tickets removed from their Ticketmaster accounts and sold by Ticketmaster to someone else . . . " ("Contract Four"). *Id.* ¶ 483(a).

Plaintiffs allege that Ticketmaster breached the contract by (1) "allow[ing] users without codes to participate in and buy tickets during the Verified Fan Presale;" (2) "let[ting] in bots, scalpers and fake accounts to both the Verified Fan and Capital One presales;" and (3) failing to "give 'preferred access' or a 'boost . . . in line' to prior 'Lover Fest' Verified Fans or to purchasers of 'Midnights'

18

merchandise." *Id.* ¶ 484 (internal citations omitted). Defendants assert that Plaintiffs fail to plausibly allege a breach of contract claim under any of their alleged contract theories. *See* Motion at 16-17. The Court addresses each theory in turn.

First, Defendants assert that Contracts One and Two "fail at the first element because these are not the terms of any contract Plaintiffs entered into." *Id.* at 16. Defendants argue that "[n]owhere in the Verified Fan Terms of Use . . . does Ticketmaster promise a presale 'free of interference from bots and scalpers.'" *Id.* (quoting 4AC ¶ 483(b)). Rather, "those Terms *disclaim* responsibility for any technical and/or communications malfunctions, unauthorized human intervention, and any injury or damage resulting from participation in the Verified Fan program – *i.e.*, just the opposite of what Plaintiffs now claim was promised." *Id.* (emphasis in original) (citing Ex. S, Docket No. 168-20, at 5). Defendants claim that the other exhibits attached to the 4AC "warn repeatedly that codes and tickets were 'never guaranteed' and that participating in a presale simply gave individuals the 'best chance' to purchase tickets for a highly in-demand event." *Id.* at 16 n.12 (quoting Ex. F, Docket No. 168-6, at 1, 5) (citing Ex. G, Docket No. 168-8, at 2, and Ex. Y, Docket No. 168-26, at 2). Plaintiffs contend in opposition that "Ticketmaster promised 'Verified Fans with codes first access to tickets . . . on November 15, 2022" yet "admitted selling to Verified Fans *without* codes on that date." Opp. at 13 (emphasis in original) (quoting 4AC ¶ 484(a)) (citing Ex. M, Docket No. 168-14, at 3). Pointing to Defendants' focus on "the absence of a contract promising no bots," Plaintiffs claim that Defendants "completely ignore[ ] the express requirement of a code that Ticketmaster breached." *See id.* (citing Motion at 16). Similarly, Plaintiffs argue that for Contract Two, "Defendants focus on the bot issue rather than the breach of their express promise of access to cardholders." *Id.* at 14 (same).

Plaintiffs expressly allege that the contract at issue is based on the Terms of Use of the Verified Fan Program. *See* 4AC ¶ 483; Ex. S, Docket No. 168-20. It is alleged that this contract is further modified "by course of dealing, promotional material and email and other communications by Ticketmaster to its customers." *See* 4AC ¶ 483; *see also, e.g.*, Ex. F, Docket No. 168-6.

For Contract One, Plaintiffs specifically reference Exhibits F through H. *See* 4AC ¶ 483(b). Exhibit F is a Ticketmaster blog post announcing the Eras Tour and providing information regarding registration for the Verified Fan Presale. *See* Ex. F, Docket No. 168-6. Exhibit G includes two screenshots, one of which appears to be a confirmation of being in line to

register to be a Verified Fan and the other appears to be the registration portal itself on the Ticketmaster website.  *See* Ex. G, Docket No. 168-8.  Exhibit H appears to be an automated email from Ticketmaster confirming registration and notifying the registrant that "[w]hile Verified Fan does not guarantee that everyone will get a ticket, it does help ensure only fans are invited to buy tickets."  *See* Ex. H, Docket No. 168-9, at 2.

For Contract Two, Plaintiffs reference Exhibits F-1, X, and Y.  *See* 4AC ¶ 483(c).  Exhibit F-1 appears to be an email from "Taylor Nation" with information about the dates for the Verified Fan registration, the presales, and the general public onsale.  *See* Ex. F-1, Docket No. 168-7.  Exhibit X is an announcement on Capital One's website regarding the Capital One Presale that includes instructions on how to gain access to presale tickets for Capital One cardholders.  *See* Ex. X, Docket No. 168-25.  Exhibit Y is Ticketmaster blog post that, *inter alia*, provides instructions on how to "gain entry into the [Capital One P]resale."  *See* Ex. Y, Docket No. 168-26, at 2.

