JOHN M. GENGA (SB# 125522)
GENGA & ASSOCIATES
jgenga@gengalaw.com
16501 Ventura Blvd., Suite 400
Encino, CA 91436
(747) 231-3400 | Fax: (818) 474-7070

JENNIFER A. KINDER (*pro hac vice*)
jkinder@justcallkinder.net
KINDER LAW PLLC
3701 W. Northwest Hwy., Suite 304
Dallas, TX 75220
(214) 812-9800 | Fax: (214) 484-2144

DENNIS B. HILL (SBN 218131)
ticketmasterlawsuit@gmail.com
D.B. HILL, a Professional Law Corporation
640 Fifth Street, Suite 200
Lincoln, CA 95648
(916) 434-2553 | Fax: (916) 434-2560

Attorneys for Plaintiffs
JULIE BARFUSS, *et al.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIE BARFUSS, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>LIVE NATION ENTERTAINMENT, INC., TICKETMASTER L.L.C., STADCO LA, LLC as DOE 1, and DOES 2 through 10, inclusive,<br><br>Defendants. | Case No.: 2:23-cv-01114-GW (KKx)<br><br>**FIFTH AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs hereby respectfully submit their Fifth Amended Complaint since filing their action in the California Superior Court, County of Los Angeles, their fourth in this U.S. District Court since defendants noticed the removal of the action hereto. This iteration of their pleading adheres to the Court's order following the November 13, 2025 hearing on Defendants' motion to dismiss ("MTD") the Fourth Amended Complaint. Specifically, this Fifth Amended Complaint: (i) removes the former fourth, fifth and sixth claims for relief, for negligence and intentional and negligent misrepresentation, respectively (and makes corresponding revisions to earlier portions of the pleading referring to those claims), as to which the Court granted the MTD without leave to amend; (ii) amends the former seventh (now the fourth) claim for relief, for breach of contract, since and to the extent the Court granted leave to amend that claim in ruling on the MTD; and (iii) no longer seeks restitution on the former eighth (now the fifth) claim for relief, alleging violation of the California Unfair  Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et esq.* ("UCL"), which the Court struck in its MTD ruling. For the convenience of the Court and the parties, the substantive amendments to the breach of contract allegations appear at paragraphs 445 and 446 of the fourth claim for relief herein (former paragraphs 483 and 484 of the prior seventh claim for relief).

## I.    INTRODUCTION

1.    This case arises out of the concert ticket sale debacle for Taylor Swift's "The Eras" Tour in the United States (the "Eras Tour") that began with TaylorSwiftTix Verified Presale for "Verified Fans," who ostensibly were given "codes" to access that sale, beginning on November 15, 2022 (the "Verified Fan Presale") and TaylorSwiftTix Presale powered by Capital One, also with "codes" to access that sale, beginning on November 16, 2022 (the "Capital One Presale"). Sparking such public outrage that Congress held hearings about it, the catastrophe exemplified the effect of years of anticompetitive conduct by defendant Live Nation Entertainment, Inc. ("Live Nation") and the ticketing company it acquired

in 2009, defendant Ticketmaster L.L.C. ("Ticketmaster").  The dominance and power of the combined entity in the market for concert tickets in the United States has allowed Ticketmaster to get away with impunity providing ticketing services of lower quality at higher prices, harming concertgoers throughout America and, in particular, the fans of Taylor Swift who have brought this action.

2.      Live Nation has effectuated this anticompetitive scheme by requiring the most suitable venues for large concerts, most of which Live Nation owns and controls, to use Ticketmaster as their exclusive ticket provider.  Ticketmaster's monopoly and disincentive to invest in acting with due care to provide competent services led directly to the Verified Fan Presale disaster on November 15, 2022, followed by a delayed and truncated Capital One Presale and cancellation of the general "onsale" until then scheduled for November 18, 2022.  A November 22, 2022 article quotes Taylor Swift's own tour promoter as confirming that having no option but to use Ticketmaster for that presale created the mess that no one could get around:

> Ticketmaster's exclusive deals with the vast majority of venues
> on the "Eras" tour required us to ticket through their system.
> We didn't have a choice.

*See* https://www.cnbc.com/2022/11/22/taylor-swift-tour-promoter-had-to-work-with-ticketmaster.html?msockid=30060ef16eab6ed82c391a556fc16fcb, a true and correct copy of which is also attached hereto as Exhibit A. Instead, Live Nation and Ticketmaster misled Taylor Swift's fans – including plaintiffs herein – and Ms. Swift herself, to which she reacted as follows:

> It's really difficult for me to trust an outside entity with these
> relationships and loyalties, and excruciating for me to just
> watch mistakes happen with no recourse….  I'm not going to
> make excuses for anyone because we asked them, multiple
> times, if they could handle this kind of demand and we were

**FIFTH AMENDED COMPLAINT**

assured they could.  It's truly amazing that 2.4 million people

got tickets, but it really pisses me off that a lot of them feel like

they went through several bear attacks to get them.

*See* https://www.cnbc.com/2022/11/18/taylor-swift-slams-outside-entity-over-ticketmaster-tour-sale-fiasco.html, a true and correct copy of which is also attached hereto as Exhibit B.

3.    Up until now not restricted legislatively, unless enjoined judicially and made to pay damages, Live Nation, Ticketmaster and venue operators who agree to ticket exclusively via Ticketmaster, will keep perpetrating such abuses. "It's called capitalism," a former Ticketmaster CEO said when responding to questions about an article in which he blamed "whining" fans for what has happened with concert tickets in the U.S.:

The public brought all this on itself…. I have no sympathy for

people whining about high ticket prices…. They helped create

this situation where artists have to make all their money on

tour. Artists and the market set the prices, and you can't pay a

Motel 6 price and stay at the Four Seasons.

*See* https://www.cbc.ca/radio/asithappens/ticketmaster-ex-ceo-1.6724785, a true and correct copy of which is also attached hereto as Exhibit C, and https://www.yahoo.com/entertainment/everyone-hates-ticketmaster-everyone-wrong-130057017.html, a true and correct copy of which is also attached hereto as Exhibit D.

4.    The Department of Justice and several states did not see things the same way when they challenged Live Nation's acquisition of Ticketmaster in 2010 and then entered a consent decree with them in United States, *et al.* v. Ticketmaster, etc., *et al.*, U.S. Dist. Ct. (D.D.C.) case no. 1:10-cv-00139 ("Consent Decree," and the action, the "Original DoJ Case").  Since even the Consent Decree judgment has not deterred them from misusing their market power and entering

-4-

into agreements to restrain trade illegally, the federal and many state governments sued Live Nation and Ticketmaster again on May 23, 2024 in <u>United States, *et al.* v. Live Nation, etc., *et al.*</u>, U.S. Dist. Ct. (S.D.N.Y.) case no. 1:24-cv-03973 (the "Pending DoJ Case"). This amended pleading draws heavily from the facts and evidence uncovered by the Justice Department and alleged in its complaint in the Pending DoJ Case, which has withstood defendants' effort to dismiss it under Fed. R. Civ. P. 12(b)(6). Allegations similar to those made by plaintiffs herein likewise have survived such a motion in the related case of <u>Heckman, *et al.* v. Live Nation, etc., *et al.*</u>, U.S. Dist. Ct. (C.D. Cal.) case no. 2:22-cv-00047-GW-GJS ("Heckman Case"). In addition to pleading monopolization and combination in restraint of trade in close alignment with such allegations made under Sherman Act sections 2 and 1 in the Pending DoJ and Heckman Cases (First and Second Claims for Relief), plaintiffs here assert that Live Nation and Ticketmaster:

- Violated the Cartwright Act of California, Bus. & Prof. Code §§ 16700 *et seq.*, and in particular §§ 16720 and 16727 thereof, by unlawful exclusive dealing (Third Claim for Relief),
- Made and failed to perform false promises to plaintiffs to their detriment, constituting breach of contract (Fourth Claim), and
- Engaged in conduct actionable under California's Unfair Competition Law, Bus. & Prof. Code §§ 17200 *et seq.* ("UCL") (Fifth Claim).

Plaintiffs no longer make these allegations against "Doe 1" defendant StadCo LA, LLC ("StadCo"), which they have voluntarily dismissed from this action without prejudice, subject to renaming it should plaintiffs determine that discovery in this case provide a basis for them to do so.

## II.    JURISDICTION AND VENUE

5.    Defendants Ticketmaster and Live Nation have invoked the subject matter jurisdiction of this Court by removing this action from California state court

**FIFTH AMENDED COMPLAINT**

pursuant to the federal Class Action Fairness Act, 28 U.S.C. § 1332(d), which the Court has accepted.

6.    Venue properly lies in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and 1441(a).

### III.    THE PARTIES

A.    *Plaintiffs*:

7.    Each of the persons listed below in paragraphs 8 through 364, inclusive, is an adult individual.  They are organized by categories that describe the status and experience each had when attempting to purchase Eras Tour tickets.

i.    *Verified Presale Fans with passcodes who were thwarted from completing purchases of tickets, including those selected and in their shopping carts, by stated "internal server errors" and "interaction issues," "passcode validation," "authentication" and "checkout" errors, who were also Verified Capital One Presale Fans with passcodes likewise prevented from completing purchases of carted tickets on the same stated bases:*

