UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 23-1114-GW-KKx | Date | April 22, 2026 |
|---|---|---|---|
| Title | *Julie Barfuss, et al. v. Live Nation Entertainment, Inc., et al.* | | |

Present: The Honorable    GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | None Present | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

**PROCEEDINGS:**    **IN CHAMBERS - TENTATIVE RULING ON DEFENDANTS' PARTIAL MOTION TO DISMISS FIFTH AMENDED COMPLAINT [186]**

Attached is the Court's Tentative Ruling on Defendants' Motion [186] set for hearing on April 23, 2026 at 8:30 a.m.

:

Initials of Preparer    JG

***Julie Barfuss et al v. Live Nation Entertainment, Inc. et al***; Case No. 2:23-cv-01114-GW-(DTBx)
Tentative Ruling on Partial Motion to Dismiss the Fifth Amended Complaint

Before the Court is Defendants' Partial Motion to Dismiss the Fifth Amended Complaint ("5AC") (the "Motion"). *See* Motion, Docket No. 186. The Court has considered the Motion, Plaintiffs' opposition ("Opp.," Docket No. 189), and Defendants' reply ("Reply," Docket No. 190). For the reasons stated herein, the Court would **DEFER RULING** on the Motion.

## I.    Background

Julie Barfuss along with forty-nine other individuals initiated this action against Live Nation Entertainment, Inc. ("Live Nation") and Ticketmaster L.L.C. ("Ticketmaster") (collectively, "Defendants") in the Superior Court of California, County of Los Angeles, on December 5, 2022. *See* Docket No. 1, at 1. Barfuss, et al. ("Plaintiffs") filed a First Amended Complaint ("1AC") on December 14, 2022, *see* 1AC, Docket No. 1-1; a Second Amended Complaint ("2AC") on April 6, 2023, *see* 2AC, Docket No. 44; and a Third Amended Complaint ("3AC") on January 27, 2025, *see* 3AC, Docket No. 128.[1] Defendants Live Nation and Ticketmaster filed a motion to dismiss the 3AC on February 26, 2025, *see* Docket No. 138, and a motion for sanctions on March 14, 2025, *see* Docket No. 140. Defendant StadCo filed a separate motion to dismiss the 3AC on April 15, 2025. *See* Docket No. 154. Motions to compel arbitration were also filed but later withdrawn. *See* Docket No. 165, at 1 n.1. On May 15, 2025, the Court granted the motions to dismiss with leave to amend in part and deemed moot the motion for sanctions. *See* Docket Nos. 165-66. Plaintiffs filed the Fourth Amended Complaint ("4AC") on July 14, 2025. *See* 4AC, Docket No. 168. On August 12, 2025, Plaintiffs voluntarily dismissed StadCo as a named defendant in this action. *See* Docket No. 169.

The 4AC raised eight causes of action for: (1) monopolization of Primary Concert Ticketing Market and U.S. Eras Tour Market in violation of Sherman Act § 2; (2) unlawful exclusive dealing in violation of Sherman Act § 1; (3) unlawful exclusive dealing in violation of Cal. Bus. & Prof. Code §§ 16720, 16727; (4) negligence; (5) fraud; (6) negligent misrepresentation; (7) breach of contract; and (8) violation of California's Unfair Competition Law

---

[1] The 3AC added StadCo LA, LLC ("StadCo"), which "owns and operates SoFi Stadium," *see* 3AC ¶ 366, as the third named Defendant. Plaintiffs later limited the claims it sought to bring against StadCo. *See* Notice of Dismissal of Certain Claims, Docket No. 150.

("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq. *See generally* 4AC. Plaintiffs sought unspecified damages (including actual damages, punitive damages, and treble damages), injunctive relief, attorney's fees, and other forms of relief. *See id.*