Upon review of the relevant allegations and accompanying exhibits, the Court would find that Plaintiffs fail to allege the existence of any contract with respect to Contracts One and Two because of the lack of sufficiently definite contractual terms.  While Ticketmaster may have represented that the Verified Fan Presale "creates the best opportunity to . . . keep tickets out of the hands of bots," there is nothing in Exhibits F through H that shows in any definite terms that there was an agreement between the relevant parties that the presale would be "free of interference from bots and scalpers."  *See* Ex. H, Docket No. 168-9, at 2; 4AC ¶ 483(b).  Plaintiffs appear to concede as much for both Contracts One and Two by failing to directly address this challenge in their opposition.  *See* Opp. at 13-14.  Plaintiffs expressly allege that both Contracts One and Two required that access to the presales be "free of interference from bots and scalpers."  *See* 4AC ¶¶ 483(b)-(c).  If this is not a term of either Contracts One or Two, as Plaintiffs appear to concede, then it is unclear to the Court why Plaintiffs would allege otherwise in the 4AC.

Even if the Court were to find the terms of such contracts plausibly alleged, the Court is unpersuaded that Plaintiffs have sufficiently alleged that Defendants breached either of them.  Plaintiffs argue that Defendants do not address the "express requirement" in Contract One of "first access to tickets" for Verified Fans with codes and the "express promise [in Contract Two] of access to [Capital One] cardholders."[14]  *See* Opp. at 13-14.  Defendants argue – and the Court

---

[14] Plaintiffs make general references to the various exhibits without specifically identifying the precise language from each that supports their allegations with respect to each contract.  The Court is skeptical that even the existence

would agree – that such terms (assuming they are "express" terms of the relevant contracts) do not appear to have been breached. *See* Reply at 9-10. With respect to Contract One, Plaintiffs claim that Defendants "admitted selling to Verified Fans *without* codes on that date." Opp. at 13 (emphasis in original) (citing 4AC ¶ 484(a) and Ex. M., Docket No. 168-14, at 3). This allegation seems hardly plausible when it had been announced on November 17, 2022 that "[e]very ticket was sold to a buyer with a Verified Fan code" and that "[n]obody (not even a bot) could join a queue without being Verified." Ex. M, Docket No. 168-14, at 3. Plaintiffs allege that this announcement, however, was changed the following day to indicate that "[a]ll 2 million tickets for the Verified Fan onsale were sold to Verified Fans." 4AC ¶ 411. Plaintiffs suggest that, through these changes, "Ticketmaster admitted that it sold tickets to Verified Fans *without* codes on November 15." *Id.* (emphasis in original). Without more, however, the Court would decline to draw such an inference, especially in light of the fact that the modified announcement on November 18, 2022 also makes clear that only Verified Fans with codes could "complete their purchase[s]." *See* Ex. M, Docket No. 168-14, at 3 ("For additional security, ticket buyers also had to enter their unique code to complete their purchase.").

With respect to Contract Two, while access to the presale tickets appears to have been promised to Capital One cardholders, the ability to purchase tickets was not. *See, e.g.*, Ex. X, Docket No. 168-25, at 2 ("Capital One is offering cardholders the opportunity to access . . . presale tickets . . . *while supplies last*." (emphasis added)); Ex. Y, Docket No. 168-26, at 2 ("Having an eligible Capital One credit or debit card does not guarantee tickets."). In other words, Capital One cardholders received access to presale tickets as promised but could only purchase them if they were still available. *See* 4AC ¶ 412 (indicating that 101 Plaintiffs "got into the system for the Capital One sale and had tickets in their shopping cart and . . . tried for hours but could not complete their purchases due to multiple stated errors").

Second, Defendants assert that Contract Three "fails to plausibly allege any breach" because Plaintiffs do not "explain what exactly they believe 'preferred access' or a 'boost . . . in line' should have entailed." Motion at 16. Plaintiffs contend in opposition that "they expected that prior 'boosts' would put them ahead of all other Verified Fans" and that "[u]nless every successful ticket buyer had such boosts and preferred access over every other Verified Fan, 37

---

of these purportedly "express" terms has been sufficiently alleged in the 4AC.