8.    Julie Barfuss resides and is domiciled in Utah.

9.    Randy Floyd Barfuss resides and is domiciled in Utah.

10.    Jennifer Landry resides and is domiciled in Texas.

11.    Joseph Akmakjian resides and is domiciled in Colorado.

12.    Allison McCroan resides and is domiciled in Florida.

13.    Matt McCroan resides and is domiciled in Florida.

14.    David Kilbridge resides and is domiciled in San Francisco, California.

15.    Christopher Toth resides and is domiciled in Los Angeles, California.

16.    Emma Earnest resides and is domiciled in North Carolina.

17.    Rachael Coombs resides and is domiciled in New Hampshire.

18.    Kaitlin Rose Grogg resides and is domiciled in Pennsylvania.

19.    Brenda Gallagher resides and is domiciled in Massachusetts.

20.    Kimberly Stevenson resides and is domiciled in Massachusetts.

21.   Frank Scolaro resides and is domiciled in Massachusetts.

22.   Kathleen Milligan resides and is domiciled in Texas.

23.   Andrew Gautieri resides and is domiciled in New Jersey.

24.   Aytza Gautieri resides and is domiciled in New Jersey.

25.   Emily Niklaus Davis resides and is domiciled in Georgia.

26.   Jennifer Hoppe resides and is domiciled in Washington.

27.   Veronica Higareda resides and is domiciled in Texas.

28.   Kathleen Owens resides and is domiciled in Indiana.

29.   Shannon Larsen resides and is domiciled in Florida.

30.   Natalie Cruze resides and is domiciled in Lake Forest, California.

31.   Joanna Cooper resides and is domiciled in Michigan.

32.   Staci Downing resides and is domiciled in Pennsylvania.

33.   Amanda Frost resides and is domiciled in Wareham, Massachusetts.

34.   Holly Taysom resides and is domiciled in Utah.

35.   Theresa A. Standing resides and is domiciled in Missouri.

36.   Clay Murray resides in Rhode Island and is domiciled in California.

37.   Lauren Michele Gotthelf resides and is domiciled in Colorado.

38.   Jennifer Tierney resides and is domiciled in Massachusetts.

39.   Kathryn Johnson resides and is domiciled in North Carolina.

40.   Rumer Henry resides and is domiciled in Arkansas.

41.   Lauren Keating resides and is domiciled in New York.

42.   Darcy Rubino resides and is domiciled in Massachusetts.

43.   Melony Pugh resides and is domiciled in Ohio.

44.   Morgan Smallwood resides and is domiciled in Texas.

45.   Sean Smallwood resides and is domiciled in Texas.

46.   Teena Marie Cook resides and is domiciled in Illinois.

47.   Cynthia C. Cole resides and is domiciled in Texas.

48.   Sanford Glovinsky resides and is domiciled in North Carolina.

49.    Robyn Spencer resides and is domiciled in New Jersey.

50.    Ashley McNealy resides and is domiciled in Tennessee.

51.    Veronica Polivanaya resides and is domiciled in California.

52.    Kristy Voelker resides and is domiciled in Ohio.

53.    Ali Molavi resides and is domiciled in Florida.

54.    Lori Rikard resides and is domiciled in Alabama.

55.    Mark Rikard resides and is domiciled in Alabama.

56.    Sara Higgins resides and is domiciled in Illinois.

57.    Tim Higgins resides and is domiciled in Illinois.

58.    Savannah Dahlquist resides and is domiciled in Virginia.

59.    David Cook resides and is domiciled in Colorado.

60.    Christina Rondash resides and is domiciled in Kansas.

61.    Raelicia Reyes resides and is domiciled in California.

62.    Ashley Cate resides and is domiciled in Washington.

63.    Christopher King resides and is domiciled in Illinois.

ii.    *Verified Presale Fans with passcodes who were thwarted from completing purchases of tickets, including those selected and in their shopping carts by stated "internal server errors" and "interaction issues," including but not limited to "passcode validation," "authentication" and "checkout" errors:*

64.    Selena Monette Miller resides and is domiciled in Alabama.

65.    Christy LaBonne resides and is domiciled in Arkansas.

66.    Kris LaBonne resides and is domiciled in Arkansas.

67.    Courtney Butler resides and is domiciled in Arizona.

68.    Danielle Lips resides and is domiciled in Arizona.

69.    Edward Hakobjanyan resides and is domiciled in California.

70.    Melissa Ayala Quintero resides and is domiciled in California.

71.    Jennifer Uselton resides and is domiciled in California.

72.    Kelli Hernandez resides and is domiciled in Colorado.

73.  Michael Collins resides and is domiciled in Florida.

74.  Venisha Jardin resides and is domiciled in Florida.

75.  Jennifer Baggett resides and is domiciled in Georgia.

76.  Sarah Chattin resides and is domiciled in Kansas.

77.  Karen Brandel resides and is domiciled in Michigan.

78.  Jessica Becker resides and is domiciled in North Carolina.

79.  Betsy Victoria Wanner resides and is domiciled in North Carolina.

80.  Michael Vitulli resides and is domiciled in New Jersey.

81.  Ashleigh Camacho resides and is domiciled in Pennsylvania.

82.  Anthony Lanni resides and is domiciled in Rhode Island.

83.  Denise Hull resides and is domiciled in Texas.

84.  Kelly Melton resides and is domiciled in Texas.

85.  Crystal Willis resides and is domiciled in Texas.

86.  Alyssa McCoy resides and is domiciled in Virginia.

87.  Ashley Bove resides and is domiciled in Rhode Island.

88.  Dawn Wiezcrorez resides and is domiciled in Illinois.

89.  Maranda Gomez resides and is domiciled in Arkansas.

90.  Stephanie Palmer resides and is domiciled in New Hampshire.

91.  Paula C. Miller resides and is domiciled in Ohio.

92.  Delayna Lutchka resides and is domiciled in Illinois.

93.  Jesse Adams resides and is domiciled in Burbank, California.

94.  Sabrina Darnell resides and is domiciled in Illinois.

95.  Catherine Bugden resides and is domiciled in Utah.

96.  Jennifer Hudson resides and is domiciled in Ohio.

97.  Melody Langevin resides and is domiciled in Arizona.

98.  Kathleen Beech resides and is domiciled in Studio City, California.

99.  Skye Landau resides and is domiciled in Massachusetts.

100.  Kyle Jordan resides and is domiciled in Georgia.

FIFTH AMENDED COMPLAINT

1    101.  Abigail Alvord resides and is domiciled in Oregon.

2    102.  Michael Bascone resides and is domiciled in New Jersey.

3    103.  April Stumpe resides and is domiciled in Missouri.

4    104.  Derek Levesque resides and is domiciled in Massachusetts.

5    105.  Gabriella Blunck resides and is domiciled in Washington.

6    106.  Anthony Blunck resides and is domiciled in Washington.

7    107.  William R. Noah resides and is domiciled in Louisiana.

8    108.  Jimmy Hoang Ta resides and is domiciled in Missouri.

9    109.  Carrie Bastain resides and is domiciled in Indiana.

10   110.  Brett Andrew Walt resides and is domiciled in Pennsylvania.

11   111.  Audrey Costar resides and is domiciled in Ohio.

12   112.  Melinda Schneck resides and is domiciled in Pennsylvania.

13   113.  Lisa Day resides and is domiciled in Pennsylvania.

14   114.  Megan Joy Skeuse resides and is domiciled in New Jersey.

15   115.  Beatriz Aguilar resides and is domiciled in Michigan.

16   116.  Chrys Jardin resides and is domiciled in Florida.

17   117.  Teresa Eichinger resides and is domiciled in Massachusetts.

18   118.  Jacquelyn Bean resides and is domiciled in Missouri.

19   119.  Kim Bean resides and is domiciled in Missouri.

20   120.  Dorothy Lynn Fenton resides and is domiciled in Santa Ana,

21   California.

22   121.  Toni Mae B. Abaca resides and is domiciled in New Jersey.

23   122.  Tracey Roman resides and is domiciled in Massachusetts.

24   123.  Timothy Ellis resides and is domiciled in Minnesota.

25   124.  Glen Bristol resides and is domiciled in Washington.

26   125.  Sherry Poniewaz resides and is domiciled in Wisconsin.

27   126.  Irene Perez resides and is domiciled in Irvine, California.

28   127.  Nikita Ramirez resides and is domiciled in Los Angeles, California.

128.   Kandice Bridges resides and is domiciled in Texas.

129.   Eileen Haubrich resides and is domiciled in Missouri.

130.   Deborah Snow resides and is domiciled in Washington.

131.   Kayleigh Aiello resides and is domiciled in New York.

132.   Ashlee Underwood resides and is domiciled in Georgia.

133.   Salomon Passariello resides and is domiciled in Van Nuys, California.

134.   Katherine Wagner resides and is domiciled in Texas.

135.   Jennifer Continillo resides and is domiciled in Hickman, California.

136.   Hollie Meyers resides and is domiciled in Indiana.

137.   Dora Scharf resides and is domiciled in Ontario, Canada.

138.   Jason Schacter resides and is domiciled in Ontario, Canada.

139.   Lindsay LaFountaine resides and is domiciled in Vermont.

140.   Linda Martin resides and is domiciled in North Carolina.

141.   Patrick Dalton resides and is domiciled in Illinois.

142.   Jennifer Wilkins resides and is domiciled in Oakland, California.

143.   Michelle Fera resides and is domiciled in Arizona.

144.   Traci Renee O'Brien resides and is domiciled in Flintridge, California.

145.   Holly Smith resides and is domiciled in Tennessee.

146.   Carmen Fiengo resides and is domiciled in Texas.

147.   Sierra Brunner resides and is domiciled in Pennsylvania.

148.   Cleofi Blass resides and is domiciled in New Jersey.

149.   Katherine Glass resides and is domiciled in Menlo Park, California.

150.   Pam Thaxton resides and is domiciled in Ohio.

151.   Carly Thaxton resides and is domiciled in Ohio.

152.   Jacqueline Sonethanouphet resides and is domiciled in California.

153.   Sean Knepper resides and is domiciled in Ohio.

154.   Jennifer Kelly resides and is domiciled in Illinois.

1    155.  Alexandria Martelli resides and is domiciled in Pennsylvania.

2    156.  Jenni Tranweaver resides and is domiciled in Texas.

3    157.  Taylor Wooley resides and is domiciled in Georgia.

4    158.  Katie Younkins resides and is domiciled in Ohio.

5    159.  Gabriel Gomes resides and is domiciled in Ohio.

6    160.  William O. Watson resides and is domiciled in Georgia.

7    161.  Angelia Balthaser resides and is domiciled in Pennsylvania.

8    162.  Heather Slack resides and is domiciled in Massachusetts.

9    163.  Ashley Quellette resides and is domiciled in New Jersey.

10   164.  Ed Massuda resides and is domiciled in Maryland.

11   165.  Michelle Barto resides and is domiciled in New Jersey.

12   166.  Molly Rahe resides and is domiciled in Virginia.

13   167.  Debbie Brown resides and is domiciled in Florida.

14   168.  Jason Brown resides and is domiciled in Florida.

15   169.  Michelle Robbins resides and is domiciled in Texas.

16   170.  Karl Partch resides and is domiciled in Chatsworth, California.

17   171.  Caroline Mangan resides and is domiciled in Washington.

18   172.  Conrad Haubrich resides and is domiciled in Missouri.

19   173.  Lori Breedlove resides and is domiciled in Texas.

20   174.  Dustin Spielman resides and is domiciled in Tennessee.

21   175.  Virginia Spielman resides and is domiciled in Tennessee.

22   176.  Rebecca Brown resides and is domiciled in New Jersey.

23   177.  Kevin Brown resides and is domiciled in New Jersey.

24   178.  Chad Gilligan resides and is domiciled in Ohio.

25   179.  Kristin Gilligan resides and is domiciled in Ohio.

26   180.  Jori Kubek resides and is domiciled in Illinois.

27   181.  Marissa Kirchner resides and is domiciled in Massachusetts.

28   182.  Robert Layman resides and is domiciled in Alabama.

**FIFTH AMENDED COMPLAINT**

1      183.   Kacey L. Burgess resides and is domiciled in Massachusetts.

2      184.   Elizabeth Campbell resides and is domiciled in Virginia.

3      185.   Jennifer Mathieu resides and is domiciled in West Virginia.

4      186.   Tyrel Hartman resides and is domiciled in Colorado.

5      187.   Michael Uselton resides and is domiciled in Jackson, California.

6      188.   Anella Strudler resides and is domiciled in Georgia.

7      189.   Antonia Mascari resides and is domiciled in Indiana.

8      190.   Angela Dunbar resides and is domiciled in Kentucky.

9      191.   Tatyana Bardash resides and is domiciled in South Carolina.

10     192.   Lora Ellis resides and is domiciled in North Carolina.

11     193.   Larissa Solomon resides and is domiciled in San Francisco,

12   California.

13     194.   Jessica Taylor resides and is domiciled in Alabama.

14     195.   Kenneth Engleson resides and is domiciled in North Carolina.