Defendants filed a motion to dismiss the 4AC on August 28, 2025. *See* Docket No. 172. On November 21, 2025, the Court granted the motion with respect to claims four, five, and six without leave to amend, granted the motion in part with respect to claim seven with leave to amend, and denied the motion with respect to claims one, two, three, and eight (except as to restitution). *See* Docket Nos. 176-77, 182. Plaintiffs filed the 5AC on December 31, 2025. *See* 5AC, Docket No. 185. Plaintiff indicates that the 5AC: "(i) removes the former fourth, fifth and sixth claims for relief, for negligence and intentional and negligent misrepresentation, respectively (and makes corresponding revisions to earlier portions of the pleading referring to those claims) . . . ; (ii) amends the former seventh (now the fourth) claim for relief, for breach of contract . . . ; and (iii) no longer seeks restitution on the former eighth (now the fifth) claim for relief, alleging violation of the [UCL]."[2] *Id.* at 2. On January 21, 2026, Defendants filed the instant Motion, seeking to dismiss with prejudice two theories related to Plaintiffs' now-fourth claim for breach of contract. *See generally* Motion. The Court has recounted the allegations in this action in its most recent ruling, *see* Docket No. 176, at 2-4, and will largely limit its review to only the "the substantive amendments to the breach of contract allegations [that] appear at paragraphs 445 and 446 of the fourth claim for relief," *see* 5AC at 2.[3]

As Plaintiffs allege in the 5AC, "[t]his case arises out of the concert ticket sale debacle for Taylor Swift's 'The Eras' Tour in the United States (the 'Eras Tour') that began with TaylorSwiftTix Verified Presale for 'Verified Fans,' who ostensibly were given 'codes' to access that sale, beginning on November 15, 2022 (the 'Verified Fan Presale') and TaylorSwiftTix Presale powered by Capital One, also with 'codes' to access that sale, beginning on November 16, 2022 (the 'Capital One Presale')." *Id.* ¶ 1. With respect to Plaintiff's claim for breach of contract, it is alleged that "Plaintiffs entered into a binding contract with Ticketmaster based on [the Verified Fan] Terms of Use, Ex. S[, Docket No. 185-20], and modified by course of dealing, promotional

---

[2] There are also now 357 named Plaintiffs involved in this action. *See* 5AC ¶ 408.

[3] The well-pled facts therein are accepted as true for the purpose of this ruling. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001).

material and email and other communications by Ticketmaster to its customers." *Id.* ¶ 445. Plaintiff alleges the following three theories in support of this claim:

    a.  Plaintiffs Catherine Bugden, Flor Flores and Maranda Gomez purchased Eras Tour tickets in the Verified Fan Presale.  They later had these tickets removed from their Ticketmaster accounts and sold by Ticketmaster to someone else, in breach of Ticketmaster's Terms of Use and Verified Fan Terms of Use. [Henceforth "Contract 445(a)."]

    b.  Ticketmaster offered to give Verified Fans with codes first access to tickets starting with the Presale on November 15, 2022. Exs. F-H[, Docket Nos. 185-6, 185-8, 185-9].  ***290 plaintiffs*** accepted this offer by performance that included registering to become Verified Fans and following all instructions, supplying personal information, obtaining a code that Ticketmaster had deemed necessary to participate in the Presale, investing 8-12 hours of their time obtaining tickets for their online shopping carts and attempting to purchase them – in some instances, having their credit cards charged – to no avail. [Henceforth "Contract 445(b)."]

    c.  Ticketmaster offered "preferred access" to prior "Lover Fest" Verified Fans – which, for that tour, had meant getting a "spot in line … based on … total boosts from the previous Taylor Swift Tix campaign" – as well as a "boost . . . in line" for buying merchandise surrounding the release of Ms. Swift's "Midnights" album.  Exs. F[, Docket No. 185-6,] at 2, I[, Docket No. 185-10], J[, Docket No. 185-11,] K[Docket No. 185-12], L[, Docket No. 185-13].  ***37 plaintiffs*** accepted one or the other of these offers by signing in with qualifying information, supplying personal information and, like the others, investing an entire day attempting to consummate purchases that Tickermaster's [sic] system rejected.  [Henceforth "Contract 445(c)."]