[P]laintiffs validly claim breach." Opp. at 14 (citing 4AC ¶ 408). Specifically, Plaintiffs allege that Ticketmaster breached Contract Three because "[i]t did not give 'preferred access' or a 'boost . . . in line' to prior 'Lover Fest' Verified Fans or to purchasers of 'Midnights' merchandise." 4AC ¶ 484(c). The Court would agree with Defendants that this conclusory allegation is insufficient. The relevant allegations in the 4AC suggest that Plaintiffs do not even know precisely what kind of "preferred access" they would receive, just that it would be "some enhanced access beyond Verified Fan status alone." *See id.* ¶ 408. While Plaintiffs with "preferred access" may have been "rejected in their multiple purchase efforts," *see id.* ¶ 475(c), there is nothing in the 4AC that suggests they were not given the "enhanced access" they believed they were promised.

Lastly, Defendants assert that Contract Four "is far too vague and conclusory to state a claim" because "Plaintiffs provide neither the contract nor allege its essential terms – *e.g.*, price, quantity, venue – to properly demonstrate a binding commitment involving any supposed purchases, despite having received all transaction information for each of their Ticketmaster accounts." Motion at 16 (citing Docket No. 27). Plaintiffs contend in opposition that "it makes no difference whether they paid $2 or $2,000, for one ticket or half a dozen, for Yankee Stadium or Timbuktu Hyena Flats; three plaintiffs did everything they needed to do, and in fact got their tickets, consummating their deal on whatever terms they got." Opp. at 14. The Court would agree with Plaintiffs' position. Plaintiffs' sufficiently allege (although perhaps a bit briskly) the four elements of a breach of contract: (1) the contract (here a sale of tickets to the Eras Tour), (2) Plaintiffs' performance (they purchased the tickets), (3) defendants' breach (they removed the tickets from Plaintiffs and sold them to someone else), and (4) resulting damages (Plaintiffs had their property – *i.e.*, the tickets – taken from them).

Accordingly, the Court would find that Plaintiffs have not plausibly alleged a breach of contract claim under the first three theories they set forth in the 4AC, but not as to the fourth. The Court had previously made clear that Plaintiffs' breach of contract theory would require "more specificity from Plaintiffs in terms of what Defendants represented." *See* Docket No. 165, at 7. Again, the Court is "left to guess not only what form the contract took and how the parties agreed to it, but also what its terms truly were." *Id.* (citing *A.B. Concrete Coating Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 491 F. Supp. 3d 727, 736 (E.D. Cal. 2020)). As such, the Court would **GRANT** the Motion with respect to claim seven, at the hearing the Court will discuss with the parties whether the dismissal should be with or without leave to amend, as to the first three theories.

22

### D.  Antitrust Claims (Claims One, Two, and Three)

Defendants seek to dismiss the antitrust claims because "(1) it is based on irrelevant allegations improperly incorporated by reference and completely disconnected from their alleged harm related to The Eras Tour, and (2) the claims now depend in part on an impermissible 'single-brand' market."  Motion at 17.  The Court addresses each argument in turn.

### 1.  Plaintiffs' Incorporation of Allegations from Other Cases

First, Defendants assert that Plaintiffs have impermissibly incorporated portions of the complaints in *United States v. Live Nation*, No. 1:24-cv-03973-AS (S.D.N.Y.) (the "Government Action") and *Heckman v. Live Nation*, No. 2:22-cv-00047-GW-(GJSx) (C.D. Cal.) to allege that Defendants engaged in exclusionary conduct in violation of both the Sherman Act and the Cartwright Act.  *See id.* at 17-19.  Plaintiffs contend in opposition that they have merely restated facts from the Government Action in their own 4AC.  *See* Opp. at 3 (footnote omitted).  Defendants rely on *Meyer v. Cnty. of San Diego*, No. 21-cv-341-RSH-(BLMx), 2025 WL 2042360, at *14 (S.D. Cal. July 21, 2025), for the proposition that "[a]llegations in pleadings in another action, even if between the same parties, cannot be incorporated by reference."  *See* Motion at 18. Plaintiffs rely on *Blackwell v. Jones Day L. Firm*, No. 2:20-cv-11493-SFC-(DRG), 2021 WL 764124, at *3 (E.D. Mich. Feb. 26, 2021), to support the position that they are only "*re-stating the allegations* at issue."  *See* Opp. at 3 (emphasis in original).  Defendants argue in response that "Plaintiffs do not allege *as facts*, based on their *own* investigation, any of the borrowed examples in the [4]AC."  Reply at 12 (emphasis in original).  Instead, Defendants claim that Plaintiffs "merely note that the Government Plaintiffs alleges these things."  *Id.* (citing 4AC ¶¶ 381, 386, 393-94).