15     196.   Monica Engleson resides and is domiciled in North Carolina.

16     197.   Nicholas Engleson resides and is domiciled in North Carolina.

17     198.   Jennifer Vieira resides and is domiciled in Massachusetts.

18     199.   Cavan Farley resides and is domiciled in New Jersey.

19     200.   Tiffany Bray resides and is domiciled in Pennsylvania.

20     201.   Emily Gaudet resides and is domiciled in Connecticut.

21     202.   Elizabeth Atkinson resides and is domiciled in Texas.

22     203.   Melissa Bailey resides and is domiciled in Pennsylvania.

23     204.   Telka Becker resides and is domiciled in Tennessee.

24     205.   Michele Fiedler resides and is domiciled in Pennsylvania.

25     206.   Amy Maupin resides and is domiciled in North Dakota.

26     207.   Xiao Sebastien Sang resides and is domiciled in Cerritos, California.

27     208.   Wendy Thomas resides and is domiciled in Indiana.

28     209.   Madison Shaner resides and is domiciled in Colorado.

**FIFTH AMENDED COMPLAINT**

210. Bruce Nuneley resides and is domiciled in California.

211. Stacy Lestage resides and is domiciled in Ohio.

212. Dawn Adrian resides and is domiciled in Salinas, California.

213. Kristen Newman resides and is domiciled in Escondito, California.

214. Penny Harrison resides and is domiciled in Maryland.

215. Jessica Van Winkle resides and is domiciled in Massachusetts.

216. Mykenzie Day resides and is domiciled in Pennsylvania.

217. Brandy Adams resides and is domiciled in Kentucky.

218. Bradley Emerson resides and is domiciled in Texas.

219. Katherine L. Eaves resides and is domiciled in Oklahoma.

220. Flor Flores resides and is domiciled in Texas.

221. Angela Dinnerville resides and is domiciled in California.

222. Ann Clark resides and is domiciled in Utah.

223. Anne St. Clair resides and is domiciled in Pennsylvania.

224. Agathe Dawson resides and is domiciled in Texas.

225. Alexandra Prejzner resides and is domiciled in Illinois.

226. Alexis Schnatmeir resides and is domiciled in Missouri.

227. Alton W. Do resides and is domiciled in California.

228. Alyssa Dahle resides and is domiciled in California.

229. Ronny Dahle resides and is domiciled in California.

230. Amanda Donmoyer resides and is domiciled in Pennsylvania.

231. Amy Kelly resides and is domiciled in Massachusetts.

232. John Kelly resides and is domiciled in Massachusetts.

233. Andrea Rene Pierce resides and is domiciled in Illinois.

234. Anjie Crow resides and is domiciled in Tennessee.

235. Arthur Meyer Jr. resides and is domiciled in Arizona.

236. Bob Bride resides and is domiciled in California.

237. Calie Holian and is domiciled in Ohio.

**FIFTH AMENDED COMPLAINT**

238.   Catherine Hatfield resides and is domiciled in Texas.

239.   Catherine Tain resides and is domiciled in Texas.

240.   Christel Mena Kafati resides and is domiciled in Florida.

241.   Danell Geertson resides and is domiciled in California.

242.   Dawn Callahan resides and is domiciled in Massachusetts.

243.   Diamond Daniels resides and is domiciled in Tennessee.

244.   Jeff Follbaum resides and is domiciled in Michigan.

245.   Elmer Bunger resides and is domiciled in Ohio.

246.   Elisa Pirard resides and is domiciled in California.

247.   George Nicholas resides and is domiciled in Massachusetts.

248.   Haley Huschka resides and is domiciled in Colorado.

249.   Hugh Daly resides and is domiciled in Illinois.

250.   Isabel Rodriguez resides and is domiciled in California.

251.   Isai Valdez resides and is domiciled in Washington.

252.   Jamie Hild resides and is domiciled in Pennsylvania.

253.   Jill Bana resides and is domiciled in Illinois.

254.   Joel Harrell resides and is domiciled in North Carolina.

255.   John Montuori III resides and is domiciled in New Jersey.

256.   Juliana Fuhrmann resides and is domiciled in Illinois.

257.   Kara Verbsky resides and is domiciled in Colorado.

258.   Karen White resides and is domiciled in Connecticut.

259.   Katielyn Garelik resides and is domiciled in Michigan.

260.   Keith Maravich resides and is domiciled in North Carolina.

261.   Kharma Noel resides and is domiciled in West Virginia.

262.   Kimberly McNaughton resides and is domiciled in Oklahoma.

263.   Bryan Bowers resides and is domiciled in North Carolina.

264.   Laura Mondrick resides and is domiciled in North Carolina.

265.   Laura L. Squillace resides and is domiciled in North Carolina.

266. Laura Watson resides and is domiciled in Florida.

267. Laurie Stapleton resides and is domiciled in Massachusetts.

268. Mackenzie Wray resides and is domiciled in Virginia.

269. Maggie Otten resides and is domiciled in Iowa.

270. Maria Ramos resides and is domiciled in Massachusetts.

271. Marla Dupree resides and is domiciled in Texas.

272. Melanie Vasquez resides and is domiciled in Florida.

273. Michael Sussman resides and is domiciled in Florida.

274. Michelle Jones resides and is domiciled in Kentucky.

275. Nancy Ramos resides and is domiciled in California.

276. Patricia Julian resides and is domiciled in Illinois.

277. Rachael Shepley resides and is domiciled in Illinois.

278. Rachael Talbot resides and is domiciled in Colorado.

279. Randee Kirby resides and is domiciled in Tennessee.

280. Rose Shapiro resides and is domiciled in New York.

281. Roy Shauli resides and is domiciled in California.

282. Samantha Sauer resides and is domiciled in Wisconsin.

283. Samay Gheewala resides and is domiciled in Illinois.

284. Brenda Marhall resides and is domiciled in North Carolina.

285. Savannah Elizabeth Jones resides and is domiciled in Tennessee.

286. Shannon Denzel-Bartok resides and is domiciled in Minnesota.

287. Shannon Tierney resides and is domiciled in Virginia.

288. Sonya Robel resides and is domiciled in Washington.

289. Stephanie Dilaveri resides and is domiciled in Kansas.

290. Stephanie Halczenko resides and is domiciled in Pennsylvania.

291. Susan Bernstein resides and is domiciled in Florida.

292. Susan Conlon resides and is domiciled in California.

293. Teresa Conrad resides and is domiciled in Indiana.

**FIFTH AMENDED COMPLAINT**

294.   Fred Conrad resides and is domiciled in Indiana.

295.   Tiffany Lynn Paul resides and is domiciled in Arizona.

296.   Tim Dyar resides and is domiciled in South Carolina.

297.   Joseph Hernandez resides and is domiciled in Michigan.

iii.    *Verified Capital One Presale Fans with passcodes who were
thwarted from completing purchases of tickets, including those selected and in
their shopping carts, by stated "internal server errors" and "interaction issues:"*

298.   Maverick Wagner resides and is domiciled in North Carolina.

299.   Samantha Tosetti resides and is domiciled in Weaverville, California.

300.   Diane Douglas resides and is domiciled in Wisconsin.

301.   Rebecca Van Dale resides and is domiciled in Rhode Island.

302.   Grace Van Dale resides and is domiciled in Rhode Island.

303.   Cindy Mueth resides and is domiciled in Illinois.

304.   Ian Clites resides and is domiciled in Florida.

305.   Genesis Borrero resides and is domiciled in Florida.

306.   Eleana Villa resides and is domiciled in Arizona.

307.   Daniel Reyes resides and is domiciled in Texas.

308.   Maribel Serrao resides and is domiciled in Long Beach, California.

309.   Rochelle Castrillo resides and is domiciled in Oregon.

310.   Jennifer Lemeke resides and is domiciled in New Jersey.

311.   Laura Hastings resides and is domiciled in Illinois.

312.   Cindy Deimling resides and is domiciled in Illinois.

313.   Kiley Krzyzek resides and is domiciled in Connecticut.

314.   Rosemarie Patterson resides and is domiciled in New Jersey.

315.   Wally Nunez resides and is domiciled in Ontario, California.

316.   John Willis resides and is domiciled in Illinois.

317.   Shelly Graupner resides and is domiciled in South Carolina.

318.   Rafael Ortiz III resides and is domiciled in Texas.

-17-

**FIFTH AMENDED COMPLAINT**

319.   Jennifer Beeman resides and is domiciled in North Carolina.

320.   Meghan Clarke resides and is domiciled in Massachusetts.

321.   Anthony LeBlanc resides and is domiciled in Rhode Island.

322.   Eva Barna resides and is domiciled in Georgia.

323.   Kaitan Perez resides and is domiciled in Texas.

324.   Alton W. Do resides and is domiciled in Irvine, California.

325.   Carissa Hoppenworth resides and is domiciled in Michigan.

326.   Erica Taylor Simpson resides and is domiciled in South Carolina.

327.   Stacey Tucker resides and is domiciled in Ohio.

iv.     *Verified Presale Fans without passcodes who were told they would get "preferred access" or a "boost (in line)" for being a previous "Lover Fest" Verified Fan purchaser or a "Loyal Fan," including by purchasing merchandise associated with Ms. Swift's "Midnights" Album:*

328.   Tracy Le resides and is domiciled in Texas.

329.   Nancy Cordero resides and is domiciled in Lincoln, Nebraska.

330.   Sofia Ganz resides and is domiciled in Florida.

331.   Maura Matvey resides and is domiciled in Washington, D.C.

332.   Cendra Shepherd resides and is domiciled in Kentucky.

333.   Rebecca Cole resides and is domiciled in Texas.

334.   Jose R. Hernandez resides and is domiciled in California.

335.   Adrienne Hernandez resides and is domiciled in Michigan.

336.   Jean Pierre Espinozo resides and is domiciled in Florida.

337.   Ashlynn Alexander resides and is domiciled in New York.

338.   Alyra Parker resides and is domiciled in Delaware.

339.   Tammy Steeves resides and is domiciled in Massachusetts.

340.   Sofia Lewis resides and is domiciled in Texas.

341.   Danielle Munoz resides and is domiciled in Jurupa Valley, California.

342.   Elisabeth Clapp resides and is domiciled in Wisconsin.

343.   Loren Dunsworth resides and is domiciled in Los Angeles, California.

344.   Cassandra Diamond resides and is domiciled in California.

345.   Annie Patota resides and is domiciled in Virginia.

346.   Tracy Huynh resides and is domiciled in Texas.

347.   Mark Kirschner resides and is domiciled in Missouri.

348.   Donna Follbaum resides and is domiciled in Michigan.

349.   Ashleen Skye Watson resides and is domiciled in Florida.

v.   *Verified Presale Fans without passcodes who were told they would get "preferred access" or a "boost (in line)" for being a previous "Lover Fest" Verified Fan purchaser or a "Loyal Fan," including by purchasing "Midnights" merchandise, and were also Verified Capital One Presale Fans with passcodes thwarted from completing purchases of tickets, including those selected and in their shopping carts by stated "internal server errors" and "interaction issues," including but not limited to "passcode validation," "authentication" and "checkout" errors:*

350.   Jessica Schroetter resides and is domiciled in South Carolina.

351.   Jessica Krizman resides and is domiciled in Rhode Island.

352.   Janis Houston resides and is domiciled in Florida.

353.   Mary Kirk resides and is domiciled in South Carolina.

354.   Michael Berlin resides and is domiciled in Oakland, California.

355.   Nicholas Ritter McGee resides and is domiciled in Connecticut.

356.   Mary Vandiver resides and is domiciled in North Carolina.

357.   Karissa Pitstick resides and is domiciled in Illinois.

358.   Sabrina Hastings resides and is domiciled in Texas.

359.   Raymond Chace Jr. resides and is domiciled in Maryland.

360.   Laura Bowers resides and is domiciled in North Carolina.

361.   Emily Mollenkopf resides and is domiciled in California.

362.   Shannon Fern Guyott resides and is domiciled in Michigan.

363.    Emily Grandusky resides and is domiciled in West Virginia.

364.    Lauren Chappell resides and is domiciled in Florida.

B.    *Named Defendants*:

365.    Defendant Live Nation is a Delaware corporation with its principal place of business at 9348 Civic Center Drive, Beverly Hills, California 90210.