*Id.* (emphasis in original).[4]

## II.    <u>Legal Standard</u>

### 1.  Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a party may bring a motion to dismiss for failure to state a claim upon which relief can be granted.  Rule 12(b)(6) must be read in conjunction with Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief," in order to give the defendant "fair notice of what the claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

---

[4] There were "four different contract theories" which were delineated in Plaintiffs' 4AC which were respectively designated as "Contracts One, Two, Three and Four."  *See* 4AC ⫿ 483, and the November 12, 2025 Tentative Ruling, Docket No. 176 at 19 of 31.  In the 5AC, Plaintiffs have apparently abandoned what was "Contract Two;" placed what was "Contract Four" into 5AC ⫿ 445(a); placed what was as "Contract One" into 5AC ⫿ 445(b); and placed what was "Contract Three" into 5AC ⫿ 445(c).  *See* Docket No. 185 at 47.

(2007).

Under Rule 12(b)(6), the court must: (1) construe the complaint in the light most favorable to the plaintiff, and (2) accept all well-pleaded factual allegations as true, as well as all reasonable inferences to be drawn from them. *See Sprewell*, 266 F.3d at 988; *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998). In its consideration of the motion, the court is limited to the allegations on the face of the complaint (including documents attached thereto), matters which are properly judicially noticeable, and "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001). Dismissal pursuant to Rule 12(b)(6) is proper only where there is either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988); *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121-22 (9th Cir. 2008); *see also Twombly*, 550 U.S. at 561-63 (dismissal for failure to state a claim does not require the appearance, beyond a doubt, that the plaintiff can prove "no set of facts" in support of its claim that would entitle it to relief).

2. Rule 15(a)

Under Federal Rule of Civil Procedure 15(a)(2), federal courts are instructed to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a). A district court, however, may in its discretion deny leave to amend "due to 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment.'" *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

## III.   **Discussion**

Defendants seek the dismissal with prejudice of Plaintiff's claim for breach of contract premised upon Contracts 445(b) and 445(c).[5] *See* Motion at 5-6. Specifically, Defendants argue that Plaintiffs: (1) have failed to follow this Court's instructions in amending their claim; and (2)

---

[5] Defendants do not challenge the other theory – *i.e.* Contract 445(a)) – because this Court already indicated in a prior ruling that Plaintiffs have plausibly alleged a breach of contract claim under such theory. *See* Motion at 6 n.4 (citing Docket No. 176, at 22); *see also* Docket No. 182, at 2.

4

still cannot plead the existence and breach of either contract. *See generally id.* Plaintiffs contend that they have "allege[d] two contracts by stating their material terms; plead[ed] that they did what those contracts required them to do; and state[d] facts establishing that Defendants breached those contracts to the damage of a specifically identified number of plaintiffs having contracts on the terms that Defendants failed to honor." Opp. at 1. The Court addresses each contract theory in turn.

"To allege a cause of action for breach of contract, a plaintiff must allege, (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." *Bushell v. JPMorgan Chase Bank, N.A.*, 220 Cal. App. 4th 915, 921 (2013) (internal quotation marks and citation omitted). To state a claim for a breach of contract, "it is absolutely essential to plead the terms of the contract either [verbatim] or according to legal effect." *Twaite v. Allstate Ins. Co.*, 216 Cal. App. 3d 239, 252 (1989*); see also Langan v. United Servs. Auto. Ass'n*, 69 F. Supp. 3d 965, 980 (N.D. Cal. 2014) ("To plead a claim for breach of contract, Plaintiff must at least allege the material terms of a specific contract . . . .").

### A. Contract 445(b)

Plaintiffs allege that "Ticketmaster offered to give Verified Fans with codes first access to tickets starting with the Presale on November 15, 2022." 5AC ¶ 445(b) (citations omitted). As they had done previously, to set forth the metes and bounds of the contract, Plaintiffs generally reference Exhibits F through H in support of this alleged offer. *Compare id. with* 4AC ¶ 483(b). Exhibit F is a Ticketmaster blog post announcing the Eras Tour and providing information about registration for the Verified Fan Presale. *See generally* Ex. F, Docket No. 185-6. Exhibit G consists of two screenshots, one of which appears to be a confirmation of being in line to register for the Verified Fan Presale and the other appears to be the registration portal itself on the Ticketmaster website. *See generally* Ex. G, Docket No. 185-8. Exhibit H appears to be an automated email from Ticketmaster confirming registration and notifying the registrant that "[w]hile Verified Fan does not guarantee that everyone will get a ticket, it does help ensure only fans are invited to buy tickets." *See generally* Ex. H, Docket No. 185-9.