Defendants rely on Rule 11(b), which provides in relevant part:

> By presenting to the court a pleading, written motion, or other paper – whether by signing, filing, submitting, or later advocating it – an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances[,] the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Fed. R. Civ. P. 11(b)(3).  "Consistent with this rule, '[w]hen drafting a complaint, an attorney may rely in part on other sources, but may not rely entirely on other sources as the sole basis for the complaint's allegations.'"  *SEC v. Strong Inv. Mgmt.*, No. 8:18-cv-00293-JLS-(DFMx), 2018 WL

8731559, at *5 (C.D. Cal. Aug. 9, 2018) (quoting *Elliot v. China Green Agricultures, Inc.*, No. 3:10-CV-0648-LRH-(WGC), 2012 WL 5398863, at *3 (D. Nev. Nov. 2, 2012)).  Plaintiffs may rely on allegations from complaints in other cases only to the extent that they have investigated such allegations.  *See Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10-CV-0302-MRP-(MANx), 2011 WL 4389689, at *20 (C.D. Cal. May 5, 2011).

Defendants do not appear to seek sanctions; rather, they indicate that "the Court should disregard both the paragraphs wholesale incorporated by reference as well as the 'restated' examples Plaintiffs have not themselves investigated."  Reply at 13 (identifying twenty-one paragraphs in the 4AC that "are drawn explicitly from the complaint in the Government Action").  Plaintiffs do not indicate that they have taken any measures to investigate the bases for the allegations from the complaints in the Government Action and *Heckman* that they incorporate into the 4AC.  It is, therefore, unclear to the Court whether Plaintiffs have conducted a reasonable investigation as required by Rule 11(b).  Nonetheless, the Court's review of some of the allegations identified by Defendants as being "wholesale incorporated by reference" do not convince the Court that the 4AC runs afoul of Rule 11(b).  At least some of these allegations appear to have been included to corroborate the rest of the allegations set forth in the 4AC.  *See, e.g.*, 4AC ¶ 379 (describing "a concrete example" from the Government Action to support allegations of Live Nations's use of threats against venues).  Plaintiffs also indicate that "the 4AC goes at length and in detail into '[o]ther ways' in which Defendants wield their power that are 'more directly relevant to this action'"  Opp. at 3 n.1 (citing *id.* ¶¶ 376, 377-87).  At this time, the Court would decline to disregard the portions of the 4AC Defendants suggest are improperly pled.

    2.   <u>Primary Concert Ticketing Market as a Relevant Market</u>

Second, Defendants assert that Plaintiffs "fail to connect the allegations [from the Government Action or *Heckman*] to the harm they supposedly suffered in *this* case" and that the allegations in those two other actions are "irrelevant to Plaintiffs' specific complaints."  *See* Motion at 18 (emphasis in original).  Defendants point to Plaintiffs' allegation that "[t]he dominance and power of [Defendants] in the market for concert tickets in the United States has allowed Ticketmaster to get away with impunity providing ticketing services of lower quality at higher prices, harming concertgoers throughout America and, in particular, the fans of Taylor Swift who have brought this action."  *See* Motion at 18; 4AC ¶ 1.  Based on this allegation, Defendants claim "Plaintiffs' theory is evidently that Defendants have been accused of antitrust