366.    Defendant Ticketmaster is a wholly owned subsidiary of Live Nation and is a limited liability company organized and existing under the laws of Virginia with its principal place of business at 9348 Civic Center Drive, Beverly Hills, California 90210.

367.    Plaintiffs no longer include StadCo, previously added as "Doe No. 1" hereto, as a defendant to this action, and will voluntarily dismiss it without prejudice promptly.

C.    *Fictitiously Named Defendants and Co-Liability*:

368.    Plaintiffs do not know the true identity, nature and capacity of the defendants they name herein as Does 2 through 10, inclusive.  Plaintiffs are informed and believe and based thereon allege that each of these defendants is in some way responsible for the damages and injuries alleged in the complaint. Plaintiffs are further informed and believe and based thereon allege that Does 2 through 10, inclusive, include but are not limited to the following: various persons, firms, corporations, organizations and/or other business entities that have participated as co-conspirators in the conduct, acts, omissions and violations alleged herein as the basis for liability and have performed acts in furtherance of these conspiracies.

369.    Plaintiffs are informed and believe and based thereon allege that, at all times material hereto, each of the defendants was the agent, co-conspirator or alter-ego, and in these or other capacities participated in or had some responsibility for, the acts of each of its codefendants, including both named and Doe defendants, and in doing the things hereinafter alleged was acting within the course and scope of

such agency and/or employment, with the permission and consent or at the direction and control of all their codefendants.  As such, unless expressly stated to the contrary, all references to any defendant herein shall be deemed to include each and every other defendant, including Does 2 through 10, inclusive.

IV.    FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

A.    *Origins and Ascendancy of Live Nation and Ticketmaster*

370.    Established in 1996 as SFX Entertainment, Live Nation began as a live events promoter.  It has used the decades since to grow its scope across nearly the entire live entertainment industry, including live event promotions, primary and secondary ticketing, venue ownership and operations, sponsorships, artist management and more.  It did so by aggressively acquiring smaller players in the live entertainment sphere to consolidate power in concert promotions.  Live Nation maintains that strategy through today, as the Pending DoJ Case alleges by quoting its CEO as explaining that its strategy of consolidation began "from day one," and that "we want to continually be the largest promoter in the world, have as many boots on the ground in as many cities and countries in the world as possible ...."

371.    Founded in 1976 as an independent ticketing company, Ticketmaster has been the largest primary ticketer for major concert venues for decades.  Like Live Nation, it expanded largely through acquisitions to consolidate its leading position in primary ticketing.  Ticketmaster expanded and solidified its dominance by orchestrating structural changes to ticketing contracts that reduced competitive pressures to lower ticketing fees ultimately borne by fans.  First, it started passing more ticketing costs, in the form of fees, onto consumers – who have no choice but to use its services – and then shared some of such additional revenue with venues.  Second, Ticketmaster began paying venues large upfront advances in exchange for the exclusive, multi-year right to sell and distribute their tickets.

B.    *The Live Nation/Ticketmaster Merger and Ensuing Market Stranglehold*

372.    On February 10, 2009, Live Nation and Ticketmaster agreed to merge. By then, Live Nation had become Ticketmaster's largest direct competitor in primary ticketing services.  Alleging the merger likely would substantially lessen competition in the provision of primary ticketing services for and sale of tickets at major concert venues, the DoJ and others brought the Original DoJ Case and entered into the Consent Decree, a judgment that allowed the merger to go forward subject to certain conditions, ostensibly to curb its anticompetitive effect.

373.    The Consent Decree hasn't worked.  By now, as touted in its 2023 securities filings and referenced in the Pending DoJ Case, Live Nation has become the "largest live entertainment company in the world," the "largest producer of live music concerts in the world," and "the world's leading live entertainment ticketing sales and marketing company."  It owns, operates, leases, has equity interest in or has exclusive booking rights for or significant influence over 373 venues globally and more than 265 in North America for which it has power to decide who performs at any such venue, control over many other aspects of the concert experience and the means of generating additional revenues from sources such as sponsorships, food and beverage sales and shares of ticket sales.

374.    According to the complaint in the Pending DoJ Case, Live Nation's business brings in over $22 billion dollars in revenue a year globally.  Live Nation divides its business into three segments: concerts (*e.g.*, promotions, venue management and music festival production), ticketing (*i.e.*, the Ticketmaster business), and sponsorship and advertising.  Again as alleged in the Pending DoJ Case, Live Nation in 2023 generated $18.8 billion in concert revenue, $2.9 billion for ticketing and $1.1 billion in sponsorship and advertising.

375.    The reach of Live Nation and Ticketmaster gives them exceptional access to highly valuable customer information.  The Pending DoJ Case quotes Live Nation's CEO as bragging:

**FIFTH AMENDED COMPLAINT**

No one has 80 million customers segmented in a database as
rich as ours ... that audience and that platform is really the key,
unique part of our business.

376.  Live Nation and Ticketmaster have become the combined behemoth known today by acquiring competitors or entering into agreements with them that marginalize their relevance and reduce the obstacles they pose to its ongoing expansion.  Examples of their acts in furtherance of that strategy appear at paragraphs 70 through 86, 120 through 135 of the complaint in the Pending DoJ Case.  Other ways in which Live Nation wields its power as stated in the Pending DoJ Case and more directly relevant to this action are detailed more fully below.

i.  *Live Nation Uses Its Dominance and Threats to Get Ticketmaster in Nearly Every Major Concert Venue*

377.  Live Nation leverages its power in artist management, concert promotion and venue ownership to insinuate the primary ticket selling business of Ticketmaster nearly everywhere.  In addition to easily installing Ticketmaster as the sole ticketing service provider at its own large concert venues, it can and does put other venue owners and operators to the choice of either using Ticketmaster as their exclusive provider of primary ticketing services to get them the artists that Live Nation represents and the concerts it promotes, or using a competing ticketer and risk losing access to those artists and acts.

378.  Live Nation need not expressly threaten venues (although it does) to discourage them from signing ticketing contracts with competitors.  Those in the industry know the risks well, as Live Nation's highest executives do not hesitate to point them out publicly, if thinly-veiled, as its CEO did at a 2019 conference hosted by Goldman Sachs:

We can't say to a Ticketmaster venue that says they want to use
a different ticketing platform, "If you do that, we won't put
shows in your building." ….. [But] **we have to put the show**

**FIFTH AMENDED COMPLAINT**

> **where we make the most economics, and maybe that venue**
>
> **[that wants to use a different ticketing platform] won't be**
>
> **the best economic place anymore because we don't hold the**
>
> **revenue**.

*See* https://newrepublic.com/article/181916/everybody-hates-ticketmaster-live-nation-lawsuit-justice-dept (emphasis in original), a true and correct copy of which is also attached hereto as Exhibit E.

379.    As a concrete example, the Pending DoJ Case describes a threat Live Nation made against a venue that had decided to move its primary ticketing service from Ticketmaster to SeatGeek, which would have given the venue a greater share of secondary ticketing revenue.  The Pending DoJ Case refers to a text found from a senior Live Nation executive to the CEO of the venue – evidence that plaintiffs do not have the same investigative power as the DoJ to have uncovered – stating:

> Apparently seatgeek are telling [nearby venue] and others that
>
> they have a contract deal with you guys already??  Anyways
>
> should think about bigger relationship with LN not just who is
>
> writing a bigger sponsorship check.

When the recipient did not get the hint, the Current DoJ Case points to evidence that Live Nation's CEO emailed the venue's owner a few days later that "[we] will be very concerned that seatgeek a secondary provider will be selling our LN artist tickets when not authorized by the artist."  Once the venue finalized its move to SeatGeek, Live Nation re-routed concerts to other venues, and the promotions side of its business demanded that the venue disable secondary ticketing from the SeatGeek platform for all Live Nation-promoted concerts, to deprive the venue and SeatGeek of secondary fee revenue.  Ultimately, Live Nation allowed the venue to enable secondary ticket sales but only after (a) the venue agreed to split with Live Nation its share of secondary fee revenue received through SeatGeek, and (b) SeatGeek agreed to change its ticket-buying interface to make it more like

**FIFTH AMENDED COMPLAINT**

Ticketmaster's, whether fans or the venue preferred that or not.  Within a year, the
venue went back to using Ticketmaster.

      ii.    *Ticketmaster Exacts Exclusive, Long-Term Venues Contracts that*
                *Lock Competition Out of a Large Share of Primary Ticketing Markets*

380.   By entering into long-term, exclusive agreements with venues,
Ticketmaster protects and expands its and Live Nation's chokehold on the live
concert industry, and on primary ticketing in particular.  These agreements make
Ticketmaster the sole provider of primary ticketing services for all or nearly all
events held at a venue for multiple years – some for as long as 14 years, according
to the complaint in the Pending DoJ Case.

381.   The complaint in the Pending DoJ Case goes on to allege that
Ticketmaster's exclusive agreements cover more than 75% of concert ticket sales
at major concert venues, thus depriving rival ticketers of a substantial share of the
primary ticketing market.  It again quotes Ticketmaster as touting this strategy as a
"[h]edge against significant improvements by the competition or even a new
competitor," since the "client is under contract for longer and not able to leave
[Ticketmaster] or price the competition's offer into our new deal for an extended
time."  So, even if another ticketer offered a better price, better product or ticketing
experience, an exclusive Ticketmaster venue could not choose that provider for a
long time.

382.   Before its long-term exclusive agreements expire, Ticketmaster also
works defensively to deny others the opportunity to compete at all.  Ticketmaster
often renews or extends its agreements before they expire, thus foreclosing other
providers from the opportunity even to bid for the business.  This both eliminates
the chance Ticketmaster will lose the contract and mitigates competitive pressure
on Ticketmaster to improve the terms of its contracts.  By contrast, reducing or
ceasing exclusivity so multiple primary ticketers could service a particular venue
or concert would benefit fans, make it easier for them to find tickets over multiple

platforms and create incentives for such platforms to compete for fans' purchases by offering better prices, technology or user experience.