Defendants assert that Plaintiffs have not identified any contract for "first access to tickets" because Plaintiffs were never promised "access to tickets" at all, even for Verified Fans who received presale codes. Motion at 11. The Court would agree with Defendants that, based on the allegations and the supporting exhibits, there can be no question that "no one, even those with

5

codes, was guaranteed the ability to buy tickets." *Id.* Plaintiffs concede as much, yet contend that "achieving Verified Fan status and getting a code assured them the *opportunity* to *access* the presale *ahead of* Verified (or other) Fans *without* codes." Opp. at 4 (emphasis in original). The Court would understand the dispute, therefore, to be regarding the precise nature of the offer.

Construing all allegations in the light most favorable to Plaintiff and accepting all reasonable inferences to be drawn from them – as this Court must do under applicable law (*see National Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 181 (2024), the Court would find that Ticketmaster offered Verified Fans *with* codes the opportunity to purchase tickets ahead of Verified Fans *without* such codes. Exhibit F provides that "[w]hile the TaylorSwiftTix Presale powered by Verified Fan doesn't guarantee that everyone who registers will get a ticket, it does help ensure *only fans are invited to purchase tickets*." Ex. F, Docket No. 185-6, at 1 (emphasis added). Exhibit G provides that "[r]egistering for Verified Fan is the best way to ensure you have *a chance to purchase tickets*." Ex. G, Docket No. 185-8, at 1 (emphasis added). Exhibit H similarly frames the offer in terms of "eligib[ility] to *participate* in the [Verified Fan] Presale." Ex. H, Docket No. 185-9, at 3 (emphasis added). To the extent Plaintiffs suggest there was an offer to Verified Fans with access codes of first access to the opportunity to purchase tickets, the Court would agree. Plaintiffs allege that this offer was "accepted . . . by performance that included registering to become Verified Fans and following all instructions, supplying personal information, obtaining a code that Ticketmaster had deemed necessary to participate in the Presale, investing 8-12 hours of their time obtaining tickets for their online shopping carts and attempting to purchase them – in some instances, having their credit cards charged – to no avail." *See* 5AC ¶ 445(b).

Although the Court finds that Plaintiffs have plausibly pled the existence of Contract 445(b), Plaintiffs' allegations do not necessarily support a breach of this contract. Plaintiffs allege the following with respect to breach of Contract 445(b):

> Ticketmaster allowed users without codes to participate in and buy tickets during the Verified Fan Presale, in breach of its promise to ***290 plaintiffs*** that it would not do that. *See* Ex. M[, Docket No. 185-14] at 3 (changing language regarding who bought tickets from "only Verified Fans with codes" to "only Verified Fan"). Verified Fan plaintiffs *with* codes did not even get access to the Presale, while Ticketmaster admits that at least *some* Verified Fans *without* codes *did*. This breaches Ticketmaster's promise to give Verified Fans with codes priority access over others without them.

*Id.* ¶ 446(b) (emphasis in original). To put it simply, Plaintiffs allege that Verified Fans with access codes were not given first access to the opportunity to purchase tickets because

Ticketmaster allegedly "admit[ted]" to selling tickets to Verified Fans without such codes.  The Court observes that this allegation, however, appears to be contradicted by the very exhibit upon which Plaintiffs rely for support.  Indeed, this Court already made the same observation in its prior ruling with respect to the same contract theory.  *See* Docket No. 176, at 21.  Specifically, the Court explained:

> With respect to Contract One, Plaintiffs claim that Defendants "admitted selling to Verified Fans without codes on that date."  Opp. at 13 (emphasis in original) (citing 4AC ¶ 484(a) and Ex. M., Docket No. 168-14, at 3).  This allegation seems hardly plausible when it had been announced on November 17, 2022 that "[e]very ticket was sold to a buyer with a Verified Fan code" and that "[n]obody (not even a bot) could join a queue without being Verified."  Ex. M, Docket No. 168-14, at 3.  Plaintiffs allege that this announcement, however, was changed the following day to indicate that "[a]ll 2 million tickets for the Verified Fan onsale were sold to Verified Fans."  4AC ¶ 411.  Plaintiffs suggest that, through these changes, "Ticketmaster admitted that it sold tickets to Verified Fans without codes on November 15."  *Id.* (emphasis in original).  Without more, however, the Court would decline to draw such an inference, especially in light of the fact that the modified announcement on November 18, 2022 also makes clear that only Verified Fans with codes could "complete their purchase[s]."  *See* Ex. M, Docket No. 168-14, at 3 ("For additional security, ticket buyers also had to enter their unique code to complete their purchase.").