violations in other contexts in other cases[ ] and . . . the service [Plaintiffs] received from
Defendants during The Eras Tour onsale was poor, so there must be an antitrust violation here
too." Motion at 18. Defendants then claim that the Government Action focuses on alleged
anticompetitive conduct related to "Major Concert Venues," which Defendants indicate does not
include the stadiums at which the Eras Tour was held in the United States. *See id.* at 18-19 (citing
Government Action, Docket No. 257, ¶ 27 and Ex. F, Docket No. 168-6, at 8-9). Relying on the
allegations in the Government Action, Plaintiffs allege that "Ticketmaster's exclusive agreements
cover more than 75% of concert ticket sales at major concert venues, thus depriving rival ticketers
of a substantial share of the primary ticketing market." 4AC ¶ 381. Defendants assert that such
an allegation is not plausible because "Plaintiffs' alleged antitrust damages relate to a *stadium*
tour, yet they have copied-and-pasted a market from another case that *does not include stadiums*."
Motion at 19 (emphasis in original). Plaintiffs argue in response that the Government Action "is
not so limited" based on their own allegations in the 4AC. *See* Opp. at 4 (citing 4AC ¶¶ 373, 389,
395, 398).

        Plaintiffs allege that the relevant market is a "specialized market" within the "'Primary
Concert Ticketing Market,' which includes major concert venues and concert fans as two distinct
sets of customers." *See* 4AC ¶ 389. This Primary Concert Ticketing Market "concerns the
provision of primary ticketing services to major concert venues in the United States." *Id.* ¶ 390.
Defendants claim that the definition of this alleged market is derived from the Government Action,
which involves alleged anticompetitive conduct related to "Major Concert Venues." *See* Motion
at 18; Government Action, Docket No. 257, ¶ 27 ("Major concert venues include large
amphitheaters and arenas that are particularly suited to hosting live concerts for popular artists due
to their capacity, infrastructure, and amenities."). Defendants also claim without referencing the
docket in the Government Action that "[t]he Government Plaintiffs have explicitly excluded
stadiums from their calculations of alleged damages." Reply at 14 n.9. The complaint in the
Government Action alleges that "[t]he venues most directly impacted by Live Nation's scheme are
major concert venues" and that such venues are "big enough to host major concerts and able to
provide a suitable environment and infrastructure for widely attended concerts, like large arenas
and amphitheaters." Government Action, Docket No. 257, ¶ 165. None of these allegations
clearly indicate that the Government Action excludes conduct related to stadiums. Even if they
did, Plaintiffs have specifically alleged that Defendants' anticompetitive conduct involves "the

provision of primary ticketing services to major concert venues in the United States, *including with respect to the Eras Tour*." 4AC ¶ 429 (emphasis added). Defendants do not indicate what more is required at this stage. Furthermore, while noticeably absent from the 4AC is the word "stadium," the Court fails to see any meaningful distinction between arenas, amphitheaters, and stadiums that would render baseless Plaintiffs' reliance on the Government Action's definition of "major concert venues" in support of their relevant market theory.

       3.   U.S. Eras Tour Market as a Single-Brand Market

Third, Defendants assert that Plaintiffs' antitrust claims fail because they rely on a "single-brand market" – that is, the alleged "U.S. Eras Tour Market" – which Defendants claim is "a common ploy designed to guarantee high market share which courts almost always reject, except in limited 'aftermarket' scenarios not applicable here." *See* Motion at 19 (citing *Stubhub, Inc. v. Golden State Warriors, LLC*, No. 3:15-cv-01436-MMC, 2015 WL 6755594, at *4 (N.D. Cal. Nov. 5, 2015) and *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008)). Defendants claim that this "special market" was intentionally carved out from the larger "Primary Concert Ticket Market" to "focus[ ] solely on Ticketmaster's provision of primary ticketing services for Taylor Swift's Eras Tour in the United States." *See id.* (quoting 4AC ¶¶ 399, 401-02). Plaintiffs contend in opposition that "Defendants' dominance over the Primary Concert Ticketing Market spilled over into the U.S. Eras Tour Market for Taylor Swift concert tickets" and that these "effects . . . were held sufficient to state a plausible monopoly claim in *Newcal Indus.,* [*Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1047-50 (9th Cir. 2008)]." Opp. at 5 n.2.