383.    As a result, and as the Pending DoJ Case highlights, primary ticketing fees in the United States greatly exceed those elsewhere in the world.  By tying up the market with exclusivity, Ticketmaster also impedes development of different or more specialized ticketing services.  Exclusivity further raises costs for competing ticketers and heightens barriers for potential new entrants to the market.

384.    As an example of this, the Pending DoJ Case discusses Ticketmaster's encrypted mobile ticket platform.  This "innovation," called "SafeTix," replaces static barcodes on PDF ticket images with encrypted barcoding that continually refreshes.  While Ticketmaster predictably markets this development as protection from ticket fraud, it also makes transferring tickets through someone else's secondary platform more difficult, creating uncertainty about when, or if, a ticket can be so transferred, and thus hesitancy to transfer other than through Ticketmaster's own secondary platform by which it extracts additional fees.  Those who nonetheless persist in transferring across platforms – both buyer and seller – must have or set up Ticketmaster accounts and provide Ticketmaster with their personal data.  From this, Ticketmaster expects to grow its database – its 80 million customers already by far the largest of any ticketer, but still not enough for it and Live Nation – by as much as 30 to 40%, according to internal Ticketmaster documents uncovered in connection with the Pending DoJ Case (but to which plaintiffs as yet do not have access), which also quotes the CEO of Live Nation:

> One of the advantages we've launched under the transfer strategy is we now not only know the person that bought the ticket, but *we're going to know those three people that you are taking to the show*, which we have not known historically.

(Emphasis added.)  Live Nation can monetize this wealth of data throughout its various businesses and further entrench itself as the live entertainment industry's

800-pound gorilla.  Ticketmaster thus uses SafeTix offensively to expand and cement its access to customers, as well as defensively as described further above.

  iii. *Harm Caused by Live Nation and Ticketmaster to Competition*

  385. The size of the Live Nation and Ticketmaster empire, and the power it exerts, hurts the live music industry, harms competition and fans significantly. The entity's anti-competitive conduct allows it to take and keep more for itself, impede innovation, stifle competition, squash threats and maintain its monopoly and sway.  As a result, fans have paid more in fees, which are neither transparent nor negotiable and cannot be shopped to (virtually nonexistent) competitors for comparison, and have been denied access to more concert and ticketing options that a competitive process would produce.  Arenas and other venues have fewer choices for landing concerts and utilizing ticket services, which has harmed fans as well by limiting their choices and driving up the prices they pay for tickets and ancillary products and services.

  386. Live Nation and Ticketmaster have constructed barriers for rivals and new entrants to compete on the merits in relevant markets with better, lower-priced or different services to bring more innovations to the marketplace, develop scale to improve offerings, increase investments, or expand and enhance their own competitive reputations, all of which would encourage competition and benefit artists and their fans.  The predatory acts of Live Nation and Ticketmaster have made venues reasonably fear the disruption, retaliation and complications of not doing business with them so as not to lose access to lucrative major concerts.  Such conduct in turn has driven up costs to competitors.  For example, as alleged in the Pending DoJ Case, at least one other ticketing service has had to agree to "make good" or "lost event guarantee" clauses in some of its ticketing contracts if those venues choose that provider and Live Nation retaliates, obligating the ticketing provider to compensate its venue customer if Live Nation diverts or pulls concerts in response to that venue's choice to go with a Ticketmaster competitor.  Thus, the

conduct of Live Nation and Ticketmaster not only limits the ticketer venues may use, but also raises the costs for like services that try to compete with Ticketmaster.

387.   Competition on the merits would enable more invention and better offerings.  For example, other ticketing services could become more fan-friendly by creating more streamlined user interfaces and purchase flows, transparency in ticket inventory, enhanced buying options and flexible refund policies.  Instead, such would-be contenders face artificial barriers to enter or grow in the marketplace, which in turn quashes motivation to innovate.  The lack of such competition likewise eases pressure on Live Nation and Ticketmaster themselves to innovate or even act with ordinary care regarding their own products, platforms and services, knowing fans have little or no choice but to use what they offer.  Live Nation instead employs capital it might otherwise invest toward technological improvements instead to sweeten ticketing contracts and keep venues locked into long-term exclusive deals and out of reach of competitors.

iv.   *The Relevant Markets Harmed by Live Nation and Ticketmaster*

388.   Courts look for defined relevant product and geographic markets to help identify the lines of commerce and areas of competition impacted by alleged anticompetitive conduct.  Multiple relevant markets can cover the same or similar products and services, and need not have precise boundaries.  A relevant market also may include distinct groups of customers or sellers, where each is identifiable and particularly susceptible to anticompetitive conduct; submarkets within them that rest on differences in products, services and competitive conditions faced by various customer groups within the broader market; and related markets that exist next to each other and offer distinct products and services to separate customers.

389.   The government plaintiffs in the Pending DoJ Case, from "[p]ractical indicia in the industry, the structure of the industry and behavior of market participants, … substantial evidence that includes ordinary course documents, economic analysis, and other evidence" – data to which their unique and broad

investigatory powers give them access that average citizens such as plaintiffs lack – have identified several relevant antitrust markets.  It calls one that pertains specifically to this case the "Primary Concert Ticketing Market," which includes major concert venues and concert fans as two distinct sets of customers, although conduct affecting the former also impacts the latter.  Defendants' acts in this more general market have created a yet even more specialized market for this case: for the sale of primary tickets for fans of Taylor Swift – indeed, "Verified Fans" with "codes" or otherwise purportedly given "preferred access" – to attend at least one of her Eras Tour concerts in the United States (the "U.S. Eras Tour Market").

a)    *The Primary Concert Ticketing Market*

390.   This relevant market concerns the provision of primary ticketing services to major concert venues in the United States.  Primary ticketing providers offer a variety of related but distinct services to venues on the one hand and to fans on the other.

391.   Primary ticketing services help a venue sell, track and distribute some or all of the tickets for a show, and from the perspective of a fan, allow him or her to purchase tickets for a show employing a bundle of services that handle payment processing and customer service.  In today's market, contracts between primary ticketing services and venues dictate the terms and conditions on which primary ticketers can offer tickets to fans, thus directly impacting, and usually limiting, competition for such services from the fan perspective.

392.   Fans utilize primary concert ticketing offerings to buy concert tickets. Primary ticketers typically provide an online interface to purchase tickets to a concert during an initial sale.  Primary concert ticketers typically also provide customer service to fans, employ mechanisms to detect and prevent fraud, store credit card information, keep track of fan purchases and provide other related services to fans.  These functions require, among other things, sophisticated

software capable of handling complex ticketing arrangements, voluminous traffic for high-demand events, and large databases of user and other information.

393.   With very few exceptions, fans in the U.S. today have access to only one primary ticketing service for a given concert, and for all primary sales for a given venue.  To support the existence of a Primary Concert Ticketing Market, the Pending DoJ Case notes that internal Live Nation documents – again, to which those such as plaintiffs who do not have the DoJ's investigative powers do not yet have access – track its share of primary concert ticketing separately from resale concert ticketing and ticketing for other types of events, and identify different sets of competitors in each area.

394.   Also, the United States constitutes a distinct and relevant geographic market for primary concert tickets for fans.  Those seeking to attend shows in the United States must use primary concert ticketing services that offer tickets for those shows.  The Pending DoJ Case references internal Live Nation documents, as yet unknown to plaintiffs, as supporting the United States as a relevant geographic market, such as documents reflecting that Live Nation evaluates the business and competitive conditions in areas within the United States separately from Canada. The higher ticketing fees paid in the U.S. over other countries likewise support it as a distinctly defined market.

395.   Based on information such as the foregoing uncovered in and supporting the Current DoJ Case, a monopolist in primary concert ticketing offerings to fans at major concert venues in the United States would be able to maintain prices above competitive levels and/or maintain quality below the level that would prevail in a competitive market.  Through Ticketmaster, Live Nation has a durable monopoly in primary concert ticketing offerings to fans at major concert venues in the United States.  The Pending DoJ Case, for example, states that in 2022 Ticketmaster accounted for at least 80% of the total face value associated with all concert tickets sold at major concert venues.

396.   Ticketmaster's ability to control prices and/or exclude competition in primary concert ticket sales further demonstrates its monopoly power in the major concert venue market in the United States.  Live Nation maintains a high market share of large American concert venues through its ownership and/or operation of or exclusive contracts with such venues.  As a result, Ticketmaster charges much higher fees for concert ticket sales at such locations relative to other countries notwithstanding comparable costs.  In addition, Live Nation can and does exclude competition by insisting that venues utilize only Ticketmaster for all shows and for all tickets sold for a given show.

397.   Live Nation has protection for its monopoly in primary concert ticketing offerings to fans by virtue of significant barriers to entry and expansion.  To build primary concert ticketing capabilities successfully requires substantial investment and access to scale, which Live Nation touts as a significant advantage of its offering.  Live Nation's market power in concert promotions helps foreclose competition for primary ticketing service for fans, and also imposes additional barriers to entry by preventing ticketers who are not vertically integrated from competing on a level playing field.  Live Nation's venue ownership and operation, and exclusive ticketing agreements with venues that it does not own or operate, act as further barriers to entry because they impede the ability and incentive of others to compete.

398.   Again through Ticketmaster, Live Nation has a monopoly in this market for ticketing services to venues.  For example, the complaint in the Pending DoJ Case indicates that, in 2022, Ticketmaster accounted for more than 70% of the total transactions associated with all tickets sold or resold for concerts at major concert venues in the United States.  This economically relevant measure of power in this market, however, minimizes these defendants' true reach, as it captures only transactions handled principally by Ticketmaster.  As described above, from its use of technology like SafeTix, Ticketmaster insinuates itself in the resale of tickets

that take place entirely on others' secondary ticketing platforms, and thus has the
ability to exert a degree of control over these transactions as well as obtain fees
and valuable fan data related to ticket transfers.  So, Ticketmaster's "share" of the
market understates its competitive significance therein.

399.   Ticketmaster's ability to control prices and/or exclude competition as
to venues further establishes its monopoly power in that market.  Ticketmaster can
charge higher prices where it has the greatest power, despite comparable costs, as
evidenced by the much higher fees charged in the United States, where it has a
high market share compared to other locations around the world where its shares
are much lower.  In addition, Live Nation can and does exclude competition, such
as by successfully threatening and retaliating against venues that consider or use
rival primary ticketers and imposing various other restrictive terms of contracts as
described above.

400.   Live Nation's monopoly position enjoys the protection of material
barriers to entry and expansion, such as the significant investment in infrastructure
discussed above.  Live Nation uses its power in concert promotions to foreclose
competition to primary ticketing providers who are not so vertically integrated and
thus cannot compete on the same level playing field, and enters into exclusive
long-term contracts for Ticketmaster to preclude competition even further.  And, as
also stated previously, Live Nation and Ticketmaster hinder transfer and resale of
concert tickets by their SafeTix program that gives them access to more customer
data while discouraging actual or potential competitors from entering the resale
market or using it as a springboard to expand into primary concert ticket sales.

b)    *The U.S. Eras Tour Market*

401.   This market focuses solely on Ticketmaster's provision of primary
ticketing services for Taylor Swift's Eras Tour in the United States.  Ms. Swift's
fans had to use Ticketmaster's primary concert ticketing service to see one of her
Eras Tour concerts.  They had to deal with Ticketmaster's wholly inadequate

online interface to try to purchase such tickets, from which they should have had the benefit and protection of sophisticated software capable of handling complex ticketing arrangements, voluminous traffic for high-demand events and large databases of user and other information and preventing injury to them by unauthorized users.  As does the Primary Concert Ticketing Market generally, this specific market allowed fans to use only one primary ticket service, Ticketmaster, which thus had a complete monopoly over this narrow market in the U.S.