*Id.*  Plaintiffs reiterate in their opposition that "[b]ecause not all Verified Fans got codes, and the statement about tickets going only to those *with* codes got deleted, one can reasonably construe the change to mean that Verified Fans *without* codes *did* get tickets (and, necessarily, access to the presale)."  Opp. at 5 (emphasis in original).  Plaintiffs argue that "[w]hether or not [this Court] *agrees* with th[eir] construction, the Court cannot definitively rule at this stage that . . . the statements by Ticketmaster could *not* reasonably be so interpreted."  *Id.* (same).  The Court disagrees because, as Defendants point out, "[t]his argument is based on a highly misleading excerpt of the updated blog post."  Reply at 3.  The Court fails to understand how it could be "reasonably . . . interpreted," *see* Opp. at 5, let alone plausible, that Verified Fans without access codes gained access to the Verified Fan Presale and purchased tickets when only those with a "unique code" could "complete their purchase."  *See* Ex. M, Docket No. 185-14, at 3.  To find otherwise would require the Court to ignore the plain language of the very exhibit upon which Plaintiffs rely to support their "construction."  *See* Opp. at 5.

Plaintiffs allege that "Verified Fan plaintiffs *with* codes did not even get access to the Presale, *see* 5AC ¶ 446(b) (emphasis in original), but this allegation appears contradicted by

allegations elsewhere in the 5AC.  Specifically, it is alleged that the 290 plaintiffs who "***became Verified Fans and received codes***" (1) "[l]ogged onto the Ticketmaster website;" (2) "[c]licked the link in their text message, email or after logging in to access the [Verified Fan] Presale;" (3) "[e]ntered a waiting room for 30 minutes and then got moved to the queue line;" and (4) "[s]pent 8-9 hours attempting to purchase tickets." *Id.* ¶ 410 (emphasis in original).  It is further alleged that "[e]***very one of the 290 Verified Fan plaintiffs with codes*** selected tickets to one of his or her preselected venues, many in fact getting tickets all the way into their online "shopping carts," ***but the site allowed <u>none</u> to complete a transaction***." *Id.* (same).  Contrary to Plaintiffs' allegation, therefore, all of these plaintiffs "g[o]t access to the Presale." *See id.* ¶ 446(b).  In other words, that these plaintiffs were not able to purchase tickets does not necessarily mean that they were not given the opportunity to do so ahead of Verified Fans without codes.

However, despite the above, if any tickets were in fact initially sold to persons who were not Verified Fans with codes (or, heaven forbid, any bots) or if such persons/bots were allowed to participate in the presales, then it could be contended that Contract 445(b) was breached.  The Court will discuss this issue with the parties at the hearing.

### B.  Contract 445(c)

Plaintiffs next allege that "Ticketmaster offered 'preferred access' to prior 'Lover Fest' Verified Fans – which, for that tour, had meant getting a 'spot in line . . . based on . . . total boosts from the previous Taylor Swift Tix campaign' – as well as a 'boost . . . in line' for buying merchandise surrounding the release of Ms. Swift's 'Midnights' album." *Id.* ¶ 445(c) (citations omitted).  Defendants assert that, in addition to Plaintiffs' failure to allege a contract or breach, Plaintiffs cannot show that Contract 445(c) is supported by consideration.  *See* Motion at 12.

To sufficiently plead the existence of a contract, a plaintiff must plead, *inter alia*, that the contract is supported by "good consideration." *Rockridge Tr. v. Wells Fargo, N.A.*, 985 F. Supp. 2d 1110, 1142 (N.D. Cal. 2013).  "Good consideration" is defined as:

> Any benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise.

Cal. Civ. Code § 1605. !"California courts have repeatedly refused to enforce gratuitous promises, even if reduced to writing in the form of an agreement." *Jara v. Suprema Meats, Inc.*, 121 Cal. App. 4th 1238, 1249 (2004) (citations omitted).