The Cartwright Act "generally outlaws any combinations or agreements which restrain trade or competition or which fix or control prices . . . and declares that, with certain exceptions, every trust is unlawful, against public policy and void." *In re Cipro Cases I & II*, 61 Cal. 4th 116, 136 (2015) (quoting *Pac. Gas & Elec. Co. v. Cnty. of Stanislaus*, 16 Cal. 4th 1143, 1147 (1997) (internal citations omitted)). "The analysis under California's antitrust law mirrors the analysis under federal law because the Cartwright Act . . . was modeled after the Sherman Act." *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001); *see also Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000) ("Our disposition of [the plaintiff's] Sherman Act claims disposes of its claims under the California Cartwright Act. The Cartwright Act is patterned after the Sherman Act, and 'federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act.'" (quoting *Marin Cnty. Bd. of*

*Realtors, Inc. v. Palsson*, 16 Cal. 3d 920, 925 (1976))).

"In order to state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power within a 'relevant market.'  That is, the plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market."  *Newcal Indus.*, 513 F.3d at 1044.  Still, "[t]here is no requirement that these elements of the antitrust claim be pled with specificity . . . [and] [a]n antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect." *Id.*  "Allegations of a relevant market and market power generally pass the test at the pleading stage unless the market definition is 'facially unsustainable.'"  *Biddle v. Walt Disney Co.*, 696 F. Supp. 3d 865, 882 (N.D. Cal. 2023) (citing *Newcal Indus.*, 513 F.3d at 1045).

In *Newcal*, the Ninth Circuit stated the relevant market: (i) must be "a product market," not one defined by consumers; (ii) must encompass the product as well as "all economic substitutes for the product"; and (iii) may include a submarket if it is "economically distinct from the general product market."  *Newcal Indus.*, 513 F.3d at 1045.  Submarkets are identified by indicia like "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).  "Defining the relevant market requires identifying those competitors who have the actual or potential ability to deprive each other of significant levels of business . . . [but] [t]he process of defining the relevant market is [generally] a factual inquiry for the jury."  *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993).

"[I]n some instances one brand of a product can constitute a separate market."  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992); *see also Newcal Indus.*, 513 F.3d at 1048 ("[T]he law permits an antitrust claimant to restrict the relevant market to a single brand of the product at issue.").  Specifically, the relevant market may be an aftermarket, which "[t]he Supreme Court and the Ninth Circuit have only found . . . plausible in the context of *aftermarkets* which are 'wholly derivative from and dependent on the primary market.'"  *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1107 (N.D. Cal. 2022) (emphasis in original) (quoting *Newcal Indus.*, 513 F.3d at 1049) (citing *Streamcast Networks, Inc. v. Skype Techs., S.A.*, 547 F. Supp. 2d 1086, 1094 (C.D. Cal. 2007)).  "'Single-brand markets are, at a minimum, extremely rare' and courts have rejected such market definitions '[e]ven where brand loyalty is intense.'"  *Id.* (quoting

*Apple, Inc.*, 586 F. Supp. 2d at 1198). "[T]o establish a single-brand aftermarket, a plaintiff must show: (1) the challenged aftermarket restrictions are 'not generally known' when consumers make their foremarket purchase; (2) 'significant' information costs prevent accurate life-cycle pricing; (3) 'significant' monetary or non-monetary switching costs exist; and (4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 977 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 (2024), and *cert. denied*, 144 S. Ct. 682 (2024).

As already noted, Plaintiffs allege that the U.S. Eras Tour Market was an "even more specialized market for this case" within the Primary Concert Ticketing Market. *See* 4AC ¶ 389. The U.S. Eras Tour Market was "for the sale of primary tickets for fans of Taylor Swift . . . to attend at least one of her Eras Tour concerts in the United States." *Id.*; *see also id.* ¶¶ 401-02. Plaintiffs neither allege nor argue in their opposition that the U.S. Eras Tour Market is an aftermarket. Even if they had made the argument in their opposition, however, the allegations in the 4AC do not suffice to plausibly allege a single-brand aftermarket under Ninth Circuit precedent.

In sum, while the Court would agree with the issues identified by Defendants with respect to the U.S. Eras Tour Market, the Court would disagree with Defendants' arguments regarding Plaintiffs' reliance on the allegations in the other actions relating to the Primary Concert Ticketing Market. Defendants do not present any other challenges to the sufficiency of the allegations with respect to this other alleged relevant market or any of the other elements of Plaintiffs' antitrust claims. As such, the Court would **DENY** the Motion with respect to claims one, two, and three.[15]

### E.  UCL Claim (Claim Eight)

To state a claim under the UCL, a plaintiff must "establish that the practice is either unlawful (i.e., is forbidden by law), unfair (i.e., harm to victim outweighs any benefit) or fraudulent (i.e., is likely to deceive members of the public)." *Albillo v. Intermodal Container Servs., Inc.*, 114 Cal. App. 4th 190, 206 (2003) (citations omitted).