402.    Ticketmaster's monopoly in this special market allowed it to control and charge outrageous prices for primary concert tickets, or to so botch its one job that fans had to wait hours on a dysfunctional platform without ever being able to buy a single ticket, and then turn to the secondary market where ticket prices already had risen up to ten times face value or more.  We describe in greater detail below what plaintiffs had to go through when attempting to buy tickets in this market, and what Live Nation and Ticketmaster did or failed to do to give rise to the antitrust and other claims for relief asserted herein.

C.    *The Eras Tour Ticketing Fiasco*

403.    A global superstar named "Artist of the Year" by the American Music Awards seven times (five more than any other), Taylor Swift just completed her record-breaking, world-wide concert tour dubbed "The Eras," her first since the COVID-19 pandemic made her cancel the "Lover Fest" tour she had scheduled for 2020.  Given Ms. Swift's status as one of the most, if not the most, iconic artists in the world, millions of fans attempted to purchase tickets to the Eras Tour.

404.    Herself or through Taylor Swift Management, Ms. Swift contracted with Ticketmaster to provide primary concert ticketing services on an exclusive basis for venues hosting her concerts on the tour.  Ticketmaster controlled at all times the registration for and access to Taylor Swift's the Eras Tour tickets.

405.    On November 1, 2022, Ticketmaster announced on its blog, a true and correct copy of which is attached hereto as Exhibit F, the opening of registration

-33-

for a TaylorSwiftTix Verified Fan Presale during November 1-9, 2022.  The blog
described the Verified Fan program as the "best" way to "help ensure that only
fans are invited to purchase tickets."  Ex. F at 1.[1]  As users signed up, they received
communications from Ticketmaster, true and correct copies of samples of which
are attached hereto as Exhibits G and H, representing that becoming a Verified Fan
"creates the best opportunity to get more tickets into the hands of fans who want to
attend the show and keep tickets out of the hands of bots."

406.   "Swifties" such as plaintiffs were then familiar with TaylorSwiftTix
Verified Fan sales from prior experience.  In 2017, Taylor Swift's "Reputation"
Tour was powered by TaylorSwiftTix Verified Fan presale, as was her "Lover
Fest" Tour that got cancelled in 2020 due to COVID-19.  For "Reputations,"
Ticketmaster described how the program would work in a December 2, 2017
email, a true and correct copy of which is attached hereto as Exhibit I, which
provided fans who signed up with an "access code just for YOU," and included for
those signing up in the first week "a BONUS BOOST" characterized to "add[ ] a
little pep to your step (in line)."  Likewise, for "Lover Fest," fans signing up
received, among other announcements, an October 13, 2019 email from
verifiedfan@email.ticketmaster.com, a true and correct copy of which is attached
hereto as Exhibit J, telling them: "You've Got Preferred Priority Access to the
Taylor Swift Lover Fest … Presale powered by Ticketmaster Verified Fan!"  The
email goes on to promise, "Your spot in line will be based on your total boosts
from the previous Taylor Swift Tix campaign!"

407.   Against this backdrop, Ticketmaster's announcement of the Eras Tour
on its blog on November 1, 2022 represents, "Previous Lover Fest Verified Fan
purchasers will receive *preferred access* to participate in the TaylorSwiftTix

---

[1] Fans including plaintiffs also received such information in an email sent to them
on November 1, 2022, a true and correct copy of which is attached hereto as
Exhibit F-1.

**FIFTH AMENDED COMPLAINT**

Presale." Ex. F at 2 (emphasis added). As noted by a fan in a text communication
at or about the time the Verified Fan registration opened for the Eras Tour, a true
and correct copy of which is attached hereto as Exhibit K, the same information
appeared on a search for Taylor Swift on the Ticketmaster website. Fans thus
came to expect the same experience for the Verified Fan Presale in 2022 as they
had seen for the earlier tours – that is, when becoming a Verified Fan, they would
receive a "code" that would give them "preferred access" to and a "boost" in line
for the Presale as long as they registered using the same Ticketmaster account as
they had used for the prior tours.

408.    During the November 1-9, 2022 signup for the Verified Fan Presale,
those registering received an email, a true and correct copy of which is attached
hereto as Exhibit L, that their "Loyal Fan" status, including from purchasing
merchandise associated with the then-release of Taylor Swift's "Midnights" album,
as indicated by email from TaylorSwift.com, would "boost your place in line for
the Taylor Swift | The Eras Tour TaylorSwiftTix Presale powered by Verified
Fan." The email went on to instruct the user what to do "to ensure a boost is
applied to your TaylorSwiftTix profile," implying some enhanced access beyond
Verified Fan status alone. Of the 357 plaintiffs herein, ***37 of them, listed at
paragraphs 328 through 364 hereof, inclusive, had satisfied the criteria for
"preferred access" or a "boost" in their "place in line" for Eras Tour tickets***.

409.    In order to participate at all in the Verified Fan Presale, users had to
log into their Ticketmaster accounts and enter an email address (recommended as
one associated with account), full name, zip code and mobile number. The
registrant would then choose up to three shows that he or she wished to attend. If
accepted as a Verified Fan, the registrant either would receive a code on November
14, 2022 to participate in the Verified Fan Presale, or get notified on that date that
he or she would go on a waitlist for a code before he or she could participate, if at
all, in the Verified Fan Presale. A code would be good for only one of the three

shows preselected by the fan.  That code, along with a link that accompanied it, gave the fan the opportunity to purchase six tickets for that one show.  "Only fans who have been verified and invited to shop by receiving an access code will have the opportunity to purchase tickets during the TaylorSwiftTix Presale powered by Verified Fan."  *See* Ex. F at 5.

410.    Of the 357 plaintiffs herein, ***290 of them, listed in <u>paragraphs 8 through 297</u> hereof, inclusive, became Verified Fans and received codes***.  On November 15, 2022, the day of the Verified Fan Presale, they:

a.      Logged onto the Ticketmaster website;

b.      Clicked the link in their text message, email or after logging in to access the Presale;

c.      Entered a waiting room for 30 minutes and then got moved to the queue line; and

d.      Most spent 8-9 hours attempting to purchase tickets.

***Every one of the 290 Verified Fan plaintiffs with codes*** selected tickets to one of his or her preselected venues, many in fact getting tickets all the way into their online "shopping carts," ***but the site allowed <u>none</u> to complete a transaction.  One hundred percent*** of them got an ***"internal server errors" and/or "interaction issues" message every time*** they tried to buy tickets.[2]  One of the plaintiffs, a nurse who had just come off a 12-hour shift, spent nine hours the day of the Presale

---

[2] By contrast, Ticketmaster claimed on page 2 of its November 17, 2022 blog, a true and correct copy of which is attached hereto as Exhibit M, "we estimate about 15% of interactions across the site experienced issues, and that's 15% too many, including passcode validation errors that caused fans to lose tickets they had carted."  Among the dozens of different error messages received by ***all 290 Verified Fan plaintiffs*** were "kicked out of queues," "kicked off Ticketmaster," error codes 500, 503, 504, 1100, "its us not you," passcode validation errors, cart errors, checkout errors (***90% of the 290 plaintiffs***), queue delay, "sorry we could not process," "code assigned to a different user," "wrong date" and "tickets removed from cart" (again, ***90% of the 290***).

-36-

getting nowhere as described above, received 30 different error codes, then had to return immediately to another 12-hour shift to care for patients.  Lead plaintiff Julie Barfuss tried 41 times during that day to buy the tickets in cart, and got none even though Ticketmaster charged over $14,000 to her credit card.  And, ***at least three additional plaintiffs – Maranda Gomez, Catherine Budgen and Flor Flores – completed their purchases and received their tickets electronically only to have Ticketmaster take them back*** with no appropriate explanation.

411.    According to Ticketmaster's blog on November 17, 2022, as part of a comparison to its blog post the very next day – more on that further below – (i) 3.5 million people registered as Verified Fans for the Presale; (ii) 1.5 million of those were provide codes that would allow them actually to participate in the Presale; and (iii) two million fans got waitlisted. Ex. M at 1.  The blog on November 17 revealed that two million tickets were sold during the Verified Fan Presale and, on November 18, another 400,000 during the Capital One sale, leaving no more remaining for the general public onsale. *Id.* at 3.  From November 17 to the 18th, the blog also changed its description of the Verified Fan Presale:

| *November 17, 2022* | *November 18, 2022* |
|---|---|
| • Over 2 million tickets were sold for Taylor's shows on Nov. 15 – the most tickets ever sold for an artist in a single day. | • Over 2 million tickets were sold for Taylor Swift \| The Eras Tour on Nov. 15 – the most tickets ever sold for an artist in a single day. |
| • Every ticket was sold to a buyer with a Verified Fan code. Nobody (not even a bot) could join a queue without being Verified.  The 2 million tickets | • All 2 million tickets for the Verified Fan onsale were sold to Verified Fans. |

**FIFTH AMENDED COMPLAINT**

1

2

we sold only went to Verified

Fans.

*Id*.; *see also* Reddit comparison at Exhibit O hereto.  By the changes made from

November 17 to the 18th, Ticketmaster admitted that it sold tickets to Verified

Fans *without* codes on November 15, and that bots in fact *did* get into the queue

that day.  In fact, the blog on both dates states that a "staggering number of bot

attacks *as well as fans who did not have codes* drove the unprecedented traffic on

our site, resulting in 3.5 billion total system requests …."  Ex. M at 3 (emphasis

added).  Despite claiming that "[t]he biggest venues and artists turn to us because

*we have the leading ticketing technology* in the world," *id.* (emphasis added),

Ticketmaster quickly had to acknowledge that that its systems failed during the

November 15 Verified Fan Presale due to bots, as the CEO of Live Nation's

largest shareholder conceded in a November 17, 2022 article, a true and correct

copy of which is attached hereto as Exhibit P: "14 million people hit the

[Ticketmaster] site, including bots, which are not supposed to be there."

412.   During the Verified Fan Presale, Ticketmaster announced in a

November 15, 2022 post on Twitter, a true and correct copy of which is attached

hereto as Exhibit N, that it would push the Capital One sale – formerly called a

presale and now for some reason an onsale – back to the next day at 2pm local

venue time.  A November 4, 2022 Ticketmaster blog post, a true and correct copy

of which is attached hereto as Exhibit Y, had announced that holders of Capital

One credit cards would have an opportunity to purchase Eras Tour tickets before

they went on sale to the general public on November 18, 2022:

To best access the Taylor Swift Eras Tour Capital One

Cardholder Presale ticket queues, fans should log into their

Ticketmaster account and click on the link for your preferred

dates below.