Under California law, "[a] written instrument is presumptive evidence of a consideration." Cal. Civ. Code § 1614. Therefore, "[a] party seeking to invalidate or avoid a contract for lack of consideration bears the burden of showing that there was inadequate consideration." *ChromaDex, Inc. v. Elysium Health, Inc.*, 369 F. Supp. 3d 983, 988 (C.D. Cal. 2019) (citing *id.* § 1615). Some "courts reject motions to dismiss premised on a failure to allege adequate consideration" where the existence of a written instrument is alleged. *See id.* Other courts, however, have dismissed claims based on written contracts at the motion to dismiss stage for lack of consideration where consideration was not part of the bargain. *See, e.g.*, *Patriot Sci. Corp. v. Korodi*, 504 F. Supp. 2d 952, 960-63 (S.D. Cal. 2007).

Here, there is no dispute that Contract 445(c) is based on written materials. Defendants argue, however, that "'[p]referred access' was . . . a free benefit for loyal fans disappointed by the cancellation of a different tour years earlier" and that "[t]he same is true of the 'boosts' email." Motion at 13. Exhibit F provides that "[p]revious Lover Fest Verified Fan purchasers will receive preferred access to participate in the [Verified Fan] Presale."[6] Ex. F, Docket No. 185-6, at 2. Exhibit J provides that Verified Fans with "Preferred Priority Access" would obtain a "spot in line . . . based on [their] total boosts from the previous Taylor Swift Tix campaign." Ex. J, Docket No. 185-11, at 3. Exhibit L provides that those who obtained "Loyal Fan" status were given a "boost . . . in line for the [Verified Fan] Presale" "[a]s a thank you for [their] contribution to a historic week." Ex. L, Docket No. 185-13, at 2. It is alleged that Verified Fans could obtain such status by "purchasing merchandise associated with the then-release of Taylor Swift's 'Midnights' album." 5AC ¶ 408. Defendants also identify the allegation indicating that "Verified Presale Fans without passcodes . . . were told they would get 'preferred access' or a 'boost (in line)' for being a previous 'Lover Fest' Verified Fan purchaser or a 'Loyal Fan,' including by purchasing merchandise associated with Ms. Swift's 'Midnights' Album." 5AC at 18; Motion at 13. Defendants aver that "[i]n both cases, therefore, the 'preferred access' or 'boost' was offered as a reward 'for' past loyalty or previous purchases, *not* in exchange for any contemporaneous consideration." Motion at 13 (emphasis in original) (footnote omitted).

Plaintiffs raise two arguments in response – only the second of which is persuasive. First, Plaintiffs contend that "acknowledgement of a prior unenforceable obligation gives rise to a new

---

[6] The "Lover Fest" Tour was cancelled in 2020 due to the COVID-19 pandemic. 5AC ¶ 406.

enforceable promise, supported by a 'moral obligation' which is regarded as sufficient consideration." Opp. at 7 (quoting *Walker v. Given Int'l*, 100 Cal. App. 3d 54, 58 (1979)). Under California law, "[a]n existing legal obligation resting upon the promisor, or a moral obligation originating in some benefit conferred upon the promisor, or prejudice suffered by the promisee, is also a good consideration for a promise, to an extent corresponding with the extent of the obligation, but no further or otherwise." Cal. Civ. Code § 1606. The California Supreme Court interpreted this section to mean that "a moral obligation is sufficient to support an express promise, where a good and valuable consideration has once existed." *In re McConnell's Est.*, 6 Cal. 2d 493, 498 (1936) (citations omitted). Plaintiffs do not make any attempt to explain the applicability of § 1606, and the Court can find no reason for its applicability where Plaintiffs do not allege anywhere in the 5AC that there was some moral obligation preceded by a prior legal obligation. As Defendants explain, "Plaintiffs do not allege they were still owed something from the cancelled Lover Fest tour or from their Midnights purchases; nor do they allege that Ticketmaster acknowledged or assumed some (unpled) preexisting obligation." Reply at 5.