Defendants assert that Plaintiffs' UCL claim should be dismissed because Plaintiffs have

---

[15] Defendants also argue in a footnote that "Plaintiffs do not even attempt to allege whether or how '*each*' [ticketing] agreement had a discrete effect on competition,' as they must." Motion at 19 n.13 (emphasis and alteration in original) (quoting *Gibson v. Cendyn Grp., LLC*, 148 F.4th 1069, 1087 (9th Cir. 2025)). The Court would decline to address such an argument absent any further discussion from Defendants.

not plausibly alleged the inadequacy of their legal remedies at law.  *See* Motion at 20.  Defendants rely primarily on *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020).[16]  The *Sonner* decision has raised much discussion as to the scope of its holding, its substantive underpinnings, and its precedential value.  *See, e.g.*, Stern, *Bus. & Prof. Code § 17200 Practice* (The Rutter Group 2025) §§ 5:239-239.5 ("*§ 17200 Practice*") (and cases cited therein).  This Court has adopted the approach of "apply[ing] *Sonner*'s bar in the situation where plaintiffs are seeking equitable restitution under the UCL where the same monetary relief is available to them in the form of damages under some legal cause of action (*e.g.*, under the CLRA)."  *See Wesley Africa v. Vision Path, Inc. et al*, No. 2:23-cv-04570-GW-(MBKx) (C.D. Cal.), Docket No. 167, at 11.  This Court explained that "[i]n such situations, there is an adequate remedy at law which vitiates the need for equitable relief as to that injury.  However, where a person is engaging in activities which constitute unfair competition and there is no apparent bar to that person's continuation of that improper conduct, injunctive relief would be available as there is no adequate remedy at law."  *Id.* (citing *Barquis v. Merchants Collection Ass'n*, 7 Cal. 3d 94, 111 (1972)).

Here, the Court would agree with Defendants that Plaintiffs have not sufficiently pleaded the inadequacy of their remedies at law in seeking equitable restitution under the UCL.  Plaintiffs argue that "they frequently attend concerts and that damages cannot make them whole because they will have to deal with Defendants' unlawful, unfair and fraudulent practices well into the future unless the Court enjoins such conduct."  Opp. at 15 (citing 4AC ¶ 492).  Specifically, Plaintiffs allege that "damages alone cannot afford them adequate relief" and that, without equitable relief, "plaintiffs as music fans and concertgoers – who undoubtedly will need to deal with Live Nation and Ticketmaster in the future – would continue to suffer from [Defendants'] misconduct."  4AC ¶ 492.  The Court would find this allegation insufficient to show their alleged "right to restitution."  *See id.*  Therefore, the Court would **DENY** the Motion with respect to claim

---

[16] In *Sonner*, the plaintiff brought a putative class action against a manufacturer of dietary supplements seeking, *inter alia*, $32 million in damages for false and/or misleading advertisement under the California Consumer Legal Remedies Act ("CLRA") and the same amount in equitable restitution under California's Unfair Competition Law ("UCL").  Just before trial, the plaintiff dropped the CLRA claim for damages and only sought the $32 million in equitable restitution.  The Circuit referenced the common-law rule that a plaintiff seeking equitable relief had to demonstrate the absence of an adequate remedy at law.  *Sonner*, 971 F.4th at 843-44.  It went on to hold that, even though the plaintiff had voluntarily dismissed the class's CLRA damages claim, the CLRA did provide an adequate remedy at law as to the $32 million and, hence, there was no basis for seeking equitable restitution under either the UCL or the CLRA.  *Id.*

eight insofar as it seeks to dismiss Plaintiffs' request for equitable relief under the UCL based on *Sonner*, except as to restitution.

## IV.    <u>Conclusion</u>

Based on the foregoing discussion, the Court would **GRANT** the Motion with respect to claims four, five, six, and seven (but as to claim seven, only in part) and **DENY** the Motion with respect to claims one, two, three, and eight (except as to restitution).