-38-

**FIFTH AMENDED COMPLAINT**

Please keep in mind:

- Capital One Cardholder Presales are scheduled for
  November 16 …
- Queues will open 15 minutes prior to the onsale time.
- To gain entry into the sale, enter the first 6 digits of your
  Capital One credit or debit card.
- At checkout, remember to use an eligible Capital One
  credit or debit card to pay for your Taylor Swift Eras
  Tour tickets ….

Ex. Y at 2.  Users then received on November 14, 2022 an announcement, a true
and correct copy of which is attached hereto as Exhibit X, listing tour dates, cities,
stadiums and a link to join the queue, which directed users to the sale being
conducted on Ticketmaster.com.  Of the 357 plaintiffs in this case, ***101 of them,
listed at paragraphs 8 through 63, 298 through 327 and 350 through 364 hereof,
inclusive*** – many of whom obtained a Capital One card for the *sole* purpose of
taking advantage of *that* presale – got into the system for the Capital One sale and
***had tickets in their shopping cart*** and, just as in the Verified Fan Presale, tried for
hours ***but could not complete their purchases*** due to multiple stated errors.

413.   In its November 1, 2022 announcement, Ticketmaster had advertised
a general ticket sale to the Eras Tour to begin on November 18.  Ex. F at 7.  Yet,
by a November 17, 2022 Twitter post, a true and correct copy of which is attached
hereto as Exhibit Q, it canceled the general sale, citing insufficient quantity of
remaining tickets.  ***Every plaintiff*** expected to have one last chance to get tickets
during the general onsale, but never got it.

414.   ***All 357 plaintiffs*** herein suffered damages as a direct and proximate
result of the monopoly created by Live Nation and Ticketmaster, including by
exclusive dealing arrangements with venue owners and operators such as StadCo,
all of which allows Live Nation and Ticketmaster to get by without incurring the

-39-

costs they reasonably should to provide adequate ticketing services at the lower prices a competitive market would create. Defendants' conduct deprived plaintiffs of the opportunity they had been promised to participate meaningfully, or at all, in the Verified Fan Presale, the Capital One Presale or a public onsale, which led to most paying thousands of dollars for tickets with a face value of a fraction thereof. The Court should not countenance such conduct, and should find that plaintiffs present sufficient factual to state a right to relief plausible on its face as to each claim of their eight claims set forth below.

## V.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

Monopolization of Primary Concert Ticketing Market and
U.S. Eras Tour Market in Violation of Sherman Act § 2

415.   Plaintiffs reallege and incorporate by reference each and every other paragraph of this complaint as if fully set forth here.

416.   Live Nation and Ticketmaster have monopolized, in the United States, the Primary Concert Ticketing Market and the U.S. Eras Tour Market. These markets involve the provision of primary concert ticketing services to major concert venues, and to fans at major concert venues, in the United States, and the provision of primary concert ticketing services to fans of Taylor Swift – in particular, "Verified Fans" given special access codes – to attend at least one of her Eras Tour concerts in the United States. Each of the above constitutes a relevant antitrust market, and Live Nation and Ticketmaster have monopoly power – *i.e.*, the ability to control prices or exclude competition – in each, including based on information and evidence uncovered for and alleged in the Pending DoJ Case.

417.   Live Nation and Ticketmaster have unlawfully maintained their monopoly in the Primary Concert Ticketing Market through a course of exclusionary conduct, including:

a.    Directly or indirectly threatening venues that Live Nation will divert live music shows to other venues if they do not sign with Ticketmaster – *see*, *e.g.*, Ex. E hereto.

b.    Retaliating against venues that contract with rival ticketers by:

    i.    Diverting concerts on Live Nation-promoted tours to other venues;

    ii.   Disabling or delaying the sale of secondary tickets through rival ticketers' platforms;

    iii.  Refusing to publicize shows hosted by a venue that uses a competing ticketer;

    iv.   Diverting content away from venues ticketed by companies other than Ticketmaster, making it risky for any venue to contract with a rival ticketer; and

    v.    Lodging complaints against rival ticketers when Live Nation promotes a show at a venue where Ticketmaster is not the primary ticketer;

c.    Foreclosing actual or potential competing ticketing companies from the market by:

    i.    Imposing long-term exclusive contracts covering a significant proportion of tickets sold;

    ii.   Engaging in strategic purchases of rival promoters and venues to enhance their market power in content and to convert ticketing to Ticketmaster, further foreclosing the primary ticketing market; and

    iii.  Deterring entry and expansion by rivals into primary ticketing by using its monopoly to expand its control over secondary ticketing, which had been an entry point for primary ticketing.

418.    Each of the foregoing acts is anticompetitive and occurs in concert with and against the backdrop of the allegations and facts outlined throughout this pleading.  These acts have combined and synergistic effects that have harmed competition, the competitive process and plaintiffs in particular.

419.    The foregoing exclusionary, anticompetitive and monopolistic acts by Live Nation and Ticketmaster in the larger Primary Concert Ticketing Market have given them a monopoly more specifically in the U.S. Eras Tour Market.  In particular, they completely control in that market all primary concert ticketing services at all venues for the Eras Tour in the United States.

420.    The exclusionary conduct of Live Nation and Ticketmaster in each of these markets has foreclosed a substantial share of each such market to competitors.

421.    The anticompetitive acts of Live Nation and Ticketmaster have had harmful effects on competition and consumers, including plaintiffs in particular.

422.    The exclusionary conduct of Live Nation and Ticketmaster lacks a non-pretextual procompetitive justification that offsets the harm caused by the anticompetitive and unlawful conduct of these defendants.

423.    The anticompetitive and exclusionary acts and practices of Live Nation and Ticketmaster violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

424.    As a direct and proximate result of such violations, plaintiffs have suffered damages to be proven at trial, in an amount in the thousands of dollars per plaintiff, subject to trebling under 15 U.S.C. § 15(a).  Plaintiffs additionally have the right under the same statute to recover their "cost[s] of suit, including a reasonable attorney's fee."

SECOND CLAIM FOR RELIEF

Unlawful Exclusive Dealing in Violation of Sherman Act § 1

425.    Plaintiffs reallege and incorporate by reference each and every other paragraph of this complaint as if fully set forth here.

-42-

FIFTH AMENDED COMPLAINT

426.   The provision of primary ticketing services to major concert venues in the United States (Primary Concert Ticketing Market) is a relevant antitrust market, as is the provision of such service for the Eras Tour in the United States more specifically (U.S. Eras Tour Market).

427.   Ticketmaster's long-term exclusive agreements to provide primary ticketing services to major concert venues in the United States unreasonably restrain competition, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

428.   Plaintiffs are informed and believe based on the information found and asserted by plaintiffs in the Pending DoJ Case that these contracts exclude all competitors, are terminable only for cause, and have terms ranging from three to 14 years.

429.   Ticketmaster's long-term exclusive primary ticketing contracts restrict the access of Ticketmaster's competitors to the only significant channel of distribution for primary ticketing services to major concert venues.  They have foreclosed a substantial share of the market for the provision of primary ticketing services to major concert venues in the United States, including with respect to the Eras Tour.

430.   The anticompetitive acts of Live Nation and Ticketmaster have had harmful effects on fans of major concerts, the venues that host them and competition for primary ticketing, including with respect to the Eras Tour and to plaintiffs whose participation in the market as consumers of concert ticketing services has been hampered by the acts of defendants in restraint of trade.

431.   The exclusionary conduct of defendants in their excusive dealings lacks a non-pretextual procompetitive justification that offsets the harm caused by their anticompetitive and unlawful conduct.

432.   As a direct and proximate result of such violations, plaintiffs have suffered damages to be proven at trial, in an amount in the thousands of dollars per plaintiff, subject to trebling under 15 U.S.C. § 15(a).  Plaintiffs additionally have

the right under the same statute to recover their "cost[s] of suit, including a
reasonable attorney's fee."

THIRD CLAIM FOR RELIEF

Unlawful Exclusive Dealing in Violation

of Cal. Bus. & Prof. Code §§ 16720, 16727

433.   Plaintiffs reallege and incorporate by reference each and every other
paragraph of this complaint as if fully set forth here.

434.   Live Nation and Ticketmaster have coordinated efforts to foreclose
competition in the Primary Concert Ticketing Market and U.S. Eras Tour Market,
in violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*  These
defendants have been able to accomplish this violation because of the power that
they wield over the initial sale of concert tickets in general in the United States,
and Taylor Swift concert tickets in particular, including by exclusive agreements
with the owners and operators of venues.

435.   Ticketmaster and Live Nation together conduct themselves as a
"trust" defined in Cal. Bus. & Prof. Code § 16720 and made illegal by § 16726,
and involve therein third parties such as concert venues that agree, willingly or
otherwise, to participate in their illegal activities facilitated by exclusive dealing
contracts.  Ticketmaster requires venues, and they agree, to use Ticketmaster's
primary ticket platform exclusively for the initial sale of concert tickets, and did so
specifically as to such tickets for the Eras Tour.  Such practices have achieved and
will achieve no legitimate efficiency benefits to counterbalance their demonstrated
anticompetitive effects, including the foreclosure of competition in the primary
ticket services market and the unjust enrichment of Ticketmaster and Live Nation.

436.   Ticketmaster's conduct has allowed it to control the supply of tickets
to music concerts.  In order for artists like Taylor Swift to sell to buyers wanting to
see them in concert, the buyers and artists have little choice but to go through
Ticketmaster.  As a result, both groups have agreed to virtually exclusive dealings

-44-

with Ticketmaster that have lessened competition as well as created and
strengthened Ticketmaster's monopolistic power, which violates California law.
*See* Cal. Bus. & Prof. Code § 16727.

437.   Ticketmaster has dominant, monopolistic power in the market of
Primary Concert Ticket Market.  Ticketmaster currently controls between 70 and
80 percent of this market, according to published sources and the Current DoJ Case
complaint.  Ticketmaster's high market share, as well as its agreements with
concert venues, have given it and the stadium owners extreme power.  While a
small percentage of concert venues use other providers, for most Californians and
Americans, Ticketmaster is the only provider available.

438.   The essentially coerced exclusive dealings by Live Nation and
Ticketmaster – and the complicity therein, willingly or not, by venues – have
allowed them to charge above-market prices and excessive fees while preventing
competition against them.  In markets without a singular, monopolistic company,
charging the prices and fees that Ticketmaster does would be impossible.  And
Ticketmaster does nothing to justify these higher costs. Ticketmaster's service is
not superior or reliable; the massive disaster of the Eras Tour sales is evidence of
this.  Ticketmaster does not charge high prices to give a better service, it charges
higher prices because it has no real competition and wants to take every dollar it
can from buyers, and keeps stadium owners in line with this scheme because of the
artificially increased revenues they obtain from it.

439.   The foreclosure of competition has led to increased prices and/or
decreased output and has harmed competition.

440.   There is no legitimate business justification or efficiency gained for
these exclusive dealings. All it does it take money from the hands of artists and
buyers and into the hands of Live Nation and Ticketmaster, a purely
anticompetitive effect that is actionable under California law.  *See, e.g., Gianelli
Distributing Co. v. Beck & Co.*, 172 Cal. App. 3d 1020 (1985).