Second, and more persuasively, Plaintiffs contend that "new consideration supports the promise to the Lover Fest Verified Fans."[7] Opp. at 7. Specifically, Plaintiffs claim that the new consideration came "from accepting the offer made in connection with The Eras Tour presale by registering as a Verified Fan *at that time*." *Id.* (emphasis in original). Plaintiffs explain that "Ticketmaster bargained for Lover Fest Verified Fans to register as a Verified Fans for The Eras Tour by promising them a 'boost' for their continuing loyalty." *Id.* As such, Plaintiffs claim that Ticketmaster was conferred the benefit of being provided with "personal information" from the 37 plaintiffs who qualified for the "boost" and registered for Verified Fan status for the Eras Tour. *Id.* at 8. The Court would agree. It is plausible that the alleged promise of "preferred access" for "[p]revious Lover Fest Verified Fan purchasers," *see* Ex. F, Docket No. 185-6, at 2, and a "boost" for "being a Loyal Fan," *see* Ex. L, Docket No. 185-13, at 2, was induced by the benefit of having more individuals register as Verified Fans to participate in the Verified Fan Presale. Although the exhibits do not explicitly state that such promise was in exchange for registration, *see* Reply at 5, the promotional materials make clear that Defendants sought a high number of registrations and made certain promises – including the promise of "preferred access" and a "boost" – in hopes of

---

[7] Plaintiffs concede that "[o]ne's prior Lover Fest Verified Van status alone could not suffice" as "that indeed would amount at most to prior consideration insufficient to support a new contract." *See* Opp. at 8.

inducing more people to register for the Verified Fan Presale by, *inter alia*, supplying personal information.  The Court, therefore, does not find Contract 445(c) to be without consideration.

Plaintiffs' newly-added allegations, however, do not remedy the deficiencies identified by this Court in its prior ruling with respect to the *breach* of Contract 445(c).  The only new allegation added with respect to breach of said Contract is that "'boosted' fans did not even get access to the [Verified Fan] Presale, while buyers without such boosts did gain such access and some obtained tickets, in breach of Ticketmaster's promise to put those who qualified from 'Lover Fest' and 'Midnights' ahead 'in line' of those who did not."  *See* 5AC ¶ 446(c).  Plaintiffs do not allege any specific facts to support this conclusory allegation.  The Court previously took issue with Plaintiffs' failure to allege "precisely what kind of 'preferred access' they would receive."  *See* Docket No. 176, at 22 (citing 4AC ¶ 408).  Plaintiffs now allege that the plaintiffs eligible for "preferred access" or a "boost" did not even get access to the Verified Fan Presale.  *See* 5AC ¶ 446(c).  The meaning of such allegation, however, is far from clear.  To be clear, access to the presale is not the same as purchasing tickets.  That these "boosted" plaintiffs were "thwarted from completing purchases of tickets," *see id.* at 19, does not suggest that they were not given the "enhanced access beyond Verified Fan status alone" to which they believed they were entitled, *see id.* ¶ 408.  In short, the Court still does not understand (1) the nature of the "preferred access" or "boost" promised; and (2) how thirty-seven plaintiffs allegedly did not get what was promised.[8]

At this time and because of the issues identified with respect to the alleged breaches of Contracts 445(b) and 445(c), the Court wishes to have further arguments at the hearing.  Although the Court would find the existence of these contracts possibly pled, the Court observes various issues with how Plaintiffs have chosen to allege breach of these contracts.

Should the Court grant the Motion, Plaintiffs should come prepared to explain precisely why they should be given another chance to amend.  In previously granting Plaintiffs another opportunity to amend their claim for breach of contract with respect to the Contracts at issue, the Court made clear that this would be their "last opportunity."  *See* Docket No. 182, at 2.  The Court also "caution[ed] Plaintiffs . . . that it w[ould] not accept general references to supporting exhibits; Plaintiffs must identify the language from any exhibit cited that supports the existence of any alleged express term of the contract."  *Id.*  Plaintiffs have made very little attempt to follow this

---

[8] Indeed, it not entirely clear to the Court whether Plaintiffs who would fall within the Contract 445(c) group would, by definition, also fall within the Contract 445(b) category.

Court's guidance, leaving the Court to once again comb through their exhibits to find language supporting their claims.

## IV. <u>Conclusion</u>

Based on the foregoing discussion, the Court would **DEFER RULING** on the Motion.