441.   As a direct and proximate result of Defendants' illegal exclusive dealing arrangements, plaintiffs have been and will continue to be injured in their property in an amount not presently known with precision, but which is, at minimum, thousands of dollars per plaintiff before mandatory trebling.  While this exclusive dealing claim under the California Cartwright Act resembles the Second Claim for Relief herein under section 1 of the federal Sherman Act, 15 U.S.C. § 1, California state courts and federal courts in the Ninth Circuit acknowledge that "the extent to which antitrust injury is recognized under the Cartwright Act is enlarged, by statute, in comparison to federal law." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F. 3d 979, 991 (9th Cir. 2000), citing Cal. Bus. & Prof. Code § 16750(a) ("action may be brought by any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, regardless of whether such injured person dealt directly or indirectly with the defendant"); *Cellular Plus, Inc. v. Superior Court*, 14 Cal. App. 4th 1224, 1234 (1993).  Plaintiffs did deal directly with Ticketmaster, of course, in attempting to purchase Eras Tour tickets, but not in its exclusive dealing arrangements with venues.  If the Court finds this preclusive of recovery under the Sherman Act (which it should not), plaintiffs retain their Cartwright Act right to relief.

442.   Pursuant to Bus. & Prof. Code § 16750(a), plaintiffs have the right to recover the fees of their attorneys they reasonably incur in this action, according to proof, as well as interest on their actual damages at the statutory rate, and to preliminary and permanent injunctive relief to stop defendants' unlawful conduct.

443.   Defendants' illegal exclusive dealing arrangements violate obligations to plaintiffs not arising from contract and constitute willful misconduct that is fraudulent, oppressive and/or malicious so as to entitle plaintiffs, in addition to trebled actual damages, punitive damages to make an example of and to punish Defendants in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF

Breach of Contract

444.   Plaintiffs reallege and incorporate by reference each and every other paragraph of this complaint as if fully set forth here.

445.   Plaintiffs entered into a binding contract with Ticketmaster based on its Terms of Use, Ex. S, and modified by course of dealing, promotional material and email and other communications by Ticketmaster to its customers, including plaintiffs.  More specifically:

a.    Plaintiffs Catherine Bugden, Flor Flores and Maranda Gomez purchased Eras Tour tickets in the Verified Fan Presale.  They later had these tickets removed from their Ticketmaster accounts and sold by Ticketmaster to someone else, in breach of Ticketmaster's Terms of Use and Verified Fan Terms of Use.

b.    Ticketmaster offered to give Verified Fans with codes first access to tickets starting with the Presale on November 15, 2022.  Exs. F-H. ***290 plaintiffs*** accepted this offer by performance that included registering to become Verified Fans and following all instructions, supplying personal information, obtaining a code that Ticketmaster had deemed necessary to participate in the Presale, investing 8-12 hours of their time obtaining tickets for their online shopping carts and attempting to purchase them – in some instances, having their credit cards charged – to no avail.

c.    Ticketmaster offered "preferred access" to prior "Lover Fest" Verified Fans – which, for that tour, had meant getting a "spot in line … based on … total boosts from the previous Taylor Swift Tix campaign" – as well as a "boost … in line" for buying merchandise surrounding the release of Ms. Swift's "Midnights" album.  Exs. F at 2, I, J. K, L.  ***37 plaintiffs*** accepted one or the other of these offers by signing in with

**FIFTH AMENDED COMPLAINT**

qualifying information, supplying personal information and, like the others, investing an entire day attempting to consummate purchases that Tickermaster's system rejected.

446. Ticketmaster failed to perform the foregoing contract terms. In particular:

a. The three plaintiffs identified above who actually completed purchases of tickets had the tickets taken away from them without warning or explanation.

b. Ticketmaster allowed users without codes to participate in and buy tickets during the Verified Fan Presale, in breach of its promise to **290 plaintiffs** that it would not do that. *See* Ex. M at 3 (changing language regarding who bought tickets from "only Verified Fans with codes" to "only Verified Fan"). Verified Fan plaintiffs *with* codes did not even get access to the Presale, while Ticketmaster admits that at least *some* Verified Fans *without* codes *did.* This breaches Ticketmaster's promise to give Verified Fans with codes priority access over others without them.

c. Nor did Ticketmaster give "preferred access" or a "boost … in line" to prior "Lover Fest" Verified Fans or to purchasers of "Midnights" merchandise, in breach of its promises to **37 plaintiffs** herein. Such "boosted" fans did not even get access to the Presale, while buyers without such boosts did gain such access and some obtained tickets, in breach of Ticketmaster's promise to put those who qualified from "Lover Fest" and "Midnights" ahead "in line" of those who did not.

447. As a direct and proximate result of the foregoing breaches, plaintiffs suffered damages including loss of opportunity to purchase tickets at face value and payments of inflated prices in the secondary market, in amounts to be proven at trial but expected to range in the thousands of dollars per individual.

**FIFTH AMENDED COMPLAINT**

FIFTH CLAIM FOR RELIEF

Violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.*

448.    Plaintiffs reallege and incorporate by reference each and every other paragraph of this complaint as if fully set forth here.

449.    Under California's Unfair Competition Law, Bus. & Prof. Code §§ 17200 *et seq.* ("UCL") :

> Any person who engages, has engaged, or proposes to engage
> in unfair competition may be enjoined in any court of
> competent jurisdiction.  The court may make such orders or
> judgments … as may be necessary to prevent the use or
> employment by any person of any practice which constitutes
> unfair competition, as defined in this chapter, or as may be
> necessary to restore to any person in interest any money or
> property … which may have been acquired by means of such
> unfair competition.

*Id.* § 17203.  The statute defines "unfair competition" as "any unlawful, unfair or fraudulent business act or practice …."  *Id.* § 17200.  A business act or practice is "unlawful" when it is forbidden independently some other provision of law, "unfair" when the harm it causes to the victim outweighs any benefit to the act or practice, and "fraudulent" when it is likely to deceive members of the public. *Albillo v. Intermodal Container Servs., Inc.*, 114 Cal. App. 4th 190, 206 (2003).

450.    For the "unlawful" prong of its proscription, "section 17200 'borrows' violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable."  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1130 (9th Cir. 2014), citing *Cel-Tech Comm'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).  Defendants have committed "unlawful" acts to the extent they have violated the federal Sherman and state Cartwright Acts as

-49-

**FIFTH AMENDED COMPLAINT**

alleged in the first through third claims for relief above. *See*, *e.g.*, *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1107 (9th Cir. 2007).

451.    An "unfair" act or practice (i) causes substantial consumer injury, (2) is not outweighed by any countervailing benefits to consumers or competition, (3) which could not reasonably have avoided. *Cel-Tech*, *supra*, 20 Cal. 4th at 185. The acts alleged above in this pleading are unfair in that they have caused substantial injury to plaintiffs in the form of inflated ticket prices, inability to obtain tickets at all, multiple credit card charges and the like.  Defendants' acts did not benefit others more than they harmed plaintiffs, as they simply bolstered their control over the relevant markets and caused many fans, not just plaintiffs, to overpay for Eras Tour tickets, and will cause such harm in the future for other concerts.  Plaintiffs could not have avoided such harm, because if they wanted to see Taylor Swift in concert, they had no choice but to deal with defendants and expose themselves to their unfair conduct.

452.    Finally, a defendant commits "fraudulent" conduct actionable under the UCL if its conduct likely would deceive members of the public. *Rubio v. Capital One Bank*, 613 F.3d 1195, 1204 (9th Cir. 2010).  Plaintiffs, themselves members of the public, have alleged how they have been deceived, and the facts stated herein make public deception plausible and this aspect of the claim viable.

453.    Accordingly, as described in the foregoing paragraphs, the practices alleged herein constitute "unlawful, unfair and/or fraudulent" business acts or practices proscribed by Cal. Bus. & Prof. Code § 17200.

454.    As a direct and proximate result of such violations, plaintiffs have suffered harm for which they have the right to injunctive and other equitable relief. *Id.* § 17203.  While plaintiffs do seek to recover damages elsewhere in this pleading, damages alone cannot afford them adequate relief.  Unless the Court enjoins the unlawful, unfair and fraudulent practices alleged herein, they will go on, and plaintiffs as music fans and concertgoers – who undoubtedly will need to

deal with Live Nation and Ticketmaster in the future – would continue to suffer from such misconduct.

PRAYER FOR RELIEF

Wherefore, plaintiffs pray for judgment in their favor as follows:

1.    On the First Claim for Relief:

    a.    For damages according to proof, in an amount in the thousands of dollars per plaintiff;

    b.    For trebling of such damages pursuant to 15 U.S.C. § 15(a);

    c.    For injunctive and other equitable relief demonstrated as appropriate at trial; and

    d.    For "cost[s] of suit, including a reasonable attorney's fee," also under 15 U.S.C. § 15(a).

2.    On the Second Claim for Relief:

    a.    For damages according to proof, in an amount in the thousands of dollars per plaintiff;

    b.    For trebling of such damages pursuant to 15 U.S.C. § 15(a);

    c.    For injunctive and other equitable relief demonstrated as appropriate at trial; and

    d.    For "cost[s] of suit, including a reasonable attorney's fee," also under 15 U.S.C. § 15(a).

3.    On the Third Claim for Relief:

    a.    For damages according to proof, in an amount in the thousands of dollars per plaintiff;

    b.    For trebling of such damages pursuant to Cal. Bus. & Prof. Code § 16750;

    c.    For injunctive and other equitable relief demonstrated as appropriate at trial;

**FIFTH AMENDED COMPLAINT**

      d.     For costs of suit, including a reasonable attorney's fee, also under Cal. Bus. & Prof. Code § 16750; and

      e.     For punitive damages to make an example of and to punish defendants, in an amount to be proven at trial.

4.    <u>On the Fourth Claim for Relief</u>, for actual damages according to proof, in amounts reaching thousands of dollars per plaintiff.

5.    <u>On the Fifth Claim for Relief</u>, for injunctive and other equitable relief demonstrated as appropriate at trial.

6.    <u>On all causes of action</u>:

      a.     For costs of suit; and

      b.     For such other and further relief as the Court may deem just and proper.

DATED:  December 31, 2025      /s/ John Genga_____

             John M. Genga
             GENGA & ASSOCIATES

            ___/s/ Jennifer Kinder_____

             Jennifer Kinder
             KINDER LAW PLLC

             Attorneys for Plaintiffs
             JULIE BARFUSS *et al.*

**FIFTH AMENDED COMPLAINT**

1    <u>DEMAND FOR JURY TRIAL</u>

2          Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiffs

3    hereby demand trial by jury on all issues so triable.

4

5    DATED:  December 31, 2025          ___/s/ <u>John Genga</u>_____
                                            John M. Genga
6                                           GENGA & ASSOCIATES

7

8                                           ___/s/ <u>Jennifer Kinder</u>_____
                                            Jennifer Kinder
9                                           KINDER LAW PLLC

10
                                            Attorneys for Plaintiffs
11                                          JULIE BARFUSS *et al.*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIFTH AMENDED COMPLAINT**